E-FILED
Friday, 02 October, 2009  04:01:51 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
AT PEORIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 09-CR-10030 |
| | ) | |
| ALI SALEH KAHLAH AL-MARRI, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, through its attorneys, Michael J. Mullaney, Chief of the

Counterterrorism Section of the Department of Justice, acting through Trial Attorney Joanna

Baltes, and Jeffrey B. Lang, Acting United States Attorney for the Central District of Illinois,

acting through Assistant United States Attorney David E. Risley, file this Sentencing

Memorandum.   As requested by the Court, the Government sets forth its position that the

defendant is not entitled to credit against his criminal sentence for time spent in military

detention as an enemy combatant.[1]

## I.
## BACKGROUND

On February 26, 2009, a Grand Jury in the Central District of Illinois indicted the

defendant, Ali Saleh Kahlah Al-Marri, with one count of conspiracy to provide material support

to a designated foreign terrorist organization, to wit: al Qaeda, in violation of 18 U.S.C. §2339B,

and one count of providing material support to al Qaeda, also in violation of 18 U.S.C. §2339B.

Pursuant to an Executive Order dated February 27, 2009, the defendant was transferred to United

---

[1]The Government may file a supplemental sentencing memorandum addressing any
additional requests to impose a lower sentence contained in the defendant's sentencing
memorandum due October 16, 2009.

States Marshal's custody from the custody of the Department of Defense where he had been held as an enemy combatant pursuant to Presidential Order since June 23, 2003.    On March 23, 2009, the defendant was arraigned on the indictment in the United States District Court for the Central District of Illinois.   On April 30, 2009, the defendant pled guilty pursuant to a plea agreement to count one of the indictment, conspiracy to provide material support to a designated foreign terrorist organization, to wit: al Qaeda, in violation of 18 U.S.C. §2339B.   In exchange for his guilty plea to count one, the government agreed to dismiss the remaining count at sentencing.   The defendant is scheduled to be sentenced on October 28, 2009.

## II.
### THE COURT SHOULD SENTENCE THE DEFENDANT TO 15 YEARS IMPRISONMENT

For the reasons set forth herein, the United States respectfully submits that a 15-year sentence is necessary and reasonable when the full record is considered in light of the statutory factors enumerated in 18 U.S.C. § 3553(a).   Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245 (2005), finding that the Sentencing Guidelines are "effectively advisory", district courts must follow specific steps in determining an appropriate sentence. First, district courts must correctly calculate the sentencing range under the advisory guidelines.   See, *Gall v. United States*, 128 S.Ct. 586, 596 (2007).   Second, the district court must allow "both parties an opportunity to argue for whatever sentence they deem appropriate." *Id*. The district court must analyze the §3553(a) factors and make an "individualized assessment based on the facts presented." *Id*.   Finally, the district court "must adequately explain the chosen sentence" and provide sufficient justification for varying from the advisory guideline sentence. *Id*. at 596-597.

A.    But For the Statutory Maximum of 15 Years,  the Advisory Guideline Range Would be
      30 Years to Life

The defendant pled guilty to count one in the indictment–conspiracy to provide material

support to a designated foreign terrorist organization, to wit, al Qaeda, in violation of 18 U.S.C.

2339B.   The base offense level is 26 pursuant to USSG §2M5.3.    The defendant stipulated to

the terrorism enhancement pursuant to USSG §3A1.4 which provides for a 12 level upward

adjustment.   Application of the terrorism enhancement also increases the defendant's Criminal

History Category from Level II to Level VI .   Accordingly, the guideline range is 360 months to

life imprisonment.

The count in the indictment to which the defendant pled guilty carries a statutory

maximum penalty of 15 years.   Therefore, while the guideline range becomes 15 years pursuant

to USSG §5G1.1(a), that starting point is already one-half of the minimum sentence otherwise

advised by the Sentencing Guidelines.   Absent some truly extraordinary mitigating factor(s), no

lesser sentence would be reasonable.   Whatever the merits of the defendant's claims regarding

potential mitigating factors, they fail to come even close to meriting any further reduction in

sentence than is inherent in the government's agreement to dismiss count two of the indictment.

