# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL OF ILLINOIS AT PEORIA

UNITED STATES OF AMERICA

v.

ALI SALEH KAHLAH AL-MARRI,

DEFENDANT.

Criminal No. Case No. 09-CR-10030

## SENTENCING MEMORANDUM
## OF DEFENDANT ALI SALEH KAHLAH AL-MARRI

GIBBONS P.C.
One Gateway  Center
Newark, New Jersey 07102-5310
(973) 596-4500

Savage & Savage PA
15 Prioleau Street
P.O. Box 1002
Charleston, SC 29401
843/720-7470

Hinshaw & Culbertson
416 Main Street, Suite 600
Peoria, IL 61602
309/674-1025

*On the memorandum:*
  Lawrence S. Lustberg, Esq.
  Jennifer B. Condon, Esq.
  Eileen M. Connor, Esq.

# TABLE OF CONTENTS

Page

I.      PRELIMINARY STATEMENT ................................................................1

II.     PERSONAL BACKGROUND AND FAMILY LIFE........................................3

III.    THE CHARGES, PRE-SENTENCE PROCEDURAL HISTORY AND THE
        PLEA  AGREEMENT............................................................................7

        A.      Mr. al-Marri's  Arrest and Federal Criminal Prosecution ......................7

        B.      Mr. al-Marri's Challenge to His Designation and Unlawful Detention as
                an "Enemy Combatant"..............................................................8

        C.      Mr. al-Marri's Offense Conduct and the Plea Agreement...................11

IV.     THE GOVERNMENT SUBJECTED MR. AL-MARRI TO EXCEPTIONALLY
        HARSH TREATMENT AND CONDITIONS OF PRETRIAL DETENTION .............14

        A.      Severe Isolation at the U.S. Naval Brig in South Carolina, as Well as the
                MCC, FCI Pekin, and the Peoria County Jail ......................................16

                1.      Isolation, Indefinite Detention and Incommunicado Detention at
                        the Brig ................................................................18

                2.      A Physical Environment Designed to Maximize Discomfort and
                        Anxiety and Instill Feelings of Hopelessness and Despair to
                        Facilitate Interrogation.............................................23

                        a.      Prolonged sensory deprivation and environmental
                                manipulation ..................................................24

                        b.      Denial of mattress, glasses, and other basic necessities ..............25

                        c.      Extreme, dehumanizing lack of privacy and twenty-four
                                hour surveillance .............................................28

                3.      Deliberate Interference with Mr. al-Marri's Practice of His
                        Religion.................................................................29

                4.      Physically and Psychologically Abusive Interrogations .........................32

                        a.      Repeated and prolonged interrogation without access to
                                family or counsel .............................................32

                        b.      Gagging during interrogation .......................................34

                        c.      Threats of harm to Mr. al-Marri and his family members............34

        B.      Mr. al-Marri's Treatment Is Further Corroborated By Public Documents
                Regarding A Now-Repudiated System of Detention and Interrogation..............37

V.      MR. AL-MARRI'S SIGNIFICANT TRANSFORMATION DURING
        CONFINEMENT. ..............................................................................41

**TABLE OF CONTENTS**
(continued)

Page

VI.   LEGAL ARGUMENT.................................................................................47

A.    Introduction.............................................................................47

B.    Guideline Sentence ...............................................................49

1.    An Upward Adjustment for Specific Offense Characteristics Is Not Warranted Because Mr. al-Marri Did Not Support a Specific Mission Or Plan.......................................................49

2.    Mr. al-Marri Qualifies For a Downward Adjustment Given His Limited Role in the Offense ...................................51

C.    Departures ................................................................................57

1.    The unusually harsh treatment and conditions of confinement suffered by Mr. al-Marri warrant a departure from the sentencing guidelines ...........................................................57

a.    Mr. al-Marri's six year's of indefinite detention in and of itself warrants a downward departure ...........................................58

b.    Mr. al-Marri's unusually harsh conditions of confinement since his arrest in 2001 warrant a downward departure. .............61

(1)   Eight years of solitary confinement warrants at least an equivalent reduction in Mr. al-Marri's sentence ..........61

(2)   A "constellation" of harsh treatment and abuse further warrants a reduction in Mr. al-Marri's sentence....................................................64

(3)   Mr. al-Marri's treatment during his detention as an enemy combatant is a proper basis for a downward departure .....................................................68

2.    This court should grant a departure under U.S.S.G. § 4A1.3(b) because the guidelines substantially over-represent the seriousness of his criminal history and likelihood of recidivism..............................74

D.    Section 3553(a) Factors .........................................................78

1.    Introduction.........................................................................78

2.    (a)(1): Nature and circumstances of the offense ....................................81

3.    (a)(1): History and characteristics of the defendant .................................83

# TABLE OF CONTENTS
### (continued)

**Page**

4.   (a)(2) The need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant ..................................................................84

    (1)   just punishment and respect for the law ...........................84

    (2)   deterrence and need to protect the public .......................85

5.   (a)(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct..........................................................................................86

    a.   military commissions cases ........................................87

    b.   criminal justice 2339B cases ......................................88

VII.   CONCLUSION……………………………………………………………114

## I.   <u>PRELIMINARY STATEMENT</u>

Defendant Ali Saleh Kahlah Al-Marri respectfully submits this Memorandum in support of his request for a just, merciful and appropriate sentence.  Mr. al-Marri faces a suggested advisory Guideline range of 180 months for the offense to which he pleaded guilty.  For the following reasons, Mr. al-Marri submits that any sentence of incarceration at or near the term suggested by the Guidelines would subvert rather than fulfill this Court's statutory directive to impose a sentence that is "sufficient, but not greater than necessary" to achieve Congress's goals of sentencing.  Indeed, in truth, Mr. al-Marri has now been punished more than enough to fulfill the statutory purposes of sentencing under the unique and extraordinary facts of this case.

Before turning to the legal arguments, this Memorandum provides a description of the man this Court will sentence, the extraordinarily harsh conditions he endured throughout eight years of solitary confinement, including six years in which he was held in severe isolation, and his remarkable transformation during this period, during which he has developed meaningful relationships with his Americans, including his legal team, has grown to enjoy U.S. culture, and has exhibited genuine respect and gratitude for our country's men and women in uniform. Through Mr. al-Marri's sincere, heart-felt letters to his attorneys and the past or anticipated testimony of several of his custodians who were responsible for his confinement at the Consolidated Naval Brig in Charleston, South Carolina, a picture emerges of a person who, rather than being hardened by hatred or motivated by anger, violence, or retribution, is humbled, already severely punished, and still bears the psychological and emotional scars of years of brutal treatment and stark isolation, including symptoms of Post-Traumatic Stress Disorder, but is extremely grateful to those who have treated him humanely and who have tried to help him resolve the indeterminacy of his confinement.  He credits the American legal system with providing him defense counsel and with what he trusts will ultimately be just and fair treatment.

Section VI, *infra*, sets forth the legal bases for such a sentence. After *United States v. Booker*, 543 U.S. 220 (2005), the Court's obligation at sentencing is clear. <u>First</u>, the Court must calculate Mr. al-Marri's suggested Guidelines sentence. *Gall v. United States*, 128 S.Ct. 586, 597 (2007); *United States v. Bartlett*, 657 F.3d 901, 909-10 (7th Cir. 2009). <u>Second</u>, the Court must rule on all departure motions. *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005). <u>Third</u>, the Court must engage in a meaningful analysis and application of the factors set forth in 18 U.S.C. §3553(a). *Id.* Ultimately, as noted, the Court must fashion and impose a sentence that is "sufficient, but not greater than necessary" to achieve Congress's sentencing goals. *See United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006).

Here, and as discussed in greater detail below, the Guidelines analysis is as follows. <u>First</u>, , the Court must decide it if will raise Mr. al-Marri's offense level based upon an enhancement for the specific offense characteristic described in U.S.S.G. § 2M5.3(b)(1)(E). Here, the Court should not impose that enhancement because Mr. al-Marri did not act with the intent or knowledge that his support would be used to assist in the commission of a violent act. Furthermore, the Court must decide whether to adjust Mr. al-Marri's offense level pursuant to U.S.S.G. § 3B1.2, given that his role in the offense was mitigating: he was a minor player, inconsequential both within the larger operations of al Qaeda and, more specifically, within the particular conspiracy of which he has been convicted.

<u>Second</u>, the Court must determine whether the unusually harsh conditions of confinement that Mr. al-Marri endured at each of the detention facilities where he has been held during the eight long years since his arrest on December 12, 2001 warrant a downward departure from the applicable advisory sentence pursuant to U.S.S.G. § 5K2.0. Those conditions include the

anguish of years of solitary confinement, prolonged and indefinite detention, and inhumane, degrading, and abusive treatment in violation of Mr. al-Marri's fundamental human rights.

With respect to the <u>third</u> step of the sentencing process, an analysis of the factors set forth in 18 U.S.C. §3553(a) warrants a sentence well below the advisory Guideline range. Although Mr. al-Marri's conduct was serious and deserving of appropriate punishment, it is relevant under subsection (a)(1) that he was a minor player, that his actions did not cause harm to any person, and that his involvement in any future plot was entirely speculative. His history and characteristics indicate that he is an otherwise productive and law-abiding citizen, a person of deep faith and a devoted family man as to whom the actions here at issue, for which he has accepted full responsibility, were out of character. The considerations of 18 U.S.C. § 3553(a)(2) — the need for the sentence to deter, punish, and promote respect for the law — likewise militate in favor of a sentence below the Guideline range. Mr. al-Marri has already been severely punished, beyond what our nation stands for and tolerates as a matter of respect for the law, and, his extraordinary transformation, discussed in great detail below, leaves one comfortable in the knowledge that he will not act — and will never even agree to act — in a way that violates the law or would endanger American citizens. Finally, a review of the sentences received by similarly situated defendants reveals that a sentence well below the Guideline sentence is required in order to avoid an unwarranted disparity in sentences.

This Court's sentence will serve as what should be the final chapter in what has been an extraordinary and unusual case. The unique circumstances of this matter — including the conditions of Mr. al-Marri's detention, the process that first removed and then returned him to the criminal justice system, including the fundamental legal issues raised by that process, and the ways in which Mr. al-Marri has reacted to that experience — all culminate in a sentencing,

which presents fascinating questions of law but still returns the Court to the appropriate inquiry: is additional imprisonment necessary or is a sentence of time served sufficient, but not greater than necessary to serve the purposes of sentencing as they apply in this unique and compelling context.

## II.    PERSONAL BACKGROUND AND FAMILY LIFE

Defendant Ali Saleh Kahlah al-Marri was born on September 24, 1965, in Doha, Qatar into a large and close-knit family.  Presentence Report ("PSR") ¶ 75-76; Exhibit 59 at 30:15-20 (Transcription of Detention Hearing, March 18, 2009).  Mr. al-Marri's father, Saleh al-Marri, who passed away in 2008, was a retired policeman, and his mother, Bakhatah al-Marri, was a homemaker.  PSR ¶ 75; Exhibit 59 at 34:24-25.  He was raised in Qatar along with his seven brothers and four sisters. PSR ¶ 76, 78.  All but one of Mr. al-Marri's siblings currently live in Saudia Arabia, along with their now 80-year-old mother.  PSR ¶ 76.

Mr. Al-Marri, who is a citizen of both Qatar and Saudi Arabia, graduated from high school in 1983 in Doha, Qatar.  PSR ¶ 93.  At the suggestion of his brother, in 1983, Mr. al-Marri came to the United States as a student.  PSR ¶ 78; Exhibit 59 at 40:15-25.  He took various courses at local universities in Illinois before transferring to Bradley University in Peoria.  PSR ¶ 78.  Mr. al-Marri's brother, Naji, also attended Bradley University and encouraged him to matriculate.  Exhibit 59 at 40:15-25;  Exhibit 73 (Transcription of Taped Interview with Naji al-Marri ).  Naji told his brother to "come to this . . .very good town," Peoria, "it's not that big, not that small, to be bored...."  *Id.*  Mr. al-Marri followed his brother's advice and on December 21, 1991, Mr. al-Marri received a Bachelor of Science degree in business management from Bradley University.  PSR ¶ 97.

In fact, several of Mr. al-Marri's family members, including his eldest brother Mohammed, who works as an engineer for an oil company in Saudi Arabia, were educated in the United States. Exhibit 59 at 40:5-14; 41:2-7; Exhibit 74 (Transcription of Taped Interview with Mohammed Al-Marri). Mohammed received his Bachelor of Science degree from a university in Texas in 1996. *Id.* Naji al-Marri noted that "American education is different . . It [] gives you a broad way of learning," allowing one to meet people of different nationalities and cultures. Exhibit 73. Notably, Mr. al-Marri's family members sought to study in the United States based upon their respect for the American way of life and their belief in the American system of justice. Exhibit 74.

After graduating from college, Mr. al-Marri returned to Qatar; in 1992, he married his wife, Maha, in Saudi Arabia. PSR ¶ 77. He then worked in Qatar as an investment officer for Qatar National Bank in Doha from 1992 to 1993. PSR ¶ 103. From 1993 through 1997, Mr. al-Marri worked in the audit department of Qatar Islamic Bank. PSR ¶ 102. His family describes him as "a key person at the bank," a person known to help others and whom many people liked. Exhibit 74 ("They all say they like Ali" and ask "Where is he, and how is he"). Mohammed noted that his family has made many friends at the bank because of Mr. al-Marri's relationships. *Id.* After next being briefly employed in a family business, Mr. al-Marri worked from 1998 to 2000 as a senior auditor for the Government of Qatar. PSR ¶ 100.

During this period in Qatar, Mr. al-Marri and his wife had five children, who now range in age from 8 to 16 years old. PSR ¶ 77. Mr. al-Marri's family remembers him as a "kind and gentle" father, but one who aimed to instill great discipline and faith in Islam in his children. Exhibit 59, at 39:4-10; Exhibit 74 (noting Mr. al-Marri is a good father who took "care of them for every single small thing").

5

In Qatar, Mr. al-Marri was also known as a deeply religious person, who always looked after his parents and siblings.  Exhibit 59 at 39:12-13;  Exhibit 73 (transcribed interview with Naji al-Marri); *see also* Exhibit 59 at 30: 3-6 (Transcript of Detention Hearing) (testimony of Cheryl Savage describing Mr. al-Marri as incredibly "devout" and noting "his religion is very important to him. He observes all prayer times.  He observes all religious customs and practices. It's the essence of who he is.").  Mr. al-Marri was taught in his religion to treat people kindly "even if they're not Muslims," and "even if they are from another religion, [to] still respect them."  Exhibit 74 (Transcription of Interview with Mohammed Al Marri).

On September 10, 2001, Mr. al-Marri returned to the United States with his wife and five small children.  He enrolled at Bradley University and set about to pursue a second degree in computer information systems.  PSR ¶¶ 31, 37, 39.  To allow time for his family to adjust, Mr. al-Marri opted to take a lighter credit load his first semester.  PSR ¶ 39.  Admittedly, Mr. al-Marri never excelled as a student in the United States; his classes were conducted in English, his second language.  Even when pursuing his first degree at Bradley University his performance was mediocre; he earned a cumulative grade point average of 2.28.  PSR ¶ 97.  But when he returned to Illinois to pursue his second degree, the difficulty of caring for his five small children when they were sick and his wife's inability to shoulder many of the family's responsibilities because she did not speak English, all had a significant impact on Mr. al-Marri's grades and attendance.  PSR ¶ 39.

On December 12, 2001, Mr. al-Marri was arrested on a material witness warrant issued in the United States District Court for the Southern District of New York.  PSR ¶ 1.  His eldest son, Abdulhadi, who was eight years old at the time, was present in the vehicle when the FBI took his father into custody.  Exhibit 59 at 37:13-16.  Mr. al-Marri has been held in the custody of the

6

United States and has not seen his family ever since. His wife and children now live in Saudi Arabia with his wife's father. PSR ¶ 77.

Mr. al-Marri's family has suffered enormously from his prolonged and incommunicado detention, not having had any contact with their husband, father, son, and brother for more than six years, and not having seen him in more than eight. Exhibit 55 (2009 Declaration of Stuart Grassian, M.D.). When several of Mr. al-Marri's attorneys traveled to Qatar and Saudi Arabia to meet with his family in 2008, one of the very first questions Mr. al-Marri's wife, Maha, asked was "is her husband alright because she knew that he had had surgery" while he had been detained. Exhibit 59 at 33:9-11 (Transcript of Detention Hearing) (testimony of Cheryl Savage). "Unbeknownst to her, his surgery had been five years prior." *Id.* at 33:12-15 (detention hearing testimony of Cheryl Savage). Mrs. al-Marri had not known what the surgery was for, "if he was alright or if there are any lasting effects…." *Id.* at 33:12-15. His family also asked "questions you would never expect a wife and children to have to ask about their father or their husband. What did he look like? Did he ask questions about them?" *Id.* at 33:17-21. Other members of Mr. al-Marri's family noted that for years they did not know whether Mr. al-Marri was dead or alive. Because she is so "worried about her son," Mr. al-Marri's 80-year-old mother Bakhatah simply "cried 90 percent of the time" during the visit. *Id.* at 35:4-7

Mr. al-Marri's eldest son, Abdulhadi, who was 8 years old when Mr. al-Marri was first arrested, is now 16 years old. PSR ¶ 77. Mr. al-Marri has twin girls, Maryam and Hajar, who are now 13 years old. *Id.* They were five years old when they last saw their father. His other daughter, Khaola is now 10 years old. PSR ¶ 77. She was only two when she last saw her father. *Id.* His youngest son, Abdulrahman, is now eight. *Id.* He was only an infant when he

last saw his father, and does not know him at all.   Exhibit 59 at 37:7-8; *see* Exhibit 72 (Photographs of Mr. al-Marri's Family).

In 2008, the government permitted Mr. al-Marri to communicate by phone with his wife and children for the first time, after not speaking to them at all for six years.  Even now that this communication with family is more frequent, nevertheless, "the conversations are painful." Exhibit 55.  As Dr. Stuart Grassian noted after evaluating Mr. Al-Marri, "He is a stranger to his children.  He does not know even what to ask them about, because he really has no idea at all about their lives — their friends, their schools and teachers and recreational activities, or really anything at all.  It is just awkward."  Exhibit 55.  As Dr. Grassian noted, even with his wife, Mr. al-Marri notes "there is little to say.  He experiences her as a good and faithful wife, but they don't really know each other anymore."  *Id.*

In addition to losing contact with his wife and particularly with his children during their formative years, Mr. al-Marri also suffered another devastating loss while detained incommunicado:  he learned that his father had passed away more than a year after it happened and without any chance of seeing him before he died.  As Cheryl Savage, who is part of Mr. al-Marri's defense team, testified at Mr. al-Marri's detention hearing, "probably one of the worst times and hardest visits" she ever had with Mr. al-Marri at the Brig was when she and her husband had to tell him that his father had passed away.  Exhibit 59 at 34:23-24; *id.* at 35:1-2 ("He had been dead for a year before we told Ali because it was a year before we knew.") .

In spite of the lost years, Mr. al-Marri's family eagerly awaits his return and looks forward to the day when they can reintegrate him into their family.  Mr. al-Marri's brother Mohammed noted that it was his father's wish to see Ali before he died; now that Mr. al-Marri's

mother is 80 years old, it is also her wish "to see Ali before she passe[s] away."  Exhibit 74.

Mohammed noted "we as a family, we need to see our . . . Ali."  *Id.*

That sentiment is also expressed by members of Mr. al-Marri's community in Qatar and

Saudia Arabia, as well. When his attorneys visited Doha, a growing city that is, however, still a

small town, many of Mr. al-Marri's former neighbors or associates at the bank where he had

worked asked about him and how he was doing.  Exhibit 59 at 35:14-20 (Transcript of Detention

Hearing); Exhibit 74 (Transcription of Interview with Mohammed Al-Marri).  Even the attorney

general of Qatar asked about Mr. al-Marri and expressed concern about his welfare.  Exhibit 59

at 35:15-20.

Mr. al-Marri's closely-knit family and support within his community establish not only

the good and decent man that he was in the past, but also indicate that once he is returned to his

home, he will be welcomed.  Thus, Mr. al-Marri will heal, move on with his life, and avoid the

tragic judgments that so devastatingly led to his current circumstances and long, painful

separation from his family.

## III.   THE CHARGES, PRE-SENTENCE PROCEDURAL HISTORY AND THE PLEA AGREEMENT

### A.     Mr. al-Marri's  Arrest and Federal Criminal Prosecution

On December 12, 2001, FBI agents arrested Mr. al-Marri at his home in Peoria, where he

then lived with his wife and five young children.  PSR ¶ 1.  Following his arrest, the government

held Mr. al-Marri for almost a month in complete isolation at the Peoria County Jail.  Exhibit 50

(Jail Incident Report, June 4, 2003).  Although the government has never alleged or proven that

Mr. al-Marri had any connection whatsoever to the September 11, 2001 terrorist attacks, after his

arrest, the FBI transported Mr. al-Marri to New York and, from January 4, 2002 through May 13,

2003, held him in solitary confinement in the maximum-security Special Housing Unit ("SHU")

at the Metropolitan Correctional Center ("MCC") in Manhattan as a material witness in the investigation of those attacks. PSR ¶ 1; Exhibit 56 (Letter from Mark Berman, Esq.).

Two months later, in February 2002, the United States filed the first of three successive criminal indictments against Mr. al-Marri. The initial indictment, filed in the United States District Court for the Southern District of New York, charged him with credit card fraud; the second, also filed in the Southern District of New York, added charges of issuing false statements to the FBI, bank fraud, and identity theft. PSR ¶¶ 2-3. In April 2003, Mr. al-Marri moved to dismiss both indictments on the ground that venue was constitutionally improper in the Southern District of New York. On May 12, 2003, the court granted the motion and dismissed the indictments. PSR ¶¶ 2-3. Four days later, a single indictment alleging the very same counts was filed in the Central District of Illinois. PSR ¶ 4.

Mr. al-Marri was transferred back to Peoria. PSR ¶ 2-4. Upon his return to Illinois, Mr. al-Marri was again detained in the Peoria County Jail, where the government held him in solitary confinement and denied him all contact with the outside world. Exhibit 54 (General Log, U.S. Naval Brig, June 22, 2003-April 23, 2004). The unusually harsh conditions of confinement that Mr. al-Marri endured at each of the detention facilities at which he was held from December 2001 through June 2003 are set forth in greater detail in Section IV, *infra*.

On May 29, 2003, this Court set a pretrial conference for July 2, 2003, with a jury trial to begin on July 21, 2003. On June 20, 2003, the Court scheduled an evidentiary hearing in connection with Mr. al-Marri's pre-trial suppression motion. At this point, Mr. al-Marri had already been imprisoned for eighteen months.

On June 23, 2003, just days before the scheduled suppression hearing and less than a month before trial, the government moved without notice to dismiss the indictment based on a

one-page declaration signed that same morning by President Bush, declaring Mr. al-Marri an "enemy combatant." PSR ¶5. This Court dismissed the Indictment with prejudice and Mr. al-Marri was transferred to the custody of the Department of Defense and transported to the Consolidated Naval Brig in Charleston, South Carolina. PSR ¶5. As set forth in Section IV, *infra*, for the next sixteen months, Mr. al-Marri was held in isolation and denied access to his attorneys, his wife and children, and even the International Committee for the Red Cross.

**B.     Mr. al-Marri's Challenge to His Designation and Unlawful Detention as an "Enemy Combatant"**

On July 8, 2003, Mr. al-Marri, acting through his counsel, Mark Berman, as his "next friend," filed a petition for a writ of habeas corpus in this Court, challenging his indefinite and unlawful detention as an enemy combatant. PSR ¶ 7. On August 1, 2003, the Court dismissed the petition on venue grounds; that decision was affirmed on appeal, and certiorari was denied. *See al-Marri v. Bush*, 274 F. Supp. 2d 1003 (C.D. Ill. 2003), *aff'd sub nom. al-Marri v. Rumsfeld*, 360 F.3d 707 (7th Cir.), *cert. denied*, 543 U.S. 809 (2004); PSR ¶ 7.

Accordingly, on July 8, 2004, Mr. al-Marri filed a second habeas corpus petition, this time in the United States Court for the District of South Carolina, again challenging his indefinite and unlawful detention as an enemy combatant. PSR ¶ 80. The government answered Mr. al-Marri's petition by appending a redacted declaration from Jeffrey N. Rapp, Director of the Joint Intelligence Task Force for Combating Terrorism ("Rapp Declaration"), as sole support for al-Marri's indefinite military detention. Exhibit 58. The Rapp Declaration alleged that Mr. al-Marri associated with high-level al Qaeda members, was ordered to enter the United States before September 11, 2001, and agreed to provide support for al Qaeda's operations in the United States. *Id.* The Rapp Declaration, however, did not assert that al-Marri posed any imminent threat. Instead, it alleged criminal conduct, echoing the very allegations of this case.

*Compare* Plea Agreement and Stipulation of Facts, docket no. 22 ("Plea Agreement") *and* Exhibit 59 (Transcript of Detention Hearing) *with* Exhibit 58 (Rapp Declaration).

Mr. al-Marri moved for summary judgment on the ground that the President lacked legal authority to detain him militarily or to deny him the procedural protections afforded by the Constitution to those accused of criminal wrongdoing. The district court denied the motion and referred the case to a magistrate judge for elaboration of the process to be afforded Mr. al-Marri in light of the Supreme Court's decision in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004). *al-Marri v. Hanft*, 378 F. Supp. 2d 673 (D.S.C. 2005). PSR ¶ 5. In August 2006, the magistrate judge recommended dismissal of Mr. al-Marri's habeas petition and the district court adopted the recommendation and dismissed the petition. *al-Marri v. Wright*, 443 F. Supp. 2d 774 (D.S.C. 2006).

Mr. al-Marri appealed. PSR ¶ 8. On June 11, 2007, a divided panel of the United States Court of Appeals for the Fourth Circuit reversed, concluding that Mr. al-Marri's military detention was unauthorized by law. *al-Marri v. Wright*, 487 F.3d 160 (4th Cir. 2007). On the government's motion for rehearing, the Fourth Circuit vacated the panel opinion and heard the case *en banc*. PSR ¶ 8.

On July 15, 2008, the *en banc* court issued a closely divided and fragmented decision. *al-Marri v. Pucciarelli*, 534 F.3d 213 (4th Cir. 2008). In a brief per curiam opinion, the court held, by a 5-4 margin, that Congress had empowered the President to detain Mr. al-Marri indefinitely as an enemy combatant based on the facts asserted in the Rapp Declaration, but by a different 5-4 majority held that, even assuming Congress empowered the President to detain Mr. al-Marri indefinitely, Mr. al-Marri had been afforded insufficient process to challenge the government's assertions. PSR ¶ 8. Seven judges filed separate opinions.

On December 5, 2008, the United States Supreme Court granted a writ of certiorari to review the first part of the Fourth Circuit's *en banc* decision, which allowed Mr. al-Marri's indefinite detention; the other holding, regarding the insufficiency of the process afforded Mr. Al-Marri, was not appealed by the government. *al-Marri v. Pucciarelli*, 129 S.Ct. 680 (2008); PSR ¶ 8.