B.    The Factors in 18 U.S.C. § 3553 Support a 15-Year Sentence

The district court must impose a sentence sufficient, but not greater than necessary, "(A)

to reflect the seriousness of the offense, to promote respect for the law, and to provide just

punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect

the public from further crimes of the defendant; and (D) to provide the defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most

effective manner." 18 U.S.C. § 3553(a)(2).   In determining that sentence, this Court must

consider "the nature and circumstances of the offense and the history and characteristics of the

3

defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

      1.     *Applicable Guideline Range*

This Court should give considerable weight to the advisory Guidelines range which is properly calculated to be the statutory maximum 15 years imprisonment.  "The fact that § 3553(a)(4) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall* at 596-597 n.6 (2007)("the Guidelines should be the starting point and the initial benchmark") ; *United States v. Hurt*, 574 F.3d 439, 443 (7th Cir. 2009).   Furthermore, the Sentencing Commission based the Guidelines on § 3553(a), writing the Guidelines to "carry out these same § 3553(a) objectives," resulting in "a set of Guidelines that seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007); *United States v. Mykytiuk*, 415 F.3d 606 (7th Cir. 2005).  In addition, "[t]he Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill this statutory mandate." *Rita*, 127 S. Ct. at 2464; *accord* <u>*Gall*</u>, 128 S. Ct. at 594 (the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions").

The Seventh Circuit has gone so far as to declare that a sentence properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness on appeal. *Mykytiuk* at 607, ("The Sentencing Guidelines represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.")   Indeed, the federal sentencing guidelines represent the collective determination of three governmental bodies -- Congress, the Judiciary, and the Sentencing Commission -- as to the appropriate punishments for a wide range of criminal conduct. *See* S. Rep. 98-225, at 39 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3222 (declaring Congress's intent to "assure that sentences are fair both to the offender and to society, and that such fairness is reflected both in the individual case and in the pattern of sentences in all federal criminal cases"); S. Rep. 98-225, at 151 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3334 (anticipating that case law developed from appellate review of outside-guidelines sentences "will assist the Sentencing Commission in refining the sentencing guidelines as the need arises").

The Sentencing Commission "is a respected public body with access to the best knowledge and practices of penology."   *United States v. Wachoviak*, 496 F.3d 744, 753, (7th Cir. 2009), citing, *United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007).   "The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country. "The Sentencing Commission will continue to collect and study [district court] and appellate court decision making.  It will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices." The best way to express the new balance, in our view, is to acknowledge that any sentence that is properly calculated under the Guidelines is entitled to a rebuttable presumption of reasonableness." *Mykytiuk*  at 607-608, citing *Booker* at 766.

2.      *Nature and Circumstances of the Offense*

The defendant is guilty of conspiring with senior al Qaeda leaders to enter the United States and provide himself to al Qaeda's ongoing terrorist mission.   As the defendant admitted in his statements during the Court's colloquy as part of his guilty plea and in the Plea Agreement, the defendant joined the conspiracy with knowledge that al Qaeda was responsible for prior attacks against the United States that resulted in the murder of innocent civilians.   Specifically, the defendant was aware of the fatwas issued by Usama bin Laden against the United States and knew that al Qaeda was responsible for the Embassy bombings in East Africa in 1998 and the USS Cole bombing in Yemen in 2000.   When the defendant met with Khalid Sheikh Mohammed ("KSM") and offered himself to al Qaeda, he knew that KSM was the external operations chief for al Qaeda.

The defendant was directed by KSM to enter the United States prior to September 10, 2001, and knew that to remain undetected he had to conceal his association with al Qaeda.    To accomplish these goals, the defendant applied to Bradley University for a bachelor's degree in computer science, despite already holding a bachelor's degree in business administration from the same institution.   However, the defendant was not concerned with enrolling in the university to attain a degree, he only needed to gain admission to Bradley University so that he could obtain a student visa to enter the United States.   Once he obtained his student visa, the defendant traveled to Pakistan to deliver electronic items and meet with KSM before he traveled to the United States.