On January 22, 2009, President Barack Obama issued an Executive Order directing the Attorney General and other cabinet-level officials to immediately commence a review of Mr. al-Marri's status to "determine the disposition options" with respect to him.   *See* President Barack Obama, Memorandum, *Review of the Detention of Ali Saleh Kahlah*, (Jan. 22nd, 2009).[1]   On February 26, 2009, a federal grand jury in the Central District of Illinois returned a two-count indictment charging Mr. al-Marri with providing material support to al-Qaeda and conspiring with others to provide material support to al-Qaeda in violation of 18 U.S.C. § 2339B(a)(l).  Plea Agreement at 2, ¶ 3; PSR ¶ 9.  The next day President Obama issued a Memorandum to the Secretary of Defense, directing him "to transfer Mr. al-Marri to the control of the Attorney General upon the Attorney General's request."   PSR ¶ 10; President Barack Obama, Memorandum For The Secretary Of Defense, *Transfer of Detainee to Control of the Attorney General* (February 27, 2009)[2].  The memorandum superseded President Bush's directive of June 23, 2003, to the Secretary of Defense, which designated Mr. al-Marri an enemy combatant.  PSR ¶ 10.  It also made clear that upon Mr. al-Marri's transfer to the control of the Attorney General, the authority to detain him as an enemy combatant ceased.  PSR ¶ 10.

---

[1]*available at*
http://www.whitehouse.gov/the_press_office/Review_of_the_detention_of_Ali_Saleh_Kahlah/
[2]  *available at*  http://www.whitehouse.gov/the_press_office/Transfer-of-Detainee-to-Control-of-the-Attorney-General/

On February 27, 2009, the Department of Justice announced that Mr. al-Marri's transfer would be effected once the Supreme Court ruled on the government's motion to dismiss on mootness grounds, Mr. al-Marri's pending case before the U.S. Supreme Court. On March 6, 2009, the Supreme Court vacated the Fourth Circuit's *en banc* decision and remanded the matter to the Fourth Circuit with instructions to dismiss the appeal as moot. *al-Marri v. Spagone*, 129 S. Ct. 1545 (2009). PSR ¶ 10.

On March 10, 2009, Mr. al-Marri was released from detention by the Secretary of Defense. PSR ¶ 11. The United States Marshals Service immediately took him into custody. After a detention hearing in the United States District Court for the District of South Carolina, Mr. al-Marri was held without bail and transported to Peoria, where he remains in custody at the Federal Correctional Institution at Pekin. PSR ¶ 11.

## C.    Mr. al-Marri's Offense Conduct and the Plea Agreement

On April 30, 2009, Mr. al-Marri entered a plea of guilty to Count 1 of the indictment pursuant to a written Plea Agreement. PSR ¶ 12; Plea Agreement. As reflected in that carefully negotiated agreement, Mr. al-Marri has admitted that he conspired to provide material support to al Qaeda. Plea Agreement at 9, ¶ 20. As is also clear from the Plea Agreement, the only support that Mr. al-Marri agreed to provide was "personnel, including himself, to work under al Qaeda's direction or control." Plea Agreement ¶ 7. Additionally, there is no evidence, nor has the government ever alleged the existence of any evidence, to establish that Mr. al-Marri provided support with respect to the commission of a particular violent act or that Mr. al-Marri ever engaged in any violent act. Although Mr. al-Marri was aware at the time that al Qaeda had perpetrated specific violent acts in the past, Plea Agreement at 11, ¶ 20, he was not aware of the attacks of September 11, 2001 before the occurred, PSR ¶ 38; nor was he given any instructions

14

about a specific plan or operation with respect to which he was to assist.  Mr. al-Marri's offense conduct as reflected in the Plea Agreement and PSR is as follows:

Mr. al-Marri attended various training camps to prepare himself for jihad, "an individual's striving for spiritual self-perfection or a Muslim holy war or spiritual struggle against infidels, as crusade or struggle." PSR ¶ 19; Plea Agreement at 10, ¶ 20.  Mr. al-Marri admits that while attending these training camps, he stayed at safe houses, which the government would prove at trial, were run by and for the benefit of al Qaeda.  PSR ¶ 20; Plea Agreement at 10, ¶ 20.  While at these camps, Mr. al-Marri received "basic military training." Plea Agreement at 10, ¶ 20; PSR ¶ 19.

During this time, Khalid Sheikh Mohammed ("KSM") approached Mr. al-Marri and asked him to assist with al Qaeda operations in the United States.  Plea Agreement at 11, ¶ 20; PSR ¶ 21.  Mr. al-Marri agreed, and KSM instructed him to enter the United States no later than September 10, 2001.  Plea Agreement at 11, ¶ 20.  KSM also instructed Mr. al-Marri to meet with Mustafa al-Hawsawi, whom Mr. al-Marri had never met before and did not know by name. Plea Agreement at 11, ¶ 20; PSR ¶ 23.

In August of 2001, Mr. al-Marri met with al Hawsawi in Dubai, from whom he received $10,000 to purchase certain items, including a laptop computer.  Plea Agreement at 14, ¶ 20; PSR ¶ 34.  Mr. al-Marri then met with KSM and provided him with various requested items, including electronic devices.  Plea Agreement at 14, ¶ 20; PSR ¶ 34.  KSM instructed Mr. al-Marri to communicate with him and others using a rudimentary ten-digit code.  Plea Agreement at 12, ¶ 20; PSR ¶ 24.

After enrolling at Bradley University to pursue a degree in computer information systems, on September 10, 2001, Mr. al-Marri traveled to the United States with his wife and

five small children.  Plea Agreement at 15, ¶ 20; PSR ¶¶ 30, 37.  After several unsuccessful attempts, he later communicated with KSM via email.  Plea Agreement at 12, ¶ 20; PSR ¶¶ 27, 42.  Mr. al-Marri was "unsuccessful" in contacting other individuals in al Qaeda.  Plea Agreement at 16, ¶ 20; PSR ¶ 43.  Once Mr. al-Marri finally made contact, KSM "criticized" him for failing to follow his instructions regarding how to communicate by email.  Plea Agreement at 13-15, ¶ 20; PSR  ¶ 29.  Rather than directing Mr. al-Marri to engage in any specific actions, KSM simply told Mr. al-Marri to contact him once he was settled in the United States.  Plea Agreement at 14, ¶ 20; PSR ¶ 29.

Mr. al-Marri acknowledges that he looked on-line at various chemical supplier websites and that he studied various commercial uses for cyanide compounds and sulfuric acid.  Plea Agreement at 16, ¶ 20.  He agrees that the government would prove at trial that this research was consistent with the type of research conducted by persons trained in camps teaching methods used by al Qaeda.  Plea Agreement at 16, ¶ 20.  Additionally, while Mr. al-Marri admits that his laptop had an anonymizer program on it, Plea Agreement at 17,  ¶ 20, he did not utilize this program in order to purposely surf internet sites anonymously.  Mr. al-Marri notes that an anonymizer is a routine application in most computer software.  PSR ¶ 48. The government agrees that Mr. al-Marri has accepted responsibility for this criminal conduct and that his sentence should reflect that fact accordingly.  Plea Agreement ¶ 14; PSR ¶ 14.

Although Mr. al-Marri has admitted to conspiring to provide material support to further the general goals of al Qaeda — certainly a serious crime, for which Mr. al-Marri accepts full responsibility — in determining a fair and just sentence appropriate for this particular defendant and this particular offense it is important to note that Mr. al-Marri, nevertheless, possessed limited knowledge and understanding of al Qaeda, and its missions and activities.  For example,

although he knew of the organization's general purpose and past activities, *see* Plea Agreement at 11, ¶ 20, PSR ¶ 22, Mr. al-Marri new nothing of al Qaeda's plans on September 11, 2001, until after they occurred, even though he had been in contact with al Hawsawi and KSM during the months preceding the attack, Plea Agreement at 11-12, ¶ 20; PSR ¶¶ 28, 34, 38. Likewise, Mr. al-Marri was ignorant both of al Hawsawi's identity — he did not  know of him at all until referred to him by KSM, Plea Agreement at 11, ¶ 20 — and was completely ignorant of his role as chief financier of the September 11 attacks.

Mr. al-Marri also lacked knowledge regarding the scope of his role in the conspiracy. Mr. al-Marri did not have knowledge of what, if any, specific directive he might receive at some undefined point in the future.  *See* Plea Agreement at 11, ¶ 20; PSR ¶ 22 (Mr. al-Marri understood that he was to remain in the United States for an indefinite period of time); Plea Agreement at 13, ¶ 20; PSR ¶ 25. He also had no role in determining the manner or type of support that he was to provide. Plea Agreement ¶ 11-13. KSM, who had approached Mr. al-Marri (and not the other way around,  Plea Agreement at 6, ¶ 13), "instructed" Mr. al-Marri "to enter the United States" and told him when to do so. *Id.* KSM also directed the defendant to meet with al Hawsawi, even though Mr. al-Marri had no idea at the time who al Hawsawi was. And KSM told Mr. al-Marri how to communicate with him and others. *Id.* While the Plea Agreement acknowledges that KSM was going to use these email communications "to pass on instructions to the defendant," the record indicates, and the government has never alleged otherwise, that he never actually did.

Moreover, Mr. al-Marri failed to carry out even the simple and low-level instructions for communication dictated by KSM, *see* Plea Agreement at 6, ¶ 13-14, and was unsuccessful in establishing contact with any other al Qaeda operative once he was in the United States, Plea

Agreement at 15-16, ¶¶ 15-20.  In addition, a forensic review of the hard drive of Mr. al-Marri's laptop establishes that he is an unskilled user of computers, not a sophisticated technical operative, *see* Exhibit 67 (Report of Forensic Examiner Bill Capps), and that he did not actually attempt to purchase any chemicals or related equipment nor did he acquire any recipe, formula, or plan with respect to the development of any kind of a weapon of mass destruction, *see* Exhibit 49 (Report of Forensic Examiner David Martinez).[3]

Specifically, Mr. al-Marri failed to properly install the Arabic version of his operating system, WinME.  Exhibit 67 (Report of Forensic Examiner, Bill Capps).  He failed to "wipe" his drive, leaving numerous instances of viruses and "Trojan" programs responsible for corruption of the operating system.  *Id.*  Mr. al-Marri's choice of the WinME operating system itself indicates a lack of sophistication one might expect from an individual trained in the use of computer technology.  The limited command line function of WinME precludes its user from installing and using "hacking" programs.  *Id.*  Even Mr. al-Marri's use of the "anonymizer" program indicates his lack of sophistication and thus the limits of the "support" he could provide to al Qaeda.  For example, the anonymizer was activated at all times during his browsing, rather than only when he viewed particular websites, suggesting that Mr. al-Marri may have been unaware of the presence of the anonymizer.  *See id.*  Further, the specific anonymizer found on Mr. al-Marri's computer is not of the kind that affords truly anonymous internet browsing.  *Id.*

---

[3] The forensic review of Mr. al-Marri's computer by David Martinez, a twenty-year veteran of the Federal Bureau of Investigation and former coordinator of the Weapons of Mass Destruction and Crisis Management division of the FBI, did not encompass the review of several documents found on the computer in the Arabic language.  The defense has not had access to the conclusions or reports of the government's forensic expert, who presumably reviewed these documents.  In any event, the government has not come forth with allegations or evidence to contradict the findings of Martinez.

All of this evidence indicates that Mr. al-Marri played an extremely limited role in the operations of al Qaeda in general and in the particular conspiracy at issue here. As set forth below in Section VI, Mr. al-Marri's lack of responsibility for directing the conspiracy, his tenuous relationship to KSM and al Hawsawi, his complete ignorance of any defined objectives or operations planned with respect to the conspiracy, his lack of sophistication, and ultimately his lesser culpability as compared to the other members of the conspiracy, all warrant a downward adjustment, pursuant to U.S.S.G. § 3B1.2 and are pertinent circumstances of the offense, pursuant to 18 U.S.C. § 3553(a).

## IV.   THE GOVERNMENT SUBJECTED MR. AL-MARRI TO EXCEPTIONALLY HARSH TREATMENT AND CONDITIONS OF PRETRIAL DETENTION .

At each of the detention facilities at which he has been held since he was first arrested on December 12, 2001, Mr. al-Marri has endured unusually harsh conditions of prolonged indefinite detention, including the anguish of more than eight years of solitary confinement, as well as inhumane, degrading, and abusive treatment. Mr. al-Marri suffered the worst abuse beginning in June 2003, during his detention as an enemy combatant at the Consolidated Naval Brig in Charleston, South Carolina. During that time, Mr. al-Marri was subjected to numerous violations of his basic constitutional and human rights: indefinite and incommunicado detention, denial of access to counsel, denial of contact with his family, interference with the practice of his religion, and imposition of a physical environment designed to maximize his disorientation, discomfort, hopelessness, and despair. These conditions of confinement are corroborated by contemporaneous videos of Mr. al-Marri's confinement, logs from the Special Housing Unit ("SHU") at the Brig, and the government's own summaries of Defense Intelligence Agency ("DIA") documents.

19

Moreover, given that the government's admitted destruction of evidence related to Mr. al-Marri's treatment during the pendency of ongoing litigation related to the conditions of his confinement, Mr. al-Marri is also entitled to an inference that further corroborating and incriminating evidence bearing on his treatment existed, but that the government has destroyed it in order to his conceal his extraordinarily harsh treatment. Moreover, recently released government reports related to the government's now-repudiated program of unlawful detention and interrogation further reveal that many of the same methodologies improperly employed by the government against other detainees were used against Mr. al-Marri, including threats by interrogators to harm his family. These reports corroborate Mr. al-Marri's account of his treatment and, as discussed below, bear upon, the appropriate sentence in his case under 8 U.S.C. § 3553(a)(2) (need to promote respect for the law).

While some of Mr. al-Marri's conditions of confinement improved during his later years at the Brig, in part in response to vigorous advocacy by his attorneys and in part due to the more enlightened views of the military and civilian staffs responsible for Mr. al Marri at the Brig, the physical and psychological toll of his early treatment, and the severe impact of ongoing isolation, indefinite detention, and separation from his family did not. *See* Exhibit 45 at ¶ 13-15 (2008 Declaration of Stuart Grassian, M.D.) (noting that when "nothing was done to fundamentally address Mr. al-Marri's isolation" his "mental state began to deteriorate" and did so through 2008 as he exhibited increased paranoia, disruption of his sleep cycle, ongoing headaches, and hopelessness); Exhibit 55 (2009 Declaration of Stuart Grassian, M.D.) (noting fears that the long term effects of Mr. al-Marri's isolation have traumatized Mr. Al-Marri, rendering him emotionally numb and forever changed). These unusually harsh conditions of confinement are so egregious that, as set forth in Part VI, they warrant a downward departure from the applicable

advisory range; as set forth in Part VI D, they also bear upon the appropriate sentence under 18 U.S.C. § 3553 (a)(2).

    A.    **Severe Isolation at the Consolidated Naval Brig, as well as at the MCC, the Peoria County Jail, and FCI Pekin.**

For almost eight years  — from the date of his initial arrest as a material witness on December 12, 2001 through the present — Mr. al-Marri has been held in solitary confinement and denied even the limited human interaction with family and other inmates permitted to convicted felons.  *See* Exhibit 45, at 16.  Following his arrest, the government held Mr. al-Marri for almost a month in complete isolation at the Peoria County Jail.  Exhibit 50 (Jail Incident Report, June 4, 2003).  Then, from January 4, 2002 through May 13, 2003, he was held in the Special Housing Unit ("SHU") of the Metropolitan Correctional Center ("MCC") in New York, where he spent every day locked down in a small cell, without exercise or recreation, and was denied all contact with his family.  Exhibit 52 at ¶ 9 (Prisoner Request Form, March 10, 2009). In the  SHU, his confinement was  marked by extreme isolation and  other severe  restrictions, including denial of communication with family and limited access to counsel.  Exhibit 56 (Letter from Mark Berman, Esq.) (noting that while he was held at the MCC, Mr. al-Marri "was fully segregated from other inmates and outside activities" "was not afforded any outside recreation" or telephone contact with family and never saw the sun); Exhibit A attached to Berman  Letter (Letter from Ali al-Marri to U.S. District Judge Marrero, Southern District of New York) (noting that while detained in the SHU guards repeatedly strip searched him, woke him repeatedly every night, denied him telephone calls with his lawyer, and mocked his religion).  A  federal court in New York described the oppressive isolation at the SHU, known as 10 South, as follows: "Detainees in 10 South are confined to cells with blacked out windows 23 hours per day during the week, and round-the-clock on weekends. . . .[T]he lights are left on 24 hours a day.  Access

to radios, and reading materials, including legal papers, appears in practice to be quite limited. Meals are received on trays that are pushed through a narrow slot in the cell door." *United States v. Basciano*, 369 F .Supp. 2d 344 (E.D.N.Y. 2005) (internal citations omitted).  Noting that telephone privileges are "nonexistent" and "contacts with other human beings are sharply curtailed," the court in that instance ordered the release of a pretrial detainee from the SHU, refusing to countenance his "indefinite placement in solitary confinement" as a pretrial detainee. *Id.* at 351-53.

Moreover, the Department of Justice's Office of the Inspector General concluded in a 2003 report that detainees held in these conditions after September 11th were subjected to physical and verbal abuse, and improperly denied access to legal counsel, medical care, and recreation.  Department of Justice, Office of the Inspector General, *The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks* (June 2003)[4] (describing conditions at the SHU in the Metropolitan Detention Center in Brooklyn, which was modeled on the nearby MCC in Manhattan where Mr. al-Marri was held); *see also* Human Rights Watch, *Witness to Abuse: Human Rights Abuses under the Material Witness Law since September 11*, vol. 17, no. 2, at 3(G) (June 2005)[5] (citing Mr. al-Marri's case and noting generally that individuals detained under the material witness law in New York after September 11th "typically were held around-the-clock in solitary confinement and subjected to the harsh and degrading high security conditions typically reserved for prisoners accused or convicted of the most dangerous crimes").

After the government transferred Mr. al-Marri from the MCC back to the Peoria County Jail in May 2003, he was again held in solitary confinement and denied contact with the outside

---

[4] *available at* http://www.usdoj.gov/oig/special/0306/index.htm
[5] *available at* http://www.hrw.org/en/node/11678/section/1

world.  Mr. al-Marri was held in 24-hour lockdown, denied all personal possessions, taken to shower in handcuffs and shackles, and denied access to counsel, consular officers, family, reading materials, and appropriate medical treatment.  Exhibit 56 (Letter of Mark Berman, Esq.). Mr. al-Marri was also prohibited from interacting with other inmates, deprived of access to the Quran, and denied regular exercise outside of his cell.  *See* Exhibits 51-52.[6]

As set forth in detail below, however, the most egregious treatment, including the most extreme isolation, that Mr. al-Marri endured occurred during the nearly six years that he was detained as an enemy combatant at the Consolidated Naval Brig in Charleston, South Carolina. As Dr. Stuart Grassian observed, "I have evaluated quite a large number of individuals incarcerated in solitary confinement, but have only very uncommonly encountered an individual whose confinement was as onerous as Mr. al-Marri's, except for individuals who had been incarcerated in some third-world country."   Exhibit 45 (2008 Declaration of Stuart Grassian, M.D.).  Mr. al-Marri  endured this unremitting isolation from June 23, 2003, when President Bush declared him an enemy combatant, through March 10, 2009, when the Department of Defense transferred him back to the custody of the Department of Justice.  While Mr. al-Marri is no longer subject to the conditions of the Brig, he has not recovered from that "onerous" treatment.  *See* Exhibit 55 (2009 Declaration of Stuart Grassian, M.D.).  Indeed, to this day, he remains in isolation at the FCI Pekin.

---

[6] Exhibit 50 (Jail Incident Report, Peoria County Sheriff's Dept, Dated June 4, 2003 noting (noting that because Mr. al-Marri was being denied yard time, he complained of becoming "very dizzy when he is forced to walk in circles in his cell"); Exhibit 51 (Jail Incident Report, Peoria County Sheriff's Dept, dated June 5, 2003 noting Mr. al-Marri's attempt to ask another inmate to call a religious store for him to secure a Quaran because he was prevented from doing so himself); Exhibit 22  (Jail Incident Report, Peoria County Sheriff's Dept, dated June 7, 2003 noting Mr. al-Marri requested to see a doctor after "his left arm and leg were numb" because he needed more water and exercise and that there was not enough room to exercise in his cell).

### 1.  Isolation, Indefinite Detention and Incommunicado Detention at the Brig.

For nearly sixteen months, from June 23, 2003 through October 14, 2004, the government subjected Mr. al-Marri to incommunicado detention and near total isolation, denying him human contact and any connection to the outside world.  Exhibit 21 at ¶ 6 (Certification of Andrew J. Savage, III, Esq.).  Although Mr. al-Marri was actively represented by defense counsel in his criminal proceedings in the year and a half prior to June 2003, once President Bush designated him an enemy combatant and ordered his detention at the Brig, he was instantly cut off from his legal representatives, denied any opportunity to personally challenge his status, the conditions of his confinement, or the violation of his rights.  *Id.*  He was, in essence, thrown into a legal black hole.  Exhibit 48 at 22 (June 24, 2003 Brig logbook entry from Mr. al-Marri's second day at the Brig noting that he stated during first interview "Why am I here" "It's cold" "Where am I"); *id.* at 24 (July 10, 2003 Brig logbook entry noting that "when Mr. Seymour visited al-Marri, the EC asked Mr. Seymour if he had any rights, Mr. Seymour answered 'no'").

Mr. al-Marri was also deprived of all contact with his family and, though purportedly held as a military detainee, denied access to the International Committee for the Red Cross ("ICRC").  Exhibit 21, ¶ 6.  In fact, during this sixteen-month period, Mr. al-Marri's only human contact was with his interrogators during abusive and threatening interrogation sessions, or with military personnel during the brief moments when they delivered food to him through a small tray slot in his cell door, escorted him to shower, or permitted him indoor "recreation" while restrained in arm and leg irons or sometimes in a steel cage outdoors.  *Id.* at ¶ 7.  To exacerbate Mr. al-Marri's isolation, the government even deprived him of human contact with his captors: military personnel wore duct tape over their name tags and were prohibited from speaking with him except when issuing orders.  Exhibit 48 at 21 (June 23, 2003 Brig logbook entry instructing

guards that "tape must also be worn over nametapes and service tapes" and "nothing is to be said to EC [enemy combatants] at all"); at 31 (December 9, 2003 Brig logbook entry noting "No one is to talk to EC #2 at all!!! Direction only.").[7]  For example, a Brig logbook entry dated January 13, 2004 noted "per order of Senior Chief Keen do not talk, I repeat, do not talk to EC #2, he will start asking a lot of questions according with what the interviewers told him, whatever he asks for say 'noted' nothing else, not yes or no, just noted."  Exhibit 48, at 56.

In addition to isolating Mr. al-Marri, the government created a harsh and abusive environment that compounded the harmful impact of his indefinite, incommunicado detention.  *See* Exhibit 48 at 3 (October 28, 2003 Brig logbook entry noting that Mr. al-Marri "is to be blindfolded everywhere.  Anytime he is out of his cell except rec call.  Blackout goggles and ear protection").  The government, for example, deliberately disoriented Mr. al-Marri as to the time, day, and month.  The single window in his cell was opaque so that he could not see outside or know the time of day, Exhibit 21 ¶ 11, and he was deprived of access to the outdoors and sunlight.  That fact is confirmed by a summary of a government document dated December 20, 2003, which notes that, instead of another interrogation, Mr. al-Marri "saw daylight for the first time in nearly six months."   Exhibit 10 (DIA Interrogation Summaries 0005999).   Even the small, interior window that would have allowed Mr. al-Marri to see inside the rest of his cell block, was kept completely covered with a magnet, so that all Mr. al-Marri could see was the four walls of his cell.  *Id.*

---

[7] The two other enemy combatants held at the Brig, Yaser Hamdi and Jose Padilla, were referred to respectively as EC # 1 and #3 at the Brig.  Mr. al-Marri was referred to as EC #2.  Brig logbook entries confirm that during the first sixteen months of his detention, Mr. al-Marri was often subjected to even harsher treatment than were Padilla or Hamdi.  For example, unlike Mr. al-Marri, Padilla was allowed daily phone calls with his mother, Hamdi and Padilla had access to reading materials, and neither was subjected to forced shaving.  *See* Exhibit 48.

The government reinforced Mr. al-Marri's isolation, disorientation and sensory deprivation by denying him of all access to books, newspapers, magazines and anything else that would have provided him with some sense of time, some minimal connection to the outside world, or some activity to occupy his mind. Exhibit 39 (List of Privileges Denied to Mr. al-Marri) (listing Mr. al-Marri's "privileges" and confirming that he was denied news and reading material in 2003 and 2004). Mr. al-Marri was also denied access to an English-Arabic/Arabic-English dictionary that would have allowed him to better communicate and understand the guards. Exhibit 21 at ¶ 18. Instead, the government ensured that Mr. al-Marri remained confined within his own, solitary world.

It was not until sixteen months after his initial detention at the Brig, and several months after the Supreme Court's decision in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), that Mr. al-Marri's incommunicado detention and isolation finally eased slightly when he was again permitted to meet and communicate with his attorneys, albeit with extreme restrictions, including audio and video surveillance during attorney-client visits. Exhibit 21 at ¶¶ 6, 34-35.[8] Even then, Mr. al-Marri still endured severe isolation and protracted confinement in his cell. *See* Exhibit 21 at ¶ 54. He was the only person living in his cellblock and remained alone day after day, year after year. *Id.* For extended periods, he was not let out of his cell at all. For example, on March 6, 2005, he wrote to his attorneys: "I have been inside my cell for the last 35 days." *Id.* As a result, psychologically-damaging isolation still dominated Mr. al-Marri's daily existence at the Brig.

---

[8] Mr. al-Marri's early meetings with his attorneys were tightly controlled by officials from the Defense Intelligence Agency, who remained in the room during Mr. al-Marri's first meetings with his counsel. Exhibit 21 ¶ 34. During attorney client-visits, Mr. al-Marri remained handcuffed and shackled around his stomach and legs, and he was bolted to the floor. *Id.* at ¶¶ 34-35. Counsel was not permitted to take notes. *Id.* at ¶ 34.

In a January 30, 2005 letter to his attorneys Mr. al-Marri noted, "I feel like I was hold[ing] my breath for along time and with those letters to you and Mark [Berman, Esq.], I am letting the air out…."  Exhibit 25.  But later, on April 30, 2005, he told his attorneys: "My body is tired & I don't know how long I can take it anymore."  Exhibit 30.  By early 2005, Mr. al-Marri told his counsel that they he thought he was "losing his  mind."  Exhibit 21 at ¶ 46 (Declaration of Andy Savage, Esq. noting that "on several occasions during that winter and spring, Mr. al-Marri spoke of possible imminent death").  Recognizing that the severe isolation was taking a toll on him, on July 10, 2006, that is, at the beginning of his third year of indefinite detention and isolation, Mr. al-Marri wrote to his attorneys requesting "some information about the effect of & the symptom of isolation.  I need that so I would know what to be aware of and to warn of it before I get worse or irreversible…."  Exhibit 35.