Despite the defendant's rushed admission and repeated requests for his visa, he arrived in the United States, ostensibly to attend classes, over three weeks after the fall semester began. Although the university had a 12-unit minimum requirement for international students, the defendant requested that he be allowed to enroll in only 6 units.   As the defendant's true purpose

for entering the United States was on behalf of al Qaeda and not to gain a second bachelor's degree, he rarely attended class and was in failing status before the end of the first semester.

Prior to entering the United States on September 10, 2001, the defendant attended various terrorist training camps from 1998 through 2000, where he learned basic military training, including the use of various weapons and basic operational security tradecraft that al Qaeda associates employed which allowed those engaged in terrorist operations to avoid detection, conceal the true nature of their communications, and generally protect their operations. These methods included the use of prearranged codes and various other techniques to protect communications, counter-surveillance techniques, and the protection of information on computers. The defendant also took various courses to learn about poisons and chemicals that would be suitable for use in a terrorist attack.

Once safely ensconced in the heartland of the United States, under the pretense of being an international student and complete with family in tow, the defendant reached out to KSM to let al Qaeda's external operations chief know that he had arrived and was enrolled in class. To conceal his contact with KSM, the defendant traveled to another university in central Illinois and set up five different email addresses using various aliases. The defendant used a pre-arranged communication code to conceal the fact that the defendant was contacting al Qaeda from within the United States. The defendant also used the pre-arranged code to provide his cellular telephone number to KSM. By this time, the defendant had witnessed the carnage of the September 11, 2001 attacks, knew that al Qaeda was responsible for those attacks, and further understood the reason why KSM directed him to enter the United States prior to September 10, 2001.

Over the next two months, the defendant attempted contact with Mustafa al Hawsawi, who he knew was an al Qaeda associate and who he had met in Dubai in August at the direction

of KSM.   While in Dubai, the defendant was provided $10,000 in funding from al Hawsawi, part of which he used to purchase a laptop computer for his mission.

In order to conceal his attempts to contact al Hawsawi, the defendant used pre-paid calling cards at payphones located many miles from his apartment in Peoria in the middle of the night.   When the defendant was interviewed by the FBI in October 2001 and December 2001, he denied knowing al Hawsawi and denied making calls to al Hawsawi, despite electronically maintaining al Hawsawi's contact information concealed in 10-code format in his personal digital assistant.

Also during this time, the defendant used his laptop computer, which he purchased using funds provided by al Qaeda, to conduct internet research on the location, availability for purchase, pricing, and toxicity of various poisons and compounds which he knew were suitable for terrorist attacks.   The research that the defendant conducted on the poison compounds was consistent with the training he previously received at the various terrorist training camps he attended.   Upon a search of the defendant's apartment in December 2001, the FBI discovered an Almanac, purchased by the defendant, which was book-marked on a page containing information on dams, tunnels and waterways in the United States–locations that were suitable for a terrorist attack using poisonous compounds and chemicals.

The nature and circumstances of the offense to which the defendant pled guilty supports the application of the 15-year guideline sentence, and nothing less.

   3.      *History and Characteristics of the Defendant*

A 15-year sentence is also supported by "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).   Even though the United States had previously afforded the defendant educational opportunities in the form of a bachelor's degree from Bradley University in 1991, the defendant was fully intent on furthering al Qaeda's violent philosophy against the United States.

The defendant does not stand before the Court as someone whose offense conduct finds its roots in a troubled upbringing or difficult economic circumstances.   To the contrary, the defendant's background shows that he had many opportunities to live a productive life.   He sought and obtained a bachelor's degree in business management from Bradley University in 1991.   He married his wife in 1992 and fathered five children.   The defendant worked as a senior auditor for the Bureau of Government in Doha, Qatar, in the audit department of Qatar Islamic Bank in Doha and as an investment officer for Qatar National Bank.   All three jobs reportedly provided an income of $4,000 to $5,000 per month.   Rather than use his education and professional experience to lead a productive and law-abiding life, however, he spurned them in favor of the violent philosophy of al Qaeda, attending terrorist camps where he received training in weapons, operational tradecraft and poisons.   Further, to help conceal the true nature of his mission to the United States, the defendant brought his family, including young children, fully aware that as a single male, he would have attracted far more attention from law enforcement.   Accordingly, this factor strongly weighs in favor of a 15-year sentence.