This lack of human contact and isolation has caused Mr. al-Marri deep emotional and psychological injury.  After reviewing Mr. al-Marri's circumstances in 2008, Dr. Stuart Grassian noted that Mr. al-Marri's isolation was "extremely severe and prolonged."  Exhibit 45.  Dr. Grassian concluded at that time that Mr. al-Marri's "psychological resilience ha[d] eroded to a worrisome degree" and that his "symptomatic presentation is strikingly consistent with published descriptions of the particular psychopathological disturbance associated with solitary confinement."  *Id.*  To this day, Mr. al-Marri bears the emotional and psychological scars of his prolonged isolation and separation from his family.  After recently re-evaluating Mr. al-Marri at FCI Pekin, Dr. Grassian noted that Mr. al-Marri has numbed himself to his emotions in order to cope with his ongoing solitary confinement and separation from his family.  Exhibit 55.  He also noted that Mr. al-Marri exhibits many of the symptoms of Post-Traumatic Stress Disorder, an

affliction marked by "agitation, hyperfocus on details of the traumatic experiences" that can affect individuals who survive the destructive experience of prolonged isolation. *Id.*

The government's own documents make clear that for the first sixteen months of Mr. al-Marri's detention, the enforced isolation, as well as the denial of legal process, access to counsel, and communication with family suffered by Mr. al-Marri were calculated deprivations designed to render him hopeless and thus vulnerable to interrogators. An October 22, 2003 document states that a DIA official made a request "via the OB to CLF Fleet JAG" to ensure that Mr. al-Marri received as "minimal interaction possible" with others and that he not be notified of "prayer times and notice of religious observances." Exhibit 9. A February 6, 2004 document notes that "Brig personnel were told to limit their interaction with al-Marri" and that he would be "allowed no visitors." Exhibit 14. A DIA official noted the need to "extinguish [Mr. al-Marri's] expectations of due process and entitlements in order to induce compliance." Exhibit 14.

Moreover, the DIA has publicly acknowledged that it subjected detainees at the Brig to isolation and indefinite detention precisely because the government wanted to maximize their vulnerability. *See* Exhibit 44 at 5, 8-9 (Declaration of Vice Admiral Lowell E. Jacoby, *Padilla v. Bush*, No. 02 Civ. 4445 (S.D.N.Y Jan. 9, 2003)) (asserting that enemy combatant held at the Brig should not be provided counsel because "anything that threatens the perceived dependency and trust between the subject and interrogator directly threatens the value of interrogation as an intelligence-gathering tool"). That statement is consistent with what an interrogator candidly told Mr. al-Marri: he could only "bring about a change in the quality of life at the Brig and resolution to his status by cooperation…." Exhibit 3.

Significantly, the use of harsh and punitive conditions of confinement to coerce Mr. al-Marri's "cooperation" was not limited to his time in the Brig; rather, it was a tactic used by the

government throughout his case, even when Mr. al-Marri was detained as a criminal defendant. In May 2003, after Mr. al-Marri's counsel pressed to have Mr. al-Marri's indictment dismissed in the Southern District of New York based upon improper venue, Mr. al-Marri and his counsel met with David N. Kelley, Deputy United States Attorney for the Southern District of New York, at the request of the United States Attorney's Office.  Exhibit 52 at ¶ 21; Exhibit 56.  Mr. Kelley informed Mr. al-Marri that if he insisted on moving to dismiss the indictment, and continuing his assertion of innocence, the circumstances of his confinement, which were already severe, would become worse.  *Id.;* Exhibit 56 (Letter of Mark Berman, Esq.).  According to former Attorney General John Ashcroft, who was closely involved in the decision to designate Mr. al-Marri an enemy combatant, the government labeled him  an "enemy combatant" because he became a "hard case" by "reject[ing] numerous offers to improve his lot by . . . providing information." John Ashcroft, NEVER AGAIN: SECURING AMERICA AND RESTORING JUSTICE 168-169 (2006).

In contrast to his criminal proceedings, however, when Mr. al-Marri was threatened at the Brig, he was deprived of counsel and, therefore, the threat was very real.  When he asserted his right to counsel and due process, interrogators informed him that he had no right to either and that cooperation was "his only hope of changing his situation and status."  Exhibit 3.  Through this coercion, the interrogators effectively conveyed to Mr. al-Marri that they controlled him and every aspect of his environment.  A September 15, 2003 document noted that after an interrogation session on September 12, 2003, guards observed that Mr. al-Marri was "trembling" and "noticeably shaken by what the Interrogator had told him."  Exhibit 7; Exhibit 48, at 26 (September 13, 2003 Brig logbook entry noting "EC #2 was shaking going to and coming from the interview room").  According to the government, the following day guards observed that Mr.

al-Marri still appeared "nervous" and "restless," and that he began praying longer and more frequently. *Id.*

Although the interrogations of Mr. al-Marri stopped in October 2004, after counsel was finally permitted to see their client, some of the most onerous of Mr. al-Marri's conditions did not otherwise improve. Mr. al-Marri remained in solitary confinement and was not permitted to communicate with his family, including his wife and five children, from June 2003 until 2007. Once he was permitted to correspond with them in writing, his communication with them was still severely restricted, censored, and delayed. Exhibit 21 at ¶ 57-60 (noting that letters and a DVD from Mr. al-Marri's family which aimed to "help mitigate Mr. al-Marri's loneliness and isolation" were "subject to extraordinary delays due to the government's screening/review process" with one package of letters being held by the government for 21 months). The government even denied Mr. al-Marri's request to allow him to provide a picture of himself, which was taken by the ICRC, to his family. In fact, Mr. al-Marri was not permitted to speak to his family by phone until Spring 2008, following the death of Mr. al-Marri's father. Exhibit 21 at ¶ 60. Thereafter, Mr. al-Marri was only permitted to speak with his family twice before he left the Brig. His requests for more frequent calls were rejected.[9]

The pain of not having had any contact with his family for so long was profound. In a February 20, 2005 letter to his attorneys, after being denied the opportunity to communicate with his wife for nearly two years, Mr. al-Marri implored: "please tell me what happened in my wife matter. . . I want to know shall I write to her or not. Is she still my wife or not." Exhibit 26. Mr. al-Marri came to believe that "he would never get out alive, never see his family again" and

---

[9] Mr. al-Marri was not even permitted to call his attorneys until Spring 2006.

would wake up in the night after dreaming about his kids, turn his back to the video camera and silently cry.  Exhibit 55 (2009 Declaration of Stuart Grassian, M.D.).

### 2.   A Physical Environment Designed to Maximize Discomfort and Anxiety and Instill Feelings of Hopelessness and Despair to Facilitate Interrogation.

To compound the profound deprivation of solitary confinement and incommunicado detention, the government also ensured that Mr. al-Marri's physical environment at the Brig was exceptionally harsh and degrading.  For the first several years of his confinement, the government confined Mr. al-Marri to a small, claustrophobic cell, which he was rarely permitted to leave.  In addition to this cramped, isolated confinement, the government also denied Mr. al-Marri regular physical exercise outside of his cell.  Exhibit 21 at ¶ 8.  When Mr. al-Marri was permitted outside his cell for "recreation," he was bound in hand and leg irons and prohibited from exercising or interacting with other prisoners or guards.  *Id.* at ¶ 9; Exhibit 39 (government privilege list provided in discovery listing "privileges" in 2003 and 2004 and confirming Mr. al-Marri was only allowed "indoor recreation" with restraints).

Mr. al-Marri reports that he was also subjected to physical brutality by the guards.  Some intentionally handcuffed him tightly and stomped on his bare feet with their boots.  *See* Exhibit 55, 2009 Grassian Decl. (noting that this abuse occurred when Mr. al-Marri had to stick his feet out of a slot on the bottom of the cell door to be shackled before exciting his cell).

#### a.   *Prolonged sensory deprivation and environmental manipulation*

The temperature, noise, and light in Mr. al-Marri's cell were manipulated to maximize his discomfort and anxiety, and to deprive him of consistent sleep, in order to render him compliant with his interrogators.  The government kept the temperature in Mr. al-Marri's cell very cold, *id.* at ¶ 39, and often refused to give him adequate clothing and blankets, frequently causing him to shiver uncontrollably.  Exhibit 48 at 25 (June 27, 2003 Brig logbook entry noting "EC asked if

we can turn down the A.C." and "EC expressed that he was cold and if we could do something to change the temp"); *id.* at 6 (November 10, 2003 Brig logbook entry noting that "#2 complaining about light and being cold").  In addition, Mr. al-Marri's sleep was constantly disrupted by the guards' banging on the walls and bars of his cell or by opening and shutting doors to empty cells adjacent to Mr. Al-Marri's.  Exhibit 21 at ¶ 39.

Later during his confinement, Mr. al-Marri was forced to endure the grating noise of a portable industrial fan that was intentionally placed near the door of his cell, and operated 24 hours a day, 7 days a week.  The speed of the fan was adjusted to deliberately punish or torment him.  *Id.* at ¶ 42.  Although the fan did not circulate any of the air in Mr. al-Marri's cell, its loud noise, which varied randomly in pitch, made it difficult for Mr. al-Marri to think or sleep.  *Id.* Mr. al-Marri reported to his attorneys that when he complained about his conditions of confinement, his custodians "raised the fan on high, very noisy" in order to punish him through sensory overload.  Exhibit 31.

In addition, Mr. al-Marri's cell was entirely barren and the government did not permit him to have any visual, mental, or emotional stimulation within this austere, cramped space.  For the first years of his detention, the cell was devoid of a table, chair, or desk, such that  his movements and activities were restricted even within the barren cell to which he was confined every minute of every day.  *Id.*  at ¶ 13.  Mr. al-Marri was given nothing to read, no television, no radio, not even the ability to practice his religion, so there was nothing to distract him from his torment.  The government also deprived Mr. al-Marri of even the most basic items in order to maximize his discomfort.  He was, for example, denied a pillow for long periods of time and, at first, only allowed him  to have one small, thin blanket that was not large enough to cover his body.  Exhibit 21 at ¶ 13; Exhibit 48 at 19 (March 25, 2004 Brig logbook entry instructing guard

to give Mr. al-Marri "an extra blanket (2) total, make it look like a mistake"). This left Mr. al-Marri completely vulnerable and exposed to the frigid temperatures in his cell without any respite or remedy.

Later in his confinement, Mr. al-Marri became deeply troubled by noxious odors smelling like sewage or car exhaust that he believed were purposely introduced into his cell. *Id.* at ¶ 41; Exhibit 24 (February 17, 2005 Letter from al-Marri to Andrew Savage) (describing suffering from migraine headaches because of the smell). It bothered Mr. al-Marri so profusely that he started stuffing his vents with food to try to block the smell. *Id.* While Dr. Grassian has suggested that Mr. al-Marri's obsessive preoccupation with the smell in his room could have been a symptom of his psychological deterioration caused by prolonged solitary confinement, Exhibit 45, whether real or perceived, was another aspect of the unrelenting discomfort endured by Mr. al-Marri on a daily basis.

                    b.    *Denial of mattress, glasses, and other basic necessities*

In order to create an environment of enduring discomfort and dependency on his interrogators, the government also denied Mr. al-Marri access to the most basic necessities. For example, at various times, the government withheld eye glasses from Mr. al-Marri, who has poor eyesight and wears glasses full-time, in order to cause him discomfort and to disorient him. *See* Exhibit 48, at 44 (March 9, 2004 Brig logbook entry noting "EC #2 is not to get his Quran or glasses anymore"); *id.* at 46 (March 11, 2004 Brig logbook entry "EC #2 Quran & glasses are secured . . . till further notice"); *id.* at 51 (June 16, 2004 Brig logbook entry noting EC #2 asked "if he could wear his glasses in his cell because his eyes are hurt"); *id.* at 15 (June 4, 2004 Brig logbook entry noting "#2 requested his glasses. MACs briefed"); *id.* at 17 (June 25, 2004 Brig logbook entry noting "EC #2 receives Quran and glasses").

During the first years of his detention, the government also deprived Mr. al-Marri of a mattress and forced him to sleep on the hard, concrete and metal bed affixed to the wall of his cell.  Exhibit 37; Exhibit 39 (government privilege list provided in discovery confirming denial of the "privilege" of a mattress in 2003 and 2004); Exhibit 48 at 25 (July 13, 2003 Brig logbook entry noting EC "reported that his legs and back hurt and go numb. . .asked about if he was getting a mattress").  Sleeping on that hard, irregular surface for so long caused Mr. al-Marri constant pain.  Exhibit 21 at ¶ 14.

Summaries of the government's own documents reveal that for the first several years of his detention, the denial of basic necessities to Mr. al-Marri was not simply a disciplinary consequence for Mr. al-Marri's behavior.[10]  Nor were the hardships endured by Mr. al-Marri the ordinary inconveniences of prison life.  Rather, as the government's admissions make clear, the conditions of Mr. al-Marri's confinement were manipulated by interrogators in order to create an environment of total discomfort, anxiety, and helplessness.  For example, a summary of an October 22, 2003 government document reveals that DIA officials ordered that Mr. al-Marri be deprived of a mattress, and overrode medical recommendations that he have one.  Exhibit 9.  Specifically, because Mr. al-Marri experienced persistent pain in his legs, neck, and other parts of his body as a result of sleeping on a hard surface, early in his detention, Brig doctors prescribed for Mr. al-Marri a foam mattress, a cushioned chair, and a table to lean on.  Exhibit 43

---

[10]  In the later years of Mr. al-Marri's confinement, when Brig officials denied Mr. al-Marri certain "privileges" because of his failure to follow Brig rules or procedures, Mr. al-Marri's behavior was a direct consequence of the extreme isolation to which he was subjected.  Exhibits 45; 55 at 4 (Declaration of Dr. Stuart Grassian noting that Mr. al-Marri's behavior exhibited tell-tale signs of the psychological trauma associated with prolonged and severe solitary confinement, including visual and auditory illusions, as well as "paranoid preoccupation with his conditions of confinement [that] would become unbearable").  Dr. Grassian notes that Mr. al-Marri acted out to "allow his mind some relief" from the torment.  *Id.*  When Mr. al-Marri's conditions improved and his severe isolation was alleviated even slightly, many of his preoccupational obsessions dissipated.  *Id.*

(Chronological Record of Medical Care, June 24, 2003) (noting that Mr. al-Marri's "numbness/tingling could be positional due to sleeping on hard rack" and recommending foam mattress and possible x-rays or MRI); Exhibit 42 (Chronological Record of Medical Care, September 4, 2004) (medical record noting Mr. al-Marri's complaint of "shooting pain" because of "hardness of the rack" he was sleeping on without a mattress and noting doctor's recommendation to the commanding officer that Mr. al-Marri be provided with a "chair for sitting" and possible x-rays); Exhibit 48 at 18 (September 13, 2004 Brig logbook entry noting "#2 has positional back pain SR Doc recommend chair or x-ray"). Nevertheless, interrogators overrode the medical recommendation and Mr. al-Marri was denied these items for years. Exhibit 9.

Two and a half years into his detention, the government finally provided Mr. al-Marri with a thin mattress. Even then, the government only allowed Mr. al-Marri access to this mattress from 10 p.m. to 5 a.m. and periodically took it away from him. Exhibit 21 at ¶ 15; Exhibit 28. At all other times, he was denied any soft place to sit or lay down within the hardened, cold interior of his cell where he spent each and every day. *Id.* In a July 9, 2006 letter to his attorneys, for example, he noted that he was "[s]leeping straight on the metal bed and have only one short blanket to cover b/c it was cold, for about 3 or 4 weeks." Exhibit 34. It was only after three years of confinement that he finally received a chair. *See July 20, 2005 Letter from al-Marri to Andy Savage, Esq. et al.*, Exhibit 37. Thus, for the first several years of his detention, Mr. al-Marri was deprived of any soft surface upon which to sit or lay upon within his cell. Exhibit 21 at ¶ 13.

The government also deprived Mr. al-Marri of socks and footwear, forcing him to stay on his bed to avoid walking on the ice-cold floor of his cell. Exhibit 21 at ¶ 16; Exhibit 48 at 25

(July 15, 2003 Brig logbook entry noting "EC requested socks and to request the air conditioning could be turned down").  Mr. al-Marri spent as long as 20 days confined to the hard surface of his bed because it was too painful to stand or walk on the floor.  *Id.* at ¶ 16.  In a March 6, 2005 letter to his attorneys, Mr. al-Marri wrote:  "I would like for you to write to the Red Cross & tell them the following:  I have been laying down in my bed for the last 11 days and counting, b/c I do not have socks nor shoes to walk inside my cell, the floor is very cold.  I only get up for the bathroom, food, or when they take me out to clean my cell."  Exhibit 27.  As the government's own documents acknowledge, it was not until well into Mr. al-Marri's detention that socks were provided to him, and  then only after he implored Brig officials because he was experiencing bruising from ankle shackles and suffering from the cold.  Exhibit 15.  In a letter to his attorneys, Mr. al-Marri noted that it was nearly two years into his detention, specifically March 2005, that he had permanent access to socks or shoes.  Exhibit 24.

At various times during Mr. al-Marri's detention, the government also denied him clean clothes, a toothbrush, toothpaste, soap,  and even toilet paper.  Exhibit 21 ¶ 30.  He was also forced to eat cold meals — usually military rations known as MREs — for weeks or months at a time, including for eight months while he was being interrogated.  *Id.*; Exhibit 48 at 5 (November 7, 2003 Brig logbook entry noting EC #2 "keeps asking for soap? was told no"); *id.* at 14 (April 16, 2004 Brig logbook entry directing "as of 0900 stop heating the MRE's for EC #2 for all meals"); *id.* at 47 (May 13, 2004 logbook entry noting "as per [interrogator] EC #2 has been given no toilet paper in his cell").

DIA documents further reveal that a DIA interrogation team "requested that other items be withdrawn from Mr. al-Marri to include one of his blankets and a pillow."  Exhibit 17.  Other documents confirm that, under the government's interrogation plan for Mr.  al-Marri, only a DIA

interrogator could provide him with dental floss, Exhibit 8, and that Mr. al-Marri was deprived of toilet paper, subjecting him to the indignity of having to request it from guards when he needed it or if they refused, not having access to it at all, Exhibit 15.   Under the Standard Operating Procedures in place at this time, interrogators had total control over Mr. al-Marri and could do anything they saw fit to facilitate interrogation.

> c.      *Extreme, dehumanizing lack of privacy and twenty-four hour surveillance.*

The conditions of Mr. al-Marri's confinement were manipulated by the government in order  to convey to him that he possessed no rights, privacy, or dignity, and that he was subject to the whim and will of his interrogators.  One way this message was conveyed to Mr. al-Marri was through the 24-hour surveillance to which he was subjected during his nearly six years of confinement.   Exhibit 21 at ¶ 32.   Whether in his cell, showering, going to the bathroom, or being transported to an interrogation, the government video-taped Mr. al-Marri continuously, thereby eliminating any sense of autonomy or privacy.  *See* Exhibit 54 at 7 (June 25, 2004, one of many Brig logbook entries noting that Mr. al-Marri was observed using the toilet in his cell); at 8 (noting observations of Mr. al-Marri in cell and recording "standing head call" and "sitting head call"); (February 27, 2004  logbook entry noting one of many references to Mr. al-Marri being observed "secured in the shower").

Moreover, government documents reveal that at least during the first two years of Mr. al-Marri's detention, the 24-hour surveillance was not simply aimed at ensuring the safety of the Brig staff or Mr. al-Marri, but rather, was utilized to monitor his psychological status and vulnerability for purposes of interrogation.  For example, a DIA document dated January 19, 2004 notes that watch supervisors at the Brig informed interrogators about Mr. al-Marri's routine and habits, particularly his prayer habits.  Exhibit 13; *see also* Exhibit 48 at 12 (February 14,

2004 Brig logbook entry directing guards to "log every event an EC does i.e. crying as per Mr. Seymour"); at 26 (September 13, 2003 Brig logbook entry noting "the interrogators will be back Monday 15 Sept. 03 at 12:30. Until that time we are to take note of all emotions and every little movement EC #2 makes, as per [interrogator]").

### 3.      Deliberate Interference with Mr. al-Marri's Practice of His Religion

The government also severely restricted Mr. al-Marri's ability to practice his religion. Exhibit 21 ¶ 19; *see* Exhibit 34 (June 10, 2005 Letter from al-Marri to Andrew Savage, Esq. et al.) (noting that officials "start banging on the door, turning the light on and off, screaming and yelling while I am praying").  For example, interrogators denied him access to religious items, including the Quran, in an attempt to coerce cooperation and instill in him a sense of complete psychological dependence on his interrogators.  Worse still, guards sought to provoke Mr. al-Marri by throwing the Quran on the floor of Mr. al-Marri's cell or placing other items on top of it (a sign of disrespect which is prohibited in Islamic tradition).  Exhibit 21 at ¶ 19.  Mr. al-Marri, a devout Muslim, was also denied copies of other religious texts, a prayer rug, a cover for his head for use during prayer, water to purify himself before prayer, and meetings with an Imam or any Muslim cleric.  *Id.* at ¶ 20; Exhibit 39 (government document provided in discovery listing Mr. al-Marri's "privileges" at the Brig and confirming denial of "prayer calls" "prayer rug" and "religious visits" in 2003 and 2004, and denial of "sacred text" in 2003, as well).  When Mr. al-Marri attempted to use his shirt as a head cover during prayer, officials took it away from him as punishment.  Exhibit 21 at ¶ 20; *see* Exhibit 33 (June 16, 2009 Letter from al-Marri) ("They took my T-shirt because I cover my head when praying.")

The government also interfered with Mr. al-Marri's observance of Islam by refusing to tell him the direction of Mecca (towards which Muslims must face when praying), and denying him access to a prayer schedule, clock or watch, thereby preventing him from knowing the five

times per day when a Muslim is obligated to pray.  Exhibit 21, at ¶ 21; see also Exhibit 48, at 28 (November 3, 2003 Brig logbook entry noting that EC "#2 does not get prayer call"); at 3 (October 25, 2003 Brig logbook entry noting "#1 and #3 will be told when Ramadan starts" "#2 will not be told when Ramadan starts"); Exhibit 48 at 2 (October 23, 2003 Brig logbook entry reflecting "no prayer calls for #2").  Mr. al-Marri noted in a July 20, 2006 letter to his attorneys that he "was only told the direction of Mecca after 2 years."  Exhibit 37.  Even then, government officials still periodically deprived Mr. al-Marri of information about prayer times as punishment when they deemed his behavior non-compliant. Exhibit 37 (July 20, 2006 Letter from Al Marri) (noting that the Brig considers "practice of my religion [] a privilege").

Moreover, logbook entries confirm that interrogators purposefully interfered with Mr. al-Marri's access to the Quran in an attempt to coerce his cooperation and instill in him a sense of complete psychological dependence.  It is clear that, during this period, DIA interrogators, along with a "Consultant," alone determined when Mr. al-Marri would be permitted to have a Quran. See Exhibit 17; Exhibit 48 at 8 (December 18, 2003 Brig logbook entry noting "EC #2 now has a Quran was given by interviewer"); at 9 (December 23, 2003 Brig logbook entry noting "As of 2200, EC #2 does not get his Quran, as per Mr. Seymor and [interrogator]" and December 26, 2003 logbook entry noting "[interrogator] called and ask about EC#2 and how he was reacting without his Quran"); at 47 (May 12, 2004 logbook entry noting "EC2 does not receive Quran no more until further notice").

DIA documents also reveal that control over Mr. al-Marri's access to the Quran was a ploy used recurringly by interrogators.  For example, a January 16, 2004 document notes that before one interrogation session, DIA interrogators "previously planned" to leave the Quran in the control of the Brig guards and "instruct[ed]" them that if Mr. al-Marri asked for the Quran,

he could have it before the interrogation session, thereby ensuring that Mr. al-Marri knew that he only had access to it because of his interrogators.  Exhibit 11.  Similarly, a DIA document dated June 14, 2004 noted that an interrogation team "decided to offer [Mr. Al-Marri] a copy of the Koran" and "that SJA Fleet Forces Command had previously agreed that the Koran could be used as an incentive."  Exhibit 17; Exhibit 48 at 32 (December 18, 2003 logbook entry noting "EC #2 received Quran from interviewers" but at the end of the day "Glasses and Quran need to be taken from EC #2!").

This document also makes clear that when Mr. al-Marri asked for a prayer rug and notification of prayer times, interrogators decided with the concurrence of the "Consultant" to take away Mr. al-Marri's access to the Koran altogether.  Exhibit 17.  Two weeks later, on June 30, 2004, when a decision was made "to return the Koran" to Mr. al-Marri, his interrogators were intent on making clear to Mr. al-Marri that his status, conditions, and ability to exercise even his most basic human rights such as practicing his religion, were totally dependent upon the grace of his interrogators.  The document notes that "allowances were made for us to give [Mr. al-Marri] the book or have the message conveyed to him." Exhibit 18.

Similarly, a DIA document dated August 2, 2004 reveals that interrogators forcibly shaved Mr. al-Marri's beard and head for the first year of his detention, and did not give him "permission to grow his beard" until early July 2004.   Exhibit 19; Exhibit 48 (noting "[interrogator] would like for EC#2 to get a shave and a hair cut tomorrow" and "would like the mirror removed from his cell"); Exhibit 48 at 13 (February 23, 2004 Brig logbook entry instructing guards to trim and groom other enemy combatants detained at the Brig but to "shave everything" for Mr. al-Marri).  Given that growing a beard has religious significance in Islam, this was calculated to convey to Mr. al-Marri that he could not practice his religion or comply

with the tenets of his faith without cooperating with his interrogators.  *See also* Physician for Human Rights, *Aiding Torture: Health Professionals' Ethics and Human Rights Violations Revealed in the May 2004 CIA Inspector General's Report*, at 2 (2009) ("In addition to the violation of cultural and religious taboos, forced shaving constitutes an intrusion into the personal space and bodily integrity of the person, infringing on autonomy and self-control. The combined effects of this type of treatment in combination with other techniques have been associated with long-lasting psychological injury such as posttraumatic stress disorder, anxiety and depression.") [hereinafter "Physician for Human Rights, Aiding Torture Report"] [11]

In short, all of these documents confirm that DIA interrogators manipulated Mr. al-Marri's faith and religious obligations to coerce his cooperation during interrogation.  Exhibit 14. By interfering with Mr. al-Marri's practice of his religion and, at times, even degrading his faith, the government not only provoked feelings of profound helplessness, frustration, and despair in Mr. al-Marri, but brutally exacerbated the unsettling and debilitating effects of isolation by attempting to deny him even the comfort and solace of his religious beliefs.  Exhibit 21 at ¶ 22.

### 4.  Physically and Psychologically Abusive Interrogations.

#### a.  *Repeated and prolonged interrogation without access to family or counsel.*

The government subjected Mr. al-Marri to repeated and abusive interrogations.  *Id.* at ¶ 23.  The government now acknowledges that, from September 2003 through July 2004, it interrogated Mr. al-Marri 37 times, with some interrogation sessions lasting for up to ten hours. Exhibit 2 (noting that "the agent has been with al-Marri through fifteen prolonged sessions, many lasting ten hours or more").  In one ten-day period, the government interrogated Mr. al-Marri for a total of nine days.  Exhibit 2.  By way of example, Brig logbook entries confirm that

---

[11] available at *http://physiciansforhumanrights.org/library/news-2009-08-31.html*

in 2004, the government interrogated Mr. al-Marri on January 9, 10, 11, 12, 14, 15, 16, 17 & 18 and on March 8, 9, 10, 11, 12, 13 & 14 for several hours each day.  Exhibit 54.