     *4.     Need for the Sentence Imposed to Reflect the Seriousness of the Offense*

The seriousness of the defendant's conduct supporting the charged offense cannot be overstated.   A 15-year sentence is needed "to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense."   18 U.S.C. §3553(a)(2)(A). *United States v. Busara*, 551 F.3d 669 (7th Cir. 2009); *Gall*, 128 S. Ct. at 599 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law"). The defendant came to the United States after agreeing to assist KSM with an operation to be conducted within the United States.   The defendant was fully aware of the nature of al Qaeda's violent philosophy against the United States and their ability to inflict mass casualties.   He agreed to the mission knowing that it would be in furtherance of that agenda.

The advisory guidelines provide for a sentence of 360 months to life imprisonment. The 15- year sentence that the defendant faces as a result of the statutory maximum sentence is already only half of the recommended guideline sentence. Any further reduction of the defendant's sentence would undermine the seriousness of the offense to which the defendant pled guilty–namely, conspiring with al Qaeda to assist in a post-September 11, 2001 operation within the United States. The fact that the defendant was unable to conduct an operation within the United States should not be a factor that reduces his sentence. The defendant did not choose to end his mission for al Qaeda, rather he was thwarted in furthering his goals and should not be unjustly rewarded with a sentence outside of the advisory guideline range.

5.      *Need for Adequate Deterrence & Protection of the Public*

A sentence of 15 years will demonstrate that individuals who engage in terrorism will be prosecuted and, if convicted, face a substantial term of imprisonment. Providing lengthy sentences for these types of crimes was specifically contemplated by Congress. Application of the terrorism enhancement in this case which increases the offense level by 12 and the criminal history to VI, reflects how Congress, the Judiciary and the Sentencing Commission view the seriousness of this offense, the lack of rehabilitation, and increased risk of recidivism for those convicted of terrorism- related offenses. In committing the instant offense, the defendant was motivated by his belief in al Qaeda's violent mission against the United States, including the fatwas issued by Usama bin Laden.

This case, unlike most cases, has the potential to serve as a powerful general deterrent to those individuals, at home or abroad, who wish to advance their political or religious agenda through support of a designated foreign terrorist organization. The public posture of this case and the undeniable fact that al Qaeda-inspired terrorists pose a continuing threat to our country and her people, requires a 15-year sentence in order to deter other potential terrorists from

entering the United States to pursue al Qaeda's violent agenda. The defendant slipped into the United States unsuspected as an al Qaeda supporter just one day before the nation's worst terrorist attack.   A 15-year sentence is absolutely justified to ensure that the defendant, who has not renounced his support for al Qaeda, will not return to support their terrorist cause in the near future.

6.     *Need to Avoid Unwarranted Sentencing Disparities*

Entering the United States at the behest of KSM to conduct operations within this country on behalf of al Qaeda encompasses conduct that warrants a sentence at the high end of the guideline range.   Imposition of a 15-year sentence within the advisory Guideline range best serves "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).   Congress "sought uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct" prior to the Guidelines. *Rita*, 127 S. Ct. at 2464.   Because "uniformity remains an important goal of sentencing," "Section 3553(a)(6) directs *district courts* to consider the need to avoid unwarranted disparities."   *Kimbrough*, 128 S. Ct. at 573-74 (emphasis by Court).   "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall, 128 S. Ct. at 596.   The Guidelines "help to 'avoid excessive sentencing disparities,'" *Kimbrough*, 128 S. Ct. at 573-74, because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," Gall, 128 S. Ct. at 599.   Accordingly, "[t]he Guidelines remain at the center of this effort to 'avoid excessive sentencing disparities,'" and "'remain an essential tool in creating a fair and uniform sentencing regime across the country.'" *United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007).

## III.

## THE DISTRICT COURT SHOULD NOT IMPOSE A LOWER SENTENCE ON THE DEFENDANT AS A RESULT OF HIS DETENTION AS AN ENEMY COMBATANT.