During these sessions, interrogators manipulated Mr. al-Marri's cell conditions in order to break his will and coerce his cooperation.  Exhibit 21 at ¶ 23.  For example, for periods as long as eight days at a time, the government placed Mr. al-Marri in a frigid and completely bare cell when he refused to answer their questions, denying his requests for adequate clothing or blankets.  *Id.* at ¶ 24.

The government's written summaries of interrogations reveal that it subjected Mr. al-Marri to a calculated interrogation plan, organized into phases and aimed at exploiting changes in his emotional status and well-being.  For example, one DIA document notes that before one interrogation session in October 2003, officials were "briefed on [Mr. al-Marri's] emotional behavior and attitude…."  Exhibit 7.  It also references the "last phase" of interrogation, which the government acknowledges left Mr. al-Marri "shaken."  *Id.*  A January 19, 2004 DIA summary further notes that interrogators were at the Brig for the "latest phase" of interrogation.  Exhibit 12.

That Mr. al-Marri was subjected to "phases" of interrogation aimed at exploiting his vulnerability is consistent with similar interrogation methodologies utilized in other instances in the "War on Terror."  *See* Exhibit 22 at Part IB (Department of Defense's Standard Operating Procedures for Guantánamo).  For example, under the Behavior Management Plan used in 2003 for interrogations at Guantánamo, detainees were subjected to multiple phases of interrogations.  *Id.* at 4-20.  The first phase involved extreme isolation and deprivations, including denial of access to the ICRC, chaplains, books, mail, blankets, the Quran, prayer beads, and prayer cups in an attempt to "enhance and exploit the disorientation and disorganization felt by a newly arrived

detainee in the interrogation process." *Id.* Phase two "continue[d] the process of isolating the detainee and fostering dependence on the interrogator" with "the Koran, prayer beads and prayer cap distributed by the interrogator." *Id.* Mr. al-Marri's "phases" of interrogation appear to track with those at Guantánamo in 2003, when some of the most serious abuses of detainees took place. Neil A. Lewis, *Red Cross Finds Detainee Abuse in Guantánamo*, N.Y. Times, Nov. 30 2003 (describing report by the ICRC recounting significant abuses against prisoners in 2002 and 2003).

The application of Guantánamo procedures within the United States is significant. The government built the prison facility at Guantánamo in order to avoid the reach of American law. Indeed, the government long argued that detainees at Guantánamo were not entitled to any constitutional protection, a question only settled recently. *See Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008) (rejecting government's claim that the Constitution did not apply to Guantánamo). By contrast, American citizens and legal residents detained within the United States clearly enjoy the protection of the First, Fourth, and Fifth Amendments. Among other things, the Guantánamo SOP violated the Fifth Amendment by subjecting all new detainees to maximum security conditions, including extreme isolation and sensory deprivation – not for any legitimate penological purpose but solely "to enhance and exploit the disorientation and disorganization felt by a newly arrived detainee in the interrogation process." *See* Exhibit 22 § 4-20(a). Under this policy, the interrogator alone decided whether the detainee would be allowed any relief from the most stringent conditions. *See id.* at § 4-20(b).

Documents released by the government through the Freedom of Information Act reveal that the Brig was ordered to follow standard operating procedures developed for Guantánamo though Navy officers doubted the wisdom of applying those rules on American soil. Exhibit 6

43

(Brig emails released through FOIA).  In fact, many Brig officials expressed grave concerns about the effects of solitary confinement on the detainees held at the Brig and frustration with the practice of denying the detainees access to legal counsel or any information about their fates. *See id.; see also* Exhibit 79 (Notes of Major Deborah Sirratt) (reflecting staff support for improving Mr. al-Marri's conditions, including phone calls with family and counsel).

b.     <em>Gagging During Interrogation.</em>

The government's descriptions of Mr. al-Marri's interrogations further confirm the abuse to which he was subjected.  One government document describes how on March 11, 2004, interrogators placed Mr. al-Marri in a chair with his hands and ankles shackled, while "the lead interrogator wrapped duct tape over al-Marri's mouth" and kept him in that condition for fifteen minutes, to force him to stop praying.  Exhibit 1.  The government acknowledges that in one session, Mr. al-Marri remained gagged for up to 15 minutes, and that interrogators used "cotton or cloth" and "four layers of duct tape."  *Id.*  Although the government asserts that that the cotton or cloth was not forced into Mr. al-Marri's mouth, it acknowledges that "at the end" of this treatment when the duct tape was being removed, Mr. al-Marri appeared to have "difficulty breathing" and appeared "to gag."  *Id.*

The government also acknowledges that interrogators physically and psychologically taunted Mr. al-Marri during this interrogation, by patting his face, forcing him to look at pictures of his family, pressing fingers under his chin, placing hands on his shoulders, rubbing his shoulders and sitting on his lap.  *Id.*

c.     <em>Threats of harm to Mr. al-Marri and his family members.</em>

Government officials threatened Mr. al-Marri, including by telling him they were going to send him to Egypt or to Saudi Arabia where he would be tortured and sodomized and where his wife would be raped in front of him.  Exhibit 21 at ¶ 25.  Interrogators also falsely informed

44

Mr. al-Marri that four of his brothers and his father were in jail because of him, and that his cooperation with interrogators could secure their release. *Id.* at ¶ 26. Interrogators further threatened Mr. al-Marri with enforced disappearance, suggesting that they would plant a false story about his escape in the news. *Id.* at ¶ 27. To ensure that Mr. al-Marri took these threats seriously, interrogators told him that they had made prisoners disappear before and would do so again if he refused to provide information. *Id.* at ¶ 27. Mr. al-Marri believed these threats noting, "They had total control over me." Exhibit 55.

In a document dated January 19, 2004, the government confirms that interrogators threatened to subject Mr. al-Marri's family to arbitrary detention and abusive treatment. Although the government's cursory summary does not contain all of the details of the threat that Mr. al-Marri first reported to his lawyers, Exhibit 21 at ¶ 25, the summary is remarkably similar to Mr. al-Marri's account in that it notes that the DIA threatened to "have the Saudi and Qatari authorities round up his family," if he did not cooperate and specifically mentioned Mr. al-Marri's siblings and some of their spouses. Exhibit 13. The document also notes that after threatening Mr. al-Marri, the DIA interrogators "reviewed [the] plan with the Consultant, who concurred and provided an outstanding suggestion for a reply if [Mr. al-Marri] refused to cooperate." *Id.* The following day when the interrogator returned for what the DIA described as a "confrontation" session "for a decision," the interrogator again threatened to make Mr. al-Marri's "family in Saudi Arabia and Qatar [] suffer the consequences of his refusal" noting they could not guarantee that his family would be treated respectfully. *Id.*

It is clear from this document, that the threat of arbitrary detention of family members in a country known for gross human rights violations in detention was part of a DIA "strategy" and "plan" to "shake" Mr. al-Marri that was developed with the use of a "consultant." *Id.* This

misconduct is consistent with threats to family members employed during other now impermissible interrogations conducted during the "War on Terror." *See infra* Part IVB (discussing CIA's use of threats to rape family members as reported by the CIA's Office of the Inspector General and the Senate Armed Services Report: Inquiry into the Treatment of Detainees in U.S. Custody).

The documents also demonstrate that this interrogation strategy included the use of a mental health "consultant," an unethical exploitation of Mr. al-Marri's emotional and psychological vulnerability. *See* Physicians for Human Rights, *Aiding Torture* Report, *supra* at 1 ("The very premise of health professional involvement in abusive interrogations — that they have a role in safeguarding detainees — is an unconscionable affront to the profession of medicine."); *see also* SASC Report discussed *infra* Part IVB. As is clear from the government's discovery disclosure, DOD issued a policy in 2005 that authorized mental health professionals called "Behavioral Science Consultants" to make "psychological assessments of the character, personality, social interactions, and other behavioral characteristics of interrogation subjects and provide advice" for interrogations, *see* Exhibit 41 — an improper exploitation and abuse of detainees' mental and emotional health that has engendered substantial criticism. *See, e.g.*, Mark Costanzo, et al. *Psychologists and the Use of Torture in Interrogations*, Analyses of Social Issues and Public Policy, Vol. 7 No. 1, 7 - 20 (2007); Stephen Soldz and Brad Olson, *Positive Illusions and the Necessity of a Bright Line Forbidding Psychologist Involvement in Detainee Interrogations*, Analyses of Social Issues and Public Policy, Vol. 7, No. 1 pp. 1-10 (2007). The government's January 19, 2004 interrogation summary suggests that the DIA improperly relied on "Behavioral Science Consultants" in Mr. al-Marri's case even earlier than the 2005 memorandum.

That the threat to Mr. al-Marri's family was intended to "shake" him and provoke psychological distress is also evident from the fact that the DIA closely monitored Mr. al-Marri's reaction. The government acknowledges that, after Mr. al-Marri was threatened, the DIA received a report from the Brig's Watch Supervisor in the SHU that when Mr. al-Marri "was brought to his cell, he again commenced praying." *Id.* A supervisor informed the DIA interrogator that the night after Mr. al-Marri's family was threatened, he "prayed for only a short time" after the interrogators left and that his normal routine had changed, with him exercising and praying less. Exhibit 13.

The threats to Mr. al-Marri's family caused him severe, psychological anguish. Mr. al-Marri feared that U.S. officials had harmed his wife and children, but had no way of confirming their safety. Exhibit 21 at ¶ 28. The inability to communicate with his family even as he did not know their fate compounded Mr. al-Marri's feelings of hopelessness, despair, and isolation. A DIA document dated March 15, 2004 noted that after interrogators left Mr. al-Marri alone in an interrogation room for two hours to look at photographs of his children, he said out loud to the photographs upon his departure from the room "see you in heaven." Mr. al-Marri was then placed on a modified Suicide Watch. Exhibit 15.

In addition, because the government has admitted destroying evidence bearing on the conditions of Mr. al-Marri's confinement, including his treatment during interrogations, *see* Josh White & Joby Warrick, *Detainee's Suit Says Abuse Was Videotaped*, Washington Post, Mar. 13, 2008; Defs.' Resp. at 10-11; *al-Marri v. Gates*, 05-cv-2259 (D.S.C. May 19, 2008) (citing Decl. of John Pucciarrelli, ¶¶ 3-4, Exhibit 3 to Defs.' Resp.; Decl. of Robert H. Berry, Jr., Defense Intelligence Agency, Exhibit 2 to Defs.' Resp.), an adverse inference arises that further incriminating evidence of Mr. al-Marri's abusive treatment during confinement existed at one

time.  *See, e.g., Crabtree v. National Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001) ("[I]f, being sensitive to the possibility of a suit, a company then destroys the very files that would be expected to contain the evidence most relevant to such a suit, the inference arises that it has purged incriminating evidence.") (quoting *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 272 (7th Cir. 1993)).  That presumption is particularly warranted here given that the government destroyed evidence bearing on Mr. al-Marri's treatment during the course of litigation in which that evidence was highly relevant.[12]

### B.  Mr. al-Marri's Treatment Is Further Corroborated By Public Documents Regarding A Now-Repudiated System of Detention and Interrogation.

Mr. al-Marri's treatment during his nearly six years of detention at the Brig is consistent and corroborated by a broader system of detention and interrogation deliberately calculated to provoke hopelessness and despair as a means of facilitating interrogation.  Mr. al-Marri's treatment — including the government's use of indefinite detention, extreme isolation, abusive interrogation techniques, as well as sensory deprivation and psychological pressure — parallels the interrogation practices utilized at other detention facilities in the "War on Terror."  This evidence is significant: Not only does it support Mr. al-Marri's account of unusually harsh conditions of confinement, but it also indicates that the government harmed Mr. al-Marri in bad

---

[12] The government has admitted to destroying:
(1) a still unspecified number of recordings of the government's interrogations of Mr. Almarri conducted at the Navy brig from his arrival on June 23, 2003, to "sometime in 2004," during which time Mr. Almarri was detained *incommunicado* and brutally abused;
(2) "notes and working papers associated with those [interrogation] sessions"; and
(3) almost five years worth of continuous recordings made by a digital video recording system at the Navy brig that meticulously documented Mr. al-Marri's treatment and conditions of confinement in his housing unit since the outset of his detention at the brig on June 23, 2003, until April 10, 2008.
Defs.' Resp. at 10-11; *al-Marri v. Gates*, 05-cv-2259 (D.S.C. May 19, 2008) (citing  Decl. of John Pucciarrelli, ¶¶ 3-4, Exhibit 3 to Defs.' Resp.; Decl. of Robert H. Berry, Jr., Defense Intelligence Agency, Exhibit 2 to Defs.' Resp.).

faith — intentionally subjecting him to severe isolation, indefinite detention, and abusive and degrading treatment in order facilitate interrogation — a relevant factor when evaluating whether a downward departure is warranted.  *See infra* Part IVC.

For example, fomenting a detainee's "disorientation and disorganization" in order to "enhance and exploit" interrogations was written policy at Guantánamo in 2003.  Exhibit 22 at 25.  The Department of Defense's Standard Operating Procedures for Guantánamo noted the importance of "isolating the detainee and fostering dependence of the detainee on his interrogator." *Id.*  Those procedures provided that — just as in Mr. al-Marri's interrogations — during the initial phase of interrogation, detainees should be denied contact with all persons except interrogators.  *Id.*  And as noted above documents released pursuant to the Freedom of Information Act, make clear that the Brig was ordered to follow the procedures developed for Guantánamo, even though it was against Brig officials' better judgment.  Exhibit 6 (FOIA emails).

Moreover, it is also now well-documented and publicly acknowledged that government officials reverse-engineered physically abusive techniques and methods of psychological pressure developed in the military's Survival Evasion Resistance Escape ("SERE") program — which aimed to help U.S. servicemen survive and resist coercion under torture if captured abroad — for offensive use on so-called "War on Terror" detainees.  A report by the Senate Armed Services Committee released in 2009 confirms that government officials used isolation, induced debilitation, threats, and degrading treatment to exert physical and psychological pressure on detainees held overseas — at Guantánamo, in Afghanistan and Iraq, as well as at CIA "black sites." *See, e.g.,* S. Comm. of the Armed Services, Inquiry into the Treatment of Detainees in

U.S. Custody, 110th Cong., 2d Sess. xiii-xv, xix-xx (Nov. 20, 2008) ("SASC Report");[13] *see also* Jane Mayer, THE DARK SIDE: THE INSIDE STORY OF HOW THE WAR ON TERROR TURNED INTO A WAR ON AMERICAN IDEALS   157-64 (2008).[14]   The SASC Report makes vividly clear that "consultants" — apparently like those referred to in the DIA summaries released in this case, *see* Exhibits 13, 17 — provided instruction in the use of these improper techniques against detainees in U.S. custody.   *Id.* at xix-xxii; at xiv-xv (quoting testimony of Lieutenant Colonel Baumgartner, Chief of Staff of the Joint Personal Recovery Agency ("JPRA"), of which the SERE program was a part, that JPRA "offer[ed] exploitation assistance to those government organizations with the mission of gleaning intelligence from enemy detainees").   And it appears that SERE officials extended their consultations to the U.S. Naval Brig in South Carolina. Exhibit 41 (DOD policy authorizing mental health professionals called "Behavioral Science Consultants" to "provide advice" to interrogators at the Brig).   That Mr. al-Marri's treatment was consistent with a broader program of deliberate isolation, induced debilitation, threats, and degrading treatment — developed with the help of mental health consultants and intended to render detainees helpless and vulnerable — demonstrates that Mr. al-Marri's accounts of mistreatment are credible and accurate.   This treatment was fundamentally inconsistent with the protections afforded by the United States Constitution and basic human rights standards; it most certainly is far more severe than that suffered by a typical prisoner.   As the Senate Armed Service Committee concluded, the use of SERE techniques offensively "was at odds with the commitment to humane treatment of detainees in U.S. custody."   SASC Report at xxvi.

---

[13] *available at* http://levin.senate.gov/newsroom/supporting/2009/SASC.DetaineeReport.042209.pdf

[14] Although the SASC report focused on the treatment of detainees in DOD custody, it did not, address or analyze the treatment of detainees at the Consolidated Naval Brig in Charleston.

Moreover, the recently released report of the Central Intelligence Agency's ("CIA") Office of Inspector General ("OIG"), *Special Review: Counterterrorism Detention and Interrogation Activities* (September 2001 - October 2003), confirms that many of the same repudiated methodologies employed by the government against other "War on Terror" detainees were used against Mr. Al-Marri. The CIA's OIG report, in particular, describes "specific unauthorized" techniques improperly used by CIA interrogators abroad that were also utilized by DIA interrogators against Mr. Al-Marri.

For example, the report discusses the OIG's investigation into an interrogation that appears similar to one of Mr. Al-Marri's. The report notes that during an oversees interrogation, a CIA official reportedly threatened a detainee's family, noting that if he did not talk "We could get your mother in here" and "We can bring your family in here." Exhibit 23 ¶ 42. The OIG noted that the official was reportedly attempting "for psychological reasons" to exploit Middle Eastern detainees' well-known fear of an "interrogation technique [that] involves sexually abusing female relatives in front of the detainee." *Id.* The report further notes that the OIG investigated another case in which an interrogator purportedly threatened a detainee's children. *Id.* The report also confirms that another improper technique used by DIA interrogators against Mr. al-Marri, was also used by CIA interrogators abroad: subjecting detainees to cold temperatures to facilitate interrogation. *Id.* at ¶ 178 (noting one interrogation plan that "used an air conditioner" and "deprivation of warm clothing/blankets" to increase a detainee's "physical comfort level to the point where he may lower his mental/trained resistance abilities").

Indeed, several of the so-called "Enhanced Interrogation Techniques" discussed in the OIG Report, which have since been repudiated by President Obama,[15] were specifically utilized during Mr. al-Marri's interrogations.  In particular, DIA interrogators used the "the attention grasp" which the OIG report describes as consisting of "grasping the detainee with both hands, with one hand on each side of the collar opening, in a controlled and quick motion," and drawing the detainee toward the interrogator "in the same motion."  *Id.* at 15.  Interrogators also used the "facial hold," which the OIG report describes as an interrogator holding "the detainee's head immobile" while he "places an open palm on either side of the detainee's face and the interrogator's fingertips are kept well away from the detainee's eyes."  *Id.*  The government's summaries of Mr. al-Marri's interrogations seem to reflect the use of these techniques.  *See, e.g.*, Exhibit 1 (acknowledging that interrogators patted Mr. al-Marri's face and pressed fingers under his chin).

This publicly released evidence regarding improper methods of detention and interrogation that coincide with Mr. al-Marri's treatment further corroborates his account of unusually harsh conditions of confinement while also demonstrating that his treatment was part of a larger, now-repudiated program designed to improperly provoke hopelessness and despair as a means of facilitating interrogation.  Perhaps the best proof of that improper mission and purpose is from the public statements of the Director of the Agency responsible for Mr. al-Marri's interrogations in 2003.  Referring to another enemy combatant held in similar conditions of indefinite detention and isolation at the Brig, Jose Padilla — though conditions which were

---

[15] Specifically, through an Executive Order issued at the start of his term, President Obama shuttered the CIA's secret and indefinite detention program, directed officials to treat all detainees humanely, and prohibited all government officials from relying upon any methods of interrogation not outlined in the Army Field Manual.  Exec. Order No. 13,491, 74 Fed. Reg. 4,893 (Jan. 22, 2009).  He also rescinded all Office of Legal Counsel memoranda purporting to authorize the mistreatment of detainees, including detainees in CIA and DOD custody.  *Id.*

even slightly less onerous than Mr. al-Marri's — Vice Admiral Lowell E. Jacoby, Director of the DIA noted in a court filing that "[o]nly after such time that [a detainee] has perceived that help is not on the way can the United States reasonably expect to obtain all possible intelligence…." Exhibit 44.

## V.    MR. AL-MARRI'S SIGNIFICANT TRANSFORMATION DURING CONFINEMENT.

In spite of his unusually harsh treatment in confinement, and his earlier mistakes and poor judgment, Mr. al-Marri has experienced an extraordinary transformation during his eight years of confinement:  he has developed meaningful relationships with his American attorneys, has grown to enjoy U.S. culture, and has exhibited genuine respect and gratitude for our country's men and women in uniform.  This evidence, showing that Mr. al-Marri is a thoughtful, non-violent, individual, who enjoys such uniquely American pursuits as NASCAR and cares deeply about many of the Americans that have helped him through his difficult experience, reveals a fuller picture of who Mr. al-Marri is as a person and who he will be upon his release from prison.  As set forth in Part V below, this evidence is material to several of the factors that this Court must consider under section 3553(a), in order to arrive at "a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing;  it warrants a sentence beneath the Guidelines.

Remarkably, even after being subjected to severe isolation, abuse, and deprivations, including being unable to speak with his family until late 2007 such that several of his children think of him as a stranger, Mr. al-Marri harbors no ill-will toward his custodians at the Brig and elsewhere or against the United States in general.  Although Mr. al-Marri has suffered substantial emotional and psychological trauma from his ordeal, Exhibits 45,  55, even in his darkest hours, he never swore retribution or expressed any intent to be an enemy of the United States.  Instead,

he has sincerely and consistently expressed gratitude to those who have shown him kindness and respect during a difficult and sometimes hopeless period.

Mr. al-Marri's own words demonstrate that, in spite of the extraordinary conditions in which he was living, and the psychological trauma that those conditions caused, he nevertheless exhibited surprising humility and graciousness. In a March 6, 2008 letter to his attorneys, for example, Mr. al-Marri referred to them as his family, noting "[n]ow, you are also my medical consultant, it is not enough that you are my pro bono lawyer, supply officer, treasurer, pen pal, social help. In short, that is what my Arabian family would have done and that is why I call you family." Exhibit 69. In another letter, he expressed regret "for the repeated and continuous requests from me," noting, "but you are my only window to the world." Exhibit 70. In closing, he noted "May Allah never put you in a position of need and if he does, to send a wonderful and gracious rescue as he sent you to me." *Id.; see also* Exhibit 66.

Although the government's summaries of DIA interrogation records attempt to portray Mr. al-Marri as an individual who was not only demanding but maliciously non-compliant with Brig regulations, that characterization of Mr. al-Marri is, in truth, inaccurate and belied by the evidence which renders a much fuller picture of who he is. In a March 14, 2005 letter to his attorneys, he expressed appreciation for "being so patient & generous in accommodating my needs." Exhibit 46. In another letter, he noted: "I truly thank you from the bottom of my heart…" Exhibit 36.

In addition to expressing gratitude, Mr. al-Marri has also shown sincere concern for the welfare of others, expressing concern not only for his attorneys, but their families, as well. *See* Exhibit 68, (Jan. 4, 2008 Letter from Al-Marri) ("I hope you and the family, especially the little ones, is in the best health. May Allah keep the family in good health and love."). When one of

Mr. al-Marri's attorneys experienced a family medical emergency, he exhibited a genuine ability to empathize with other persons' pain. Exhibit 71 (Mar. 15, 2008 Letter from Al-Marri) ("I hope your [grandson] be better soon. I will pray for his well being God willing. I told Andy, if he does not feel good in the next few days, please call me with him and I will pray for his well being.").

Significantly, Mr. al-Marri's ability to recognize and appreciate the kindness of others, as well as empathize with their individual burdens, was not reserved solely for his attorneys. In a March 2, 2006 letter, he expressed appreciation for the efforts of those at the Brig who sought to treat him humanely and endeavored to improve his conditions of solitary confinement. Noting that he knew his problem of indefinite detention was not something caused by Brig personnel, Mr. al-Marri expressed appreciation that the leaders of the Brig shook his hand when visiting him, that guards stopped putting leg irons on him when they brought him to the shower, and that the Brig staff seemed genuinely concerned about his well-being. Exhibit 64. Indeed, Mr. al-Marri never hesitated to recognize the good intentions of the guards or medical staff. *See* Exhibit 62 (June 17, 2005 Letter from Al-Marri) (noting that he met a new member of the medical staff and that "he is a good man"); Exhibit 35 (July 10, 2006 Letter from al-Marri) (recognizing that Brig staff "do small things I ask for it shows me that they mean no harm to me"). Often, Mr. al-Marri showed enormous self-awareness and understanding regarding the difficult circumstances in which both he and his custodians found themselves. *See id.* ("I don't wish to make things harder for them here, but I am doing it and they do not wish either to make things harder for me, but they are doing it."). That Mr. al-Marri exhibited qualities of kindness, self-reflection, and the capacity for transformation is also reflected in a memorandum that the Commanding Officer of the Brig sent to Mr. al-Marri in 2006. It states: "I have read your response to my letter of 08 May 2006 regarding the non-compliance of 07 May 2006. I agree

that humans make mistakes and appreciate your statement that you 'lost your head.'  Staff has reported that your composure has returned and I thank you for regaining your self-control." Exhibit 65;

The fact is that a real understanding of Mr. al-Marri's behavioral issues during his eight years of solitary confinement leads inexorably to the conclusion that they were not hostile acts motivated by the desire to harm anyone.  Rather, when Mr. al-Marri "acted out" he did so to understandably protest his indefinite detention and the isolation that made him feel as if he was "losing his mind."  Exhibit 21 at ¶ 46.  As the Declaration of Dr. Stuart Grassian explains, Mr. al-Marri's behavior at the Brig exhibited tell-tale signs of the psychological trauma associated with prolonged and severe solitary confinement.  Exhibits 45; Exhibit 55 at 4 (noting that Mr. al-Marri experienced visual and auditory illusions, as well as  "paranoid preoccupation with his conditions of confinement [that] would become unbearable").  Dr. Grassian notes that Mr. al-Marri's action were designed to "allow his mind some relief" from the torment.  *Id.*  But significantly, as Dr. Grassian notes, when Mr. al-Marri's conditions improved and his severe isolation was alleviated even slightly, many of his preoccupational obsessions did as well.  *Id.*

Perhaps even more telling of Mr. al-Marri's transformation, as well as of his fundamentally non-violent and respectful nature, is that in spite of his protests of Brig rules or his inability to conform to the rules in light of his psychological condition, as the years went on, Mr. al-Marri's custodians did not consider him to be a security threat.  *See* Exhibit 78 (Memorandum Regarding Vacation of Special Administrative Procedures, July 7, 2009).  Petty Officer David Heatherly, one of the guards at the Brig, testified at Mr. al-Marri's detention hearing that Mr. al-Marri never hoarded contraband or any offensive weapon, never tried to escape, and never threatened the security of the institution whatsoever.  Exhibit 59 at 65.  In fact,

Officer Heatherly explained that during the more than two years he spent guarding Mr. al-Marri at the Brig, he never heard him express any hatred for America or any intent to cause anyone harm.  Exhibit 59 at 65.  The testimony of Sanford Seymour, the technical director at the Brig, echoed that assessment, noting that Mr. al-Marri never caused harm to the Brig personnel. Exhibit 59 at 57:1-9.  It is anticipated that Mr. Seymour will recount this assessment again in his forthcoming testimony at the sentencing hearing.