The Seventh Circuit requires that, after considering the Sentencing Guidelines, district courts must hear arguments from the parties about whether there should be a departure from the guidelines-because the case falls outside the heartland of the guidelines, or because a guidelines sentence fails to reflect the § 3553(a) factors, "or perhaps because the case warrants a different sentence regardless." *United States v. Smith*, 562 F.3d 866, 872 (7th Cir. 2009) quoting *Rita v. United States,* 127 S.Ct. 2456, 2465 (2007).  The advisory Sentencing Guidelines in this case provide a range of 360 months to life imprisonment for the offense to which the defendant pled guilty.  The defendant's sentence however, is capped by the statutory maximum of 15 years for the crime of conspiracy to provide material support to a designated foreign terrorist organization.  That cap, for which the defendant bargained and to which the government agreed, represents all the consideration to which the defendant may be arguably entitled due to his prior confinement in military custody.

Whether styled as a request for downward departure or credit for time served, the District Court should deny any request by the defendant to impose a lower sentence due to his prior status as an enemy combatant for several reasons.  First, the District Court is not authorized to award credit for time served at sentencing.  *United States v. Wilson*, 503 U.S. 329, 332 (1992).  Second, the defendant's confinement as an enemy combatant was pursuant to the Law of War and it is the position of the United States that such confinement does not qualify for prior custody credit for purposes of 18 U.S.C. §3585(b).  Third, applying the time spent in Law of War detention against a criminal sentence is contrary to the fundamental principles set forth in 18 U.S.C. §3553 and inconsistent with customary international law.

A.     <u>The District Court Lacks Authority to Award the Defendant Credit for Time Served</u>.

18 U.S.C. §3585 governs when a federal sentence of imprisonment commences and whether credit against that sentence must be granted for time spent in "official detention" before the sentence begins.   It provides:

> (a) Commencement of a Sentence.–A sentence to a term of imprisonment commences on the date the defendant is received into custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served.
>
> (b) Credit for Prior Custody.–A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences–
>
>> (1) as a result of the offense for which the sentence was imposed; or
>> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed; that has not been credited against another sentence."

In *United States v. Wilson*, 503 U.S. 329 (1992), the Supreme Court rejected the argument that 18 U.S.C. § 3585(b) authorizes a district court judge to award credit at sentencing.   Rather, the power to grant sentencing credit under 18 U.S.C.§ 3585(b) is vested with the Attorney General of the United States, who has delegated that authority to the Bureau of Prisons (BOP). Under 18 U.S.C. § 3621, a person who has been sentenced to a term of imprisonment is committed to the custody of the Bureau of Prisons until the expiration of the term imposed.   As the Supreme Court explained in *Wilson*, "to fulfill this duty, BOP must know how much of the sentence the offender has left to serve.   Because the offender has a right to certain jail-time credit under § 3585(b), and because the district court cannot determine the amount of the credit at sentencing, the Attorney General has no choice but to make the determination as an administrative matter when imprisoning the defendant." *Id.* at 335.

In *United States v. Ifeoluwa*, 238 Fed. Appx. 895, 900 (3rd Cir. 2007), the defendant sought credit for time spent in immigration custody prior to his arrest on federal charges.   The

Third Circuit rejected this argument and held that the sentencing court did not have the discretion

to grant the defendant credit for time served in immigration custody because 18 U.S.C. §3585(b)

vests that authority with the Attorney General through the BOP.  *Id.*

Similarly, the District Court here lacks the authority to award the defendant credit for

time served based upon his confinement as an enemy combatant.   After the District Court

imposes a sentence, the defendant may then seek administrative review of BOP's computation of

any credit for time served through the Administrative Remedy Program.   28 CFR

§§542.10-542.16.   Further, the defendant may seek judicial review of BOP's decision once all

administrative remedies have been exhausted. *Wilson* at 335.

B.   Even if the District Court had Authority to Grant Credit for Time Served, the Defendant's
Detention as an Enemy Combatant was Pursuant to the Law of War and such
Confinement Does not Qualify for Prior Custody Credit for Purposes of 18 U.S.C. §3585.