Even in his protests, Mr. al-Marri tried his best to remain respectful of guards and officers at the Brig.  In fact, Mr. al-Marri anticipates introducing testimony at the sentencing hearing from Commander John Pucciarelli, the Commanding Officer of the Consolidated Brig during part of Mr. al-Marri's last two years of detention, describing that while Mr. al-Marri sometimes threw food or other items to demonstrate concerns about his conditions of confinement, he would first warn the staff, so that they could move out of the way.  *See also* Exhibit 56 (Letter of Mark Berman, Esq.) (noting "never in my entire career have I heard of an inmate, like Mr. Al-Marri, who before engaging in such symbolic protests [as throwing food] warned the soldiers guarding him to move out of the way so their uniforms would not be sullied").  Moreover, when Mr. al-Marri gave his word that he would stay in compliance with Brig rules, he did so.  *See* Exhibit 23 (May 10, 2005 Letter from Al-Marri) (noting in a letter to his attorneys "Andy, I gave you my word to be in compliance & I do stand by my word"); *see also* Exhibit 57 (January 11, 2006 Special Housing Unit Visitation Form signed by Brig official, Stan Davis, noting "very cordial conversation" with Mr. al-Marri and that he "restated that he has given his word to be compliant and will continue").

Additionally, by way of proffer, Commander Pucciarelli will address in his testimony at the sentencing hearing how when the Brig staff made a concerted effort to treat Mr. al-Marri

respectfully, Mr. al-Marri responded in kind.  The Commander will note how Mr. al-Marri was very respectful of him during a meeting with the Commander before he left his position at the Brig, and expressed thanks for his treatment by the staff and how they worked to improve his conditions.  Commander Pucciarelli will also explain how when the Commander took steps to grant Mr. al-Marri greater privacy, such as allowing him to put a sheet up around the toilet in his cell, Mr. al-Marri responded positively.

In fact, during Mr. al-Marri's later years at the Brig, Mr. al-Marri was not only respectful of the Brig staff, he even engaged in friendly conversations with the guards.  *See* Exhibit 60 (January 12, 2007 Letter from Andy Savage to Commanding Officer) (noting Mr. al-Marri's "change in attitude and his more 'positive' outlook over the past several years has been quite significant.  I attribute that to the professionalism of your staff and the respect that they accord him during their daily interactions.").  As Officer Heatherly testified at the detention hearing, Mr. al-Marri embraced American culture, even becoming a fan of NASCAR after Officer Heatherly introduced him to the sport.  Exhibit 59 at 65:25; 66:1-2.  After the Brig arranged for Mr. al-Marri to have a television, he watched NASCAR on Sunday afternoons, and as Commander Pucciarelli will testify at the detention hearing, even shared his TV with the guards on duty, turning it toward them so that they could, for example, watch the Super Bowl, which Mr. al-Marri understood was something that meant a great deal to them, although it did not to him.

In a testament to Mr. al-Marri's transformation, in his final "chit" — the prisoner request forms that Mr. al-Marri had used for years to relay complaints about his conditions of confinement to the Brig supervisors — instead of expressing final complaints or regrets, Mr. al-Marri conveyed his appreciation.  On March 10, 2009, the day Mr. al-Marri was transferred back to the criminal justice system, he wrote to the Commander:  "I would like to extend my thanks

and gratitude to you and your staff for the continuous professionalism . . . especially today.  Do please convey that same to the [U.S.] Marshals.  They were utmost professional and humane. Thank you."  Exhibit 52.  Mr. al-Marri developed cordial relationships with other government officials, as well.  Exhibit 77 (Letter from Special Agent Tim Kirkham to Mr. al-Marri).  This evolution in Mr. al-Marri's outlook was no doubt occasioned by  his change in circumstances: He went from a prisoner held in indefinite detention without any legal process or access to counsel, to an individual afforded the full protection of his most basic constitutional rights.

This evolution is also evident in Mr.  al-Marri's decision to take responsibility for his crime, to cooperate with the government, and to admit his wrongdoing in the Plea Agreement. Indeed, on the day before the plea hearing, Assistant United States Attorney David Risley and Special Agent Tim Kirkham interviewed Mr.  al-Marri in the presence of his counsel.   At this time, the government was  polite and respectful of Mr.  al-Marri, candid in acknowledging the extent as well as the  limits of its proof.  Perhaps not surprisingly, Mr. al-Marri cooperatively answered their questions  once he was finally  treated with dignity and afforded his most basic constitutional rights.

All of this evidence reveals that Mr. al-Marri is not an individual who has been hardened by hatred or who is motivated by anger, violence, or retribution.  Rather, he is someone who through who his own capacity for understanding and self-awareness has been transformed by the kindness and respect of others during an otherwise difficult experience that could have easily left him bitter and angry.  That transformation has been witnessed first hand by one of Mr. al-Marri's attorneys, Mark Berman, one of the few people who has had direct contact continuously with Mr. al-Marri throughout the six and half years of his detention, and who developed a close personal relationship with his client.

In a letter to the Court, Mr. Berman describes his confidence that Mr. al-Marri has "demonstrated the skills and self-awareness necessary to change." Exhibit 56 at 3. He notes that despite holding very strong political and religious views, Mr. al-Marri also "proved eager to learn" about Judaism, "to hear opposing viewpoints, and to consider whether they could be reconciled with his religious view of the world." *Id.* Even after intense debates with Mr. al-Marri in 2006 regarding the Second Lebanon War, Mr. Berman, who describes himself as a patriotic American and "Zionist with a deep love for the State of Israel," observed that Mr. al-Marri "demonstrate[d] the ability to listen, to understand, and to consider new ideas and views contrary to his own." *Id.* at 2, 4.

Mr. Berman firmly believes that Mr. al-Marri's transformation has come about not because of the brutality of his early treatment or his ongoing isolation. Rather, he believes that Mr. al-Marri has been influenced by the kindness and respect shown to him by Americans. *Id.* He notes: "It appears to me that Mr. al-Marri has been moved by the relationships he has formed with his defense attorneys — especially Cheryl & Andy Savage — as well as by his interactions with those soldiers, sailors, officers and enlisted men, who endeavored to treat him with honor, fairness, and integrity, once the DIA ceased its interrogations of him at the Brig." *Id.* For example, Cheryl Savage, an officer manager at a law firm representing Mr. Al-Marri, spent "untold" hours with Mr. Al-Marri, conversing and learning about his family Exhibit 59 at 30:15-20. She cooked for him while he was at the Brig and he told her about his cuisine from home. Exhibit 59 at 17 -20. As Mr. Berman notes, this treatment was "a facet of American character to which [Mr. Al-Marri] had not previously been exposed, or which he did not previously appreciate." Exhibit 56, at 3. Because of these meaningful relationships and shared experiences that have changed Mr. al-Marri forever, Mr. Berman is confident that "regardless of the acts that

he may have been prepared to engage in when he arrived in the United States over 8 years ago . . . he would not perform those acts today." *Id.* at 5.

In sum, there is no evidence that Mr. al-Marri is a person filled with rage or that he possesses any desire to harm the United States. Rather, he is a man, who, humbled, already severely punished, and still bearing the psychological and emotional scars of years of brutal treatment and severe isolation, including symptoms of Post-Traumatic Stress Disorder, Exhibit 55, is extremely grateful to those who have treated him humanely and who have tried to help him resolve the indeterminacy of his confinement. This extraordinary transformation during confinement should factor heavily in this Court's determination of "a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing.

## VI.    LEGAL ARGUMENT

### A.    Introduction

In the sections that follow, Mr. al-Marri, following the prescribed sentencing analysis, provides the legal and factual basis for an appropriate sentence below that suggested by the advisory Sentencing Guidelines. Since ruling in *United States v. Booker*, 543 U.S. 220, 245 (2005), that the United States Sentencing Guidelines ("Guidelines") are merely advisory, the Supreme Court has outlined the procedures to be followed by district courts in fashioning criminal sentences. First, the Court must accurately calculate the applicable, advisory Guideline range for the defendant. *See Gall v. United States*, 552 U.S. 38, 128 S.Ct. 586, 596 (2007); *United States v. Rita*, 551 U.S. 338, 127 S.Ct. 2456 (2007), *United States v. Cunningham*, 429 F.3d 673, 675 (7th Cir. 2005). Next, the Court must consider and rule upon the parties' arguments for a departure from that Guideline range. *See Gall*, 128 S.Ct. at 596; *United States v. Dean*, 414 F.3d 725, 727 (7th Cir. 2005). Finally, the Court must consider whether and how each of the factors set forth in 18 U.S.C. § 3553(a) apply in the given case. *Rita*, 551 U.S. at

351; *United States v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006), *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007) ("The district courts must calculate the advisory sentencing guideline accurately…but ultimately they must sentence based on 18 U.S.C. § 3553(a)"). Based on the facts before it, the Court "must make an individualized assessment" of the defendant and the offense in order to arrive at an appropriate sentence, *i.e.*, one that is "sufficient but not greater than necessary to comply with the purposes" of sentencing. *Gall*, 128 S.Ct. at 597. In so doing, the Court must consider all of a defendant's "principal arguments that 'are not so weak as to not merit discussion.'" *United States v. Villegas-Miranda*, --F.3d---, 2009 WL 2616039 (7th Cir.) (No. 08-2308) (quoting *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)); *see also United States v. Aguilar-Huerta*, 576 F.3d 365, 367 (7th Cir. 2009) (noting that sentencing court "may not ignore substantial arguments for deviating" from the guidelines). Finally, the Court must articulate its reasons for arriving at its sentence with sufficient clarity to allow for meaningful appellate review. *Rita*, 551 U.S. at 356-57; *United States v. Omole*, 523 F.3d 691, 697 (7th Cir. 2008); *see also* 28 U.S.C. § 3553(c).

Although the Guidelines are the "starting point and initial benchmark" of a district judge's analysis, *Gall*, 128 S.Ct. at 596, the Court "may not presume that the Guidelines range is reasonable." *Gall*, 128 S.Ct. at 596-97. As the Supreme Court recently emphasized in *Nelson v. United States*, 129 S.Ct. 890, 892 (2009) (per curiam), "The Guidelines are not only *not mandatory* on sentencing courts; they are also not *presumed* reasonable." (emphasis in original.) Thus, the district judge "*must* not…begin with a presumption in favor of a Guideline sentence." *United States v. Bartlett*, 657 F.3d 901, 909 (7th Cir. 2009) (emphasis in original). Indeed, the Court "need not use the Guidelines as the fulcrum of the analysis" so long as the court

demonstrates that it "understand[s] the relation between the Guidelines and the ultimate sentence. *Id.*

This comprehensive and individualized approach ensures that the district court fashions a sentence meeting the statutory mandate of Section 3553(a)—that the court "shall impose a sentence sufficient, but not greater than necessary to comply with the purposes" of sentencing. Given the reasons set forth herein, including Mr. al-Marri's low level of knowledge regarding the operations of al Qaeda, his lack of connection to any specific mission or plan, and the severity of his conditions of confinement—including solitary confinement, prolonged indefinite detention, and abusive treatment—in the years leading up to this proceeding, Mr. al-Marri respectfully submits that the appropriate sentence in this case is one that is well below the statutory maximum of 180 months. Indeed, a sentence of time served, as set forth below, would be entirely appropriate.

### B.  Guideline Sentence

As dictated by *Rita* and *Gall*, and in accordance with the law of the Seventh Circuit, *see, e.g.*, *United States v. Hunt*, 574 F.3d 439, 442-43 (7th Cir. 2009), the Court must begin its sentencing analysis by properly calculating the Guideline sentence for Mr. Al-Marri. *See United States v. Bartlett*, 657 F.3d 901, 909 (7th Cir. 2009).  Under the advisory Guidelines, the offense to which Mr. al-Marri has pled guilty, 18 U.S.C. § 2339B(a)(1), carries a base offense level of 26.  U.S.S.G. § 2M5.3(a).  Per the plea agreement, the parties have agreed that the terrorism enhancement of U.S.S.G. § 3A1.4(b) applies, Plea Agreement at 7, ¶ 14c, and that Mr. al-Marri should receive downward adjustments to his offense level of two points pursuant to section 3E1.1(a) for acceptance of personal responsibility, Plea Agreement at 6, ¶ 14a, and of one point pursuant to section 3E1.1(b) for timely notification of his intent to enter a plea, Plea Agreement at 7, ¶ 14b.

These parameters are not in dispute. There are, however, two Guidelines issues that require resolution before addressing issues of departure and variance, and therefore, before Mr. al-Marri's ultimate sentence may be determined. These two issues, both of which arise from the nature and scope of his admitted offense conduct, are discussed *seriatim* below.

1. **An upward adjustment for Specific Offense Characteristics is not warranted because Mr. al-Marri did not support a specific mission or plan.**

The PSR concludes that a two-level upward increase to the offense level is warranted in recognition of the specific offense characteristic set forth in U.S.S.G. § 2M5.3(b)(1)(E), which addresses offenses involving the provision of "funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." U.S.S.G. § 2M5.3(b)(1)(E); PSR ¶ 56. Mr. al-Marri has objected to the inclusion of this adjustment in the PSR, and continues to dispute its applicability to his sentence.

The plain language of § 2M5.3(b)(1) indicates that the Sentencing Commission intended for this increase to apply where a defendant's actions supported a *particular* violent act. The requirement of specificity arises from the choice of the phrase "a violent act," rather than "violence" or "terrorism" more generally. Neither the plea agreement nor any other material before the Court, however, provides any factual basis for applying this increase. The carefully negotiated Plea Agreement states only that Mr. al-Marri conspired to provide material support to an organization, namely al Qaeda. Plea Agreement at 2, ¶ 3. And the only material support Mr. al-Marri conspired to provide, per the Plea Agreement, was "personnel, including himself, to work under al Qaeda's direction or control." Plea Agreement at 3, ¶ 7. There is no evidence, nor has the Government ever alleged the existence of any evidence, to establish that Mr. al-Marri

took any actions or provided any support with respect to the commission of a particular violent act.

It is true, as stipulated, that Mr. al-Marri was aware at the time that he entered into the conspiracy that al Qaeda had perpetrated specific violent acts in the past, Plea Agreement at 11, ¶ 20, and that "al Qaeda had engaged and was engaging in terrorist activity." Plea Agreement at 9, ¶20. But Mr. al-Marri was not aware of the attacks of September 11, 2001 before they occurred, PSR ¶38, nor was he aware of any specific plan or operation in which he was to become involved. He was, as the government has claimed throughout, a "sleeper agent," and his offense was not only inchoate, but it was entirely undefined. Thus, although Mr. al-Marri admits to having entered into a conspiracy with the intent to "further the terrorist activity and terrorism objective of al Qaeda," Plea Agreement at 9, ¶20, his intent was never fulfilled — he was deployed, as a sleeper agent, to the United States but he was awaiting further instruction in Peoria, Illinois. Thus, no one knows, or could know, what form, if any, his support of al Qaeda may have taken. Specifically, no one knows or could know and the government cannot prove, as it must in order for this enhancement to apply, *see, e.g., United States v. Guadagno*, 970 F.2d 214, 221 (7th Cir. 1992) (the government bears the burden of proving a specific offense characteristic justifying an enhancement of a defendant's sentence), whether Mr. al-Marri was to commit or assist in the commission of a violent act, within the meaning of U.S.S.G. § 2M5.3(b)(1)(E).

Had Mr. al-Marri agreed to be deployed to the United States by al Qaeda for the purpose of carrying out a particular mission or plan, then this increase might be indicated. *See*, *e.g.*, *United States v. Aref*, 2007 WL 804814 (N.D.N.Y.) (No. 04-CR-402) (applying two level enhancement under 2M5.3(b)(1)(E) against defendant convicted of 18 U.S.C. §2339B where

facts established that the defendant laundered funds for importation of a surface-to-air missile for use in a planned attack on the Pakistani Ambassador in New York City). However, Mr. al-Marri's offense conduct, *see* PSR ¶¶ 18-48, stops well short of any such directed behavior. Notably, the Government, in its Sentencing Memorandum, does not argue for the application of a two level upward increase in the offense level pursuant to § 2M5.3(b)(1)(E). Under the facts of this case, it could not. The adjustment should not apply.

      **2.**     **Mr. al-Marri qualifies for a downward adjustment given his limited role in the offense**

The Presentence Report makes no adjustment for the defendant's role in the offense. PSR ¶58. Respectfully, Mr. al-Marri submits that, in fact, his Guideline range should be adjusted downward pursuant to U.S.S.G. § 3B1.2 in order to reflect his role as an insignificant player not only in the overall operation of al Qaeda, but especially in the conspiracy with which he was charged and to which he pleaded guilty.

Specifically, section 3B1.2 of the Guidelines provides that if a defendant was a "minimal participant in any criminal activity," a four level downward adjustment in offense level is warranted. U.S.S.G. § 3B1.2(a). Likewise, if "the defendant was a minor participant in any criminal activity," a decrease by two levels is warranted. U.S.S.G. § 3B1.2(b). If the defendant's offense conduct falls between (a) and (b), a decrease by 3 levels is appropriate. U.S.S.G. § 3B1.2.

Mr. al-Marri bears the burden of demonstrating his entitlement to a minimal- or minor-role adjustment by a preponderance of the evidence. *See United States v. McKee*, 389 F.3d 697, 700 (7th Cir. 2004). An adjustment under this section is available to a defendant who "plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, cmt. n.4; *United States v. Corral*, 324 F.3d 866, 874 (7th Cir.

2003).  In making this determination, a district court should "weigh…the totality of the circumstances" of the "facts of the particular case."  U.S.S.G. §3B1.2, cmt. n.3(c).  Factors indicating applicability of the adjustment include a defendant's lack of responsibility and position within the conspiracy, *United States v. Mendoza*, 457 F.3d 726 (7th Cir. 2006), and "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others."  U.S.S.G. § 3B1.2, cmt n.4; *United States v. Stephenson*, 53 F.3d 836, 850 (7th Cir. 1995).  Conversely, possession of "an intimate knowledge of the [conspiracy's] inner workings" indicates that a defendant played more than a minor or minimal role.  *Id.*, 53 F.3d at 850.  An additional factor to be considered is the defendant's relationship with the enterprise's principal members.  *Mendoza*, 457 F.3d at 730.  A defendant who enjoys "the utmost trust and confidence" of an enterprise's principal members is not a minor participant in that enterprise. *Id.*; *see also United States v. Bautista*, 532 F.3d 667, 670 (7th Cir. 2008) (finding that defendant was "not at the top" but nonetheless played more than a minor role because he was trusted to witness major transactions of the enterprise).

Certainly, the government does not and could not contend that Mr. al-Marri played a major role in the scope of al Qaeda's overall operations.  However, "context cannot be disregarded in assessing…eligibility for a mitigating role reduction."  *United States v. Hill*, 563 F.3d 572, 578 (7th Cir. 2009) (reversing district court for denying adjustment because defendant, involved with gun smuggling, was only convicted of felon-in-possession offense); *see also* U.S.S.G. Chapter 3, Part B, intro. cmt ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct)…and not

solely on the basis of elements and acts cited in the count of conviction").[16]  Here, that context is defined by al Qaeda.  After all, the government's interest in initially interviewing and later arresting, detaining, interrogating and ultimately indicting Mr. al-Marri is and has always been his involvement with al Qaeda, and not any individual crimes that he may have committed.  In sentencing Mr. al-Marri, this Court must, then, consider the minor role that he played in the vast operations and far flung terrorist activities of al Qaeda as a whole.  *See Hill*, 563 F.3d at 579 (admonishing district court not to "divorce the offense of conviction from the surrounding facts").

That said, Mr. al-Marri also played a mitigating role in the offense as it is described in detail in the Plea Agreement and PSR, with respect to the particular conspiracy to provide material support to al Qaeda for which he was indicted and to which he has pled guilty.  The essence of Mr. al-Marri's conduct is as follows:

- He attended various training camps, at which he learned basic military techniques and stayed in safehouses in Pakistan, run by and for the benefit of Al Qaeda. Plea Agreement at 10, ¶ 20; PSR ¶¶ 19-20.

---

[16] *Hill* recognizes that a 2001 amendment to the comments of section 3B1.2 effectively overruled prior circuit precedent holding that where a defendant is sentenced solely for his own criminal conduct and not the conduct of the other participants in the concerted activity, that defendant is ineligible for a mitigating role adjustment.  563 F.3d at 577.  The reasoning of *Hill*, and its reversal of the district court for "treat[ing] Hill's possession of a gun as no different (and no less culpable) than anyone else's possession," thus invalidating prior Circuit precedent holding that the relevant inquiry for a district court in applying section 3B1.2 is "whether the defendant was a minor [or minimal] participant in the crime for which he was convicted, not whether he was a minor [or minimal] participant in some broader conspiracy that may have surrounded it."  *United States v. Corral*, 324 F.3d 866, 874 (7th Cir. 2003) (citing *United States v. Brown*, 136 F.3d 1176, 1185-86 (7th Cir. 1998)); *see also United States v. Beltran*, 109 F.3d 365, 370 (7th Cir. 1997) ("[B]ecause he was only charged and held accountable for the one transaction in which he admittedly was involved, Beltran played an integral and significant rather than a minor role in the offense for which he was held accountable"); *United States v. Lampkins*, 47 F.3d 175, 181 (7th Cir. 1995) ("[I]t makes no sense to claim that one is a minor participant in one's own conduct").

- He offered his services to Al Qaeda, and in 2001, Khalid Sheikh Mohammed (KSM), then chief of external operations for Al Qaeda, directed him to meet with Mustafa al Hawsawi; communicate via email using certain protocols and codes; to enter the United States by September 10, 2001; and remain there for an undetermined amount of time. Plea Agreement at 11-12, 14¶ 20; PSR ¶¶ 20-25.

- Mr. al-Marri obtained a student visa and entered the United States with his family on September 10, 2001. He used an email communication to inform KSM that he had arrived. Between September 23, 2001 and November 4, 2001, he made completely unsuccessful attempts to communicate with al Hawsawi and others. Plea Agreement at 15-16, ¶ 20; PSR ¶ 42-43.

It has also been stipulated that Mr. al-Marri took certain actions that are "consistent with" Al-Qaeda-directed behavior, including researching online information about various cyanide substances and sulfuric acid, Plea Agreement at 16, ¶ 20, and using an unspecified "anonymizer" program on his laptop, *id.* at 17. In addition, an almanac recovered from Mr. al-Marri's home was bookmarked to pages showing unspecified dams, waterways, and tunnels in the United States. *Id.*[17] Mr. al-Marri maintains that his online research related to chemicals was directed at exploring the possibility of selling chemicals to a company in Qatar where his cousin formerly worked. PSR ¶ 48; *see also* Exhibit 49 (Report of David Martinez) (concluding that forensic review of Mr. al-Marri's laptop reveals no evidence of attempts to purchase chemicals nor evidence of any plan to make a weapon of mass destruction).

---

[17] The Government nowhere alleges that Mr. Al-Marri took steps towards the destruction of or tampering with any of the sites marked in the almanac, *see* Plea Agreement at 16-17, ¶ 20; PSR ¶ 48 (maintaining that bookmarking of the almanac is "consistent with" Al-Qaeda attack planning), nor does the Government establish that Mr. Al-Marri is responsible for the bookmarking, *see id.* (stating that almanac was recovered from Mr. al-Marri's home, which he shared with his family).

These facts certainly establish that Mr. al-Marri is entitled to a mitigating role adjustment under U.S.S.G. § 3B1.2.  First, Mr. al-Marri is clearly "substantially less culpable" than the other members of this conspiracy.  *See* U.S.S.G. § 3B1.2, cmt. n.4; *United States v. Corral*, 324 F.3d 866, 874 (7th Cir. 2003).   KSM was, at the time of the conspiracy, the chief of external operations for all of al Qaeda, Plea Agreement at 11, ¶ 20; PSR ¶ 21, and was later determined to be the principal architect of the September 11 attacks,  *See* National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Final Report* (2004).   Similarly, Al Hawsawi was the primary financier of the September 11 attacks.  Plea Agreement at 12, ¶20; PSR ¶23.  By contrast, Mr. al-Marri did not hold a position of responsibility within al Qaeda.  Nor even did he hold one within the specific conspiracy here at issue.  *See United States v. Mendoza*, 457 F.3d 726 (7th Cir. 2006) (citing responsibility and position within operation as factors relevant to mitigating role analysis).  Thus, Mr. al-Marri had no role whatsoever in determining the manner or type of support that he was to provide.  Indeed, the Plea Agreement makes clear that Mr. al-Marri was directed, in every respect, by KSM with regard to what he was to do and how he was to do it.  *See* Plea Agreement at 11, ¶20; PSR ¶21 (Mr. al-Marri was approached by KSM about assisting al Qaeda in 2001); Plea Agreement at 11, ¶20; PSR ¶22 (Mr. al-Marri was instructed by KSM to enter the United States no later than September 10, 2001, and remain there for an undetermined length of time); Plea Agreement at 11, ¶20; PSR ¶ 23 (Mr. al-Marri was directed by KSM to meet with al Hawsawi); Plea Agreement at 12, ¶20; PSR ¶¶ 24-25 (Mr. al-Marri was directed by KSM to follow certain protocols in email communications); Plea Agreement at 12, ¶20; PSR ¶24 (Mr. al-Marri was provided contact information for other al Qaeda associated by KSM); Plea Agreement at 13, ¶20; PSR ¶ 25 (Once in the United States, Mr. al-Marri would receive instructions from KSM); Plea Agreement at 13,

¶ 20; PSR ¶ 27 (From June 2001 through August 2001, Mr. al-Marri attempted to communicate with KSM as directed); Plea Agreement at 13-14, ¶ 20; PSR ¶¶ 27-29 (Mr. al-Marri was criticized by KSM for failing to follow directions with respect to email communication protocols).

Certainly, Mr. al-Marri did not play an "essential part in the conspiracy," *see United States v. Garcia*, 2009 WL 2750261 (7th Cir. 2009). Rather, it was KSM who played the "essential part" of soliciting Mr. al-Marri's cooperation and in guiding his actions in relation to the conspiracy. Al Hawsawi also played an "essential part" by providing necessary funds.[18] In contrast, Mr. al-Marri offered little of value to the operation. He was not successful at following the established communication protocols. *See* Plea Agreement at 13-14, ¶20; PSR ¶¶ 27-29 (detailing Mr. al-Marri's failure to follow email protocol and subsequent chastisement from Khalid Sheikh Mohammed). And a forensic review of the hard drive of Mr. al-Marri's laptop even establishes that he was an unskilled user of computers. *See* Exhibit 67 (Report of Bill Capps) (detailing Mr. al-Marri's selection of an unsophisticated operating system, faulty installation of that operating system, failure to "wipe" his hard drive, failure to use an anonymizer that allowed for truly anonymous browsing).

The facts of the case, as stipulated to between the parties and set forth in the PSR, also indicate that Mr. al-Marri lacked knowledge and understanding of the scope of the activities of al Qaeda, yet another basis for a mitigating role adjustment. *See* U.S.S.G. §3B1.2, cmt. n.4;

---

[18] To the extent that the Government may argue that Mr. al-Marri was essential to the conspiracy in that, without Mr. al-Marri's agreement, the conspiracy would not have been formed, Mr. al-Marri disagrees. Such reasoning would prevent application of section 3B1.2 to any defendant involved in a conspiracy. This is plainly contrary to the intent of the Sentencing Commission, *see, e.g.,* U.S.S.G. §3B1.2, cmt. n. 3(A) (referencing "concerted criminal activity") and the common understanding of the minimal role adjustment, *see, e.g., United States v. Mendoza*, 457 F.3d at 730 (discussing relevance of defendant's role in conspiracy to application of mitigating role adjustment).