To receive credit for time served under 18 U.S.C. §3585, the defendant must have been

officially detained within the meaning of the statute and such detention must be "as a result of the

offense for which the sentence was imposed" or any other charge for which the defendant was

arrested "after the commission of the offense for which the sentence was imposed."   The

Supreme Court has interpreted the phrase "official detention" as used in the relevant statute, as

applying to those defendants who were detained and committed to the custody of the Attorney

General under the Bail Reform Act, 18 U.S.C. §3142.   *Reno v. Koray*, 515 U.S. 50, 61 (1995).

The Supreme Court found that BOP's interpretation was "the most natural and reasonable

reading of §3585(b)'s official detention language."   *Id.* at 61.   The Court specifically rejected

the premise that the plain language of "official detention" should include any restrictive

conditions of confinement.   *Id.* at 61.  Following the holding in *Reno v. Koray*, the Seventh

Circuit rejected a defendant's arguments that the Supreme Court's analysis supported his

14

contention that any restraint on liberty must constitute "official detention" and thus qualify for credit for time served under the statute. *Miller v. Hastings*, 87 Fed. Appx. 585 (7th Cir. 2004).

The Bureau of Prisons is responsible for implementing the congressional mandate for 18 U.S.C. §3585(b). The Supreme Court in *Reno v. Koray* expressed support for BOP's interpretation of "official detention" and recognized that BOP's internal agency guidelines are entitled to deference from the courts. 515 U.S. 50, 61. As such, BOP has issued Program Statement 5880.28 of the Sentence Computation Manual. BOP has consistently applied these internal agency guidelines to deny credit for time served for confinement stemming from non-criminal proceedings. For example, individuals are detained by the Department of Homeland Security, Immigration and Customs Enforcement under the provisions of 8 U.S.C. 1252 pending determinations of deportability. Despite the obvious restraint on their liberty, BOP guidelines provide that inmates held by ICE pending civil deportations are not being held in "official detention" pending criminal charges and thus are not entitled to receive credit against a federal sentence for time spent in immigration detention. BOP derives support for their guidelines from federal case law defining deportation proceedings as civil, not criminal actions. See, *Ramirez-Osorio v. Immigration & Naturalization Service*, 745 F.2d 937, 944 (5th Cir. 1984); *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1042-43 (1984); *Cabral-Avila v. INS*, 589 F.2d 957, 959 (9th Cir. 1978)("The deportation proceeding, despite the severe consequences, has consistently been classified as a civil, rather than a criminal matter.") Similarly, the Eleventh Circuit has held that deportation proceedings are civil, not criminal in nature. *United States v. Noel*, 231 F.3d 833, 837 (11th Cir. 2000).

Any request by the defendant for credit for time served while detained as an enemy combatant is foreclosed by the non-criminal nature of his prior military detention. Indeed, the Fourth Circuit Court of Appeals in *Al Marri v. Puciarelli*, specifically recognized that this very

defendant's detention as an enemy combatant was an exception to the usual criminal process. 534 F.3d 213, 223 (4th Cir. 2008).    In reaching its decision, the Fourth Circuit discussed the Supreme Court's reaffirmation in *Hamdi v. Rumsfeld*, 542 U.S. 507, 525-526 (2004), that the writ of habeas corpus provides the remedy for an individual held as an enemy combatant to challenge collaterally the legality of ongoing detention.    *Id.* at 224.   The Fourth Circuit concluded that the defendant's relief from military detention was grounded in civil habeas rights.

Despite the restraints on the defendant's liberty during his confinement, there is no authority under the statute, as interpreted by the Supreme Court that entitles the defendant to credit for any time spent in detention from June 23, 2003 until he was committed to the custody of the Attorney General in the instant criminal case.    Here, the defendant's military detention as an enemy combatant falls into the same non-criminal category as civil deportation proceedings and material witness confinements which do not qualify as "official detention" under 18 U.S.C. §3585, and certainly was not the result of the offense for which this sentence will be imposed.