*United States v. Stephenson*, 53 F.3d 836, 850 (7th Cir. 1995).  Although he knew of the organization's general purpose and past activities, *see* Plea Agreement at 11, ¶ 20; PSR ¶ 22, Mr. al-Marri knew nothing of the September 11 attacks until after they happened, Plea Agreement at 15, ¶ 20; PSR ¶ 38,  even though he had been in contact with Al Hawsawi and Khalid Sheikh Mohammed during the months preceding the attack, Plea Agreement at 11-12, ¶ 20; PSR ¶¶ 28, 34.  Mr. al-Marri also lacked knowledge of the understanding and scope of his own activities in relation to the object of the conspiracy.  Thus, as described above, Mr. al-Marri did not have any knowledge of what, if any, specific directive he might receive some time in the future.  *See* Plea Agreement at 11, ¶ 20; PSR ¶ 22 (Mr. al-Marri understood that he was to remain in the United States for an indefinite period of time); Plea Agreement at 13, ¶ 20; PSR ¶ 25 (Khalid Sheik Mohammed was to pass on instructions to Mr. Al-Marri).

Finally, although Mr. al-Marri came into contact with KSM and al Hawsawi, in no sense did he enjoy their confidence or hold a position of trust in their inner circle.  *See  Mendoza*, 457 F.3d at 730 (affirming denial of mitigating role adjustment where defendant was not a leader but enjoyed confidences of principal players in operation).  This is evidenced by the fact that, as stated, he had no advance knowledge of the September 11 attacks, and was ignorant both of al Hawsawi's identity — he did not know of him at all until referred to him by KSM, *see* Plea Agreement p. 11, ¶ 20; Objections to PSR — and of his role as chief financier of the September 11 attacks.  If anything, Mr. al-Marri's demonstrated lack of skill and sophistication indicate that he was not trustworthy.  He failed to carry out even the simple and low-level instructions for communication dictated by KSM, *see* Plea Agreement at 13-14, ¶ 20; PSR ¶¶ 27-29 (detailing Mr. al-Marri's failure to follow email protocol and subsequent chastisement from KSM), and was unsuccessful in establishing contact with any other al Qaeda operative once he was in the

United States, outside of notifying KSM.  *See* Plea Agreement at 15-16, ¶20; PSR ¶43.  Nor does the Plea Agreement suggest that any member of al Qaeda attempted to contact Mr. al-Marri once he was in the United States.

In sum, given Mr. al-Marri's limited role in the operations of al Qaeda in general and in the particular conspiracy here at issue in particular, his lack of responsibility for directing the conspiracy, his tenuous relationship to KSM and Al Hawsawi, the leaders of al Qaeda and the conspiracy, and his lack of sophistication and culpability relative to these others, a downward adjustment pursuant to section 3B1.2 is warranted.  In sentencing a defendant convicted of conspiring to provide material support on the basis of conduct similar to Mr. al-Marri's, another district court observed, "[W]hile participation of any sort in a terrorist enterprise is a deplorable step, and is appropriately dealt with harshly under federal law, the nature of that participation will of course vary, and not every participant will merit equal punishment.  That is especially important to bear in mind here, in a case involving no concrete evidence of any substantial involvement in al Qaeda's operations or of specific violent actions[.]"  *United States v. Warsame*, Criminal No. 04-290 (JRT), Memorandum Opinion on Sentencing (D. Minn., Aug. 24, 2009).  Without minimizing the seriousness of his conduct, Mr. al-Marri respectfully submits that his sentence should similarly reflect the minimal nature--and thus his minimal culpability--in the overall operations of al Qaeda and in the conspiracy to which his has pled guilty.  A four-level downward adjustment should be granted.[19]

---

[19] A favorable ruling by the Court on the role in the offense and special offense characteristics will have a significant impact on Mr. al-Marri's Guideline sentence.  Whereas the PSR calculates his total offense level as 37, PSR ¶ 62, that total includes a 2 point increase for special offense characteristics pursuant to U.S.S.G. section 2M5.3(b)(1)(E).  PSR ¶ 56.  Subtracting those two points, and additionally subtracting up to four points for Mr. al-Marri's mitigating role in the offense, the total offense level may be as low as 31.  The resulting Guideline sentence depends

### C.  Departures

**1.  The unusually harsh treatment and conditions of confinement suffered by Mr. al-Marri warrant a departure from the sentencing guidelines.**

The sentence imposed by the Court should reflect the unusually harsh treatment and conditions of confinement to which Mr. al-Marri was subjected while detained at the Brig in South Carolina, as well as in the Metropolitan Correctional Center in New York, the Peoria County Jail, and the Federal Correctional Institution at Pekin.  Mr. al-Marri's eight years of severe solitary confinement, prolonged indefinite detention, as well as inhumane, degrading, and abusive treatment warrant a downward departure from the Guidelines.

As the U.S. Supreme Court recognized in *Gall v. United States*, 552 U.S. 38 (2007), while the Sentencing Guidelines should be the starting point and the "'the initial benchmark'" of an appropriate sentence, after "an individualized assessment based on the facts presented" the court may consider whether a downward departure is warranted because "the case falls outside the 'heartland' of the Guidelines."  *United States v. Hurt*, 574 F.3d 439, 596 (7th Cir. 2009) (quoting *Gall*, 552 U.S. at 42; *Kimbrough v. United States*, 552 U.S. 85 (2007)).  Specifically, U.S.S.G § 5K2.0, instructs courts that they may impose a sentence beneath the range established by the applicable guideline if the Court finds that there exists "aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration by the Commission." *United States v. Bonsu*, 336 F.3d 582 (7th Cir. 2003) (quoting *Koon v. United States*, 518 U.S. 81, 94 (1996); U.S.S.G. § 5K2.0; 18 U.S.C. § 3553(b)); *see also United States v. Smith*, 562 F.3d 866, 872 (7th Cir. 2009) (requiring district courts to hear arguments regarding whether a departure from the guidelines is warranted) (citing *Rita v. United States*, 127 S.Ct. 2456, 2465

---

on the Court's resolution of the arguments with respect to Criminal History, presented in Section VI(C)(2), *infra*.

(2007)). The United States Court of Appeals for the Seventh Circuit has recognized that this provision "leave[s] room for departure . . . in atypical cases." *Id.* at 587. Here, because Mr. al-Marri's case is unquestionably "atypical" in that his unusually harsh treatment in confinement since his arrest in 2001 distinguishes his treatment from other criminal defendants, a downward departure is warranted.

> a. *Mr. al-Marri's six year's of indefinite detention in and of itself warrants a downward departure.*

First, and perhaps foremost, the nearly six years that Mr. al-Marri was incarcerated at the Brig during which time he had no idea if and when he would ever be released constitutes exceptionally harsh treatment in custody that should be reflected in the sentence imposed by this Court. Every convicted or detained felon in the United States knows the conditions that must be met in order to obtain his release, or whether there are no such conditions; for nearly six years, Mr. al-Marri did not. This treatment is a mitigating circumstance of a kind, and to a degree, not adequately taken into consideration in formulating the Sentencing Guidelines, and therefore warrants a downward departure from the Guidelines.

The Court of Appeals has held that unusually harsh conditions of a defendant's pre-trial confinement is a mitigating circumstance that may justify a downward departure. *See United States v. Ramirez-Gutierrez*, 503 F.3d 643, 646 (7th Cir. 2007) (agreeing with the Eleventh and Second Circuits "that 'extraordinary' conditions of pretrial confinement could justify a downward departure because the Sentencing Commission likely had not considered such conditions when formulating the guidelines'"); *United States v. Turner*, 569 F.3d 637, 642 n.1 (7th Cir. 2009) (finding no basis for "distinguish[ing] between" pretrial and pre-sentence conditions of confinement for purposes of determining whether a "reduced sentence" is warranted); *see also United States v. Warsame,* Criminal No. 04-29 (JRT), Memorandum

Opinion On Sentencing (D. Minn. Aug. 24, 2009) (granting a downward departure based in part upon "the difficult conditions of Warsame's confinement" which "were significantly more onerous than the conditions faced by the ordinary pretrial detainee").  Here, Mr. al-Marri's pretrial confinement was unusually harsh, and his treatment uniquely brutal for many reasons, but perhaps most fundamentally because it consisted of prolonged indefinite detention.

As set forth above, although Mr. al-Marri was being actively represented by defense counsel in his criminal proceedings in the year and a half leading up to June 2003, including before this Court, once the government designated him an enemy combatant and transferred him to the Consolidated Naval Brig in South Carolina, he was instantly cut off from counsel altogether, and for nearly six years, thrown into a legal black hole in which his fate was uncertain.  Indefinite detention itself, separate and independent from the conditions of that detention, is a uniquely brutal deprivation and imposes particularly severe injury to a detainee. Psychologists have long recognized that "the indeterminacy of prison terms, and the absence of any program leading to release from isolation" can lead to a "pervasive . . . hopelessness," and "deep feelings of despair," causing prisoners to resort to "extreme actions, and desperate solutions." Physicians for Human Rights, *Break Them Down, Systematic Use of Psychological Torture by U.S. Forces*, 65-66 (2005) (quoting Brief of Professors and Practitioners of Psychology and Psychiatry as Amicus Curiae in Support of Respondent at 18, *Wilkinson v. Austin*, 125 S.Ct. 2384, No. 04-495 (Mar. 3, 2005)).

Indeed, the practice of indefinite detention is so harmful and contrary to the rule of law, that the United States Supreme Court has recognized that the indefinite detention even of aliens within the United States would raise serious constitutional questions.  *Zadvydas v. Davis*, 533 U.S. 678 (2001); *see also Hussain v. Mukasey*, 510 F.3d 739, 742 (7th Cir. 2007) (recognizing

that "indefinite detention" even for "aliens who are ordered removed is forbidden" by the Due Process Clause of the Fifth Amendment).  Moreover, the Supreme Court has made clear that "indefinite detention for the purpose of interrogation" is never permitted.  *See Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004) (noting Congress did not authorize indefinite detention for purpose of interrogation in enacting the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF")).  As set forth above, however, the government's own admissions demonstrate that interrogation without interference of counsel or oversight of the courts was the very purpose of Mr. al-Marri's indefinite detention here.  *See* Exhibit 44 at 5, 8-9 (Declaration of Vice Admiral Lowell E. Jacoby, *Padilla v. Bush*, No. 02 Civ. 4445 (S.D.N.Y Jan. 9, 2003)) (asserting that enemy combatant held at the Brig should not be provided counsel because "anything that threatens the perceived dependency and trust between the subject and interrogator directly threatens the value of interrogation as an intelligence-gathering tool"); Exhibit 3 (September 14, 2003 DIA document noting interrogator informed Mr. al-Marri that he had no right to counsel and could only "bring about a change in the quality of life at the Brig and resolution to his status by cooperation"); John Ashcroft, NEVER AGAIN: SECURING AMERICA AND RESTORING JUSTICE 168-169 (2006) (attributing decision to designate Mr. al-Marri an enemy combatant to his failure to "cooperate").  Given that Mr. al-Marri's indefinite detention unquestionably constitutes unusually harsh treatment, it also engenders a mitigating circumstance that should be reflected in the sentence imposed by the Court.

Moreover, this mitigating circumstance certainly is "of a kind or degree not adequately taken into consideration by the Commission."  U.S.S.G § 5K2.0.  The Sentencing Guidelines did not contemplate that a criminal defendant would be removed from the criminal justice system, and subjected to years of brutal indefinite detention, only to be returned almost six years later to

the same legal process to which he was originally entitled.  Indeed, the Sentencing Commission could not have contemplated this factor because it is so antithetical to a criminal justice system like ours, which is based on the rule of law and on due process.  *See Boumediene v. Bush*, 128 S. Ct. 2229, 2262 (2008) (suggesting that unlimited, indefinite detention without due process of law is unfamiliar in U.S. law); *al-Marri v. Pucciarelli*, 534 F.3d 213, 252 (4th Cir. 2008) (Motz, J.) (noting that to recognizing such extraordinary power would "render lifeless . . . the rights to criminal process in the Fourth, Fifth, Sixth, and Eighth Amendments" and "effectively undermine all of the freedoms guaranteed by the Constitution"), *judgment vacated and remanded with instructions to dismiss as moot*, *al-Marri v. Spagone*, 129 S. Ct. 1545 (2009).

Prior to Mr. al-Marri's case, the government's removal of an individual from an ongoing criminal process to face indefinite detention without charges was unprecedented.  *See Designation Of Qatari Student As Enemy Combatant*, 97 Am. J. Int'l L. 709, 710 (Ed. Sean D. Murphy 2003) (noting Mr. al-Marri's case was the first in which a person who was charged before the U.S. criminal justice system has been removed and designated an enemy combatant). In fact, Mr. al-Marri's case appears to be the only case in the history of the United States in which the government derailed an ongoing criminal prosecution to subject the defendant to military custody and indefinite detention.  The Sentencing Commission, then, could not have accounted for such circumstance, which is the very essence of "extraordinary."

In sum, Mr. al-Marri's six years of indefinite detention is a mitigating circumstance of a kind, and to a degree, not adequately taken into consideration in formulating the sentencing guidelines.  Because it is such an egregious deprivation, it renders Mr. al-Marri's case outside the "heartland" of cases contemplated by the Sentencing Guidelines and warrants a downward departure.

> b.   *Mr. al-Marri's unusually harsh conditions of confinement since his arrest in 2001 warrant a downward departure.*

Separate and apart from his indefinite detention, Mr. al-Marri's pretrial confinement as a criminal defendant and as an enemy combatant warrants a downward departure because of both its length and the specific abuses and relentless isolation he endured while confined.   Mr. al-Marri's harsh treatment by the government since his arrest in 2001 can also be described as nothing less than "extraordinary."   *See Ramirez-Gutierrez*, 503 F.3d at 646.

> (1)   *eight years of solitary confinement warrants at least an equivalent reduction in Mr. al-Marri's sentence.*

As set forth above, for the past eight years, and to this very day, Mr. al-Marri has endured continuous solitary confinement at each of the detention facilities in which he has been held.   In this respect, the length and severity of Mr. al-Marri's eight years of severe isolation, in which he was deprived even of the types of contact that inmates typically are permitted to experience in prison, is equivalent to, and arguably much worse, than the conditions suffered by other defendants with respect to whom the courts have recognized that a downward departure could be warranted.

For example, in *United States v. Pressley*, 345 F.3d 1205, 1219 (11th Cir. 2003), the United States Court of Appeals for the Eleventh Circuit concluded that the length and conditions of defendant's six-year-long pre-sentence confinement, the majority of which was spent in a 23-hour-a-day lock down without access to the outdoors, could, as a matter of law, support a downward departure.   The court reasoned that a downward departure might be warranted because the treatment was "extraordinary both in the length of presentence confinement and in the conditions."   *Id.*   Similarly, in *United States v. Carty*, 264 F.3d 191, 193, 197 (2d Cir. 2001), the United States Court of Appeals for the Second Circuit concluded that the district court should have considered whether the defendant's eight-month-long presentence confinement in an unlit,

79

overcrowded, and unhygienic cell in a Dominican prison would warrant departure from the applicable guideline.

Mr. al-Marri's detention is at least as "extraordinary" as the defendant's circumstances in *Pressley*, if not more so, in that Mr. al-Marri has been detained for nearly eight years, all of which have been spent in isolation. As the Supreme Court recognized more than a century ago, isolation is "punishment of the most important and painful character." *In re Medley*, 134 U.S. 160, 171 (1890); *see also Chambers v. Florida*, 309 U.S. 227, 237 (1940) (prolonged isolation itself is a technique of "physical and mental torture"); *United States v. Stiles*, 9 U.S.C.M.A. 384, 386 (C.M.A. 1958) (invalidating U.S. Navy's practice of sentencing convicted sailors to solitary confinement). As other district courts have recognized, "it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee." *Basciano*, 369 F.Supp.2d at 352-53 (citing Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 531 (1997) ("Direct studies of the effects of prison isolation have documented a wide range of harmful psychological effects, including increases in negative attitudes and affect, insomnia, anxiety, panic, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, aggression, rage, paranoia, hopelessness, lethargy, depression, emotional breakdowns, self-mutilation, and suicidal impulses . . . . There is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects.")); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914 (S.D. Tex. 1999) ("[T]he pain and suffering caused by extreme levels of psychological deprivation are equally, if not more, cruel and unusual than a lashing by a cat-o'-nine tails. The wounds and resulting scars, while less tangible, are no less painful and permanent

when they are inflicted on the human psyche"); *see also* Craig Haney, *A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons*, 35 Crim. Justice & Behavior 956 (2008) (describing "the overall consensus that has emerged on the harmfulness of long-term, punitive isolation and the risks to prisoners who are subjected to it"). One district court has recognized that "indefinite and solitary confinement" pending trial in the highly restrictive SHU at the MCC where Mr. al-Marri was held for four and half months — only to be held in even harsher conditions for six years at the Brig — constituted "exceptionally harsh methods" of preventing a pretrial detainee, a suspected leader of mafia crime family, from "continuing to plan or approve violent criminal conduct while in prison." *Basciano*, 369 F.Supp.2d at 351-52. Therefore, the court held that the government failed to show that such treatment was justified, and ordered the pretrial detainee released from the SHU. *Id.* at 352.

In assessing Mr. al-Marri's conditions of confinement, Dr. Stuart Grassian noted in 2008 that though he has evaluated many individuals in confinement, he has only rarely "encountered an individual whose confinement was as onerous as Mr. al-Marri's," Exhibit 45, and those were "individuals who had been incarcerated in some third-world country," *id.* at 16 (noting "Mr. al-Marri has experienced some of the most severe conditions seen in any American prison setting").

Significantly, because there is strong evidence that Mr. al-Marri has actually exhibited many of the harmful psychological effects consistent with this treatment, his case is even more deserving of a downward departure. Dr. Grassian noted that "[a]s an individual increasingly succumbs to the neuropsychological stress of confinement, he will typically become more agitated, more impulsive, and more distrustful and isolative. Over time, there is an inevitable wearing away of whatever resilience the individual had when he first entered solitary." *Id.* at 16. In Mr. al-Marri's case, Dr. Grassian noted "clear evidence" that Mr. al-Marri's "psychological

resilience" to solitary confinement "eroded to the point that he [had] becom[e] increasingly withdrawn, at times paranoid, as well as increasingly irritable and impulsive, and increasingly obsessional." *Id*. Dr. Grassian noted "that his symptomatic presentation is strikingly consistent with published descriptions of the particular psychopathologic disturbance associated with solitary confinement" and suggested that, based on his professional experience with other "individuals exposed to such prolonged stress," Mr. al-Marri may "not fully recover" even after release. *Id.* at 16-17 ("Impairments – especially, social withdrawal, irritability, and intolerance of stimulation - continue for a prolonged period of time, or even indefinitely."); Exhibit 55 (2009 Declaration of Stuart Grassian, M.D.) (noting that Mr. al-Marri exhibits "symptoms typical of Post Traumatic Stress Disorder (PTSD)" including "agitation, hyperfocus on details on the traumatic experiences, and the emotional numbing regarding matters which an individual would normally embrace").

Moreover, Mr. al-Marri's exceptionally harsh conditions of confinement are confirmed by the government's own documents, which illustrate the impact they actually had on him. For example, the government acknowledges that in late May 2004, Mr. al-Marri started a hunger strike in a desperate attempt to stop his harmful conditions. Exhibit 19. At other times, the government concedes Mr. al-Marri was placed on a suicide watch. Exhibit 15. As Dr. Grassian noted, Mr. al-Marri fears that his experiences in confinement and prolonged isolation have permanently changed and numbed him. Exhibit 15 at ¶ 13-15; Exhibit 55. In light of the unusually harsh and prolonged use of solitary confinement in Mr. al-Marri's case and the long-lasting injury he is likely to face because of it, this Court should consider his treatment a mitigating factor which warrants a substantial departure in arriving at an appropriate sentence.

(2)    *a "constellation" of harsh treatment and abuse further warrants a reduction in Mr. al-Marri's sentence.*

In Mr. al-Marri's case, the harm of solitary confinement is not the only mitigating circumstance arising from his confinement.  Rather, in light of the unprecedented totality of deprivations and violations suffered by Mr. al-Marri over an eight-year-period of detention, if ever there were an "atypical" circumstance in which the Sentencing Commission intended for courts to have "room for departure" this is it.  *Bonsu*, 336 F.3d at 587.  As set forth above, Mr. al-Marri's harsh treatment also included:

- repeated and prolonged abusive interrogation sessions involving physical violence, including gagging, as well as threats to harm family members;

- denial of access to his counsel;

- nearly sixteen months of total incommunicado detention;

- denial of meaningful communication with family, including denial of written communication until 2007, denial of phone calls until 2008, and denial of visitation for his entire 8 years of custody;

- denial of access to sunlight and the outdoors for six continuous months while held in a cell with an opaque window and blacked out interior window to his cell-block;

- periods of prolonged lock-down in his cell for weeks at a time;

- denial of access to the International Committee for the Red Cross;

- denial of consular visits as required by treaty;

- denial of his right to freely practice his religion, including denial of the Quran;

- six years of extreme and dehumanizing violations of privacy, including twenty-four hour surveillance;

- years without outdoor recreation;

- restricted indoor recreation while wearing arm and leg irons that did not permit him to exercise freely;

- prolonged and extreme sensory deprivation, including denial, for years, of such visual, mental, and intellectual stimulation as books, newspapers, magazines and other forms of communication;

- being subjected to blacked-out goggles and ear plugs when transported from his cell;

- being held in cold temperatures without adequate blankets or clothing and constant noise that disrupted his sleep;

- denial of a mattress for 2 1/2 consecutive years of confinement and then periodically thereafter;

- denial of needed prescription glasses; and

- denial of basic necessities such as adequate blankets, hygiene items, warm food, and water.

Each of these conditions, individually, constitutes unusually harsh treatment that falls outside the standard, acceptable treatment for persons in custody in American prisons.  Indeed, the American Correctional Association, which sets forth "current standards deemed appropriate by detention facility managers and recognized organizations representing corrections" prohibits nearly all of the violations outlined above.  ACA, Standards for Adult Local Detention Facilities xiii (4th ed. 2004); std. 4274 (standard guaranteeing detainees' access to the courts); std. 4-4275 (standard guaranteeing detainees' access to counsel); std. 4-4517 (standard guaranteeing opportunity to practice religion); std. 4-4134 ("Each inmate confined to a cell/room for ten or more hours daily is provided . . .a sleeping surface and mattress at least 12 inches off the floor; a writing surface; and proximate area to sit"); std. 4-4147 ("All inmate room/cells provide access to natural light"); std. 4-4154 ("each inmate is offered at least one hour of exercise daily"); std. 4-4342  ("each offender should be provided with soap, toilet paper, and a tooth brush"); std. 4-4261("inmates in segregation should be provided basic items needed for personal hygiene as well as items such as eyeglasses  and writing materials"); std. 4-4269 ("inmates in segregation

should be provided a sufficient quantity of reading materials and have an opportunity to borrow reading materials from the institution's library").

Evaluating these deprivations in the totality, and when combined with the fact of Mr. al-Marri's lengthy indefinite detention and severe, prolonged isolation, there can be no doubt that Mr. al-Marri's treatment was exceptionally harsh and that an appropriate sentence must take into account the duration, severity, and lasting injury of this treatment. *See United States v. Leung*, 360 F.3d 62 (2d Cir. 2004) ("Where an unusual constellation of factors exists that removes any sentencing from the 'heartland' cases, district courts are obligated to consider departures even though no one factor, standing alone, might justify an upward or downward departure") (citing U.S.S.G. § 5K2.0, cmt.); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (noting that extraordinary circumstances warranting departure might exist "when a number of factors . . .combine to create a situation that 'differs significantly from the 'heartland' cases covered by the guidelines'") (quoting U.S.S.G. § 5K2.0, cmt.)).  Indeed, Mr. al-Marri's detention and treatment is not simply exceptional; it is truly unprecedented in the annals of over 220 years of American jurisprudence.

Moreover, the Seventh Circuit has recognized that when the Government "through negligence or by design" causes harm to defendant, he may be "entitled to a downward departure because he had already been punished severely prior to sentencing." *United States v. Hirsch*, 280 F.3d 811, 814-15 (7th Cir. 2002).  Indeed, in *Hirsh*, the Seventh Circuit noted that if "prison officials intentionally placed [an individual] in a cell that they knew would likely lead to his contraction of a serious illness, this could constitute prior punishment that may warrant a downward departure." *Id.* Similarly, in *United States v. Montoya*, 62 F.3d 1, 4 (1st Cir. 1995),

the First Circuit recognized that a downward departure could be applicable where government officials engaged in "outrageous or intolerable" conduct.

Here, the government's own documents, Brig logbook entries, as well as the publicly released government reports and investigations make abundantly clear that the government intentionally harmed Mr. al-Marri — by subjecting him to severe isolation, indefinite detention, and abusive and degrading treatment as an enemy combatant.  Moreover, the government destruction of evidence bearing on Mr. al-Marri's treatment during confinement, particularly during interrogations, *see* Josh White & Joby Warrick, *Detainee's Suit Says Abuse Was Videotaped*, Washington Post, Mar. 13, 2008,[20] creates an adverse inference that the materials destroyed provided further evidence of Mr. al-Marri's abusive treatment during confinement. *See Crabtree v. National Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001) ("[I]f, being sensitive to the possibility of a suit, a company then destroys the very files that would be expected to contain the evidence most relevant to such a suit, the inference arises that it has purged incriminating evidence.") (quoting *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 272 (7th Cir. 1993)).  That presumption is particularly warranted here given that the government destroyed evidence that had been specifically requested by Mr. al-Marri's counsel in the course of civil litigation regarding his conditions of confinement.[21]  The clear evidence of the government's

---

[20] Defs.' Resp. at 10-11; *al-Marri v. Gates*, 05-cv-2259 (D.S.C. May 19, 2008) (citing Decl. of John Pucciarrelli, ¶¶ 3-4, Exhibit 3 to Defs.' Resp.; Decl. of Robert H. Berry, Jr., Defense Intelligence Agency, Exhibit 2 to Defs.' Resp.).

[21] The government has admitted to destroying:
(1) a still unspecified number of recordings of the government's interrogations of Mr. Almarri conducted at the Navy brig from his arrival on June 23, 2003, to "sometime in 2004," during which time Mr. Almarri was detained *incommunicado* and brutally abused;
(2) "notes and working papers associated with those [interrogation] sessions"; and
(3) almost five years worth of continuous recordings made by a digital video recording system at the Navy brig that meticulously documented Mr. Almarri's

misconduct, as well as the further inference of wrongdoing that may be drawn from the destruction of material evidence, further bear on the appropriateness of Mr. al-Marri's sentence. *See Hirsh*, 280 F.3d at 814-15.

In sum, under "an individualized assessment based on the facts presented," the government's misconduct and the violations and deprivations suffered by Mr. al-Marri in their totality warrant a sentence significantly less severe than that otherwise called for by the Sentencing Guidelines. *See Hurt*, 574 F.3d at 443; *Gall*, 128 S.Ct. at 596. Because Mr. al-Marri suffered unusually harsh treatment of a kind, and to a degree, not adequately taken into consideration in formulating the sentencing guidelines, a downward departure to a sentence fo time served is warranted. U.S.S.G. § 5K2.0.