The defendant was not detained in a penal or correctional facility subject to the control of civilian criminal authorities until he was transferred to custody of the Attorney General after being indicted by a federal grand jury in the Central District of Illinois in February 2009.   From June 23, 2003 through February 27, 2009, the defendant was in Law of War detention at the Naval Brig in Charleston, South Carolina, because he had been designated as an enemy combatant.   The Department of Defense acted in accordance with a Presidential Determination Memorandum by which the President, in the exercise of his constitutional and statutory authorities pursuant to the Authorization for Use of Military Force, Pub. L. No. 107-30, 115 Stat. 224 (Sept. 18, 2001)("2001 AUMF"), and the Military Order of November 13, 2001, designated the defendant to be an enemy combatant.    *See* Presidential Determination Memorandum to the Secretary of Defense and the Attorney General dated June 23, 2003, attached, hereto.   That

16

confinement, by definition, is "devoid of all penal character" as its purpose is neither to punish nor exact vengence, but to ensure that a combatant does not return to the battlefield. See, *Hamdi* at 518-519, citing W. Winthrop, Military Law and Precedents 788 (rev.2d ed. 1920) .

The defendant's detention by the Department of Defense bears no legal relationship to criminal detention. In fact, Law of War detention differs fundamentally in purpose from criminal detention. The purpose of Law of War detention is to prevent persons who previously engaged in hostilities or combat against the Detaining Power from "returning to the fight," i.e. to prevent them from returning to hostilities or combat against the Detaining Power. Law of War detention denies detainees access to the battlefield. Its purpose is not to punish conduct. This is true whether detainees are members of an armed force, are other privileged belligerents as defined in the Third Geneva Convention (GC III), Article 4 (e.g., militias), or are unprivileged belligerents, that is, enemy combatants associated with al Qaeda, such as the defendant.

The Supreme Court has recognized this principle in its plurality opinion in *Hamdi v. Rumsfeld* describing the purpose of Law of War detention:

> The capture and detention of lawful combatants and the capture, detention, and trial of unlawful combatants, by "universal agreement and practice," are "important incident[s] of war." *Ex parte Quirin, supra*, at 28, 30, 63 S.Ct. 2. , at 28, 30, 63 S.Ct. 2. The purpose of detention is to prevent captured individuals from returning to the field of battle and taking up arms once again. Naqvi, Doubtful Prisoner-of-War Status, 84 Int'l Rev. Red Cross 571, 572 (2002) ("[C]aptivity in war is 'neither revenge, nor punishment, but solely protective custody, the only purpose of which is to prevent the prisoners of war from further participation in the war' " (quoting decision of Nuremberg Military Tribunal, reprinted in 41 Am. J. Int'l L. 172, 229 (1947))); W. Winthrop, Military Law and Precedents 788 (rev.2d ed. 1920) ("The time has long passed when 'no quarter' was the rule on the battlefield .... It is now recognized that 'Captivity is neither a punishment nor an act of vengeance,' but 'merely a temporary detention which is devoid of all penal character.' ...'A prisoner of war is no

17

> convict; his imprisonment is a simple war measure' "
> (citations omitted)); cf. *In re Territo,* 156 F.2d 142, 145
> (C.A.9 1946) ("The object of capture is to prevent the
> captured individual from serving the enemy. He is disarmed
> and from then on must be removed as completely as
> practicable from the front, treated humanely and in time
> exchanged, repatriated or otherwise released" (footnotes
> omitted)).

*Hamdi v. Rumsfeld*, 542 U.S. 507, 518-19 (2004).

The Commentary to GC III, Article 14 provides complementary analysis in its discussion of the "civil capacity" of war prisoners:  ". . . war captivity bears no resemblance to detention under common law . . . unlike the latter, it cannot result in any *capitis deminutio*."  The Commentary continues, "the Oxford Manual (a 19th Century forerunner to the modern Geneva Conventions) is even more explicit, since it states that captivity is 'a temporary detention only, entirely without penal character'." *Commentary, III Geneva Convention*, pages 148-149 (1960 Ed.).

The defendant's prior detention as an enemy combatant was based upon this basic Law of War principle that permits the detention of individuals in order to prevent them from returning to the battlefield to resume their service to the enemy.  Because the defendant's detention as an enemy combatant was not criminal in nature, he was not "officially detained" as a result of the charged offense, and therefore, his prior detention is not creditable against his current sentence. 18 U.S.C. §3585(b)(1).