> (3)    *Mr. al-Marri's treatment during his detention as an enemy combatant is a proper basis for a downward departure.*

Contrary to the government's argument, Defendant does not argue for a downward departure based upon Mr. al-Marri's "*status* as an enemy combatant." Gov't Mem. at 12 (emphasis added). Rather, it is his extraordinary and unusual *treatment* throughout eight years of federal custody that warrants a departure from the Guidelines. Mr. Al-Marri, an indicted criminal defendant, was plucked from an ongoing criminal process, subjected to years of indefinite detention and abuse, only to be returned six years later to the same legal process to which he was originally entitled before the same court. The government would have this Court pretend that the past six years never happened. Yet, Mr. al-Marri's experience as an enemy combatant legally cannot, and morally should not, be separated or ignored when assessing

---

treatment and conditions of confinement in his housing unit since the outset of his detention at the brig on June 23, 2003, until April 10, 2008.
Defs.' Resp. at 10-11; *al-Marri v. Gates*, 05-cv-2259 (D.S.C. May 19, 2008) (citing Decl. of John Pucciarrelli, ¶¶ 3-4, Exhibit 3 to Defs.' Resp.; Decl. of Robert H. Berry, Jr., Defense Intelligence Agency, Exhibit 2 to Defs.' Resp.).

whether his treatment by the government is "atypical" or extraordinary.  The simple fact is that the government punished Mr. al-Marri severely for six year while he languished in the Brig.  The government cannot simply wish that fact away.  Rather, it must be considered to arrive at a fair and appropriate sentence.

To be sure, when granting a downward departure, a district court is not determining whether the defendant deserves "credit" for time already served; that question is within the exclusive province of the Bureau of Prisons ("BOP").  *United States v. Wilson*, 503 U.S. 329, 332 (1992).  Thus, whether Mr. al-Marri, when he was detained as an enemy combatant, was in "official custody" for the same offense under 18 U.S.C. § 3585(b) — the statute that governs the BOP's awarding of credit for time served —  has no bearing on whether he is entitled to a departure based on his treatment by the government.

Following the Supreme Court's decision in *Koon*, "in deciding to grant downward departures" courts may consider any "unusual or exceptional circumstances" not contemplated nor prohibited by the Sentencing Guidelines.  *See U.S. v. Gallo-Vasquez*, 284 F.3d 780, 784 (7th Cir. 2002).  And in awarding departures, courts are certainly not limited to circumstances that occurred in "official detention."  *See, e.g.*, *United States v. Schroeder*, 536 F.3d 746, 755-56 (7th Cir. 2008) (concluding that a defendant's family circumstances could be a legitimate basis for a downward departure where such factors are present in an unusual way and to an exceptional degree); *Montoya*, 62 F.3d at 4 (recognizing downward departure could be appropriate where government officials engaged in "outrageous or intolerable" misconduct through "sentencing manipulation" ).  Thus, as another district has recognized, the question of whether a defendant is entitled to a downward departure because of unusually harsh conditions of confinement is a very different question than whether the Bureau of Prison should order a reduction of a sentence for

88

time already served under § 3585(b).  *United States, v. Warsame,* Criminal No. 04-29 (JRT), *Memorandum Opinion on Sentencing* (U.D. Minn. Aug. 24, 2009) (recognizing that granting a downward departure was not simply a question of granting credit for time actually served because "onerous" conditions of defendant's confinement was "comparable to a longer period of time served in federal prison").  Thus, contrary to the government's argument, Gov't Mem. at 14-15, the BOP's policy of not awarding credit for time served in immigration detention has no bearing whatsoever on whether a departure should be awarded by the court based on government misconduct or harm suffered by a defendant in confinement.  *See Koon*, 518 U.S. at 95 (holding that sentencing court must considering whether "features" of the case make it "special, or unusual" and deserving of a departure).

But even if this Court were to conclude that the nature of Mr. al-Marri's custody as an enemy combatant was somehow relevant to a departure analysis, a reduced sentence would still be warranted because Mr. al-Marri's detention at the Brig was based on the same offense for which he has been prosecuted criminally.  Thus, his treatment as an enemy combatant cannot be divorced from the assessment of his pretrial confinement.

Specifically, the record could not be clearer that Mr. al-Marri has been held by federal authorities for nearly eight years for the very same conduct that forms the basis for his criminal conviction.  In fact, the sole declaration the Government relied upon to justify its designation and detention of Mr. al-Marri as an enemy combatant, *see* Exhibit 58 (Declaration of Mr. Jeffrey N. Rapp), is indistinguishable in any material way from the facts asserted by the government at Mr. al-Marri's pretrial detention hearing, and which provided the factual basis for his guilty plea.  Indeed, the Government's description of the facts supporting the criminal charges against Mr. al-Marri virtually track the Rapp Declaration.  *Compare* Exhibit 59 at 18-19, 90 (Transcript of

Detention Hearing) *with* Exhibit 58 at ¶¶ 8-35.  Both, for example, describe Mr. al-Marri as someone who met and communicated with KSM and al Hawsawi, after trained at camps.  *See* Exhibit 58 at ¶¶ 8, 10, 17-18, 19-24, 28-30; Exhibit 59 Transcript of Detention Hearing at 18-19, 80.  And both describe how Mr. al-Marri used his computer to research certain chemicals.  *See id.*

The factual basis of Mr. al-Marri's plea agreement similarly reads like a carbon copy of the Rapp Declaration.  Both reflect that Mr. al-Marri agreed with KSM to assist al Qaeda operations in the United States.  Exhibit 60; Plea Agreement at ¶ 20; Exhibit 58 at ¶¶ 8, 12-13. Both state that Mr. al-Marri received money from Mustafa al Hawsawi to buy items in support of al Qaeda, including a laptop computer.  Plea Agreement at ¶ 20; Exhibit 58 at ¶ 15.  The plea agreement and the Declaration similarly explain how Mr. al-Marri communicated with Khalid Sheikh Mohammed through certain e-mail accounts and how he attempted unsuccessfully to contact other members of al-Qaeda.  Plea Agreement at ¶ 20; Exhibit 58 at ¶¶ 19-24, 28-30.  The two documents both suggest that that Mr. al-Marri utilized his computer to conduct research on the various uses of cyanide substances and sulfuric acid, and that the use of such materials to create cyanide gasses was a method taught by al Qaeda.  Plea Agreement at ¶ 20; Exhibit 58 at ¶¶ 10; 17-18.  In sum, the near identical set of facts that served as the basis for Mr. al-Marri's prior official detention as an "enemy combatant" and for his pretrial detention and plea of guilty in the instant case establish beyond a doubt that the government has detained Mr. al-Marri's since 2001 for the very same conduct.  Indeed, in prior discussions in this case, the government suggested as much.  This fact undermines the government's claim in its Sentencing Memorandum, Gov't Mem. 12-13, that, although the matter is properly addressed by the BOP, Mr. al-Marri's eight years of confinement does not qualify for such credit.  To the contrary, it is

clear Mr. al-Marri was held in federal custody for eight years for the very same conduct for which he now faces sentencing.

The connection between Mr. al-Marri's detention as an enemy combatant and his criminal case is also clear from the procedural history. As the PSR reflects, ¶ 2, the original January 22, 2003 criminal indictment against Mr. al-Marri remained on the docket in the Southern District of New York throughout the six years of his indefinite detention as an enemy combatant. Indeed, it was not until after President Obama determined that the appropriate "disposition" of Mr. al-Marri's detention as an enemy combatant was to return him to the criminal process,[22] that the Southern District of New York, on July 21, 2009, finally effected the official dismissal of Mr. al-Marri's original criminal indictment. Exhibit 62 at ¶¶ 2-3. The seamless link between Mr. al-Marri's criminal case and his detention as an enemy combatant could not be clearer. Accordingly, there is simply no plausible basis for this Court to ignore Mr. al-Marri's brutal treatment during his eight years of detention when fashioning a fair and just sentence.

In suggesting that Mr. al-Marri's nearly six years of indefinite detention and treatment at the Brig have no relevance whatsoever to this Court's consideration of an appropriate sentence, the government makes a series of inaccurate, misleading, and troubling arguments. The government suggests that Mr. al-Marri's prior custody was a valid law-of-war detention and, therefore, not a circumstance that this court should account for in fashioning a sentence. Gov't Mem. at 15-16. It was not. In fact, the authority the government cites for this proposition, Judge

---

[22] *See* President Barack Obama, Memorandum, *Review of the Detention of Ali Saleh Kahlah*, (Jan. 22nd, 2009)[22] (instructing cabinet level officials, including the Attorney General to "expeditiously determine the disposition options with respect to al-Marri and [to] pursue such disposition as is appropriate"); President Barack Obama, Memorandum For The Secretary Of Defense, *Transfer of Detainee to Control of the Attorney General* (February 27, 2009).

Motz's *en banc* Fourth Circuit opinion, actually concluded that Mr. al-Marri's military detention

was illegal and unconstitutional because it did not fall within the recognized exception to the

normal criminal process for law-of-war detentions.  *al-Marri v. Puccirelli*, 534 F.3d 213, 247

(4th Cir. 2008) (Motz, J.), *judgment vacated and remanded with instructions to dismiss as moot*,

*al-Marri v. Spagone*, 129 S. Ct. 1545 (2009).  In this regard, Judge Motz expressly distinguished

the Supreme Court's decision in *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004), which involved the

valid law-of-war detention of an armed soldier captured on a battlefield in Afghanistan where he

took up arms against U.S. and allied troops on behalf of enemy government forces during the

armed conflict there.  *Id.* at 228-29; *see also Hamdi*, 542 U.S. at 516-19 (plurality opinion of

O'Connor, J.) (permitting military detention as an exception to ordinary criminal process only in

the limited circumstances of that case and where supported by clearly established and long-

standing law-of-war principles).[23]

---

[23] While this Court, of course, need not decide the legality of Mr. al-Marri's prior detention in order to conclude that his detention was unusually harsh and thus warrants a downward departure, the government's reliance on the purported legality of Mr. al-Marri's detention as an enemy combatant to argue against a departure, warrants a response. Contrary to the government's suggestion, Mr. al-Marri's prior military detention was illegal for three reasons. First, Congress never authorized it.  More specifically, the 2001 Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) ("AUMF"), the statute on which the government relied, did not *sub silentio* authorize the indefinite military detention of lawful residents for suspected terrorist activity.  *See* Brief for Petitioner, *al-Marri v. Spagone* 18-35 (U.S. Sup. Ct.) ("Pet'r's Sup. Ct. Br."); *see also al-Marri*, 534 F.3d at 233, 238-40 (Motz, J.).  To the contrary, Congress expressly prohibited the indefinite detention without charge of non-citizens arrested in the United States, including those accused of terrorist activity virtually identical to Mr. al-Marri's.  Pet'r's Sup. Ct. Br. 36-45 (discussing Patriot Act); *see also al-Marri*, 534 F.3d at 240-41, 248-49 (Motz, J.) (same).  Second, Mr. al-Marri's prior military detention violated the Constitution, which prohibits the domestic exercise of military jurisdiction over individuals accused of criminal activity as long as the civilian courts are open and functioning, as they indisputably were at the time of and throughout Mr. al-Marri's detention as an "enemy combatant."  Pet'r's Sup. Ct. Br. 48-55; *see also al-Marri*, 534 F.3d at 230-31, 235-38 (Motz, J.). Third, the president has no inherent authority under Article II of the Constitution to order the militarily to seize and detain indefinitely individuals living in the United States—a proposition

Furthermore, while the government claims that "the purpose of [Mr. Al-Marri's] detention was to remove him from the battlefield," Gov't Mem. at 19, the fact is that Mr. al-Marri was never present, let alone captured, on a "battlefield." He was arrested by the FBI at his home in Peoria, indicted three times, and prosecuted criminally in federal court. More to the point, when Mr. al-Marri was declared an "enemy combatant" in June 2003, he had already been incarcerated for almost eighteen months and was pending trial in this Court; indeed, the designation of Mr. al-Marri as an enemy combatant occurred on the eve of a scheduled hearing on Mr. al-Marri's meritorious motion to suppress evidence that had unlawfully been seized from his computer. Plainly, the purpose of the order declaring him an "enemy combatant" was not to "remove him from the battlefield." Rather, as the government's interrogation summaries and public statements suggest, the purpose was actually to derail an ongoing criminal prosecution in order to facilitate interrogation and indefinite detention, by stripping Mr. al-Marri of his constitutional rights, including access to counsel or the Court.[24] *See* John Ashcroft, NEVER AGAIN: SECURING AMERICA AND RESTORING JUSTICE 168-169 (2006) (noting that the government designated Mr. al-Marri an enemy combatant because he became a "hard case" by "reject[ing] numerous offers to improve his lot by . . . providing information"); Exhibit 3 (September 14, 2003 DIA document noting interrogator informed Mr. al-Marri that he could only "bring about a change in the quality of life at the Brig and resolution to his status by

---

that no judge ever adopted and that the government itself abandoned. Pet'r's Sup. Ct. Br at 55-57; *see also al-Marri*, 534 F.3d at 247-53 (Motz, J.).

[24] Granting Mr. al-Marri a downward departure based on his prior confinement would not "violate" Common Article 3 or create any unintended "policy problem," as the government contends. Gov't Mem. at 19 n.2. Common Article 3 prohibits convictions and sentences imposed without the requisite judicial guarantees as well as various forms of mistreatment. It does not address the question before this Court. The only "policy problem" would be the one created by not considering Mr. al-Marri's prior military confinement, where that confinement was imposed under the pretext of "law of war" but without any of its protections.

cooperation…."); Exhibit 3 (DIA document noting that interrogators informed Mr. al-Marri that he had no right to counsel and that cooperation was "his only hope of changing his situation and status"); *compare* Exhibit 44 (Declaration of Vice Admiral Lowell E. Jacoby at 5, 8-9, *Padilla v. Bush*, No. 02 Civ. 4445 (S.D.N.Y Jan. 9, 2003) (asserting that enemy combatant held at the Brig should not be provided counsel because "anything that threatens the perceived dependency and trust between the subject and interrogator directly threatens the value of interrogation as an intelligence-gathering tool")).

To be sure, the legality of Mr. al-Marri's prior military detention was never conclusively decided, nor need it be resolved here for his unusually harsh treatment during custody to be properly considered at sentencing, as a basis for departure or otherwise. That said, it is beyond dispute that Mr. al-Marri's prior military detention raised sufficiently grave concerns to warrant Supreme Court review. *See al-Marri v. Pucciarelli*, 129 S. Ct. 680 (2008). In fact, the government's current position is striking, given that after it returned Mr. al-Marri to the criminal process from which it separated him six years ago, it urged the U.S. Supreme Court to vacate the Fourth Circuit's 5-4 ruling, which upheld the president's legal authority to detain Mr. al-Marri militarily.[25] The Court did so. *al-Marri v. Spagone*, 129 S. Ct. 1545 (2009). The government's request and the Court's response both indicate that at a minimum, the lawfulness of Mr. al-Marri's detention as enemy combatant for six years has been cast in serious doubt. This Court should therefore not indulge the government's inconsistent, self-serving and irrelevant argument regarding the scope of executive authority to pursue a "law of war" detention. The question before this Court simply does not involve the extent of executive detention authority.

---

[25] In opposing certiorari, the government also never contested the Fourth Circuit majority's conclusion that Mr. al-Marri's military detention violated due process, even if statutorily authorized. *See Al-Marri*, 534 F.3d at 262-75 (Traxler, J.).

Respectfully, the only issue that this Court must decide with respect to Mr. al-Marri's request for a downward departure is whether his extraordinarily harsh treatment in United States custody, which included his experience being detained indefinitely and in isolation as an enemy combatant for six years, is a mitigating factor that places this case outside the heartland of the sentencing Guidelines. The abundant evidence, admissions, and corroboration of Mr. al-Marri's account make clear that it most certainly is.

### 2. This court should grant a departure under U.S.S.G. § 4A1.3(b) because the Guidelines substantially over-represent the seriousness of his criminal history and likelihood of recidivism

Because a Guidelines sentence would substantially over-represent the seriousness of Mr. al-Marri's criminal history and the likelihood that he will commit other crimes, to ensure a fair and appropriate sentence, a downward departure pursuant to U.S.S.G. § 4A1.3(b) is also warranted. *See* U.S.S.G. §4A1.3(b)(1).[26] Specifically, a downward departure is appropriate where "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. §4A1.3(b)(1); *see generally United States v. Abbott*, 30 F.3d 71, 72-73 (7th Cir. 1994). In assessing whether either condition obtains, courts

---

[26] While Mr. al-Marri is mindful of the fact that, after *Booker*, arguments regarding the reasonableness of a sentence "should be placed in the context of the § 3553(a) factors," *United States v. Turner*, 569 F.3d 637, 640 (7th Cir. 2009) (characterizing decision whether to grant downward departure pursuant to U.S.S.G. § 4A1.3(b) as a discretionary one, relating to substantive reasonableness of sentence and having nothing to do with "correct" Guidelines calculation); *see also United States v. Johnson*, 427 F.3d 423, 426 (7th Cir. 2005) (observing that, after *Booker*, "what is at stake is the reasonableness of the sentence, not the correctness of the 'departures' as measured against pre-*Booker* decisions that cabined the discretion of judges to depart from guidelines that were then mandatory"), the commentary of the Sentencing Commission and pre-*Booker* caselaw explicating the purpose and necessity of the U.S.S.G. § 4A1.3(b) departure provision are useful in establishing the relevant considerations for this Court in determining Mr. al-Marri's sentence. *See United States v. Castro-Juarez*, 425 F.3d (7th Cir. 2005) (looking to pre-*Booker* law to assess reasonableness of sentence explained by district court in terms of upward departure); *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007) (directing district courts to "derive whatever insight the guidelines have to offer").

compare the defendant's history with that of other defendants typical of the criminal history category. *See United States v. Anderson*, 955 F.Supp. 935, 937 (N.D. Illinois, 1997) (granting downward departure pursuant to U.S.S.G. § 4A1.3 where defendant's crimes were not as serious as many of the crimes that place other defendants in the applicable category).

As the PSR accurately states, Mr. al-Marri's prior conduct earns him three criminal history points. PSR ¶¶ 64-71. All three of these points arise from a 1990 infraction, driving while under the influence of alcohol. PSR ¶65-71. Mr. Al-Marri, unrepresented by counsel, was sentenced to 12 months court supervision. PSR ¶ 65. This infraction results in one criminal history point. U.S.S.G. § 4A1.1(c). Two additional points are added, pursuant to U.S.S.G. § 4A1.1(d), because Mr. al-Marri was under court supervision for driving with a suspended license at the time of this offense. PSR ¶¶ 68, 70. As a result, Mr. al-Marri's Guideline sentence would ordinarily be calculated under criminal history category II. U.S.S.C. Ch. 5 Pt. A. However, by operation of the terrorism enhancement, Mr. al-Marri's Criminal History Category is automatically elevated from Category II all the way to Category VI. *See* U.S.S.G. § 3A1.4(b); PSR ¶ 71.

It is beyond question that Mr. al-Marri's past criminal conduct — one instance of driving under the influence and three instances of driving with a suspended license, PSR ¶¶ 65-68 — is significantly over-represented by his designation as a category VI offender. *See, e.g, United States v. Thorn*, 446 F.3d 378 (2d Cir 2006) (departing from Criminal History Category II to Category I where history consisted of drunk driving charge). In fact, his criminal history is almost identical to the example provided by the Sentencing Commission of when a downward departure may be warranted on this basis. *See* U.S.S.G. § 4A1.3 cmt. n. 3 (citing example of a defendant with two minor misdemeanor convictions close to ten years prior to instant offense

and no other evidence of prior criminal behavior in intervening period).  Certainly, Mr. al-Marri's criminal history is significantly less serious than is that of the average defendant in category VI.  *See*, *e.g.*, U.S.S.C. Ch. 5 Pt. A (defining threshold for category VI as 13 criminal history points); U.S.S.C. §§ 4B1.1(a) and (b) (defining career offender as one with at least two prior felony convictions of a crime of violence or controlled substance offense and assigning career offenders to category VI); *see also United States v. Anderson*, 955 F.Supp at 937 (ruling that criminal history category III significantly over-represents seriousness of defendant's criminal history consisting of a DUI and domestic battery conviction).

To be sure, Mr. al-Marri is in category VI not based on his prior record of criminal behavior, but because, as he has agreed, his offense conduct qualifies him for the terrorism enhancement.  Plea Agreement at 7, ¶14c, PSR ¶57.  Accordingly, Mr. al-Marri does not dispute the applicability of section 3A1.4(b).  Nonetheless, he respectfully submits that, under the unique facts of his case, the automatic elevation of his criminal history to category VI is unnecessary and does not fulfill the purposes of sentencing.

Of course, the effect of the terrorism enhancement on a defendant's sentence is "unequivocally severe."  *United States v. Benkahla*, 501 F.Supp.2d 748, 751 (E.D. Va. 2007).  Indeed, application of section 3A1.4(b) has already had a severe impact on Mr. al-Marri's guideline sentence by working a vertical adjustment to his offense level that moves the applicable Guideline range close to the statutory maximum for his offense.[27]

---

[27]  The base offense level for a violation of 18 U.S.C. § 2339B(a)(1) is 26.  U.S.S.G. § 2m5.3.  Assuming no other adjustments to this offense level and a criminal history category II, Mr. al-Marri's Guideline range would be 70-87 months.  U.S.S.G. Ch. 5 Pt. A.  By increasing the offense level to 32, as required by the terrorism enhancement, U.S.S.C. § 3A1.4(a), and assuming a criminal history category II, Mr. al-Marri's Guideline range would be 135-168 months.  U.S.S.G. Ch. 5 Pt. A.  The maximum allowable sentence for the offense of conviction is 15 years or 180 months.  18 U.S.C. § 2339B(a)(1).

But Mr. al-Marri submits that further increase in his sentence beyond this offense-level increase is unwarranted. The rationale underlying the automatic escalation of a defendant's criminal history pursuant to section 3A1.4(b) is that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal," *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003); *see also Benkahla*, 501 F.Supp.2d at 759 (positing that elevation of criminal history might be rational because terrorists are unique among criminals in likelihood of recidivism). However, the range of defendants and offense conduct subject to the terrorism enhancement is broad: by its terms, section 3A1.4 applies to any "felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a). By virtue of a cross-reference to 18 U.S.C. § 2332b(g)(5), *see* § 3A1.4 note 1, a "federal crime of terrorism" for the purposes of the enhancement is defined as a violation of one of dozens of enumerated offenses, *see* 18 U.S.C. § 2332b(g)(5)(B), which are "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A). Furthermore, courts have read the terrorism enhancement to apply to offenses even beyond those enumerated in 18 U.S.C. § 2332b(g)(5)(B). *See, e.g.*, *United States v. Arnout*, 431 F.3d 994, 1000-01 (7th Cir. 2005) (holding that a defendant need not be convicted of a federal crime of terrorism in order for section 3A1.4 to apply).

Within this broad spectrum, there are cases in which the rationale behind the criminal history elevation — namely, that a defendant convicted of a terrorism-related crime presents a high likelihood of recidivism and resultant harm to society — simply does not apply. Accordingly, courts have departed downward based upon applications like that raised here. *See, e.g., Meskini*, 319 F.3d at 92 (affirming ability of district judges to depart downward when

application of terrorism enhancement overstates defendant's criminal history and likelihood of recidivism); *United States v. Aref*, 2007 WL 804814 (N.D.N.Y., March 14, 2007) (Case No. 04-CR-402) (granting departure to Criminal History Category I for defendant convicted of 18 U.S.C. §§ 1956(a)(3), 2339A, 2339B, and 1546 based on defendant's personal characteristics and history, despite application of terrorism enhancement); *Benkahla*, 501 F.Supp.2d at 759 (rejecting contention that application of terrorism enhancement precludes downward departure based on criminal history category and granting departure to category I because defendant "does not share the same characteristics or the conduct of a terrorist, and in turn, he does not share the same likelihood of recidivism").

The same result should obtain in this case. First, as it is described above, as well as in the Plea Agreement and the PSR, the offense conduct for which Mr. al-Marri was convicted is relatively minor compared to the type of conduct that can warrant application of the terrorism enhancement: in sum, Mr. al-Marri, as a low-level "sleeper agent," directed entirely by others, had no specific mission and took no terrorist actions, violent or otherwise; what he did do, by way of attempting to communicate with others, he did unsuccessfully and poorly. Furthermore, as detailed in section V, Mr. al-Marri has undergone a significant transformation since 2001, and accordingly does not now, if ever he did, "share the same likelihood of recidivism" as other defendants convicted of terrorism-related offenses and subject to this enhancement. That is because, in sum, Mr. al-Marri would never engage in any act of violence or terrorism, especially against the United States. Although as noted above, his treatment during confinement was unusually harsh and, at times, extreme and abusive, the totality of Mr. al-Marri's experience since his arrest in 2001 has created in him a deep affection for a number of Americans with whom he has had contact, *see* Exhibit 56 (Letter of Mark Berman) (describing strength of ties

between Mr. al-Marri and his defense team and personnel at the Brig), Exhibit 68 (Jan. 4, 2008 Letter from Al-Marri) and Exhibit 71 (Mar. 15, 2008 Letter from Al-Marri) (expressing concern for health and well-being of defense team and their families), Exhibit 69 (March 6, 2008 Letter from Al-Marri) (describing defense team as "family"), Exhibit 62 (June 17, 2005 Letter from Al-Marri) (describing member of Brig medical staff as "a good man"), Exhibit 35 (July 10, 2006 Letter from al-Marri) (recognizing good intentions of staff at Brig), Exhibit 52 (March 10, 2009 letter of al-Marri) (conveying gratitude for professionalism of Brig staff and U.S. Marshals), and an understanding and appreciation for American culture, *see* Exhibit 59 (Testimony of Officer Heatherly) (describing Mr. al-Marri's embrace of American culture, including NASCAR). Moreover, he does not harbor any anti-American sentiment. *See* Exhibit 59 at 65 (Testimony of Officer Heatherly).  Whatever Mr. al-Marri's intentions may have been when he entered the United States eight years ago, as a result of his experiences since then — his experience with the American justice system and the relationships he has formed with Americans —  it is now inconceivable that he would engage in any acts against of violence or terrorism the United States in the future.  He simply wishes to return home to his family.  To the extent that the criminal history category is intended to serve as a predictor of future criminality, it is noteworthy that Mr. al-Marri is further unlikely to recidivate, given that he will return to supportive conditions under which he previously thrived.  These conditions include a strong family network, a connection to religion, and a solid record of employment. *See United States v. Stabell*, 2009 WL 775100 (E.D. Wisc. 2009) (recognizing relationship between community reintegration and family support and recidivism).

    For these reasons, Criminal History Category VI significantly over-represents both the significance of Mr. al-Marri's prior criminal history and his likelihood of recidivism, as well as

the dangerousness of his particular offense.  This court should accordingly grant a downward departure pursuant to U.S.S.G. § 4A1.3(b).