C.     <u>Any Request by the Defendant for a Downward Departure to Reflect his Prior Detention as an Enemy Combatant Should be Properly Denied as an Attempt to Nullify the Statutory Authority Granted to BOP in Calculating Credit for Time Served.</u>

The Bureau of Prisons is not authorized to award the defendant credit against his criminal sentence for time spent in military detention as an enemy combatant because Law of War detention is not criminal in nature and therefore does not qualify as "official detention" as a

result of the offense charged under 18 U.S.C. §3585.  The Supreme Court has recognized BOP's responsibility for implementing the Congressional mandate for 18 U.S.C. §3585(b), and that such determinations should be given deference.  *Reno v. Koray*, 515 U.S. at 61.  Any attempt by the defendant to seek a reduction of his   advisory guideline 15-year sentence through a request for a downward departure based upon his prior conditions of confinement is an attempt to award a credit that is clearly not authorized by 18 U.S.C. §3585(b), and should therefore be denied.

President Bush designated the defendant as an enemy combatant pursuant to the Law of War.  The purpose of his detention was to remove him from the battlefield.  The fact that he was subsequently prosecuted for criminal charges, even if supported by some of the same underlying facts, does not retroactively transform his prior confinement.  To do so would equate detainees confined pursuant to the Law of War to those held as common criminals.

In point of fact, of the approximately 750 enemy combatants held by the United States at Guantanamo Bay since 2002, over 520 have either returned to their home countries or countries which would accept them for resettlement.  Numerous others who were held under the Law of War in Afghanistan and Iraq have also been released or transferred without being charged with any offenses under either the Law of War or criminal law.  Conflating the differences between the defendant and those released detainees is not only incompatible with Law of War principles and the treatment that must be afforded detainees pursuant to the Geneva Convention, it is also contrary to the 18 U.S.C. §3553 factors regarding sentencing disparity.[2]

---

[2]Granting a downward departure also creates a significant, if unintended, policy problem. If Law of War detention were credited against a criminal sentence, some could argue that the United States has violated Common Article 3 of the Geneva Conventions, which prohibits the "passing of sentences" without "previous judgment pronounced by a regularly constituted court." In other words, equating Law of War detention with a criminal sentence would create an argument that the United States has violated its treaty obligations not to impose sentences without adequate process of law.

Granting the defendant a sentence below the 15-year statutory maximum would create a sentencing disparity between Al Marri and other defendants convicted of material support who were not also detained pursuant to the Law of War.  The fact that the defendant is not only guilty of  a criminal offense but was also part of enemy forces with whom we are at war, should not be a basis for granting him a lesser criminal sentence.  The Supreme Court recognized in the *Hamdi* decision, that the fundamental purpose and historical precedent for Law of War detention is different from a criminal prosecution.  Conflating the two would be in error.

## IV.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 15 years.  The Court should reject any argument for downward departures as the §3553(a) factors fully support the advisory guideline sentence of 15 years.

Dated: October 2, 2009                          Respectfully submitted,

                                                JEFFREY B. LANG
                                                Acting United States Attorney

                                                     /s/

                                                JOANNA P. BALTES
                                                Trial Attorney, Counterterrorism Section
                                                National Security Division
                                                Department of Justice
                                                DAVID E. RISLEY
                                                Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that on this 2 day of October, 2009, I electronically served the foregoing Government's Sentencing Memorandum to the following counsel:

Lawrence S. Lustberg, Esq.
Gibbons P.C.
One Gateway Center
Newark, NJ 07102-5310

Andrew J. Savage III, Esq.
Savage & Savage, P.A.
15 Prioleau Street
P.O. Box 1002
Charleston, SC   29402

L. Lee Smith, Esq.
Hinshaw & Culbertson
Ste. 600
416 Main Street
Peoria, IL 61602

Mark A. Berman, Esq.
126 State Street
Hackensack, NJ 07601

_____/s/_____

JOANNA P. BALTES
Counsel for the United States