### D.    Section 3553(a) Factors

#### 1.    Introduction

Ultimately, this Court must fashion a sentence for Mr. al-Marri based upon a consideration of all of the circumstances of his case in light of the factors set forth in 18 U.S.C. § 3553(a), which "unlike the guidelines themselves after *Booker*, [are] mandatory."  *United States v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005) (citing *Booker*, 125 S.Ct. at 764-65; *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007).  Thus, while the Guidelines may be the starting point and initial benchmark of an appropriate sentence, this Court must not presume that a sentence within the Guideline range is warranted.  *See United States v. Bartlett*, 657 F.3d 901, 909 (7th Cir. 2009) (citing *Nelson v. United States*, 129 S.Ct. 890, 892 (2009)).  Rather, under 18 U.S.C 3553(a)(2), the touchstone of an appropriate and fair sentence is one that, in accordance with the statutory factors, is "sufficient, but not greater than necessary" to achieve Congress's sentencing goals.

The Guideline sentence that forms the "initial benchmark" of this Court's analysis under section 3553(a) is 180 months.[28]  Because this is the statutory maximum for Mr. al-Marri's

---

[28] The government's position is that this Court's analysis under section 3553(a) ought to begin and end with the fact that Mr. al-Marri's potential sentence is limited by the statutory maximum sentence of fifteen years. *See* Government's Sentencing Memorandum at 3-4 (arguing that given the effect of the statutory maximum on the Guideline sentence, only "truly extraordinary mitigating factor(s)" may warrant "further reduction" in Mr. al-Marri's sentence).  This argument, along with the statement that Mr. al-Marri's Guideline range "is 360 months to life imprisonment," Government's Sentencing Memorandum at 3, is wrong, even if that is the applicable Guideline range, which it is not, *see* Section VI(b)-(c), *supra*.  It misunderstands the relationship between the statutory maximum and the Guideline sentence.  Application of the statutory maximum pursuant to U.S.S.G. § 5G1.1(a) is only one of the steps that this court must take in order to accurately calculate the appropriate Guideline sentence, *see* U.S.S.G. § 1B.1 (specifying that sentencing courts are to apply each chapter of the Guidelines sequentially,

offense of conviction, 18 U.S.C. § 2339B(1), the sentence imposed by the Court may not exceed 180 months.  The 3553(a) factors, however, dictate a sentence well below that statutory limit.

The nature and circumstances of the offense, discussed in Section III, *infra*, as well as the history and characteristics of the defendant, discussed in Sections II (his family background as the devoted father of five children with a large, close-knit family), IV (his prolonged suffering throughout eight years of exceptionally harsh conditions of confinement), and V (his remarkable transformation and capacity for change), *supra*, all warrant a variance from the advisory range and a sentence well below the statutory limit.  With respect to the nature and circumstances of the offense, as set forth above, while Mr. al-Marri agreed to provide material support to al Qaeda, he was in reality an insignificant player in the conspiracy:  he bungled simple instructions dictated by the leaders of the conspiracy, never did anything to further any specific mission or plot, and, in general, possessed limited knowledge and understanding of al Qaeda, its missions, and its activities.  Moreover, Mr. al-Marri's history and characteristics, a man devoted to his family and religion and lacking any background of violence and hatred, further militate in favor of a variance.  And perhaps most significantly, as those who have been responsible for his custody can attest, whatever mistakes Mr. al-Marri made previously, he has experienced a significant transformation during his confinement, developing meaningful relationships with his

---

ending with Chapter 5), as it is obligated to do under *Rita* and *Gall*, *see Bartlett* 657 F.3d at 909-910.  Moreover, section 5G1.1(a) does not alter or reduce the Guideline range—rather, it simply tells the sentencing court what the Guideline range is.  *See* U.S.S.G. § 5G1.1(a) (directing that when otherwise applicable guideline range is above the statutory maximum, "the statutorily authorized maximum sentence *shall be the guideline sentence*") (emphasis added); *see also United States v. Noel,* 2009 WL 2835428 (7th Cir., Sept. 4, 2009) (Case No. 07-6428) (Williams, J., dissenting) ("Where, as here, the guidelines range exceeds the statutory maximum, the statutory maximum *becomes the guidelines sentence*.") (emphasis added); *United States v. Warsame* (defining guideline sentence as statutory maximum for 18 U.S.C. § 2339B and considering arguments for varying below that point).  As such, it is the appropriate first step in the sentencing process.

American attorneys, an enjoyment of U.S. culture, and respect for, among others, the men and women in uniform who endeavored to improve his conditions at the Brig and to treat him humanely.  Mr. al-Marri's capacity for openness and self-awareness has permitted him to learn from his mistakes and instead of anger, he now feels gratitude for those individuals who have treated him humanely and for the U.S. justice system which provided him with defense counsel and ultimately a fair legal process.  Remarkably, even after being subjected to severe isolation, abuse, and deprivation in confinement, including being unable to communicate with his family even in writing for almost six years, Mr. al-Marri harbors no ill-will toward his custodians at the Brig or against the United States in general.  And significantly, his custodians have never considered him to be a security threat.

In addition, under 18 U.S.C. § 3553(a)(2), the need to promote respect for the law, and to achieve punishment, deterrence, and rehabilitation also warrant a variance from the applicable Guideline range.  Having endured egregiously harsh treatment during his eight years of confinement, including severe isolation, incommunicado detention, and more than eight years of separation from his wife and lost time with his five small children, Mr. al-Marri has already been significantly punished for what he actually did.  Thus, in light of the severe deprivations and psychological pain that Mr. al-Marri has endured as a result of his conduct, *see* Section IV, *infra*, general deterrence has been achieved and specific deterrence is unnecessary.  Mr. al-Marri's transformation during his confinement underscores that a further prison sentence is not necessary to deter him or to promote respect for the rule of law.  Indeed, if anything, the rule of law would be offended by the failure to in any way recognize or account for the length and form of Mr. al-Marri's years of confinement as an enemy combatant.  *Contra* Government's Sentencing Memorandum, Docket n. 36 at 12-20 (arguing that this Court should not consider and, indeed,

cannot consider the conditions of Mr. al-Marri's detention in fashioning his sentence). And additional time, let alone a lengthy sentence, is not needed to protect the public, because as attested to by his former custodians at the Brig and as is further made clear by his transformation, Mr. al-Marri does not pose a threat or seek to harm the United States.

Finally, other sentences that have been imposed in material support cases, and in military commission cases, justify a variance under 3553(a)(6).  These sentences demonstrate that individuals convicted of the same offense as Mr. al-Marri — and who played more central roles in the criminal enterprise  — received sentences well below the applicable advisory range. Accordingly, a variance well below the advisory Guideline sentence of 180 months is warranted to avoid sentencing disparities, as well.

### 2.    (a)(1): Nature and Circumstances of the Offense

The nature and circumstances of the offense and the history and characteristics of the defendant warrant a variance from the advisory range.  While Mr. al-Marri has pled guilty to a serious crime, the specific circumstances of the offense mitigate its serious nature.  As set forth above, Mr. All Marri never committed any criminal acts in furtherance of the conspiracy and possessed limited knowledge and understanding of al Qaeda, and its missions and activities.

An important aspect of the nature of a defendant's offense is the extent and type of harm that he caused.  *See*, *e.g.*, *United States v. Wachowiak*, 496 F.3d 744, 752 (7th Cir. 2007) (recognizing appropriateness of assessing harm caused by defendant's actions as nature and circumstance of the offense under section 3553(a)(1)); *United States v. Blue*, 453 F.3d 948, 951 (7th Cir. 2006) (citing "roster of victims" as aggravating circumstance under section 3553(a)(1)). Here, while the United States undoubtedly has in interest in punishing and preventing conspiracies like that to which Mr. al-Marri has pled guilty, the fact remains that Mr. al-Marri never harmed — or even came remotely close to harming any individuals — in the course of his

crime. Indeed, there is no evidence in the record or contained within the Stipulated Facts of the Plea Agreement — because none exists — that Mr. al-Marri ever even seriously contemplated causing harm to any people or things. *See* Exhibit 49 (Martinez Report) (describing lack of evidence that Mr. al-Marri had engaged in research regarding bomb making). Nor is there any reason to think, in light of Mr. al-Marri's transformation, that he would so in the future. *See* Section V.

As another district court recently observed when sentencing a defendant convicted under 18 U.S.C. 2339B, "[T]here are many possible interpretations of the nature of [the defendant]'s activities in Afghanistan and his reasons for returning to the West. … Ultimately, however, this Court's role at sentencing is not to construct the darkest possible interpretation of a defendant's conduct and potential and then sentence the defendant as if that interpretation is truth." *United States v. Warsame*, Memorandum Opinion on Sentencing, p. 5, Criminal No. 04-029-(JRT) (D. Minn. Aug. 24, 2009). Applying that reasoning here, although Mr. al-Marri has admitted his wrongdoing in agreeing to provide material support, there is no evidence that he ever formed the intent to cause specific harm, or more importantly, that he ever acted consistent with such an intent. Accordingly, he should not be sentenced as if he had. *See id.* The fact that Mr. al-Marri, in entering a guilty plea, has accepted responsibility for his actions, Plea Agreement ¶ 14; PSR ¶ 14, is also relevant to the nature and circumstances of his offense. *United States v. Wachowiak*, 496 F.3d 744, 752-53 (7th Cir. 2007) (mitigating circumstances that may be considered by a sentencing court include a defendant's cooperation, remorse, pleading guilty in a timely manner, and acceptance of responsibility). It illustrates that Mr. al-Marri has recognized the wrongfulness of his actions before he caused any harm.

A final mitigating aspect of Mr. al-Marri's crime is the undisputable reality that he was a minor participant in the operations of al-Qaeda generally and in the specific conspiracy to which he has admitted his guilt. *See United States v. Blue*, 453 F.3d 948, 951 (7th Cir. 2006) (noting that whether defendant was "a minor" or "active participant in the offense" was relevant in assessing the nature and circumstance of the offense under § 3553(a) (1)); *see also Wallace*, 458 F.3d at 613 ("If *Booker* means anything at all, it must mean that the court was permitted to give further weight to a factor covered by a specific guidelines adjustment, especially where (as is true here) that factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present."). As discussed in greater detail in Sections III, VB2 (role in the offense) *supra*, Mr. al-Marri was an inconsequential figure in al Qaeda, hapless at carrying out even simple communication protocols, and acting entirely under the direction and control of KSM. This is in contrast to other defendants who have been convicted of providing material support to al Qaeda. *See, e.g, United States v. Abu Ali*, 528 F.3d 210, 222-23 (4th Cir. 2008) (Defendant suggested to leader of al Qaeda cell specific targets and schemes that could be carried out in the United States, including assassinations and kidnappings of members of the United States Senate, the United States Army, and the President). There is simply no evidence in the record that here, Mr. al-Marri played a similarly prominent role in the conspiracy. Rather, he simply took direction from KSM without knowledge of any specific operation or plan.

### 3.        (a)(1): History and Characteristics of the Defendant

A variance from the advisory Guidelines is also warranted because a Guidelines sentence "paint[s] only a partial picture" of Mr. al-Marri's "character and the need for punishment and deterrence in this case." *United States v. Wachowiak*, 496 F.3d 744, 754 (7th Cir. 2007). An appropriate punishment must consider a full picture of Mr. al-Marri's character including his

positive attributes as a father and person, his religious devotion, his educational background, and his potential for further employment.  *See United States v. Cannon*, 2009 WL 102532 (N.D. Ind. 2009) (noting as positive characteristic defendant's devotion to family and children); *United States v. Baker*, 445 F.3d 987, 992-93 (7th Cir. 2006) (considering religious background, history of employment, and education level of defendant as positive characteristics).

As set forth in detail in Sections II and IV, *supra*, Mr. al-Marri is a deeply religious person, who is devoted to his family.  Exhibit 59, at 39:4-10 (testimony of Cheryl Savage noting Mr. al-Marri's family describes him as a "kind and gentle" father, who aimed to instill great discipline and faith in Islam in his children); Exhibit 74 (Mohammed al-Marri interview, noting Mr. al-Marri is a good father who took "care of them for every single small thing").  In Qatar, Mr. al-Marri was known by his family as a man of great faith, who always looked after his parents and siblings.  Exhibit 59 at 39:12-13;  Exhibit 73 (transcribed interview with Naji al-Marri); *see also* Exhibit 59 at 30: 3-6 (testimony of Cheryl Savage describing Mr. al-Marri as incredibly "devout" and that his religion is "the essence of who he is.").  An educated individual, with a history of gainful employment working for banks in his home country, Mr. al-Marri has the strong potential to return to his home country and to rebuild his life with the support and love of his family and community.  Moreover, Mr. al-Marri has accepted responsibility for his actions by entering into the Plea Agreement that brings him before the Court for sentencing.  *See Cannon*, 2009 WL 102532 (citing acceptance of responsibility as militating in favor of defendant's character and risk of repeating offense).

But perhaps the most defining aspect of Mr. al-Marri's character that bears on "the need for punishment and deterrence in this case" is that Mr. al-Marri possesses unique qualities of self-awareness, humility, and empathy that will enable him to learn from his mistakes and

ultimately avoid poor judgment or harmful behavior in the future.  *See* Exhibit 56, *Berman Letter* (describing Mr. al-Marri's willingness to learn and keep an open mind).  As those who have been responsible for his custody have attested or can attest, whatever mistakes Mr. al-Marri made previously, he has experienced a significant transformation during his confinement, developing meaningful relationships with his American attorneys, an enjoyment of U.S. culture, and gratitude for the U.S. justice system.

> **4.   (a)(2) The need for the sentence imposed--(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant**

> (1)   *just punishment and respect for the law*

As discussed in Section IV, Mr. al-Marri has endured egregiously harsh treatment during his six years of detention as an enemy combatant, including severe isolation, incommunicado detention, and separation from his wife and children.  Mr. al-Marri has already been significantly punished for his offense.  A just sentence must take into account the severity and prolonged nature of this harsh treatment, both with respect to the sentence that Mr. al-Marri deserves in light of his already severe punishment, and with respect to the public's general respect and confidence in the rule of law.  Although the need for a sentence to "promote respect for the law" under 18 U.S.C. § 3553(a)(2)(A) is often invoked to justify the imposition of harsh sentences, or to counsel against overly lenient ones, *see, e.g,, United States v. O'Neill*, 437 F.3d 654 (7th Cir. 2006) (the criteria of section 3553(a)(2) empowers judges to reject as too lenient a sentence specified in a negotiated plea agreement where such a sentence would undermine respect for the law), the unique facts of Mr. Al-Marri's case counsels a far different result here.

As discussed in Section IV, Mr. al-Marri was held under extraordinarily harsh conditions and subjected to abusive interrogation techniques that have since been fully repudiated as

contrary to our values and our law. *See, e.g.,* S. Comm. of the Armed Services, SASC Report at xxvi (concluding that use of abusive interrogation techniques and inhumane conditions of confinement "was at odds with the commitment to humane treatment of detainees in U.S. custody"); OIG, *Special Review: Counterterrorism Detention and Interrogation Activities* (September 2001 - October 2003) (investigating unauthorized interrogation techniques utilized by the CIA), Exec. Order No. 13,491, 74 Fed. Reg. 4,893 (Jan. 22, 2009) (shuttering the CIA's secret and indefinite detention program, directing officials to treat all detainees humanely, and prohibited all government officials from relying upon any methods of interrogation not outlined in the Army Field Manual). Promoting respect for the rule of law demands, respectfully, that this Court not ignore what occurred in this case: that Mr. al-Marri was removed from the criminal process in order so that he could be interrogated using methods that are disturbing, unlawful, and, now, have been repudiated, all in order to improperly coerce his cooperation. *See*, *e.g.*, John Ashcroft, NEVER AGAIN: SECURING AMERICA AND RESTORING JUSTICE 168-169 (2006) (attributing decision to designate Mr. al-Marri an enemy combatant to his failure to "cooperate"); Exhibit 3 (September 14, 2003 DIA document noting interrogator informed Mr. al-Marri could only "bring about a change in the quality of life at the Brig and resolution to his status by cooperation"). The extraordinary chain of events that has led Mr. al-Marri to finally be processed within the federal criminal justice system has done much to strengthen the public's view that our constitutional form of government survives, as well as that our federal criminal justice system is capable, as obviously it is, of processing cases like Mr. al-Marri's. Respect for the law will further be strengthened by fashioning a just sentence, which appropriately takes into account the length and form of the treatment to which Mr. al-Marri was subjected, and accordingly varies significantly from the advisory Guideline sentence.

(2)     *deterrence and need to protect the public*

The harsh treatment to which Mr. al-Marri has already been subjected and his extraordinary transformation during the last eight years obviates the need for a lengthy (or any further) sentence in order to achieve general deterrence.   "General Deterrence of criminal conduct dictates that a clear message be sent to society that repeated criminal behavior will aggravate the need for punishment with each recurrence." *See* U.S.S.G. Chapter 4, Part A, intr. Here, general deterrence has been served by the undeniably severe punishment that Mr. al-Marri has already endured.   And specific deterrence is unnecessary in light of Mr. al-Marri's remarkable transformation during the period of his pretrial detention, which renders negligible the risk that he will reoffend. *See* Section V, *supra*; *see also United States v. Miranda*, 505 F.3d 785, 793 (7th Cir. 2007) (noting that positive response of defendant to mental health treatment nullifies need to incapacitate him).

Indeed, as the record makes abundantly clear, whatever Mr. al-Marri may have intended in the past, he now possess absolutely no intent to cause any harm to the United States in the future.  Exhibit 56, *Berman Letter*.  By virtue of the positive relationships he has developed with his attorneys and the respect and appreciation he now has for Brig and prison officials, among others, who have treated him with dignity and respect, Mr. al-Marri has gained a real understanding and appreciation of America that he previously lacked.   Exhibit 56, *Berman Letter*.  The Court may account for the effect of pretrial detention on defendant's desire to obey the law and live a better life in the future. *See United States v. Roque*, 536 F.Supp.2d 987 (E.D. Wis. 2008).  The minimal risk posed by Mr. al-Marri is also confirmed by the solid structure of familial and community support that will welcome him back in his home country, far from our shores, when finally he is released, thereby easing his reintegration into society.   Exhibit 74 (transcribed interview with Mohammed Al-Marri); Exhibit 59 at 35:14-20.  Other courts have

recognized that this type of solid support structure may negate the likelihood of reoffending and is therefore is a relevant factor to be considered at sentencing. *See United States v. Stabell*, 2009 WL 775100 (E.D. Wisc. 2009).

> **5.    (a)(6)  the  need  to  avoid  unwarranted  sentence  disparities  among defendants with similar records who have been found guilty of similar conduct**

In sentencing Mr. al-Marri, this Court must consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6); *United States v. Bartlett*, 567 F.3d 901, 907 (7th Cir. 2009). Other sentences that have been imposed in material support cases, and in analogous military commission cases as well, justify a variance under 3553(a)(6). These sentences demonstrate that individuals convicted of the same offense as Mr. al-Marri, but who played a much more central role in the criminal enterprise than did Mr. al-Marri, received sentences well below the applicable advisory range.

> *a.    military commissions cases*

First, Mr. al-Marri points to the sentences of two defendants — David Hicks and Salim Hamdan — sentenced by military commissions. The cases stand as useful comparisons. Both Hicks and Hamdan engaged more closely with high-level al Qaeda leadership, including Osama bin Laden, than did Mr. Al-Marri. Likewise, both contributed support to al Qaeda in the form of concrete and measurable actions, unlike the speculative support that Mr. al-Marri agreed to provide, but never actually took steps to provide, through a specific terrorist operation or violent act or otherwise. Significantly, both Hicks and Hamdan received sentences equivalent to less than half of the advisory Guideline sentence of 180 months indicated for Mr. Al-Marri.

David Hicks entered a plea of guilty in 2007 to one count of material support for terrorism, in violation of 10 U.S.C. § 950v(25). He admitted to training in al Qaeda camps for

several months, learning various guerilla warfare tactics, and receiving instruction in the use of weapons. *See* Exhibit 61, *United States v. Hicks*, Stipulation of Fact, ¶¶ 27-34. Additionally, Hicks personally asked Osama bin Laden for training materials in the English language, *id.* at ¶ 30, conducted surveillance on the American Embassy in Kabul, *id.* at ¶ 33, and fought against coalition forces in Afghanistan, *id.* at ¶¶ 37-45. After Hicks admitted to being an "alien unlawful enemy combatant" as defined by the Military Commissions Act, 10 U.S.C. § 948(c), *id.* at ¶ 3h, the military commission recommended a sentence of seven years for Hicks, *see* Exhibit 53, *United States v. Hicks*, Member Instructions, March 30, 2007. Pursuant to a pre-trial agreement, *see* Exhibit 5, *United States v. Hicks*, Appendix A to Offer for a Pretrial Agreement, ¶ 1a, all but nine of these months were suspended and Mr. Hicks promptly returned home to Australia.

Salim Hamdan was convicted by a military commission of providing material support for terrorism under 10 U.S.C. § 950v(25). The factual basis for this conviction were allegations that, from February 1996 to November 2001, Hamdan provided personnel — i.e., himself — to al Qaeda; he trained at al Qaeda camps, served as a driver for Osama Bin Laden and other al Qaeda members, and transported weapons for al Qaeda. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 570 (2006). Hamdan was sentenced by the commission to 66 months of confinement, and was credited with over 61 months for time spent during pretrial detention at Guantanamo. *See* Exhibit 75, *United States v. Hamdan*, P-009, Defense Opposition to Prosecution's Motion for Reconsideration, Oct. 10, 2008. He, too, went home immediatley.

To avoid unwarranted sentence disparities among these defendants, who have been found guilty of similar, though arguably even more advanced criminal activities, Mr. al-Marri should similarly receive a sentence well below the applicable advisory range. *See* 18 U.S.C.

§ 3553(a)(6); *United States v. Bartlett*, 567 F.3d 901, 907 (7th Cir. 2009).  Indeed, Mr. al-Marri has, in light of these cases, already served more than enough time.

> b.    *Criminal justice 2339B cases*

A comparison to other defendants, sentenced in the federal criminal justice system for providing or conspiring to provide material support to al Qaeda in violation of 18 U.S.C. § 2339B, also demonstrates that a sentence of significantly less than the advisory Guideline sentence of 180 months is required to avoid unwarranted disparity in sentences for similarly situated defendants.

From September 2001 through July 2007, 108 defendants were charged with at least one count of violating 18 U.S.C. sect 2339B.  *See* Robert M. Chesney, *Federal Prosecution of Terrorism-Related Offenses: Conviction and Sentencing Data in Light of the "Soft Sentence" and "Data Reliability" Critiques*, 11 Lewis & Clark L. Rev. 851, 884 (2007).  Thirty of those defendants proceeded to sentencing.  *Id.* at 885.  The mean sentence of these thirty defendants was either 122.73 months or 118.73 months, *id.* at 886, T.7.[29]  For the 23 defendants who, like Mr. al-Marri, entered guilty pleas, the mean sentence was either 107.91 months or 102.70 months.  *Id.* at 886, T. 8.  For the 12 defendants who specifically pleaded guilty to conspiracy to provide material support — the charge to which Mr. al-Marri has pled — the mean sentence was 82.83 months.  *Id.* at  888 T. 10.  These figures demonstrate that it is common for defendants who have been convicted of violating 18 U.S.C. § 2553B to receive sentences significantly below the statutory maximum for that offense, and, for the offense to which Mr. al-Marri has pled guilty, less than the time he has already served.

---

[29] Two means are calculated because some defendants received different sentences on two separate counts of violating §2339B.  The first mean is calculated using the high sentence; the second is calculated using the low sentence.  11 Lewis & Clark at 886.

A recent sentencing decision provides a particularly useful point of comparison when considering Mr. al-Marri's sentence. Mohamed Abdullah Warsame pled guilty to a single count of conspiring to provide material support to al Qaeda. *See United States v. Warsame*, Memorandum Opinion on Sentencing, Case No. 04-CR-00029-JRT (D. Minn. Aug. 24, 2009). Warsame admitted to attending an al Qaeda training camp led by Osama bin Laden, to providing services as a security guard and English teacher for al Qaeda, to maintaining channels of communication with al Qaeda operatives in Afghanistan and Pakistan, and to soliciting money from others and wiring those funds to a bank account in Pakistan, knowing that the funds would be used to support al Qaeda. *Id.* at p. 2-3.

In fashioning Warsame's sentence, the district court found the Hamdan case to be a useful analogy. *Id.* at 7 ("Despite these relatively weighty responsibilities within al Qaeda and Hamdan's close nexus with al Qaeda leadership, a military jury sentenced him to 66 months of imprisonment.") The court also looked to the cases of the "Lackawanna Six," who were accused of traveling to Pakistan and then attending an al Qaeda training camp in Afghanistan. *Id.* at p. 7 (citing *United States v. Goba*, 240 F.Supp.2d 242, 244-45). These individuals received firearms and tactical training, heard lectures justifying martyrdom, and attended a speech delivered by bin Laden, urging attacks on the United States. *Id.* At the time they were arrested in the United States, authorities found a gun, a document justifying suicide as a form of martyrdom, and an email that made reference to a future terror operation. *Id.* The sentences in that case ranged from 84 to 120 months.

In view of the sentences imposed on the Lackawana Six, the court sentenced Warsame to 92 months. *Id.* at 8. The court reasoned that "it simply finds nothing that adequately demonstrates that Warsame was a part of a specific plot against the United States, and very little

that suggests that he was especially useful to al Qaeda, either during his training in the Middle East or upon his return to North America." *Id.* at 5-6. This characterization of Warsame's conduct is especially relevant, given that the record showed that Warsame had acted as a security guard while at the al Qaeda camp, and had delivered funds to al Qaeda while in North America — both tangible forms of support that go far beyond what Mr. al-Marri has stipulated to having done. Here, as noted previously, Mr. al-Marri never actually took any steps that furthered a specific operation or actually provided "useful" support to al-Qaeda.

In sum, the sentences imposed on other defendants, who have been sentenced in the federal criminal justice system for violations of 18 U.S.C. § 2339B even more clearly demonstrate that in this case a sentence significantly less than the advisory Guideline sentence of 180 months is required in order to avoid unwarranted sentencing disparity.

## VII.   CONCLUSION

For the foregoing reasons, the Court should impose a just and appropriate sentence that varies significantly downward from the suggested advisory Guidelines range. Indeed, under the truly unique circumstances of this case — in which the defendant was subjected to a process whereby he was removed from the criminal justice system in which he was charged, subjected to incommunicado, isolated detention, including unspeakable abuse that has now been outlawed by our government, and then returned to face charges and sentencing — no further incarceration ought, as a matter of justice, to be imposed. When the Court considers all of the facts of the very inchoate offense here at issue, and of an offender who is extraordinary for the transformation he has undergone and the understanding he has shown, such a sentence well below the advisory range is practically mandated. It is time for Mr. al-Marri to go home.

Dated:   October 20, 2009

Respectfully submitted,


**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
(973) 596-4500

*Attorneys for Defendant*
Ali Saleh Kahlah Al-Marri

By:   /s/ Lawrence S. Lustberg
         Lawrence S. Lustberg

      Andrew J. Savage III
      Savage & Savage PA
      15 Prioleau Street
      P.O. Box 1002
      Charleston, SC 29401
      843/720-7470

      L. Lee Smith
      Hinshaw & Culbertson
      416 Main Street, Suite 600
      Peoria, IL 61602
      309/674-1025