1          IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                     Plaintiff,       ) Criminal No.
                                       ) 09-10030
7          vs.                         ) Peoria, Illinois
                                       ) October 28, 2009
8   ALI SALEH KAHLAH AL-MARRI,         )
                                       )
9                     Defendant.       )

10

11

12              SENTENCING HEARING
                 VOLUME 1 OF 2
13

14

15                  BEFORE:

16         HONORABLE MICHAEL M. MIHM
            United States District Judge
17

18

19

20

21

22

23

24

25

```
 1                         APPEARANCES:

 2


 3                    DAVID E. RISLEY, ESQ.
               Assistant United States Attorney
 4                    318 S. Sixth Street
                   Springfield, Illinois  62701
 5
                          -- and --
 6
                     MS. JOANNA BALTES
 7                  Department of Justice
                   Counterterrorism Section
 8                 950 Pennsylvania Avenue NW
                    Washington, DC  20530
 9            (Appeared on Behalf of the Government)


10
                     L. LEE SMITH, ESQ.
11                  Hinshaw & Culbertson
                  416 Main Street, Suite 600
12                  Peoria, Illinois  61602

13                        -- and --

14                ANDREW J. SAVAGE III, ESQ.
                   Savage & Savage, P.A.
15                   15 Prioleau Street
               Charleston, South Carolina  29401
16
                          -- and --
17
                 LAWRENCE S. LUSTBERG, ESQ.
18                    Gibbons PC
                   One Gateway Center
19                Newark, New Jersey  07204
              (Appeared on Behalf of the Defendant)
20

21

22

23
                    Karen S. Hanna, C.S.R.
24                U.S. District Court Reporter
                  Central District of Illinois
25    Proceedings recorded by mechanical stenography, transcript
      produced by computer
```

1                          **I N D E X**

2

  WITNESS                                         PAGE
3
  SANFORD SEYMOUR
4    Direct Examination by Mr. Savage            16
    Cross Examination by Ms. Baltes             81
5   Re-Direct Examination by Mr. Savage         93

6   JOHN PUCCIARELLI
     Direct Examination by Mr. Lustberg          101
7
  DEBORAH SIRRATT
8    Direct Examination by Mr. Risley            116
    Cross Examination by Mr. Lustberg           139
9   Examination by the Court                    163
    Continued Cross Examination by Mr. Lustberg 167

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              THE COURT:  Good morning.  This is the case of

 2    the United States of America vs. Ali Saleh Kahlah

 3    al-Marri, criminal number 09-10030.  I would like counsel

 4    to please stand and identify yourselves, that is anyone

 5    who is of record in the case.  Let's start with the

 6    Government.

 7              MS. BALTES:  Good morning, Your Honor.  Joanna

 8    Baltes on behalf of the United States.

 9              MR. RISLEY:  David Risley from the U.S.

10    Attorney's Office on behalf of the United States.

11              MR. SMITH:  Lee Smith on behalf of the

12    defendant.

13              MR. LUSTBERG:  Good morning, Your Honor.

14    Lawrence S. Lustberg on behalf of the defendant.

15              MR. SAVAGE:  Good morning, Your Honor.  Andrew

16    Savage on behalf of the defendant.

17              THE COURT:  Good morning.  We are here today

18    because Mr. al-Marri previously entered a plea of guilty

19    to Count 1 of an indictment charging conspiracy to provide

20    material support and resources to a foreign terrorist

21    organization, that being al-Qaeda.

22              At the time of the plea, the Court directed the

23    probation office to prepare a pre-sentence report.  That

24    was done.  Copies were made available to everyone,

25    including the defendant.

1          Let me ask some representative from defense

2     counsel, have you had an adequate opportunity to read this

3     report and review it with your client?

4          MR. LUSTBERG:  Yes, Your Honor.

5          THE COURT:  Based on your reading and review, do

6     I understand correctly that you have identified formally

7     two objections to the report?

8          MR. LUSTBERG:  Yes, Judge.  Just to flesh this

9     out a bit, we had fairly extensive contact with the

10     probation officer, Ms. Kennedy in particular, who was

11     extremely instructive and productive, and as a result of

12     the conference calls that we had we were able to resolve

13     all other objections that we initially filed and so those

14     two are the only ones that remain.

15          THE COURT:  Okay.  And I do want to comment on

16     that, too, because I had spoken with the probation office

17     and I want to thank her for her good work and also counsel

18     for both sides because I believe we started out with about

19     30 objections and it's now down to two, so that's very

20     good.

21          MR. LUSTBERG:  Good progress.

22          THE COURT:  Okay.  Now, Mr. al-Marri, have you

23     had a reasonable opportunity to read this report and

24     review it with your attorneys?

25          MR. AL-MARRI:  Yes, Your Honor.

1           THE COURT:  Based on your reading and review, is

2   it correct that you have identified the objections that

3   your attorney has referred to?

4           MR. AL-MARRI:  Yes, Your Honor.

5           THE COURT:  And we will resolve those during the

6   course of this hearing.  And also you understand you will

7   have an opportunity to present evidence in mitigation and

8   will also have the opportunity to make a statement to the

9   Court on your own behalf before I impose sentence.  Do you

10  understand that?

11          MR. AL-MARRI:  Yes, Your Honor.

12          THE COURT:  Thank you.

13          MR. AL-MARRI:  I will.

14          THE COURT:  Let me ask the Government, are you

15  aware of anything in the report that is inaccurate?

16          MR. RISLEY:  No, Your Honor.

17          THE COURT:  Let me make a few introductory

18  comments here and then tell you how I think we should

19  proceed.  I'm certainly open to input from everyone on

20  this.

21          But I know that there have been two formal

22  objections filed.  One is an objection to page 16,

23  paragraph 56, claiming that there's no evidence that the

24  defendant contributed material support with the intent,

25  knowledge or reason to believe that that would be used to

1   commit or assist in the commission of a violent act and

2   that involves guideline 2M5.3(b)(1)(E).

3           The second objection is an objection to page 16,

4   paragraph 58, claiming that the defendant should have been

5   given a downward adjustment for what is claimed as his

6   minimal or minor role in the offense and that involves

7   guideline number 3B1.2.

8           In reading over all of this material that has

9   been presented, it seems to me that while they perhaps

10  have not been stated formally as objections as they

11  sometimes are in pre-sentence reports, it seems to me that

12  there are two other objections that the defense is

13  pursuing here.

14          One:   That there should be a downward departure

15  because the criminal history VI overstates the criminal

16  history and the defendant's likelihood to recidivate.   Is

17  that correct?

18          MR. LUSTBERG:   Yes, Your Honor.   We, as the

19  Court is aware, filed that as a departure application

20  because that's the way 4A1.3 is styled and we discussed

21  that, both of our departures, with probation and thought

22  that would be most helpful to the Court, but we're happy

23  to deal with it any way Your Honor wishes.

24          THE COURT:   The other item is a claim that there

25  should be a downward departure because of the length and

 1  harshness of conditions of confinement.  Correct?

 2          MR. LUSTBERG:  Correct, Judge.

 3          THE COURT:  Well, what I would like to do here,

 4  I would suggest what we do is this.  I understand that

 5  each side has one or two witnesses and are they available

 6  now?

 7          MR. RISLEY:  Yes.  For the Government we have

 8  one, Your Honor.

 9          THE COURT:  How many witnesses do you have?

10          MR. LUSTBERG:  We have two, Judge, and they are

11  available.

12          THE COURT:  What I was going to suggest is that

13  we take the witness testimony first and then we'll go

14  through and address each of the objections, then the

15  Government will have -- if in addition to the witness you

16  have any other evidence in aggravation, you'll have the

17  opportunity to present that.  The defense can present any

18  additional evidence in mitigation.  Then I'll hear

19  statements from counsel as to what the sentence should be

20  and from the defendant and then the sentencing will occur.

21  Is that procedure acceptable to both sides?

22          MR. LUSTBERG:  Yes, I think it is, Judge.  We

23  spoke to the Government before this and given the nature,

24  really the thrust of the defense's presentation, which is

25  that we're requesting this departure and given in

1   particular the nature of the testimony that we're going to

2   present, I think both sides were in agreement that it

3   might make sense -- of course it's up to Your Honor -- for

4   the defense witnesses to go first.

5              THE COURT:  That's fine.

6              MR. LUSTBERG:  Because the Government's witness

7   is more in the nature of rebuttal, I think, of our

8   presentation.  I don't mean to speak for them.

9              THE COURT:  That's fine.  Are you prepared to

10  present a witness now?

11             MR. LUSTBERG:  Mr. Savage will present our first

12  witness, Your Honor.

13             THE COURT:  Thank you.

14             MR. SAVAGE:  Good morning, Judge.

15             THE COURT:  Good morning.

16             MR. SAVAGE:  Judge, I did have some remarks I

17  would like to make if that is permissible for the Court at

18  this time.

19             THE COURT:  If they are involved specifically

20  with your positions, yes.

21             MR. SAVAGE:  Judge, I first would like to thank

22  the Court for the courtesies that were extended by both

23  the magistrate court and the district court during our

24  representation of Mr. al-Marri.

25                 In today's presentation we have striven as best

1    we could to properly prepare ourselves to give the Court

2    an idea of the life of Mr. al-Marri over the past eight

3    years.  In considering the complicating factors of that,

4    such as the distance between the witnesses who are now

5    scattered about the country, the volume of information

6    which is literally thousands and thousands of pages, both

7    handwritten documents and more recently electronic

8    documents, however which did not have a search capability,

9    it was not an easy task.  We have also attempted to speak

10   to a number of witnesses which the Government has made

11   available in the past month, primarily those who were

12   concerned with the custody of Mr. al-Marri at the facility

13   in Charleston, and we have been successful in doing that

14   and today we will present two witnesses who supervised his

15   custody.  One is a civilian witness, Sandy Seymour, the

16   highest ranking civilian at the Brig at that time, and

17   also one of the last commanders of the Brig who supervised

18   his custody.

19           In the last month, just on September 21, we got

20   the first production of documents.  Those were, as you

21   might recall, the electronic log documents from the Brig.

22   I think they consisted of some 36,000 entries.  In

23   addition to that there were 15 handwritten logs maintained

24   at the Brig, five for each of the detainees that were

25   there, consisting of thousands of pages.  In addition to

1    that there were videos that were maintained 24 hours a

2    day, 7 days a week, some of which became available just

3    this past week.

4              Having given us that information, we -- for

5    instance, the videos were in five different formats, none

6    of which were compatible with each other, so we have had

7    to review them, edit them, sift them to put them together

8    for this presentation.  I say that only because we're

9    going to do our best effort to make this a smooth and

10   hopefully persuasive application to this Court.

11             There are, however, some things which I think

12   the Court should note that we have not received all the

13   information that we would like to present to the Court.

14   By way of example is the computer which was taken from

15   Mr. al-Marri at or about the time of his initial detention

16   was examined by the United States Government and certain

17   opinions were rendered regarding the contents of that

18   computer.

19             Months ago we asked the Government if we could

20   interview the examiner of that computer.  That request was

21   denied.  We were -- then it was suggested to us that we

22   submit a series of questions to the Government regarding

23   the examination of that computer and we did so.  Those

24   submissions were offered to the Government in August.  We

25   have not received a response.

1          I say that only to give you background because

2    we have offered in part of our submission to the Court for

3    sentencing purposes opinions of various computer experts,

4    former head of the FBI forensic computer lab, that the

5    information that was rendered by the Government regarding

6    the content of that computer, regarding the ability of

7    that computer and regarding the research conducted in that

8    computer was false.  Nonetheless we don't have -- we have

9    not had an opportunity to speak to that examiner to see

10   what we may have missed.

11         Additionally we have sought permission to speak

12   with a federal agent by the name of Tim Kirkham who was,

13   as I'm understanding, the head of the anti-terrorism and

14   counter-terrorism in this district for several years.  He

15   had an opportunity, along with another Government

16   representative, to speak to Mr. al-Marri on the evening of

17   his guilty plea and spoke to him for some eight hours.  We

18   were told that he was out of the country and unavailable.

19   We were recently told that he's back in the country, but

20   we have not had an opportunity to speak to him.  We

21   thought it would be important for the Court to know the

22   attitude, transformation that Mr. al-Marri underwent the

23   past eight years.

24         Having said that, we do have available Mr. Sandy

25   Seymour.  We would ask him to come to the witness stand at

1    this time.

2              MR. RISLEY:  Your Honor, before that happens,

3    may the Government have an opportunity to respond to some

4    of the allegations that were made that are unrelated to

5    the testimony of this witness?

6              THE COURT:  Go ahead, but please be brief.

7              MR. RISLEY:  I will.  Your Honor, I'm a bit

8    perplexed, also a bit offended by some of these

9    accusations.  Let's take the computer first for example.

10             There was a stipulation as part of the factual

11   basis for the plea agreement as to the pertinent contents

12   on the computer, including the fact that there was

13   evidence of research into cyanides and sulphuric acid.

14   Those were the pertinent facts.  Those are the only facts

15   of which I'm aware that the Government has been asserting

16   about the computer other than the fact that it had -- the

17   uncontroversial fact that it had an anonymizing program on

18   it.

19             Now for the defense to now assert that they have

20   had examiners who have looked at the computer and

21   determined that those facts to which the defendant

22   stipulated and personally admitted to the Court at the

23   time of his guilty plea are false surprises me for two

24   reasons.  Number one:  They were stipulated.  Number two:

25   My reading of the reports of their forensic examiners

1    confirmed those two facts, not denied it.  They did

2    contest all sorts of allegations that the Government has

3    never asserted, kind of paper tiger sort of or strawman

4    sort of arguments, but at no time has the defense ever

5    asserted to the Government up until now that the facts

6    stipulated in the plea agreement were false.  That raises

7    some issues in itself.

8            Now as to the examination of the computer, there

9    were questions that were posed to us about subjects that

10   the Government was not asserting and in the course of our

11   conversations there was never any suggestion that there

12   was still a lingering need for those to be answered.  We

13   have done everything we could to accommodate the defense

14   in its independent examination of the computer.

15           Now, secondly, as to Tim Kirkham, Tim Kirkham is

16   a Government witness.  He's an FBI agent.  There are

17   procedures which we pointed out from the beginning -- in

18   fact, we made reference to them at the time of the change

19   of plea hearing, as I recall, or one of the subsequent

20   hearings -- that the defense has to comply with.  There

21   are federal regulations before a federal employee,

22   especially an FBI agent with a security clearance as

23   Mr. Kirkham does and with access to sensitive information

24   that he has, there are certain procedures the defense has

25   to go through.  Most recently when this request for his

1    testimony was renewed, we again pointed out they have yet

2    to comply with those regulations.  I cited them to the

3    defense.  I told them there was an affidavit that has to

4    be filed, that there are approvals that have to be

5    obtained, and also pointed out that we were not trying to

6    be obstructionist.  It simply is that we are required by

7    federal regulations to obtain that approval before he can

8    testify.  We then received an e-mail that the defense did

9    not want to call him as a witness.  Now those I think are

10   the facts.  I'm a little surprised by these allegations.

11              THE COURT:  All right.  Well, I'm going to

12   comment on this briefly and then we're going to get to the

13   point.

14              I first of all want to say that I think if my

15   math is correct, the Court has reviewed approximately a

16   thousand pages of briefs and exhibits that have been

17   submitted by one side or the other in preparation for

18   today's hearings.  Concerning this accusation about the

19   computer, the bottom line on this is the defense has never

20   come to the Court to my knowledge or at least in recent

21   days or recent weeks and asked me to force the Government

22   to do something.  I would normally expect if you tried to

23   get something from them, as in any other case, and they

24   don't want to comply or can't comply or whatever that you

25   would come to the Court and the Court would resolve that

 1   dispute.  The same thing is true with the FBI agent.  This

 2   is the first I've heard about an issue with him.  No

 3   request was made of me to intervene in that.

 4          So one last comment concerning the computer.

 5   One of the items that I read in all these exhibits was the

 6   defendant's forensic examiner who looked at the

 7   information from the computer and my understanding was he

 8   did not say that the facts the Government was asserting

 9   were false, but rather their conclusions from the facts

10   were not supported by what was contained on the computer.

11   Having said that, call your witness.  Who is your witness?

12          MR. SAVAGE:  Sandy Seymour.

13                      **SANFORD SEYMOUR,**

14   Having been first duly sworn, was examined and

15   testified under oath as follows:

16                    **DIRECT EXAMINATION**

17   BY MR. SAVAGE:

18   Q     Good morning, Mr. Seymour.

19   A     Good morning.

20   Q     Mr. Seymour, if you would introduce yourself to the

21   Court in terms of your name, which you've already given,

22   but your address and where you work?

23   A     My name is Sanford Edwin Seymour, S-E-Y-M-O-U-R.  I'm

24   the former technical director and currently a contractor

25   at the Naval Consolidated Brig in Charleston, South

1  Carolina.

2  Q    How long have you been at the Naval Brig in South

3  Carolina?

4  A    Twenty years, sir.

5  Q    And is that since the day it opened?

6  A    Yes, sir, since the day it opened.

7  Q    In terms of the management of the Brig, can you

8  identify for the Court where you fit in the management

9  scheme?

10  A    I'm the direct advisor and consultant to the

11  commanding officer.

12  Q    Are you the senior civilian there?

13  A    Yes, sir, I am the senior civilian, or was the senior

14  civilian.

15  Q    And you were in that position from 2003 through 2009,

16  earlier this year?

17  A    Yes, sir.

18  Q    And you were in that position at all times that

19  Mr. al-Marri was present at the facility?

20  A    Yes, sir.

21  Q    Prior to your engagement at the Brig, what was your

22  background?

23  A    I was with the South Carolina Department of

24  Corrections as a deputy warden for approximately 15 years.

25  Q    And how many years in total have you been in

1   corrections?

2   A     Approximately 35, sir.

3   Q     Your presence here today is by request of the

4   defense?

5   A     Yes, sir.

6   Q     And the Government -- excuse me -- the defense has

7   paid you for your presence here today in terms of

8   transportation, what-not; is that correct?

9   A     Yes, sir.  That's correct.

10  Q     Now let's take a look at this document 131-01.

11  Actually it's a photograph and I would ask you to identify

12  that.

13  A     Sir, that's an overhead shot of the Naval

14  Consolidated Brig in Charleston, South Carolina.

15  Q     And the mission of the Consolidated Brig prior to

16  2001 was what?

17  A     By and large the mission was to return the most

18  people that we could back to active service after doing

19  their time and also preparing those people that could not

20  be taken back to active service to be good citizens when

21  they were released from the Brig.

22  Q     So the inmates that were housed at the Brig were all

23  military members; is that correct?

24  A     Yes, sir.

25  Q     Where it says "consolidated", that represents that it

1   was a joint forces mission; that is the Air Force, the

2   Coast Guard, the Navy, Marine Corps all participated in

3   terms of employees and inmates?

4   A    Yes, sir.

5   Q    And, in addition, there are also Army detainees there

6   or UCMJ?

7   A    Yes, sir.

8   Q    If you look over at the overhead, there appears to be

9   like triangular pods.  Is that what they are?

10  A    Yes, sir.  Those are housing units.

11  Q    And the one that has just come into view now is known

12  as the special housing unit?

13  A    Yes, sir.

14  Q    And tell the Court, if you would, what that mission

15  was within the mission of the Consolidated Naval Brig?

16  A    That was to house enemy combatants as designated by

17  the President of the United States.

18  Q    And during the course of that mission you were in

19  that same position?  The position you held covered the

20  special housing unit as it did the UCMJ function; is that

21  correct?

22  A    Yes, sir.  That's correct.

23  Q    Now on June 13 -- do you recognize this photograph?

24  That's June 13 -- or excuse me -- the 23rd of June of

25  2003?

1   A     Yes, sir.  I recognize that as Mr. al-Marri.

2   Q     Is that his booking, if you will, photograph?

3   A     Yes, sir, that is.

4   Q     And at that time the UCMJ side of the house mission

5   had the same cell structure and cell block structure as we

6   saw in the overhead as the SHU; is that correct?

7   A     Yes, sir.  That's correct.

8   Q     Now let's look at photograph 116-01 and tell us what

9   this is.

10  A     That's a standard configuration cell in the special

11  quarters area of the Navy Brig at Charleston, South

12  Carolina.

13  Q     Now in the SHU, that cell looked differently.  And

14  let's put up a photograph of the SHU sell.

15  A     Yes, sir.  That's a SHU cell.

16  Q     The photograph, for the Court's knowledge, on the

17  left is the standard cell which would include a mattress,

18  which would include a nightstand --

19        MS. BALTES:  Objection, Your Honor.  I would ask

20  Mr. Savage to ask the witness the questions, please.

21        THE COURT:  Sustained.  Also, what's the exhibit

22  number on the one on the right?  Does that have an exhibit

23  number?

24        MR. SAVAGE:  I think they were all one exhibit

25  number.

1             THE COURT:  It's all one?

2             MR. SAVAGE:  It's all one exhibit number.

3             THE COURT:  All group exhibit what?  131-01?

4             MR. SAVAGE:  The exhibit on the right is Exhibit

5     No. 132.

6             THE COURT:  Thank you.

7     Q    Mr. Seymour, if you would, distinguish a standard

8     cell from the operational detainee cell as existed in June

9     of '03.

10    A    The difference would be that there is no mattress in

11    the detainee cell and there's no desk and adjoined seat.

12            THE COURT:  We have a pointer if you want to use

13    that.  It's right there.  Go ahead.

14    A    That's the bed configuration in the detainee cell and

15    as you see in this photo there is a desk with an adjoined

16    seat.

17    Q    On the upper left-hand picture, describe what's in

18    that wall.

19    A    Are you speaking of the window?

20    Q    Yes, sir.

21    A    Yes, sir.  That's a window in that standard cell.

22    Q    And can you see in and out of that window?

23    A    Yes, sir.

24    Q    Tell us about the window in the detainee cell.

25    A    The window in the detainee cell was blacked out where

1 | it could not be seen out of.

2 | Q    If you would, describe the material of the bed in the

3 | detainee cell.

4 | A    That's a steel high security bunk.

5 | Q    Where you see these black images on that, what are

6 | those?

7 | A    That's a checkerboard -- those are blank areas in

8 | that bunk.

9 | Q    So that on the right-hand side, is that a smooth

10 | surface or is that a -- is it a smooth piece of metal?

11 | A    No, sir.  It's -- those are cut-outs where you see

12 | those dark places or spots there.

13 | Q    Now in the photograph on the left, the UCMJ side of

14 | the house, who was in charge of the environmental factors

15 | on that side?

16 | A    That was the Defense Investigation Service.

17 | Q    The question I repeat on the standard cell.

18 | A    I apologize, sir.  That's -- the Navy Consolidated

19 | Brig was in charge of those cells.

20 | Q    So the commander of the Brig had total decision

21 | process in accordance with the rules and protocol of the

22 | Brig to make decisions there about environmental factors?

23 | A    Yes, sir.

24 | Q    Next, please, 124-001.  In terms of the detainee

25 | area, who was in charge of that?

1    A    That would be the Defense Intelligence Investigation

2    Service.

3    Q    132-001, please.  During the stay at the Brig, during

4    its mission for the detainees, how many detainees were

5    there?

6    A    Three, sir.

7    Q    And were they named or were they used by call

8    letters?

9    A    Both.  Detainee number 1, detainee number 2, detainee

10   number 3.

11   Q    Does that represent when they arrived?  Is that what

12   the 1, 2 and 3 would be?

13   A    Pretty much, yes, sir.

14   Q    So Padilla was there first, along comes al-Marri,

15   then Hamdi was the last one to arrive?

16   A    Yes, sir.

17   Q    And on certain times they were all there at the same

18   time?

19   A    For a period of time, yes, sir.

20   Q    Now while they were there, did you keep records of

21   their conduct and of their environment on a regular basis?

22   A    Yes, sir.

23   Q    133-01, please.  Were those handwritten, at least in

24   2003, in several different logs for each detainee?

25   A    Yes, sir.

1   Q    There was a general log book?

2   A    Yes, sir.

3   Q    And that had entries and handwriting for every 15

4   minutes or so?

5   A    Yes, sir.

6   Q    And there was a passdown log which was information

7   from one shift to the next?

8   A    Yes, sir.

9   Q    And then there was a separate recreation log, shower

10  log, visitation log, medical log and meal log?

11  A    Yes, sir.

12  Q    So for each detainee you had those handwritten

13  entries?

14  A    Yes, sir.

15  Q    In addition to that, 134-001, the Brig staff kept the

16  detainees under 24-hour-a-day, 7-day-a-week surveillance?

17  A    Yes, sir.

18  Q    And during your review of the records it appears that

19  the video data records between June of '03 and sometime in

20  the spring of '04 were destroyed?

21  A    They would have been taped over.

22  Q    No longer exist to the best of your knowledge?

23  A    Yes, sir.

24  Q    Then from the spring of 2004 forward there is

25  sporadic availability?  Some exist, some don't?

1    A    Yes, sir.

2    Q    I say that only to set the stage for the Court's

3    review of the following documents and video.  Now as by

4    way of example, 135-001, there would be a handwritten

5    entry into a large book and it would have information as

6    diverse as on the 8th of July somebody told EC -- and this

7    would be EC 2 because they were to each inmate --

8              THE COURT:  Is that a name on that document?  I

9    thought the names were all going to be --

10             MR. SAVAGE:  Judge, the names that you see up

11   here are military employees that are not relevant.  This

12   PDL, which is the passdown log, was reviewed by an

13   enlisted supervisor in the cell.  What we did was try to

14   redact everyone that was pertinent to this information.

15             THE COURT:  Thank you.

16   Q    So the log would indicate then on the 8th of July of

17   2003 what?

18   A    That Mr. al-Marri was told that he was not to -- that

19   he would not be getting his Quran.

20   Q    On the 8th of July on the passdown log entry later,

21   in entry 136-001 --

22             THE COURT:  Let me interrupt.  These numbers

23   you're using, are those exhibit numbers?  Are they page

24   numbers?  Are they Bate stamp numbers?  What are they?

25             MR. SAVAGE:  These are the internal numbers I

1  have used with our audio visual fellow, but that whole

2  thing has been submitted to the Court.

3          THE COURT:  I appreciate that, but the record --

4  just for the record, I don't have any problem when you

5  cite one of these numbers of just making that the exhibit

6  number, but the record has to be clear for reference

7  purposes.  I would suggest that would be the easiest

8  thing.

9          MR. SMITH:  We have paper copies of these, Your

10  Honor.

11          THE COURT:  That's fine.  For the record, why

12  don't we just say the number and --

13          MR. SAVAGE:  And just give --

14          THE COURT:  -- use that as the exhibit number.

15          MR. SAVAGE:  Thank you, Your Honor.

16  Q    Mr. Seymour, Exhibit No. 136-001 is also a passdown

17  log entry for July of '03; is that correct?

18  A    Yes, sir.

19  Q    What does that indicate?

20  A    It indicates that the individual was told that he

21  would not be given toilet paper unless it was needed for

22  bowel movement.

23  Q    Now as a general principle at this time, you've

24  already indicated that DIA was in charge of the

25  environmental factors, and were these decisions made by

1  the Defense Intelligence Administration?

2  A    The decision would have -- or the request would have

3  been made by the DIA.

4  Q    Now on the 10th of July in document 137-001, EC 2,

5  which is the defendant al-Marri, was visited by somebody

6  whose name has been redacted and what was he told?

7  A    The log reflects that he was told that he did not

8  have rights.

9  Q    Now on the 13th -- the 15th of July, document

10  138-001, he was visited by somebody and he made a request.

11  A    It's a question about whether he would have socks or

12  not.

13  Q    And the answer was?  Do you recall?

14  A    I don't recall, sir.

15  Q    Do you recall whether or not at this time he had

16  socks?

17  A    No, sir.  I don't recall.

18  Q    Do you recall whether or not there was a pattern of

19  concern regarding the air conditioning and the level of

20  air conditioning in the Brig?

21  A    Mr. al-Marri expressed that he was cold.

22  Q    Take a look at Exhibit 2-001, please, and,

23  Mr. Seymour, would you tell us the date of this exhibit

24  and what happened that day based on the log entries?

25  A    It appears to be September 12, 2003.  The first entry

1  says that EC was out of his cell for interview and that he

2  was returned.  He left at 16:42 and was returned at -- or

3  was placed in the interview room at 16:46 and the

4  interview began at 16:48.  The second entry is at 17:45.

5  Q    Those of course are military times that are used in

6  the Brig.  Judge, if I may.  Mr. Seymour, have you had

7  recent eye surgery?

8  A    Yes, and scheduled for more.

9  Q    So I just wanted to --

10        THE COURT:  Can you read that, sir?

11  A    If I could -- if it could be magnified just a little

12  more, please.

13        THE COURT:  I'm not sure they can do that.

14  Maybe they can.  Does that help?

15  A    Yes, sir.  The second entry is the end of the

16  interview and he was escorted out of the interview room.

17  Q    So the logs included the documentation of when he was

18  taken out of his cell on every occasion and the logs

19  actually include everything he did within his cell whether

20  it was meals or walking or bodily functions or what-not?

21  A    Yes, sir.

22  Q    And on 12 September he was taken out for interviews?

23  A    Yes, as the log says, sir.

24  Q    And let's look at 123-001.  Does this represent

25  accurately the interview room where he was interrogated?

1    A    Yes, sir.

2    Q    Does it represent the way he would be earmuffed,

3    goggled, belly chained, handcuffed and leg ironed?

4    A    Yes, sir.

5    Q    And was he also -- his leg irons were buckled to the

6    floor?

7    A    Yes, sir.

8    Q    And in that position was he able to say scratch his

9    nose?

10   A    Probably not, sir.

11   Q    Does that accurately represent where these interviews

12   took place?

13   A    Yes, sir.

14   Q    Now on Exhibit 03-001, was he again taken out on the

15   13th of September?  Your Honor, if I may have the Court's

16   permission to lead him on issues that are not --

17         THE COURT:  It think that would be wise under

18   the circumstances.  Go ahead.

19   Q    I'm looking at document number 400 -- excuse me --

20   3-001, Mr. Seymour, and does it indicate on the 13th of

21   September he was removed from his cell, taken to the

22   interview room for an interview and returned between the

23   hours of 11:04 and 11:23?

24   A    Yes, it does.

25   Q    And looking at Exhibit No. 04-001, this would be the

1    passdown log which would include information from shift to

2    shift?

3    A    Yes, sir.

4    Q    And is it directed there that the interrogators asked

5    that until the time -- "We are to take note of all emotion

6    and every little movement of EC 2 per" -- whoever that

7    person was giving the order?

8    A    Yes, sir.

9    Q    Does it also reflect disparity in the treatment of

10   the enemy combatants who are housed at the Brig in

11   September of '03?  For example, EC 1 Padilla was receiving

12   news magazines as a gift from one of the interrogators?

13   A    Yes, sir.

14   Q    And EC 2 was shaking going to and coming from the

15   interview room?

16   A    As it reflects in the log, sir.

17   Q    And in Exhibit No. 05-001, which again is a passdown

18   log, there was a continuing complaint of Mr. al-Marri that

19   he was not receiving sufficient food?

20   A    Yes, sir.

21   Q    And while we don't have the documents before you,

22   were you aware of the weight loss of Mr. al-Marri between

23   June of '03 and June of '04?

24   A    Yes, sir.

25   Q    Approximately 40 pounds; is that correct?

1    A     Approximately, sir.

2    Q     Were there further instructions given to you by those

3    in control of his environment as reflected in document

4    006-001?  Were the instructions very clear that the Brig

5    staff, the Brig staff now, those under the authority of

6    the commander, were to watch every slightest movement and

7    document it?

8    A     Yes, sir.

9    Q     And that was done?

10   A     Yes, sir, it was.

11   Q     As represented in the general logs?  For example, in

12   007-000, it's documented once again that he was taken into

13   custody, removed from his cell and taken to the interview

14   room?

15   A     Yes, sir, and returned.

16   Q     And the same thing is documented in 008-001 on the

17   22nd of October, '03?

18   A     Yes, sir.

19   Q     And, again, at this time the interrogators were

20   coming into the Brig on a daily or weekly basis,

21   interrogating Mr. al-Marri and they would leave

22   instructions for the Brig staff as represented in 009-001,

23   and on that day Mr. Padilla and Mr. Hamdi were given

24   recreation call and allowed to shower and Mr. al-Marri was

25   denied prayer call?

1  A    Yes, sir.

2  Q    And while it's not documented here, it's documented

3  throughout those logs that deprivation of religious items

4  such as the Quran, refusal to tell him prayer times,

5  refusal to tell him which direction Mecca was in, was

6  constantly employed by Brig staff at the direction of the

7  DIA?

8  A    Yes, sir.

9  Q    Now let's talk also at this time, if we could stop

10  and take a look at some of the environmental factors,

11  you've already indicated that the windows to the outside

12  world were blackened.  In a prison is there a window

13  looking into the prison from the cell?

14  A    Yes, sir.  There's a slot window approximately 6 or

15  8 inches wide and approximately 16 inches, 18 inches long.

16  Q    We've previously seen photographs.  The Court has

17  reviewed what the special unit cell looked like.  One of

18  the differences between the UCMJ side and the special unit

19  cell was that the windows, the exterior, were blackened.

20  Let's take a look at the interior window.  Do you have

21  that one, the video?

22                    (Video played)

23  Q    The video that you've just seen, does that give a

24  fair representation of how Mr. al-Marri was isolated from

25  the prison itself during the time period we're addressing?

1    A    There was a magnet for periods of time placed over

2    the windows.

3    Q    And the -- I'm sorry.  I wanted to ask you a question

4    that might call for an opinion, so I won't ask it.  Let's

5    look at document 10-001.  You have stated that there was

6    some employment techniques directed by DIA, including that

7    which is documented in the passdown log on the 25th of

8    October that EC 2 will not be told when Ramadan starts.

9    A    Yes, sir.  That's what is reflected in the log.

10   Q    And you can compare that with how Padilla and Hamdi

11   were treated on the same day at the same time.

12   A    Yes, sir.

13   Q    Now in your experience with Mr. al-Marri, your

14   observations of him, of the three detainees who were

15   present at any time at the Brig was Mr. al-Marri the most

16   religious?

17   A    Yes.

18   Q    Now in document 11-001 reflecting the passdown log on

19   the 28th of October of '03, there are really five things

20   on here I would like you to look at.  The first one is

21   that EC 2 was to be blindfolded everywhere, blackout

22   goggles and ear protection?

23   A    Yes, sir.  That's what the log reflects.

24   Q    And when he had those goggles and earmuffs on,

25   theoretically at least he could not see or hear?

1  A    Yes, sir.

2  Q    And compare that to the treatment of Hamdi at the

3  same time where Mr. Hamdi was given a watch.

4  A    Yes, sir.  The log reflects he was given a watch.

5  Q    Same day, same time?

6  A    Yes, sir.

7  Q    And the log also reflects that Hamdi was watching

8  movies and if he wanted to watch them he could, if he

9  didn't want to watch them he didn't have to?

10  A    Yes, sir.

11  Q    It also reflects that when EC 1 and 3 were doing

12  their recreation they didn't have to wear leg irons, but

13  EC 2 did?

14  A    Yes, sir.

15  Q    And that's al-Marri?

16  A    Yes, sir.

17  Q    All at the direction of those in charge of his

18  custody and confinement, the DIA?

19  A    Yes, sir.

20  Q    Now document 13-001, part of what appears to be the

21  DIA directive was to manipulate Mr. al-Marri's sense of

22  self worth and on that date they told him he had to be

23  shaved and have a haircut?

24  A    Yes, sir.

25  Q    And that he would have to have the mirror removed

1    from his cell?

2    A    Yes, sir.

3    Q    And I know you've read the summaries of the sheets

4    that the DIA prepared about their interrogations, but in

5    that they reflect that was an intentional act to remove it

6    from his cell and they caught him looking at a reflecting

7    glass of some type.

8    A    Yes, sir.

9    Q    And again we go back to the daily logs on 14-001

10   where again it documents the interviews by DIA and others?

11   A    Yes, sir, it does.

12   Q    And then the hand down logs, among other things,

13   identify who was present in the interviews and it would

14   indicate that on some occasions there were up to seven

15   interrogators present?

16   A    I believe, sir, there was only one interrogator and

17   the rest were observers.

18   Q    But there were up to seven on occasion?

19   A    Yes, sir.

20   Q    And then there would be instructions given such as

21   indicated in 14-002 on the 9th of December that no one is

22   to talk to EC 2 at all?

23   A    Yes, sir.

24   Q    And that included all of the Brig staff?

25   A    That's what the intent was.

1    Q    That's what DIA's intent was?

2    A    Yes, sir.

3    Q    And, again, we go back to he was in that spartan cell

4    at that time, the windows outside and the windows inside

5    were blocked and he couldn't talk to anyone.  Also at that

6    time the Brig staff had their name tags covered with duct

7    tape at the direction of DIA?

8    A    Yes, sir.

9    Q    Now in document 14-0001, 18 December, interviewers

10   were present and on that occasion six months into his

11   confinement he was given a Quran?

12   A    Yes, sir, by the interviewer.

13   Q    Not by the Brig staff?

14   A    No, sir.

15   Q    Because the Brig staff had been prohibited from

16   providing him one?

17   A    Yes, sir.

18   Q    And he did not have his glasses in that time and on

19   this occasion for the first time the Brig staff -- or

20   excuse me -- the interrogators gave him a pair of glasses?

21   A    Yes, sir.

22   Q    On that date, 18 December, in document 019-001 we

23   learn that EC 2 received a shower at the direction of the

24   interrogators?

25   A    Yes, sir.

1   Q    And then we also see on that same document that the

2   Brig staff was making an inquiry to the interrogators, or

3   the contractors as they called them, whether or not he

4   should be allowed outdoor recreation and the answer was

5   no?

6   A    Yes, sir.  That's what the log reflects.

7   Q    And all this does is to support the conditions of his

8   confinement which were at the direction of the Defense

9   Intelligence Agency?

10  A    Yes, sir.

11  Q    Document 018-001 again talks about him being removed

12  from his cell for interviews, as it does on 18-002, 001,

13  again documentation of the interviews which appear now to

14  be on multiple occasions on the same day?

15  A    Yes, sir, as the log reflects.

16  Q    And, again, the log will reflect that on 020-001

17  multiple interviews on the 19th of December, 021-001 on

18  the 20th of December, 022-001 on the 21st of December,

19  then on 023-001 in the passdown log the gift of the Quran

20  on the 23rd of December was removed per the DIA

21  representative?

22  A    Yes, sir.

23  Q    And on the 24th of December, again it reminds the

24  staff that EC 2 is no longer to have his Quran, but he was

25  asking for it?

1   A    Yes, sir.

2   Q    And then on the day after Christmas in 2003, one of

3   the interrogators called the Brig staff and asked how

4   Mr. al-Marri was doing without his Quran?

5   A    Yes.

6   Q    Then in document number 025-001 as we get into

7   January of '03, we again see that there are multiple

8   interviews on a daily basis.  And as reflected in 027-001,

9   the Quran again is used as an interrogation tool and is in

10  the top drawer of the safe?

11  A    Yes, sir.

12  Q    And in the document 028-001 on 10 January, again it

13  documents the interview process.  Same with 028-002 in the

14  passdown log.

15          THE COURT:  I would appreciate it if at least

16  the witness would say something.  Otherwise it's just you.

17  Q    I'm sorry.

18  A    Yes, sir, as reflected in the log.

19  Q    029-001, 11 January?

20  A    Could I see that again, please?

21  Q    029-001, the general ledger for 11 January?

22  A    Yes, sir.

23  Q    Again, thorough documentation of all the activities

24  of Mr. al-Marri including his interviews?

25  A    Yes, sir.

1  Q     At about this time do you recall in reading the

2  summaries from the DIA that was provided to the Court that

3  in December Mr. al-Marri saw daylight for the first time?

4  Let's look at the video 103D.

5                        (Video played)

6  Q     Can you stop that, please?  The orange paint and the

7  black paint you see on the windows, that lasted much

8  longer than December of '03; is that correct?

9  A     Yes, sir.  That's correct.

10  Q     Now going back to the logs -- and of course the

11  magnet on the interior side of the door, that lasted much

12  longer than just December of 2003?

13  A     Yes, sir.

14  Q     The logs of 11 January, represented by 030-001, again

15  document multiple interviews?

16  A     Yes, sir.

17  Q     Same with 032-001, 12 January '04?

18  A     Yes, sir.

19  Q     Now, again, as an exemplar of the passdown logs,

20  document 033-001, the instruction being given by the

21  interrogators, the entry reads:  "Do not talk, I repeat,

22  do not talk to EC 2."  Is it proper to assume that's the

23  direction given to the Brig staff?

24  A     Yes, sir.

25  Q     And the instruction includes:  "He will start asking

1   a lot of questions according to what the interviewers told

2   him.   Whatever he asks for, say 'noted'.  Say nothing

3   else, not 'yes' or 'no', just say 'noted'."

4   A     Yes, sir.

5   Q     Another indication of the directives of the DIA on

6   that day:   "For this watch and the next watch, EC 2 can

7   have Quran only on the 14th and 15th.  Will EC 2 be given

8   his Quran by order of one of the interrogators?"

9   A     Yes, sir.

10  Q     Again, the use of the Quran was at the direction of

11  the interrogators, given to him only by the interrogators

12  for a length of time?

13  A     Yes, sir.

14  Q     Look at document 034-001.  Again, instructions from

15  DIA to the staff?

16  A     Yes, sir.

17  Q     14 January '04.  "Make sure you observe EC 2 closely

18  and log any strange behavior.  Also, if he asks about

19  Saddam" -- I imagine that's Saddam -- "and if he was

20  captured, just say 'noted'."

21  A     Yes, sir.  That's what the log reflects.

22  Q     During this time frame and for months, in fact years

23  thereafter, did he have access to a radio, a television or

24  a newspaper?

25  A     After a period of time.

 1    Q    At this time and during the time that the DIA

 2    controlled his environment, did he have any access to any

 3    outside information?

 4    A    I don't believe so, sir, no.

 5    Q    Did he have any access to International Committee of

 6    the Red Cross?

 7    A    No.

 8    Q    Did he have access to any family members?

 9    A    No, sir.

10    Q    Did he have access to any civilians working outside

11    of the Brig?

12    A    No, sir.

13    Q    Did he have any legal representation?

14    A    No, sir.

15    Q    His source of information was limited to who?

16    A    The interrogators, sir.

17    Q    Again, another entry on the 14th of January in the

18    passdown log.  It instructs that he may have the Quran.

19    I'm sorry.  I'm looking at 034-001.

20    A    14 January '04?

21    Q    Yes, sir.

22    A    Yes, sir.  It gives instructions to the guards to say

23    "noted" when asked questions.

24    Q    And it also says that he could have his Quran to be

25    passed through the food slot?

1   A    Yes, sir.

2   Q    Generally speaking, you were aware at this time that

3   Mr. al-Marri was very concerned about the Quran and how it

4   was handled?

5   A    Mr. al-Marri was always concerned about handling his

6   Quran, sir.

7   Q    Now 035-001 indicates several interviews around the

8   14th of January?

9   A    Yes, sir.  The log date is 14 January.

10  Q    We saw in an earlier video, the Court saw how he was

11  transported from his cell to the interview room with the

12  goggles, the belly chains, the handcuffs, the leg irons

13  and what-not.

14       THE COURT:  Is that a question?

15  Q    Yes, sir.  It was a statement.  I'm sorry.  I meant

16  to ask a question.  The Court has already seen a video

17  that we would not have to show again of how he was taken

18  from his cell to the interrogation room?

19  A    Yes, sir.  That's how he was moved.

20  Q    And is that how he was moved on every occasion?

21  A    Yes, sir.

22  Q    And on this occasion on the 14th of January we know

23  by the logs, perhaps not before the Court now, who was

24  there in the interrogation room?  It's not reflected,

25  Mr. Seymour.  Yours is redacted.  But the logs would

1  indicate that?

2  A    Yes, sir.

3  Q    And when he was returned to his cell, he was strip

4  searched?

5  A    Yes, sir.

6  Q    And that would have been at the direction of DIA?

7  A    In those instances, sir, it could have been procedure

8  or it could have been at the direction of the DIA.

9  Q    On the 14th of January he was strip searched twice?

10  Each time he was interrogated he was returned and then

11  strip searched as indicated on 036-001?

12  A    Yes, sir.  Each time he left the cell he was strip

13  searched.

14  Q    And again the logs would indicate that he was

15  interviewed on multiple occasions on the 15th of January,

16  037-001 and 038-001?

17  A    The log that I'm looking at reflects 15 January '04,

18  correct.

19  Q    And this pattern of interview went on for some time

20  and was intense at this time as reflected in 039-000,

21  039-001?

22  A    The 16 January '04 date does reflect that in the log.

23  Q    042-000 on the 17th, 042-000 and 042-001?

24  A    Yes, sir.

25  Q    Three separate interviews on the same day?

 1    A    Yes, sir, on the 17th.

 2    Q    Same procedure employed.  On the 17th of January in

 3    the passdown log on 041-001, the Brig received a direction

 4    for interview interrogation preparation?

 5    A    Yes, sir.

 6    Q    To leave al-Marri in the interview room for an hour

 7    after they left?

 8    A    Yes, sir.  That's what the log reflects.

 9    Q    And as the photograph we had earlier in the

10    interrogation room reflected, that's how he was left?

11    A    I don't know that I can say that's how he was left.

12    That would have been the procedure.

13    Q    Again, on the 18th of January as reflected 043-001,

14    further interviews?

15    A    Yes, sir, on the 18th of January.

16    Q    And 044-001, in the passdown log on 20 January, a

17    reminder per order of whoever it was that there is to be

18    no contact or conversations with EC 2?

19    A    Yes, sir.  That's the 20th of January.  That's what

20    the log reflects.

21    Q    Now, Mr. Seymour, in all your experience in your

22    35 years in corrections, have you ever known anybody in

23    solitary confinement to be placed in isolation where they

24    could have no contact with humans and no conversation with

25    humans?

1    A    No, sir, not from my experience.

2    Q    And this lasted for months and months and months on

3    end?

4    A    It lasted for a number of months.

5    Q    Now let's compare that to Jose Padilla.  On the same

6    date that there was a reminder not to have any contact

7    with al-Marri, Mr. Padilla was worried about his Doritos

8    and the logs reflect that Mr. Padilla -- Doritos are all

9    gone and that he needs more?

10   A    Yes, sir.

11   Q    Did Mr. al-Marri ever get a bag of Doritos?

12   A    I don't recall that he ever received a bag of

13   Doritos.

14   Q    In 045-001, the passdown log for 23 February '04

15   again denotes the difference between the treatment of the

16   three.  Hamdi gets a little trim.  Al-Marri, shave

17   everything.  Padilla, who had a goatee I believe, gets a

18   shave down.

19   A    Yes, sir.  That's what the log reflects.

20   Q    Then we go back to the same boring, repeated log

21   entries such as 047-001 on the date of 26 February 2004?

22   A    That appears to be the 25th of February, '04, sir.

23   Q    I apologize.  That's 047-001?

24   A    That's the 26th of February, 2004.

25   Q    And 047-002 are multiple interviews on the same day?

1    A    Yes, sir.

2    Q    And 048-001, 28th of February, same thing, same

3    procedure, same daily activity?

4    A    Yes, sir.  That's what the log reflects.

5    Q    09-001, a week later on the 8th of March?

6    A    That's the 8th of March, 2004.

7    Q    051-001, 9th of March?

8    A    Yes, sir.  That's the 9th of March, 2004.

9    Q    052-001 and 002, 10th of March, multiple interviews?

10   A    Yes, sir.  That's the 10th of March.

11   Q    And 054-001?

12   A    It appears to be the 10th of March, sir.

13   Q    This is apparently when he was shown photographs of

14   his family by the interviewers?

15             MS. BALTES:  Objection.  Lack of knowledge.

16             THE COURT:  I'm sorry.  What's the objection?

17             MS. BALTES:  Objection.  Lack of knowledge.

18   He's asking about what happened during the interrogation.

19             THE COURT:  What was the question?

20   Q    The document 054-001 -- beg the Court's indulgence a

21   moment, please.  As reflected in the summary that the

22   Court has dated 11 March, and the information contained

23   therein before the Court is part of the record, during

24   this session other physical contact between the

25   interrogators and al-Marri included patting al-Marri's

1   face with both hands, turning al-Marri's face to look at

2   pictures of his family on the wall, pressing two fingers

3   under al-Marri's chin, placing hands on his shoulders,

4   rubbing his shoulders and sitting on his lap, and this is

5   when it appears to be reflected in the logs that he was

6   shown pictures.

7              THE COURT:  Well, I don't want you testifying,

8   with all due respect, please --

9              MR. SAVAGE:  Your Honor, I'll rephrase it.

10             THE COURT:  I don't really want to hear a

11  closing argument.  Save that for closing argument.  You

12  certainly can use leading questions to assist the witness,

13  but let's do it that way.

14  Q    In 045-001, would you please read the highlighted

15  entry?

16  A    It appears to say:  "When he was being moved from the

17  interview room, EC stated 'Can I say good-bye to the

18  guys?'  MA 2 said, 'Okay.'  Then the EC stated, 'I will

19  see you in heaven.'"

20  Q    And so that was reported by the Brig staff?

21  A    Yes, sir.

22  Q    The 055-001, 056-001 would be the entries for

23  activity that took place on the 11th of March in terms of

24  interviews?

25  A    Yes, sir.

1          THE COURT:  Is it your intention to go through

2    every day?

3          MR. SAVAGE:  Judge, we're skipping many, many,

4    many days.

5          THE COURT:  Go ahead.

6    Q    058-001, there is a passdown log entry on 11 March?

7    A    It's a reminder that the staff is to keep a close eye

8    on Mr. al-Marri and to do proper 509 logs.

9    Q    059-001, 060-001?

10   A    12 March 2004.

11   Q    Again reflects the times of the interviews?

12   A    Yes, sir.

13   Q    060-002, 061-001?

14   A    14 March '04.

15   Q    Again, it's the same repeated process?

16   A    Repeated process of moving him to and from the

17   interview room.

18   Q    Passdown log entry 062-001, a reminder?

19   A    A reminder that only one person was to talk to

20   Mr. al-Marri.

21   Q    And an entry on the 16th of March?

22   A    A reminder that Mr. al-Marri was on a 15-minute

23   visual check.

24   Q    Log entry on 063-001?

25   A    18 March '04.

1    Q     "EC 2 is now on MREs.  Make sure you keep one of the

2    trays empty when fixing the other ones."

3    A     When fixing the other meals, yes, sir.

4    Q     Can we surmise from that the other ones were getting

5    hot meals and he was not?

6    A     Sir, I can't testify to that.

7    Q     But we do know that even in the MREs, the directive

8    from the DIA was to take the candy out of the MREs for

9    EC 2.  Next entry.  That would be 063-001.

10   A     That's 18 March '04.  Is that the same entry that we

11   just looked at?

12   Q     Yes.

13   A     Yes, sir.  It says to remove the candy from the MREs.

14   Q     065-001 again is the general ledger indicating times

15   of the interview?

16   A     Yes, sir.

17   Q     066-001, 13 April, again the times of the interview?

18   A     Yes, sir.

19   Q     Passdown log 067-001, entry date 16 April, what are

20   the instructions from DIA that day?

21   A     It says the MREs are to be served cold.

22   Q     At that time he was restricted from having any warm

23   meals?

24   A     As the log reflects, the staff were ordered to serve

25   the meals cold.

1  Q    And on 16 April '04 as reflected in 068-001, that's

2  reaffirmed?

3  A    Yes, sir.

4  Q    "As of 09:00 stop heating the MREs for EC 2 for all.

5  Meals."

6  A    Yes, sir.

7  Q    And in the passdown log 069-001, it reflects what he

8  has in his cell?

9  A    Yes, sir.  It says he does not have any items in his

10  cell.

11  Q    So ten months after his admission to the Brig, the

12  spartan conditions of his cell are as they were reflected

13  in the comparative photograph the Court had earlier seen;

14  is that correct?

15  A    Yes, sir.

16  Q    Let's take a look at some of the video.  Your Honor,

17  you will recall the video before the spring of '04 was not

18  available.  Mr. Seymour, we want to take a look at May 2

19  of 2004.

20                     (Video played)

21  Q    Can we stop that?  Is that Mr. al-Marri, cell

22  number 119?  I think we need to help the Court tell what

23  this is and if I may lead you, this video was removed from

24  a 4-cell shot including the cells of two other detainees

25  and an empty cell and is 119 reflective of Mr. al-Marri's

1    cell?

2    A    Yes, sir.

3    Q    Now this is coming on 11 months after he had been

4    there.  No mattress and no items in his cell other than a

5    suicide blanket?

6    A    He does appear to have something under his head and

7    he does have his slippers in there too, sir.

8    Q    Well, let's roll the video.

9                        (Video played)

10   Q    Now, Mr. Seymour, going back, I have some questions

11   about that video.  Has that video been manipulated in any

12   way?  I mean, where it looks like he's running around,

13   what do you call that?  Time delay?  Is the surveillance

14   video, the surveillance camera in the cell itself, taking

15   pictures every second or something?

16   A    It's a number of frames every second, sir.  It

17   appears to be speeded up in that film footage.

18   Q    But that -- were you present when we received that

19   from the Brig staff?

20   A    Yes, sir.

21   Q    And is that what we received from the Brig staff?

22   A    I believe so, sir.

23   Q    And that depicts the conditions that he was existing

24   in on that particular day?

25   A    Yes, sir.

1   Q     About the same time in document 073-001 on 13 May,

2   again toilet paper was removed from his cell?

3   A     Sir, what I see is on 12 May and it's a reference to

4   "EC 2 does not receive Quran any more until further

5   notice."

6   Q     And right above that as per one of the interrogators,

7   the toilet paper has been returned to him.  Well, if you

8   could just tell us if that is an actual reflection of the

9   log 073-001?

10  A     Yes, that's an actual reflection.

11  Q     Let's look at the end of May now, coming up on nearly

12  a year in the video.

13                    (Video played)

14  Q     So that's Mr. al-Marri in cell 119?

15  A     Yes, sir.

16  Q     And we notice no chair, no desk, no mattress, no

17  pillow, no glasses, no Quran?

18  A     Yes, sir.

19  Q     Nobody socializing with him, painted windows looking

20  outside, magnetized metal on the inside.  All he has is a

21  toilet, a sink and a metal bed with holes in it?

22  A     That's what the footage reflects.

23  Q     And that was at the directive of the interrogators?

24  A     Yes, sir.

25  Q     And this is how he lived his days?

1  A    I believe for periods of time, sir.

2  Q    And this reflects approximately three minutes of that

3  day in that cell?

4  A    Yes, sir.

5  Q    And that's an accurate representation from the

6  Government's files of how he spent his time?

7  A    It's an accurate representation of how he spent his

8  time in this film, yes, sir.

9  Q    With toilet paper as a pillow?

10  A    I actually can't discern what he has under his head,

11  sir.

12  Q    It's pretty clear from that video that there are no

13  distractions from the boredom of his existence in that

14  cell, nothing?

15  A    Yes, sir.

16  Q    When the rack becomes uncomfortable, he lays down on

17  the concrete floor?

18        MS. BALTES:  Objection.  Lack of personal

19  knowledge.

20        THE COURT:  Sustained unless you can lay a

21  foundation.

22  Q    Is that an accurate film in the Government's files,

23  the surveillance camera in Mr. al-Marri's cell?

24  A    Yes, sir, I believe it is.

25  Q    What do you call the opposite of the ceiling, the

1    thing that is under his bed?

2    A    I believe that would be a floor, sir.

3    Q    And what is he doing?

4    A    For periods of time it appears he lays on the floor,

5    sir.

6    Q    Thank you, sir.  Can we move on to the next video?

7                        (Video played)

8    Q    77, please.  This is another day in the life of

9    Mr. al-Marri in the spring of 2004.  He's in 119; is that

10   correct?

11   A    Yes, sir.  That appears to be Mr. al-Marri.

12   Q    So when he wakes up at 7:15 that morning he actually

13   had a pillow and a blanket?

14   A    Yes, sir.  He had a pillow and a blanket at that

15   time.

16   Q    And what did he have to do with the pillow and the

17   blanket?

18   A    It appears he turned it over to a staff member on the

19   outside of the cell.

20   Q    And then the rest of the day, other than what he

21   appears to be doing now, he's back in that same cell with

22   the same conditions, the same environmental factors?

23   A    Yes, sir.

24   Q    On this particular day where did he spend his time?

25   A    Yes, sir.

1   Q    Where did he spend his time in the cell that day?  I

2   can't see him.  Do we see him go under his rack?

3   A    Yes, sir.

4   Q    Now in June of '04 did the complaints of Mr. al-Marri

5   about the environmental conditions of heat and cold

6   continue?  I'm just asking you that question.

7   A    I believe so.

8   Q    Let's look at a video from June of '04, video 078.

9                        (Video played)

10  Q    Is that Mr. al-Marri in 112?

11  A    Yes, sir.

12  Q    That's the cell he was in on that date?

13  A    Yes, sir.

14  Q    What is he doing?

15  A    He appears to be either shaving or brushing his teeth

16  or something in front of the mirror.

17  Q    Well, could it be he's stuffing his underwear in the

18  vents?

19  A    Yes, sir, that could be.

20  Q    To keep the cold air from coming through the vents?

21        MS. BALTES:  Objection.  Lack of personal

22  knowledge.  Asking for an opinion.

23        THE COURT:  Well, yes, but based on his

24  experience I think he's probably in a position to say

25  whether that appears to be what's happening.

1    Q    Again at this time, if you can tell, does he have

2    socks on or not?  If it's impossible to tell, it's

3    impossible to tell.

4    A    I can't see, sir, whether he has or has not.

5    Q    The passdown log in June of '04, particularly in

6    document number 082-001, there's a request made by

7    Mr. al-Marri, EC 2?

8    A    Yes, sir.  He requested to wear his glasses in the

9    cell.

10   Q    And again in document 083-001?

11   A    Yes, sir.  He was requesting his glasses there also.

12   Q    Do you have knowledge of the necessity that he has

13   for wearing glasses?

14   A    He had difficulty with his eyesight that I'm aware

15   of.

16   Q    Did you know that he visited the optometrist?  Let's

17   take a look at the June 30 video, please, the 085 video.

18   This is over a year after he had been there now.

19                    (Video played)

20   Q    Now, Mr. Seymour, he's belly chained there?

21   A    Yes, sir.

22   Q    He's leg ironed and he's fastened to the floor?

23   A    Yes, sir.

24   Q    And his range of motion for his hands, he can't lift

25   his hand up to his head; is that correct?

1    A    It would be difficult for him to do so, sir.

2                    (Video played)

3               THE COURT:  Unless this shows something else,

4    move along.

5               MR. SAVAGE:  It does, Your Honor.  Your Honor,

6    we just received this video last week.

7               THE COURT:  I'm just asking.  If it shows

8    something else, fine.

9               MR. SAVAGE:  It shows plenty, Your Honor.

10                    (Video played)

11               MR. SAVAGE:  Judge, I believe the rest of this

12    video shows his removal from the interrogation room.  I

13    think that's sufficient.

14   BY MR. SAVAGE:

15    Q    Can we look at document 086-001?

16    A    Yes, sir.  It's a reference from 2 July '04 saying

17    that he received his Quran and glasses.

18    Q    Now at this time, Mr. Seymour, did the Brig staff,

19    the medical staff, the command of the Brig staff as well

20    as the fleet in Norfolk Four Star start to exert more

21    control over the conditions of confinement?

22    A    Yes, sir.

23    Q    And this decision to return the Quran and the glasses

24    to Mr. al-Marri was at whose directive?

25    A    The Admiral, sir.

1    Q    And do you know whether or not that was consistent

2    with or contrary to the interests of the DIA?

3    A    Sir, I think that's a conclusion.  I don't have the

4    information.

5    Q    But the Court does have the summaries of the DIA's

6    interrogations and their opinion of that decision?

7    A    Yes, sir.

8    Q    The document 087-001, the entry on the 5th of July?

9    A    Yes, sir.  It says that EC 1 and 3 received prayer

10   schedules.

11   Q    Well, that's, I believe, the 7th of July.  Above

12   that, the 5th of July entry, in terms of Mr. al-Marri, was

13   he provided with his glasses on that day at 09:01?

14   A    Yes, sir.  He received his glasses.

15   Q    Without going into every day and every entry, would

16   it be fair to say that, generally speaking, from that day

17   on he had his glasses?

18   A    Generally speaking, yes, sir.

19   Q    I notice in entry number 088-001 the other ECs were

20   given MP3 players?

21   A    Yes, sir.

22   Q    At that time on 19th of July did Mr. al-Marri have

23   access to anything in his cell other than his glasses and

24   his Quran?

25   A    Not at that time, sir.

1    Q    On the same page, 088-001, again a reminder about the

2    instructions to the Brig staff regarding his glasses?

3    A    Yes, sir.  It says that they were reminded that he

4    was able to keep his glasses in the cell.

5    Q    In 089-001 there's passdown information that he could

6    receive something, a suicide blanket?

7    A    Yes, sir.

8              MR. SAVAGE:  May I approach, Your Honor?

9              THE COURT:  You may.  Do you know what number

10   you want to give it?

11             MR. SMITH:  Demonstrative Exhibit No. 1.

12             THE COURT:  Just mark your own exhibits.  Let's

13   just go ahead.

14   BY MR. SAVAGE:

15   Q    Mr. Seymour, is this a suicide blanket?

16   A    Yes, sir.

17   Q    Is this a suicide blanket issued in the Brig?

18   A    I believe it is, sir.  We turned -- gave you one,

19   yes, sir.

20   Q    And the entry in the passdown log, the PDL about

21   providing him with a suicide blanket, is that the type of

22   blanket that was provided?

23   A    The type of blanket, yes, sir.

24   Q    On the same date he received a clock in his window?

25   1st of August, '04, third line down?

1    A    Yes, sir, received a clock.

2    Q    And for the Court's edification, what would that

3    purpose be for?

4    A    So he would be able to tell the time of the day and

5    time of his prayers.

6    Q    Now in document 091-001, under the entry of

7    11 August, EC 1 was receiving five new CDs?

8    A    Yes, sir.

9    Q    Did Mr. al-Marri ever receive any CDs?

10   A    Not at that time, sir.

11   Q    In document 092-001 --

12   A    25 August.

13   Q    25 of August.  If you would read that entry.  Or I

14   could read it for you if you're not able to.

15   A    I can't discern all of it.

16          THE COURT:  Go ahead and read it, please.

17   Q    "Per blank, contractors" -- contractors is another

18   name for DIA or FBI; is that correct?

19   A    Yes, sir.

20   Q    "Are allowed to be in the SHU control while the

21   chaplain is making his visits."

22   A    Yes, sir.

23   Q    And in the SHU control you have both audio and visual

24   ability to record and observe any conversation, any

25   interaction of the parties in that interview room?

1   A    We have the capability of recording and hearing the

2   conversation from inside the cell.

3   Q    And what this appears to address is that the

4   contractors were party to those conversations?

5   A    It appears so, sir.

6   Q    094-001, 10 September, 15 months into Mr. al-Marri's

7   stay at the Brig, the chain of command, not DIA, but the

8   chain of command issued an order and that is that he would

9   receive regular chow?

10  A    Yes, sir, regular chow being halal or a Muslim

11  friendly meal from the chow hall.

12  Q    And on 096-001, 23 September, EC 3 was granted

13  permission to be out of his cell at any time.  He can

14  watch all channels on TV at any time except for breaking

15  news and news with the instructions that he was told to

16  change the channels with his remote if the news came on.

17  A    Yes, sir.  That's what the log reflects.

18  Q    So this enemy combatant Hamdi had his own clicker to

19  change TV channels to watch whatever he wanted at this

20  time?

21  A    Yes, sir.

22  Q    And of course he could go out for recreation at any

23  time he wanted as indicated in the log of that day?

24  A    Yes, sir.

25  Q    And the log entry on 098-002, EC 3 was authorized a

1    10-minute telephone call to his father in a foreign

2    country provided he spoke English and it was monitored?

3    A    Yes, sir.

4    Q    Now Mr. al-Marri, do you know when he received his

5    first phone call in the SHU?

6    A    When we had information that his father had in fact

7    passed on I believe.

8    Q    And that was in 2008, several years later?

9    A    Yes, sir.

10   Q    Actually logs 100-002, 001, in addition to EC 3

11   watching T.V. until 11:00 o'clock at night on Friday and

12   Saturday, he was authorized a 10-minute phone call every

13   day to his father?

14   A    Yes, sir.

15   Q    Now October of 2004, that's when the game changed for

16   Mr. al-Marri.  This was the time that the DIA ended their

17   interrogations of him, October of 2004?

18   A    Yes, sir.

19   Q    And that pursuant to the United States Supreme Court

20   order in the Hamdi decision of June of '04, he was allowed

21   to have attorneys?

22   A    I'm sorry.  Allowed to have --

23   Q    Attorneys to represent his interests?

24   A    Yes, sir.

25   Q    And prior to that date of October of '04 Mr. al-Marri

1  had not seen anyone other than his interrogators and Brig

2  staff?

3  A    Yes, sir.

4  Q    Including representatives of the International

5  Committee of the Red Cross?

6  A    Yes, sir.

7  Q    That changed in October of '04?

8  A    Yes, sir.  He was given access to attorneys and the

9  Red Cross was given access to him.

10  Q    Were you present on the day that his attorneys first

11  visited with him?

12  A    Yes, sir.

13  Q    And did you participate in that visitation?

14  A    I was there and talked to you and other attorneys I

15  believe.

16  Q    Let's take a look at 101-001.  Is that the secure

17  booth that the visit took place in?

18  A    Yes, sir.  That's the Brig non-contact visitation

19  booth.

20  Q    And that steel stool you see in the foreground, is

21  that the seating for the three attorneys who visited him

22  that day?

23  A    I believe so, sir.

24  Q    Who else was in that room?  And I mean the room where

25  that stool is.

1    A    I believe there was a Navy representative.

2    Q    Was there a DIA agent in that room?

3    A    There was someone else in the room.  I don't recall.

4    It could have in fact been a DIA agent.

5    Q    And if I visually in the courtroom today stretched my

6    arms out wide, being in that room, could I touch wall to

7    wall?

8    A    Yes, sir.

9    Q    And if I turned perpendicular, could I touch wall to

10   wall?

11   A    Yes, sir.

12   Q    In addition to the three attorneys and the

13   representative that you're not sure of his identification,

14   was there a video camera in that room?

15   A    Yes, sir.

16   Q    Was there audio recording devices in that room?

17   A    Yes, sir.

18   Q    Were the attorneys prohibited from bringing any

19   paper, pens, anything into that room?

20   A    On that day, yes, sir.

21   Q    And the room through that window where we see the

22   door knob, is that a room of the same measurements as the

23   one on the foreground?

24   A    Yes, sir.

25   Q    And was Mr. al-Marri sitting on a stool similar to

1    what we see in the foreground?

2    A    Yes, sir.

3    Q    Was he handcuffed?

4    A    Yes, sir.

5    Q    Was he belly chained?

6    A    I believe so, sir.

7    Q    Was he leg ironed?

8    A    Yes, sir.

9    Q    And was the leg iron fastened to the floor?

10   A    Yes, sir.

11   Q    Did he have military members in black gloves standing

12   guard?

13   A    There were members there.  I don't necessarily recall

14   the black gloves, sir, but there were military members

15   there in uniform.

16   Q    Were there also representatives in that confined

17   space from Washington?

18   A    Yes, sir, I believe so.

19   Q    And that's where he had the opportunity to speak to

20   his attorneys?

21   A    Yes, sir, that day.

22   Q    Now let's look at 127-001.

23             THE COURT:  Mr. Savage, pick some convenient

24   time in the next five minutes or so to stop for lunch.

25   I'll leave that up to you.

1          MR. SAVAGE:  This would be fine, Your Honor.

2          THE COURT:  Great.  Let me ask -- the witness

3   may step down.  Thank you.  How much direct do you have

4   left of this witness?

5          MR. SAVAGE:  30 minutes at most, Your Honor.

6          THE COURT:  Okay.  This blanket, I think we can

7   probably mark that.  If you have other exhibits -- either

8   side, if you have other exhibits, get stickers and you can

9   mark those yourself.  Okay.  So, sir, you'll have to be

10  back here at a little bit before 1:15, okay?  So we'll be

11  in recess until 1:15.  Thank you.

12

13                     (Noon Recess)

14

15         THE COURT:  I think we're ready to proceed.  Is

16  there some reason the defense exhibits are in front of me?

17  Is there a specific reasons for that?

18         MS. BALTES:  Yes, Your Honor.  The Government

19  would request Exhibit 48 and 54 be sealed and the defense

20  has no objection.

21         MR. LUSTBERG:  That's correct, Your Honor.

22         THE COURT:  All right.  Well, they will

23  effectively be removed from where they are now.  And the

24  reason for them being sealed is?

25         MS. BALTES:  There are active duty service

1   member names in the records.

2           THE COURT:  I'll grant the motion.  Is it 48 and

3   54?  Is that the only two?

4           MS. BALTES:  Yes, Your Honor.

5           THE COURT:  Thank you.  Mr. Savage, are we ready

6   to continue?  Would the witness come back up, please?

7   Come back up, sir.  You're still under oath.

8                       **SANFORD SEYMOUR,**

9   Having been previously sworn, was examined and

10  testified under oath as follows:

11                  **CONTINUED DIRECT EXAMINATION**

12  BY MR. SAVAGE:

13  Q    May it please the Court.  Good afternoon,

14  Mr. Seymour.

15  A    Good afternoon.

16  Q    When we recessed for lunch hour, I believe we were

17  looking at the facilities at the Brig that were provided

18  for legal counsel access in the fall or autumn months of

19  2004 and I believe that you have described the photograph

20  on the right-hand side which is labeled "secure no contact

21  visitation area".

22  A    Yes, sir.

23  Q    And these displays and the writing on the display

24  before the Court at this time was provided by the

25  Consolidated Naval Brig?

1    A    Yes, sir.

2    Q    Including the writing that's on the photographs?

3    A    Yes, sir.

4    Q    Now following the initial meeting of Mr. al-Marri

5    with his defense counsel, were you aware that there were

6    revised procedures for counsel access to Ali Saleh Kahlah

7    al-Marri at the Naval Consolidated Brig at Charleston,

8    rules which were called SAMs, Special Administrative

9    Measures, imposed on the 10th to the 13th of December of

10   2004, as shown in 126-100, 1008, which is the date they

11   were signed, which included, among other things, the

12   regulations that counsel for the defendant in Section 6 --

13   which established the procedures and policies that the

14   Department of the Defense would impose regarding

15   attorney/client communications and visits?

16   A    Yes, sir.

17   Q    Now going back to 126-001, you had earlier described

18   that in the right-hand side in the secure no contact

19   visitation area that parties were present -- of course

20   this was before the SAMs -- and that there was audio and

21   visual recording in those visitation booths?

22   A    Yes, sir.

23   Q    And at a subsequent time a secure contact visitation

24   area was proposed for meetings between counsel and

25   Mr. al-Marri?

1    A     Yes, sir.

2    Q     And when Mr. al-Marri was present at that time in

3    those meetings, he was dressed and he was secured in

4    accordance with some earlier photographs that the Court

5    has seen as he was in the interrogation room?

6    A     Yes, sir.

7    Q     Of course when he got in the room his goggles and

8    earmuffs were removed; otherwise he was restrained in a

9    similar fashion?

10   A     Yes, sir.  He was restrained with the handcuffs, leg

11   irons and belly chain.

12   Q     Now in those meetings, as in your wording in the

13   document prepared by DoD, there was a video camera in that

14   room?

15   A     Yes, sir.  That's the video camera.

16   Q     And that camera was connected to the operations

17   center of the SHU so that there was visual observation of

18   the meetings, at least initially, between legal counsel

19   and Mr. al-Marri?

20   A     The camera was actually capable of being monitored in

21   the office next to the room.

22   Q     By whoever had access to that area?

23   A     Yes, sir.

24   Q     And whoever was in that area was not necessarily

25   counsel or counsel representatives for Mr. al-Marri?

1    Government representatives were there?

2    A    Yes, government representatives were there.

3    Q    And the circle on the right-hand side at the bottom

4    of the wall, if you could look from the top towards the

5    ceiling down to where it's circled, there was a conduit

6    wire protecting an audio microphone?

7    A    Yes, sir.

8    Q    Now in those -- and that's the room in which the

9    attorneys met Mr. al-Marri at least initially?

10   A    Yes, sir.

11   Q    The SAMs that were signed by the government, as

12   indicated on document number 126-005, that those meetings

13   between counsel and the detainee will not be subject to

14   audio recordings or monitoring?

15   A    Yes, sir.

16   Q    Now later Mr. al-Marri was told that he could prepare

17   communication to counsel and that paper would be

18   allocated, a certain number of pieces of paper to him for

19   that purpose?

20   A    Yes, sir.

21   Q    As evidenced in the SAMs 126-004, "Detainee will be

22   provided with paper to prepare communications to counsel"?

23   A    Yes, sir.

24   Q    Following the imposition of those SAMs, that became

25   an issue in terms of Mr. al-Marri's compliance to the

1    rules and directives of the Brig.  Let me show you this

2    video.  I think it's 102C, Mr. Rosen.

3                        (Video played)

4    Q    Now not knowing what Mr. al-Marri meant then by the

5    court order, from June of 2004 the United States Supreme

6    Court had issued an order or an opinion that Mr. al-Marri

7    was entitled to counsel.  Do you recall that?

8    A    Yes, sir.

9    Q    And this recording, although it's not dated, from

10   your observation of the recordings that were provided to

11   us last week at the Brig, this recording comes from 2005;

12   is that correct?

13   A    Yes, sir.  That's correct.

14   Q    Well after the decision of the Supreme Court, well

15   after the signing of the SAMs by the government and

16   defense counsel?

17   A    Yes, sir.

18   Q    In 2005 did Mr. al-Marri have the benefit of

19   competent Brig-provided medical care?

20   A    Yes, sir.

21   Q    And those visits were by corpsmen as well as medical

22   physicians?

23   A    Yes, sir.

24   Q    And as a result of those examinations, were certain

25   medically necessitated recommendations made regarding his

 1 environment?

 2 A    Yes, sir.

 3 Q    Let's look at the video of the medical visit on

 4 January 4 of 2005.

 5                    (Video played)

 6 Q    If we could stop there.  Are those the complaints

 7 that were documented throughout the logs and throughout

 8 the medical reports?

 9 A    Yes, sir, those were.

10 Q    And at least at this time -- let's continue, please.

11                    (Video played)

12 Q    Mr. Seymour, based on your familiarity with the

13 personnel at the Brig, did you recognize the medical

14 provider that was there?

15 A    Yes, sir.

16 Q    And who is that?

17 A    He was a captain who at that time was the Brig -- one

18 of the Brig physicians.

19 Q    His rank was an 06?

20 A    Yes.

21 Q    And he visited with Mr. al-Marri where?

22 A    In his cell or in another area that was designated as

23 a treatment room.

24 Q    And as I understood his recommendations, they would

25 have included, among other things, an examination by an

1    eye physician?

2    A    Yes, sir.

3    Q    That he would be permitted to have a mattress in his

4    cell and that he had recommended some x-rays, but, perhaps

5    more importantly, a chair.  Now we have seen earlier

6    videos today regarding Mr. al-Marri's cell.  Did he have a

7    chair in his cell?

8    A    Not at that time.

9    Q    Did he have a mattress in his cell?

10   A    Not for the full time, all time during the day.

11   Q    And his mattress was given to him at what time?

12   A    Afternoon I believe.

13   Q    Would 10:00 p.m. sound more exact?

14   A    Yes, sir.

15   Q    And it was received back from him at 5:00 a.m.?

16   A    Yes, sir.

17   Q    So between the hours of 5:00 a.m. and 10:00 p.m. he

18   was on the steel bunk?

19   A    Yes, sir.

20   Q    Now this is in 2005, correct?

21   A    Yes, sir.

22   Q    Now in the winter months of 2005, in the 20 months or

23   so that he had been present, in the 20th month or so of

24   his presence at the Brig, did he complain of headaches?

25   A    I believe so, yes, sir.

1   Q     Let's take a look at a video which I believe was a

2   hand-held video by one of the officers at the Brig

3   regarding Mr. al-Marri's conditions of confinement in the

4   winter of 2005.

5                      (Video played)

6   Q     Now based on the conversation you heard, your

7   familiarity with al-Marri's conditions at that time, also

8   his communications with you and others at the Brig, he

9   refers to this headache and a smell?

10  A     Yes, sir.

11  Q     Do you know what his beliefs were at that time about

12  the smell?

13  A     I believe -- this is opinion, so I don't know.

14  Q     Did he tell you?

15  A     He told me that -- told me and others that he thought

16  this was an attempt to cause him discomfort.

17  Q     And that was documented?

18  A     Yes, sir, I believe so.

19  Q     And in response to that, what did he do to prevent

20  the smell from coming into his cell?

21  A     He would place things into or over the vent.

22  Q     So this would be the vent where the incoming air

23  circulation would come from?

24  A     Right.  I believe also he would place stuff in front

25  of the door.

1    Q     And as a result of that, was he viewed by the Brig

2    management as being in non-compliance with the rules and

3    regulations of the Brig?

4    A     He was told to remove it, yes, sir.

5    Q     And at this time the windows were still painted, the

6    magnet was on the door and there was basically nothing in

7    his cell?

8    A     I believe he had received something.  He was getting

9    his mattress at least in the evening.  He had blankets.

10   Q     Did he ever complain about a fan and the noise and

11   what it was doing to his psyche?

12   A     Yes, sir, he did.

13   Q     Could we play, please, 103E?

14                         (Video played)

15   Q     Can you tell us what that video is?

16   A     That's of Mr. al-Marri during a check where he was

17   asking questions and there was a fan in the background.

18   Q     Were you able to hear the questions or the answers?

19   A     No, I was not.

20   Q     And was the reason for that not an audio problem but

21   because of the location of the fan?

22   A     I believe it was the location of the fan in close

23   proximity to the video camera.

24   Q     Now in that time frame did Mr. al-Marri -- was he

25   permitted to correspond with family members?

1    A     No, he was not.

2    Q     Did there come a time where the Brig staff, through

3    the Admiral in Norfolk, obtained permission from him to

4    obtain and write correspondence from the family?

5    A     Yes, sir, we did.

6    Q     Generally speaking, do you know how long it would

7    take for correspondence from his family to arrive at the

8    Brig and correspondence from the Brig to arrive in his

9    homeland?

10   A     Yes, sir.  It could be up to several months.

11   Q     In fact, it was often over a year.  In the letters

12   that he received --

13              THE COURT:  Just a moment.  He didn't answer

14   that.  Was it over a year?

15   A     Sir, I don't know the exact time frame.  It was

16   months.  It could have been 12 months.  Some letters came

17   faster than others.

18   Q     When letters came, they often looked like

19   Exhibit 142?

20   A     Yes, sir.  They were redacted.

21   Q     And that particular exhibit is not an exaggeration,

22   but is typical of the correspondence that he received at

23   that time?

24   A     It would be typical of the correspondence that I

25   recall seeing.

1    Q    Now during that time frame did he ever receive or was

2  he allowed to receive photographs of his family?

3    A    He did receive photographs of his family.  I can't

4  tell you the exact date.

5    Q    Was he ever allowed to send a photograph of himself

6  to his family?

7    A    Much later.

8    Q    Before 2009?

9    A    No, sir.

10    Q    Before February of 2009?

11    A    No, sir.

12    Q    Now at the same time that these restrictions were

13  still being imposed, EC 1, Mr. Jose Padilla, was still

14  present at the Brig; is that correct?

15    A    I couldn't tell you the exact date that he was --

16  when Mr. Padilla left.

17    Q    And when he left, he went into civilian custody much

18  like Mr. al-Marri did years later?

19    A    Yes, sir.

20    Q    And prior to his leaving the Brig, while he was at

21  the Brig did he have visitation with his mother?

22    A    He had one visitation with his mother.

23    Q    Could he have had as many as he wanted?

24    A    He could have had additional visits.  I don't know

25  that I would characterize it as many as he wanted.

1    Q    But he was not limited?  He was not limited by the

2    Brig or DIA?  He was limited by his own choice?

3    A    Yes, sir.

4    Q    Was Mr. al-Marri in the total time he was at the Brig

5    ever allowed to have visitors other than his lawyers or

6    ICRC?

7    A    No, sir, excluding Brig staff.

8    Q    Yes, sir.  Begging the Court's indulgence a moment.

9             THE COURT:  Take your time.  Turn the microphone

10   off.  Go ahead.

11   Q    Thank you, Your Honor.  Now conditions of confinement

12   for Mr. al-Marri clearly improved?

13   A    Yes, they did.

14   Q    He was permitted to have his glasses at all times?

15   A    Yes, sir.

16   Q    He was permitted to have reading materials beyond the

17   Quran?

18   A    Yes.

19   Q    He was permitted to have a large volume of religious

20   materials?

21   A    Hundreds of volumes, sir.

22   Q    Which actually he had his own library at the

23   permission of the Brig?

24   A    Yes, sir, he did.

25   Q    He was given prompt and competent medical treatment?

1    A    Yes, sir, he did.

2    Q    He was allowed to correspond with his attorney at

3    will?

4    A    Yes, sir.

5    Q    He was eventually allowed to make phone calls to

6    counsel?

7    A    Yes, sir.

8    Q    Which were unmonitored?

9    A    Yes, sir, unmonitored.

10   Q    He was allowed to have visitation with his attorney

11   in an open, clean, safe, comfortable environment unlike

12   what we've seen in the previous photographs?

13   A    Yes, sir.

14   Q    He was at least on one or two occasions allowed to

15   have an outdoor meal with his attorneys in the recreation

16   area?

17   A    Yes, sir.

18   Q    All those --

19   A    Sir, that would be in the secure recreation area.

20   Q    All those being incentives not by national security

21   members, but by the Brig staff itself?

22   A    Yes, sir.

23   Q    Recommendations that Brig staff members made to

24   higher authorities?

25   A    Yes, sir.

1    Q    There were, however, some things that were never

2    changed.  For instance, when he went to the dentist in

3    late 2007, December of 2007 -- let's take a look at that

4    video.

5                        (Video played)

6    Q    Mr. Seymour, did you recognize that video?

7    A    Yes, sir.

8    Q    Where it was filmed?

9    A    Yes, sir.

10   Q    Where was that, sir?

11   A    That was in the dental area of the R and R area

12   inside the Brig.

13   Q    Other than one occasion for medical treatment, did

14   Mr. al-Marri ever leave the Brig?

15   A    No, sir.

16   Q    Emergent medical treatment?  In other words, it was a

17   procedure that couldn't be handled at the Brig?

18   A    Yes, sir.

19   Q    To the day that the marshals came and took control

20   and custody of Mr. al-Marri at the Brig, were all interior

21   moves, that is moves Mr. al-Marri inside the Brig in the

22   high security area, in accordance with the video we just

23   saw?

24   A    Yes, sir.  Inside the areas, in particular the high

25   security area, if he was leaving the housing unit he would

 1   have the goggles and the hearing protection.

 2   Q    As well as the handcuffs, the belly chains and what

 3   we heard, I believe, on that audio was his leg irons as he

 4   walked down the hall?

 5   A    Yes, sir.

 6   Q    From the day he arrived in June 23 of 2003 until on

 7   or about March 1 of 2009, was he ever told how long he

 8   would be there?

 9   A    No, sir.

10   Q    Was he ever permitted in that time frame to have any

11   socialization with members who were not Brig staff or

12   interrogators, legal members or the ICRC?

13   A    No, sir.

14        MR. SAVAGE:  Mr. Seymour, thank you for your

15   testimony.  Kindly answer any questions the prosecution

16   might have.

17        THE COURT:  All right.  You may proceed.  Are

18   you going to be using exhibits?

19        MS. BALTES:  No, Your Honor.

20                    **CROSS EXAMINATION**

21   BY MS. BALTES:

22   Q    Good afternoon, Mr. Seymour.

23   A    Good afternoon, ma'am.

24   Q    Mr. Seymour, the defense asked you a couple of

25   questions about the difference in treatment between

1    Mr. al-Marri and the other two enemy combatants at the

2    Brig.  Were you at the Brig the entire time that the enemy

3    combatants were housed there?

4    A    Yes, ma'am.

5    Q    And was it your job, or anyone at the Brig's job, to

6    determine the relative threat assessment for each of the

7    three enemy combatants?

8    A    It was determined from outside the facility.

9    Q    So that wasn't your job?

10   A    We would make a basic determination, yes, ma'am.

11   Q    And were there any differences in behavior between

12   Mr. al-Marri and the other two enemy combatants that were

13   at the Brig?

14   A    Yes, ma'am.

15   Q    Could you describe the behavior that you witnessed

16   for Mr. Padilla?

17   A    Mr. Padilla was quiet.  He had no issues with the

18   staff.  He never showed staff any disrespect.  He always

19   followed all the regulations and anything and everything

20   he was told when he was told to do it.

21   Q    And what about with Mr. Hamdi?

22   A    Mr. Hamdi was even more compliant in those matters

23   than Mr. Padilla.

24   Q    And if there were any incidents, were they reported

25   to you?

1  A    I would have heard almost everything, yes, ma'am.

2  Q    And would those incidents have included behavior that

3  would have been considered non-compliance by the Brig

4  staff?

5  A    Yes, sir.

6  Q    And would you -- how would you characterize

7  Mr. al-Marri's behavior?

8  A    It varied greatly from period to period.  He could be

9  reasonably compliant or he could -- his behavior could

10  take extreme terms.

11  Q    Could you describe some of the extreme terms that you

12  witnessed or that were reported to you?

13  A    Defecation on trays, food trays, shoving food trays

14  back out under the door, urination on the walls and on the

15  food trays and the floor, shoving food into the air vents

16  in the cell, on occasion throwing substances at and on the

17  staff.

18  Q    How did your staff react during those incidents?

19  A    They reacted extremely professionally.

20  Q    And were they required to clean up Mr. al-Marri's

21  cell when he defecated on his tray and urinated all over

22  his cell?

23  A    Yes, ma'am.

24  Q    Could you approximate how many times that happened?

25  A    I couldn't give you a close approximation, but in one

1  | instance it occurred for months.

2  | Q    Did you ever witness that type of behavior from any

3  | of the other enemy combatants at the Brig?

4  | A    No, ma'am.

5  | Q    Now did you have certain standard operating

6  | procedures at the Brig, specifically for enemy combatants?

7  | A    Yes, ma'am.

8  | Q    And were those for security purposes?

9  | A    Yes, ma'am.

10 | Q    The video that was shown to you with Mr. al-Marri in

11 | leg shackles and irons when he was transported out of the

12 | SHU, was that a standard operating procedure?

13 | A    Yes, ma'am.

14 | Q    Was that put in place for the protection of

15 | Mr. al-Marri?

16 | A    For the protection of Mr. al-Marri and the staff.

17 | Q    The video that you were shown of the optometrist

18 | visit, was Mr. al-Marri in the SHU during that visit?

19 | A    No.  Well, he was in fact outside the SHU in the

20 | reception and release area of the Brig in the dental and

21 | medical treatment area.

22 | Q    Any time he was taken out of the SHU, was he taken

23 | out in those -- pursuant to those standards?

24 | A    Yes, ma'am.

25 | Q    For various -- during his times of non-compliance,

1  were there certain privileges that were suspended by the

2  Brig?

3  A    Yes, ma'am.

4  Q    Now you had an opportunity to review some of the

5  other factual allegations made in the defense sentencing

6  memo before your testimony today?

7  A    Yes, ma'am.

8  Q    I believe you reviewed an allegation that for 35 days

9  straight the defendant was not allowed access to the

10  outside for recreation?

11  A    Yes, ma'am.

12  Q    Do you remember that period?

13  A    Yes, sir.  That was the period when Mr. al-Marri was

14  defecating on the trays, urinating on the walls, and also

15  I believe throwing substances at some staff members.

16  Q    Typically what were the hours that the Brig allowed

17  Mr. al-Marri to go outside and recreate?

18  A    We at first gave him two hours of recreation, either

19  inside or outside.  Some of it was weather dependent.  At

20  a later date we increased that to four hours outside.

21  Q    Do you know the number of hours that are required by

22  the Geneva Convention for enemy combatants like

23  Mr. al-Marri?

24  A    I believe it's two hours, ma'am.

25  Q    And you mentioned during the time where there was

1  extreme disruption by Mr. al-Marri, were the privileges to

2  go outside completely suspended?

3  A    No, ma'am.

4  Q    How were they suspended?

5  A    Well, if his behavior warranted, i.e. he was not

6  throwing stuff or defecating or urinating on the trays or

7  the floor, he was offered time outside the cell.

8  Q    Was it standard operating procedure for the Brig to

9  surveil Mr. al-Marri for 24 hours a day, 7 days a week?

10  A    Yes, ma'am, standard procedure.

11  Q    Was that standard procedure for the Brig in general

12  or just for enemy combatants?

13  A    If you were -- depending.  We had some areas, some

14  cells and other areas of the facility that were 24-hour

15  monitored.  All of the enemy combatants areas had 24-hour

16  monitoring in every area.

17  Q    And I believe there were times when your staffed

18  checked on Mr. al-Marri at 15-minute intervals?

19  A    Yes, ma'am.

20  Q    Is that also standard procedure?

21  A    That is standard procedure, yes, ma'am.

22  Q    I believe there were also times when the lights

23  remained on 24 hours a day?

24  A    Yes, ma'am.

25  Q    Was there a reason for that?

1   A    Yes, ma'am.  We were -- in particular when he first

2   arrived at the Brig, one of our gravest concerns was that

3   Mr. al-Marri might become suicidal and attempt to harm

4   himself.

5   Q    So the purpose of the lights on was so that your

6   staff could observe him?

7   A    So that we could better observe him in the cell at

8   night.

9   Q    Mr. Seymour, did the Brig provide medical services to

10  Mr. al-Marri throughout his entire time?

11  A    Yes, ma'am.

12        THE COURT:  I'm sorry.  I didn't hear that

13  question.

14  Q    Did the Brig employ medical services for Mr. al-Marri

15  during the entire period he was at the Brig?

16  A    Yes, sir.

17  Q    Typically how would medical services be dispatched to

18  see Mr. al-Marri?

19  A    He would be seen a number of times a week by the

20  corpsman, medication dispense.  Also, if there was a

21  corpsman present and he requested to see one, we would

22  make arrangements for the corpsman to come down and see

23  Mr. al-Marri.

24  Q    So if he had a particular complaint, he could let

25  someone know?

 1  A    Yes, ma'am.

 2  Q    And did in fact he do that?

 3  A    Yes, ma'am.

 4  Q    Did he have a lot of complaints?

 5  A    Yes, ma'am.

 6  Q    Was there a mechanism by which he could put his

 7  complaints in writing and send them to the leadership of

 8  the Brig?

 9  A    Yes, ma'am.  He could send two letters to the

10  commanding officer of the day.

11  Q    Now did Mr. al-Marri receive additional privileges

12  that general Brig population did not receive?

13  A    Yes, ma'am.

14  Q    Could you describe some of those for me, please?

15  A    He received a laptop.

16            THE COURT:  Can we have a time frame on this?

17  I'm pretty certain he wasn't given a laptop initially.

18  Q    Sure.  Do you remember approximately when he was

19  provided with a laptop?

20  A    Probably the last year and a half he was there.

21  Q    What other privileges was he provided?

22  A    He was provided a several hundred volume library in

23  Arabic text.  He was provided numerous books, religious

24  books on CD, provided magazines, newspapers, additional

25  articles that prisoners in Guantanamo were receiving.  He

1   had a compass that he could use to tell the direction of

2   east any time that he wanted to.

3   Q    With respect to that, was that for purposes of

4   prayer?

5   A    Yes, ma'am.

6   Q    And did your staff, if he asked, did you staff let

7   him know when prayer time was?

8   A    After a period of time, yes, ma'am.

9   Q    Was that after the DIA interrogations concluded?

10  A    Yes, ma'am.

11  Q    And you also described the conditions of his cell

12  earlier.  Was there a time when his cell door was opened

13  during days so he could be out in other parts of the SHU?

14  A    Yes, ma'am.

15  Q    Can you describe the other areas of the SHU he was

16  allowed to be in?

17  A    He was allowed to be in the day room, have access to

18  an elliptical machine, a treadmill, chin-up bars, nice

19  padded chairs.

20          THE COURT:  Is this all in the same time frame

21  I'm assuming, the last year and a half?  Is that what

22  you're talking about?

23  A    Approximately, yes, sir.

24  Q    What about -- did he request visits by an imam during

25  the time while he was at the Brig?

1    A     We provided an imam to Mr. al-Marri and he did

2    request to see him on a number of occasions.

3    Q     Do you remember approximately when Mr. al-Marri first

4    requested to see an imam?

5    A     It would -- I could not tell you exactly, ma'am.  I

6    believe it was probably in the last two years, maybe

7    before that.

8    Q     Was there a time that you yourself actually went and

9    purchased food, special food items for Mr. al-Marri?

10   A     Yes, ma'am.

11   Q     What type of food items were those?

12   A     We purchased miswak, which is a tooth cleaning root.

13   It's pretty much an Arabic item.  We purchased halal

14   cookies and cakes.  On one occasion we purchased a case of

15   Ensure.

16   Q     Mr. Seymour, you also testified that he did receive a

17   mattress, but not 24 hours a day?

18   A     Yes, ma'am.

19   Q     When the Brig provided him with a mattress, what were

20   the hours that generally he was provided with the

21   mattress?

22   A     To be honest with you, I don't remember exactly.  I

23   believe it was pretty much during the night hours when he

24   would be sleeping.

25   Q     And then it seems there were several complaints about

1    the temperature in his cell?

2    A    Yes, ma'am.

3    Q    Was there a separate thermostat for his control?

4    A    No, ma'am.

5    Q    So was the thermostat for the entire Brig?

6    A    It would have been building by building.

7    Q    And was there a particular temperature that the SHU

8    had to be at for standard operating procedures?

9    A    The temperature was set at that time from 70 to

10   74 degrees, I believe, which was a Navy standard.

11   Q    And we also heard testimony that there were -- that

12   Mr. al-Marri believed there was noxious fumes being pumped

13   into his cell?

14   A    Yes, ma'am.

15   Q    Were there ever noxious fumes pumped into his cell at

16   the Brig?

17   A    No, ma'am.

18   Q    Are there noxious fumes around the Brig?

19   A    Yes, ma'am.

20   Q    Can you describe those noxious fumes?

21   A    There's a large paper mill approximately 2, 2 1/2

22   miles from the facility.

23   Q    And did you yourself smell that --

24   A    Yes, ma'am.

25   Q    -- every day at work?

1   A    Yes, ma'am.

2   Q    Mr. Seymour, you testified, I believe, you have been

3   in corrections for 35 years?

4   A    Approximately 35, yes, ma'am.

5   Q    Had you ever encountered an individual like al-Marri?

6   A    No, ma'am.

7   Q    Was the Brig responsible for -- the mission of the

8   Brig, did it include gathering intelligence for purposes

9   of threat assessments?

10  A    No, ma'am.

11  Q    Was it the Brig's responsibility to determine whether

12  Mr. al-Marri had communicated with any al-Qaeda personnel?

13  A    No, ma'am.

14  Q    Was it the Brig's responsibility to determine whether

15  Mr. al-Marri had communicated with Khalid Sheikh Mohammed?

16  A    No, ma'am.

17  Q    One other question.  We heard testimony also, I

18  believe, that the Brig staff had taken toilet paper away?

19  A    Yes, ma'am.

20  Q    Was there a particular reason why that was done?

21  A    Yes, ma'am.

22  Q    Can you describe one?

23  A    He was misusing toilet paper.  One of the things he

24  would do would be to take the toilet paper and throw it

25  over the lens of the camera so we were not able to observe

1    him.

2              MS. BALTES:  Thank you.  No further questions.

3              THE COURT:  Thank you.  Mr. Savage, any

4    re-direct?

5              MR. SAVAGE:  Yes, Your Honor.  Thank you for the

6    opportunity.

7                        **RE-DIRECT EXAMINATION**

8    BY MR. SAVAGE:

9    Q    Good afternoon again, Mr. Seymour.  It was

10   painstaking this morning to see the very well defined logs

11   that you and your staff kept, those daily general ledger

12   logs, the shower logs, the recreation logs, the passdown

13   logs, the meal logs.  Who maintains those logs?

14   A    I'm sorry?

15   Q    Who maintains those logs?

16   A    They're maintained at the Brig.

17   Q    And how did Mr. al-Marri's defense team obtain

18   permission to look at those logs?

19   A    If I'm not mistaken, it was through the Justice

20   Department.

21   Q    The very people who just questioned you?

22   A    Yes, sir.

23   Q    Who have access to those logs?

24   A    I believe so.

25   Q    Yet in your testimony you didn't provide one date,

1  not one date associated with your testimony?

2  A    No.

3  Q    Now the truth is that all the questions you were

4  asked this morning regarding conditions of confinement had

5  nothing to do with Mr. al-Marri's obedience to the rules

6  and regulations of the Brig.  Those conditions of

7  compliance, no glasses, no opportunity to see outside, no

8  opportunity to see inside, no mattress, no chair, no warm

9  meals, on and on and on that this Court was bored with the

10  facts and details of this morning --

11            THE COURT:  I was not bored with them, counsel.

12  Don't put words in my mouth.  That's not correct.

13  Q    I'm sorry.  That the Court listened to this morning

14  attentively had nothing to do with the Brig but had to do

15  with a directive of DIA?

16  A    Yes, sir.

17  Q    Now once the Brig exercised its custody and control

18  of Mr. al-Marri, things were not perfect?

19  A    No, sir.

20  Q    But that was in 2005, late in 2005, and 2006

21  primarily?

22  A    Yes, sir.

23  Q    And at that time, against your wishes, Mr. Seymour,

24  and against the Brig staff recommendation, your colleagues

25  and boss, the Four Star, denied any privileges to

1  Mr. al-Marri?

2  A    For a period of time, yes, sir.

3  Q    And it was in that period of time after the departure

4  of DIA when he was still in an all hardened cell without

5  mattress, without pillow, without chair, without anything

6  that his form of communication turned out to be bodily

7  fluids?

8  A    By and large, sir.  He did have the mattress and the

9  chair for part of that period of time.

10  Q    Now the medical services made recommendations about

11  his conditions of confinement; is that correct?  You've

12  seen the video.

13  A    Yes, sir.

14  Q    And they were denied in the time frame in which we

15  showed this morning, 2005?

16  A    He did have the -- I think the reference is in fact

17  toward a Posturepedic type mattress.  He had it and then

18  he lost it and he had it and he lost it.

19  Q    The testimony you gave about he was provided with

20  several volumes, hundreds of volumes of religious

21  materials --

22  A    Yes, sir.

23  Q    The United States Government Department of Defense or

24  Department of Justice never provided him with one book;

25  isn't that correct?

1    A    No, sir.  We in fact did provide him with

2    approximately $7,000 worth of books.

3    Q    Through ICRC and his defense counsel?

4    A    No, sir.  These books were in fact purchased by the

5    facility.

6    Q    One moment, please.  You said that he was treated

7    differently to a general question asked by the

8    Government's representative than Mr. Padilla.  In the time

9    frame that was referenced in this morning's testimony,

10   that is in 2003, 2004, those were under the directives of

11   DIA, were they not?

12   A    Yes, sir.

13   Q    And those distinctions were not based on behavior,

14   but based on the needs and purposes of the DIA's

15   involvement?

16   A    They were based on a request of the DIA, sir.

17   Q    And when you responded to the Government's

18   representative that he eventually received these books and

19   other privileges such as a television, that was done in

20   the last 18 months at most, perhaps in the last 6 months

21   that some of those privileges came to be?

22   A    Some of those privileges were later.  A number of

23   them were from 16 to 20 months.

24   Q    But most of them were in the time frame we discussed

25   in this morning's testimony?

1    A     Not the early time frames.

2    Q     In 2003, 2004, 2005 and 2006.  At your urging, he got

3    a newspaper in 2007?

4    A     Yes, sir.

5    Q     And that newspaper contained classified ads, the

6    obituary column and the sports page?

7    A     Yes, sir.

8    Q     No news in the newspaper, nothing.  That newspaper

9    wasn't the New York Times.  It was a local paper, correct?

10   A     Yes, sir.

11   Q     And there was no news given to him?

12   A     No, sir.

13   Q     When he eventually received a television, which was

14   in the last 12 to 14 months of his presence there, he was

15   restricted in what he could see?

16   A     Yes, sir.

17   Q     The computer that he was given was used for what

18   purpose?

19   A     Religious text study and he did some other basic

20   stuff.  He received some other programs that he could use

21   that he utilized in his study.

22   Q     Did he use it to write correspondence to his

23   attorneys?

24   A     Sir, that I don't know.

25   Q     Was the intent of providing these privileges to

1  Mr. al-Marri, Brig staff's intention, to reduce the

2  boredom, the desolation, isolation that he existed in?

3  A    Yes, sir.

4  Q    Did any other person in the Brig, UCMJ side, ever

5  experience that deprivation of socialization?

6  A    If you're speaking of being placed in the SHU area by

7  themselves, no, sir.

8  Q    And you addressed to the Government's representative

9  a short while ago that there was surveillance on the UCMJ

10  side of the Brig?

11  A    Yes, sir.

12  Q    In fact, that is limited to the detention facility

13  within the UCMJ side?

14  A    It is, sir.

15  Q    And that the common, ordinary, everyday inmate on the

16  UCMJ side is not under surveillance 24/7?

17  A    No, sir, they are not.

18  Q    Beg the Court's indulgence one moment, please.  The

19  restriction of Mr. Padilla to meet with outsiders, family

20  members, others in the community who may have been

21  interested other than ICRC and his defense team, that was

22  not punitive or was it punitive?

23  A    No, sir, it was not punitive.

24  Q    The phone calls that he was denied up until the one

25  phone call he received in 2008 and his second phone call

1  he got in 2009, that was not punitive based on his

2  behavior, was it?

3  A     No, sir.  Sir, could I correct one thing that I

4  mentioned earlier?

5  Q     Certainly.

6  A     In the cells proper, the only cells that are

7  monitored are in the Brig lockup area.  However, all of

8  the common areas inside the housing units and many other

9  areas have common monitoring.

10  Q     I think the question -- and correct me if I'm

11  wrong -- that the Government representative asked was are

12  the other inmates 24/7?

13  A     Not in cell.  Only in the other housing unit, the

14  disciplinary housing unit.

15  Q     The type of video we saw today where every movement,

16  biological need, sleep, daily activity is just in the

17  special housing unit for detainees?

18  A     There are several cells in that other housing unit

19  where we would place people that have to be detained for

20  one reason or another that do have monitoring.

21  Q     One moment, please.  At the time of Mr. al-Marri's

22  departure from the custody of the Brig, including the time

23  that he was under the marshal's custody there, had you

24  observed a change in his attitude, his demeanor in terms

25  of his respect for the rules and regulations of the Brig?

1    A    Yes, sir.

2    Q    And at the time of his departure, was he an

3    exemplary -- I guess there's no such thing as an exemplary

4    enemy combatant -- but was he acting at least in those

5    times, in the later years that you have referenced where

6    his conditions improved, let's say from 2006 forward, his

7    attitude, his compliance, his respect and what-not, had it

8    markedly changed consistent with the change of his

9    conditions of confinement?

10   A    Yes, sir.

11            MR. LUSTBERG:  Thank you, Mr. Seymour.

12            THE COURT:  Any re-cross?

13            MS. BALTES:  No, Your Honor.

14            THE COURT:  Thank you very much, sir.  You may

15   step down.  I assume there's no possibility of recalling

16   this witness.  Is that right?

17            MR. SAVAGE:  Your Honor, no, there is not.

18                    (Witness excused)

19            THE COURT:  Call your next witness, please.

20            MR. LUSTBERG:  Major John Pucciarelli.

21

22

23

24

25

1         **JOHN PUCCIARELLI,**

2   Having been first duly sworn, was examined and

3   testified under oath as follows:

4                     **DIRECT EXAMINATION**

5   BY MR. LUSTBERG:

6   Q    Good afternoon, Commander.  For the benefit of the

7   court reporter, it probably would be a good idea for you

8   to spell your last name.

9   A    P-U-C-C-I-A-R-E-L-L-I.

10  Q    Sir, how are you employed?

11  A    Sir, I'm employed by the United States Navy.

12  Q    And at what rank and what are your current duties?

13  A    My rank is Commander, pay grade 05.  I'm currently a

14  military professor stationed at the Naval War College in

15  Newport, Rhode Island.

16  Q    Was there a time when you were employed at the

17  Consolidated Naval Brig in Charleston, South Carolina?

18  A    Yes, sir.  That's correct.

19  Q    And when was that?

20  A    I came on board December 1, 2006 until December 4 of

21  2008.

22  Q    And what was your -- what were your duties there?

23  A    My initial duties were as an executive officer.  I

24  served as the executive officer from around the 8th of

25  December approximately 2006 until July 3, 2007, at which

1    time I fleeted up to the commanding officer position and

2    filled that position until I departed in December of 2008.

3    Q      Just for the benefit of the Court, if you could

4    briefly summarize your experience prior to arriving at the

5    Brig.  I know it's not so easy to do it briefly.  Just

6    work backwards.  What had you been doing before that,

7    before you came to the Brig?

8    A      Do you want to go back my entire military career?

9    Q      How about we just take right before the Brig and I'll

10   cut you off when we've heard enough.

11   A      Before coming to the Brig I was stationed at the

12   Naval Consolidated Brig at Miramar, which is in San Diego,

13   California, and out there I served as the Director of

14   Clinical Services for a short period of time.  I was also

15   the acting executive officer of the Brig there in Miramar.

16   Q      And let's go one more.  Before that?

17   A      Prior to that I was a student at the Naval War

18   College in the College of Naval Commanding Staff.

19   Q      How long overall have you been in the Navy?

20   A      20 years and 2 months.

21   Q      And were you in the Marines before that time?

22   A      I was a Marine Corps option candidate when I was in

23   the Naval ROTC program.

24   Q      Thank you.  Do you know Mr. al-Marri?

25   A      Yes, sir, I do.

1    Q    Do see him here in court?

2    A    Yes, sir, I do.

3    Q    How did you come into contact with Mr. al-Marri?

4    A    When I reported on board as the executive officer, I

5    sat in on any meetings dealing with the enemy combatant

6    mission so that gave me my initial familiarity with

7    dealing with the enemy combatant mission.  Then as

8    commanding officer I had more interaction with

9    Mr. al-Marri.  Primarily it was written communication.  He

10   was allowed to submit chips to the commanding officer to

11   discuss different issues in written format.

12   Q    We'll come back to that in moment.  With respect to

13   the enemy combatant mission, at the time you arrived was

14   he the only enemy combatant there at the Brig?

15   A    That's correct.  We only had the one, sir.

16   Q    And just back to these chits, would you describe for

17   the benefit of the Court what a chit is?

18   A    A chit is an item that we use in the United States

19   Navy.  Any sailor can submit a chit up the chain of

20   command for various administrative reasons.  So we found

21   that as a good mechanism by which Mr. al-Marri could also

22   communicate with the chain of command and to also keep a

23   written record of those communications.

24   Q    When he would submit a chit to you, how would you

25   respond to that?

 1   A    It would work its way up through the chain, through

 2   the special housing unit chain.  If there were things in

 3   there that they could handle, you know, if it was

 4   something that could be handled at a lower level, they

 5   would do their best to take care of it.  Otherwise it

 6   would work its way up through the chain and ultimately

 7   make it to my desk.  We did our best to turn them around

 8   as quickly as possible.  Sometimes it took more time than

 9   others.  Some of them were requests to speak with counsel.

10   We could turn those around fairly quickly.  Others

11   required us to go to higher authority for guidance.

12   Q    And would you respond to him likewise in writing?

13   A    That's correct.  Yes, sir.

14   Q    Now tell me if I have this right.  He sent a fair

15   number of chits up the chain of command to you; is that

16   right?

17   A    Yes, sir.  It was approximately in my time about 332

18   chits.

19   Q    Approximately?

20   A    Yes.

21   Q    And you would always respond to those as required,

22   right?

23   A    That's correct.

24   Q    Sort of became pen pals, didn't you?

25   A    Some of them were more detailed.  Some of them were

1    comments noted.  Some of them gave more detail on what we
2    were doing to try to resolve particular situations.
3    Q    We'll come back to that.  Back to the special housing
4    unit, which is -- Mr. al-Marri was housed in the special
5    housing unit or the SHU; is that correct?
6    A    That's correct.
7    Q    And was he the only resident of the SHU at the time
8    that you were the commander of the Brig?
9    A    That's correct, sir.
10   Q    Did he have any communications with any other inmates
11   at the Brig whatsoever?
12   A    He did not have communication with any other
13   prisoners at the Brig, no, sir.
14   Q    Did he have communications with anybody outside of
15   Brig personnel, his attorneys and the ICRC, International
16   Committee for the Red Cross?
17   A    Other than communications with his family at the time
18   that those were authorized.
19   Q    That's later on?
20   A    Later on in my term, yes, sir.
21   Q    We'll talk about that.  Now during your time there,
22   if you could explain to the Court, how did Mr. al-Marri's
23   conduct change in your view?
24   A    How did it change?  When I first took command in
25   July, we started to see some disciplinary reports,

1  primarily related to issues with food, things with

2  blocking cameras, some disrespectful communications to

3  staff, not necessarily following directions of staff right

4  away, and so there was about six chits or DRs,

5  disciplinary reports, that occurred early on in my term as

6  command officer, but those fairly quickly subsided.  I

7  think there was total of about 12 or 13 disciplinary

8  reports that were issued during my time in command.

9  Q    When you say they fairly quickly subsided, did he

10  cease -- explain what happened.

11  A    Those initial half dozen or so were related to some

12  food issues with the preparation of meals, the halal

13  preparation of meals.  And we were preparing them in that

14  fashion, but my assumption is in his mind he wasn't a

15  hundred percent certain that we were preparing those meals

16  that way, although I tried my best in writing to make it

17  known that we were preparing it to the best of our ability

18  in halal fashion.

19  Q    So did something happen that caused him to become

20  satisfied that in fact you were doing the best you could

21  in that regard?

22  A    My senior staff and I really racked our brains on

23  this, on how we could demonstrate to him that we were

24  preparing the meals in accordance with his religious

25  guidelines, and we came up with an idea of giving him a

1   tour of our facility, the meal preparation facility, and

2   having my food service officer give basically a briefing

3   on how the meals were prepared.  So we arranged for --

4   after hours, once the facility was locked down and taps

5   had been sounded and prisoners were all in their racks, it

6   was very late at night and we transported him to the

7   enlisted dining facility and we showed him how meals were

8   prepared.  Now I was not there for that.  I observed it

9   all on camera from our control center.  But my senior

10  staff accompanied him to that location.

11  Q    And once he had had that, once he had had that tour

12  of the galley, were there any -- after that were there any

13  disciplinary problems at all with Mr. al-Marri regarding

14  food?

15  A    We used that tour in conjunction with a meeting with

16  our imam to help to clarify any questions that he might

17  have and it was after we went through that that meal

18  related issues subsided and I do not recall that becoming

19  an issue again during the remainder of my time in command.

20  Q    So do you remember about when, Commander, that was,

21  that tour of the galley?

22  A    I believe it was immediately following Ramadan in

23  2007, so it would have been October time frame,

24  mid-October of 2007.

25  Q    By the way, you mentioned Ramadan.  You also had

1   earlier mentioned that there had been some disciplinary

2   problems with respect to Mr. al-Marri covering the

3   cameras, the videotaping of him in his cell.  Do you

4   recall that?

5   A    Yes, sir.

6   Q    Was that at all related to Ramadan as best you can

7   recall it?  That is was he -- I'm sorry.

8   A    It was in and around the time of Ramadan as I recall.

9   Q    And was it -- do you recall whether he was covering

10  cameras so he could pray in privacy at that time?

11  A    I think, as he had related to my senior staff during

12  their meetings with him, it was a protest of sorts.

13  Q    Protesting --

14  A    Protesting that we were not providing his meals in

15  halal fashion.

16  Q    I see.  Thank you.  In any event, were there other

17  ways during the time that you were there that you

18  attempted to make Mr. al-Marri's life a little bit better?

19  A    We worked to provide him with additional items for

20  recreation.  He was very much into physical fitness.  We

21  had already provided him with a treadmill and elliptical

22  trainer, so he had access to that.  We obtained a weight

23  machine for him to work out on.  We had increased his

24  access to Islamic or religious texts and I think

25  ultimately we brought him up to over 500 volumes that he

1    had access to, a hard copy of volumes that he could do his

2    religious studies.  And towards the very tail end of my

3    tenure there, we had even obtained clearance to get

4    Islamic texts on CD which provided -- I believe the figure

5    was close to 12,000 volumes of material that he could

6    read.  He also had access to our Brig library which had a

7    couple thousand volumes, so he could pick and choose from

8    that.  He had access to movies.  He was allotted -- we

9    gave him a list, a movie list, basically the same movies

10   that we made available to our own military prisoners.  He

11   could pick and choose from that list.

12   Q    Were there any types of initiatives that you sought

13   to undertake with Mr. al-Marri to improve his conditions

14   in which you made recommendations that were rejected from

15   higher up in the chain of command?

16   A    We had pressed hard for communication with family and

17   more communication outside.  It did ultimately get

18   approved.  It was -- it took some time and it took a

19   number of times going back and forth just to get status

20   updates, but we ultimately did obtain the clearance to go

21   ahead and arrange for phone calls to his family.

22   Q    If you would, can you tell the Court what exactly

23   happened when ultimately Mr. al-Marri obtained permission

24   to speak to his family by telephone?

25   A    There were a lot of logistics involved.  It was

1    fairly easy for us at the Brig to set up and make the

2    arrangements for the phone call on our end, but there was

3    a lot of logistics involved with making contact with his

4    family overseas.  So there was a lot of work that had to

5    be done by other agencies and a lot of work beyond our

6    control in order to make that communication with his

7    family.  And I believe ultimately when they did make

8    communication or contact with his family to make these

9    arrangements, it was discovered that his father had passed

10   away a number of months prior.

11   Q    When that happened, did you write a letter to

12   Mr. al-Marri?

13   A    Yes, I did.  I consulted first with our imam.  I was

14   away at the time when we got word of that.  I want to say

15   it was April 2008 time frame when we were looking to

16   coordinate that.  I was away at my headquarters.  I

17   received immediate notification from my senior staff.  We

18   worked to have an imam flown out from Chicago, from Great

19   Lakes, to be there and his attorney, Andy Savage, came out

20   to pass the word to him of this discovery.  And, yes, I

21   did, I wrote a formal letter to Mr. al-Marri.

22   Q    Let me show you what's already been marked as Defense

23   Exhibit 80.  If you could, just for the benefit of the

24   Court, just read it.  Well, anyway, it's up there.  What

25   was your purpose in writing this letter, Commander?

1    A     Because the decision had been made that commanding

2    officers would not have direct contact with the enemy

3    combatants so that we could maintain some distance when it

4    came to making decisions.  As I mentioned earlier, all the

5    communications back and forth were in writing.  If there

6    was a prisoner -- often times we had prisoners on the

7    military side of the house where parents or a very close

8    relative died and our chaplain would make contact and I

9    would also make contact with them.  It was more of a

10   personal -- I could do it one-on-one with one of our

11   military prisoners, so this is not unlike anything I would

12   have done with one of our military prisoners.  But I

13   wanted to take an opportunity to let him know that we were

14   thinking of him, anything that he needed to help him

15   through the difficult time, hearing the difficult news.

16   Q     By this time you had established sort of a

17   relationship with Mr. al-Marri, hadn't you?

18   A     Of sorts, yes, sir.

19   Q     Not in person because you hadn't spoken to him in

20   person by that time, had you?

21   A     No, sir, I had not.

22   Q     And that relationship was through the various chits

23   that he would write, they would work their way up to you

24   and your responses to him; is that correct?

25   A     That's correct.

1    Q    And in the course of that relationship that you had

2    with him, did you discover, for example, that he had a

3    sense of humor?

4    A    On occasion some of the communications were humorous,

5    yes, sir.

6    Q    Can you think of an example?

7    A    There was one occasion where I guess some grass was

8    growing up a little high in his recreation area and he had

9    sent up an ad from Home Depot that had a weed whacker

10   there and he said, you know, if we purchased it for him he

11   would take care of that for us, along with a fee schedule,

12   I guess, that he would take care of any lawn maintenance

13   for us.

14   Q    Was he respectful to you in the course of your

15   correspondence with him?

16   A    Mostly.  You know, there was some times where I saw

17   that there was some frustration in his writing, but I

18   never took it as being totally disrespectful.  I could see

19   he was experiencing some frustrations.

20   Q    And did he express gratitude to you in terms of the

21   various initiatives you were undertaking to make his

22   otherwise isolated life more tolerable there at the Brig?

23   A    There were a couple of chits that I can recall where

24   he did send notes of thanks for when we provided him with

25   additional texts, when we provided him with access to a

1  computer that had been cleared from higher authority, but

2  he thanked us for providing that to him.  There was a time

3  where I cleared some photographs of his children to be

4  passed to him, so he provided a letter of thanks for that

5  fact.

6  Q    As a general matter -- and I asked you this earlier

7  as to whether he had changed and you talked about his

8  disciplinary record having improved in light of all these

9  initiatives that you had undertaken.  Did you notice a

10  change in his attitude as a general matter towards

11  personnel at the Brig and towards his captivity as it

12  were?

13  A    During my time in command, I always noted him to be

14  respectful.  He had good interaction with staff.  He never

15  directly threatened staff.  One item that I found

16  particularly interesting was there was a time where he was

17  going to dump his food tray and he warned one of the

18  guards that he was going to do that and asked him to step

19  aside so he wouldn't -- so the guard wouldn't get anything

20  on his uniform.

21  Q    Finally, there came a time when you -- as you

22  reported, you're no longer at the Brig, so there came a

23  time when you left your command post at the Brig, correct?

24  A    That's correct.

25  Q    And when was that again?

1  A     That was in December of 2008.

2  Q     And did you meet with Mr. al-Marri in connection with

3  your departure from the Brig?

4  A     I did.  I made a decision to go and meet with him

5  one-on-one, face-to-face.  This was an individual I had

6  been communicating with in writing for some period of

7  time.  I wanted a brief meeting with him to sit down and

8  explain that there was going to be a change of command,

9  that he could expect to be hearing from a new commanding

10  officer, one who had worked alongside me and had been

11  trained by me, but of course every commanding officer has

12  a different approach and that he could -- might expect

13  some changes in policy and things like that to come now,

14  but just if he would please be patient with those and give

15  the new commanding officer an opportunity to basically

16  ramp up and learn the new position.

17  Q     What did he say?

18  A     He was agreeable to that and he was pleased that I

19  took the opportunity to come down and meet with him.  He

20  seemed very pleased to have an opportunity to meet with

21  me.

22  Q     And did you subsequently learn whether he in fact

23  fulfilled his promise to give the new CO a chance to ramp

24  up as you say?

25  A     I talked to the new CO on a number of occasions

1  following my departure and the new commanding officer

2  never gave me any indication of any difficulties after we

3  changed command.

4  Q    Just two other areas and then I'll let you go.  One

5  is, I think I understood what you said before, but were

6  there any examples during the time that you were CO at the

7  Brig of Mr. al-Marri acting in any sort of violent manner?

8  A    No, sir, I did not note any incidents of violence

9  during his detention.

10  Q    Finally, am I right that one of the things that

11  occurred during the time that you were CO is that

12  Mr. al-Marri got a television set?

13  A    That's correct.

14  Q    And I don't know whether you were here.  There were

15  limits to what he could watch on TV, correct?

16  A    That's correct.

17  Q    And his television watching habits in fact were

18  monitored by the staff at the Brig; is that correct?

19  A    Yes, sir.

20  Q    You are aware he liked, for example, to watch NASCAR?

21  A    Yes, sir.

22  Q    You did become aware of that?

23  A    Yes, sir.

24  Q    And were you aware of an incident in which

25  Mr. al-Marri turned his television so that on Super Bowl

1    Sunday some of the guards who really wanted to watch the

2    Super Bowl could watch the Super Bowl on his TV, otherwise

3    they would miss it?

4    A    I heard that after the fact.  I heard about that

5    sometime after the fact, yes, sir.

6           MR. LUSTBERG:  Thank you very much.  I have

7    nothing further for the witness.  Thank you very much.

8           THE COURT:  Thank you.  Any questions?

9           MS. BALTES:  No questions from the Government.

10   Thank you, Your Honor.

11          THE COURT:  Thank you very much.  You may step

12   down.

13                   (Witness excused)

14          THE COURT:  Do you have any other witness to

15   present?

16          MR. LUSTBERG:  We don't, Your Honor.

17          THE COURT:  Do you have any witnesses?

18          MR. RISLEY:  Yes, we have one, Your Honor.

19                **DEBORAH KAY SIRRATT,**

20   Having been first duly sworn, was examined and

21   testified under oath as follows:

22                **DIRECT EXAMINATION**

23   BY MR. RISLEY:

24   Q    Will you state your name?

25   A    Deborah Kay Sirratt.

1    Q    Can you spell your last name?

2    A    S-I-R-R-A-T-T.

3    Q    What is your occupation?

4    A    Psychologist.

5    Q    And we can tell by your uniform you're serving in the

6    military; is that correct?

7    A    Yes, sir.

8    Q    In the Air Force?

9    A    Yes, sir.

10   Q    What is your rank?

11   A    Major.

12   Q    Would you tell us a little bit about, in summary

13   fashion, about your professional education?

14   A    I have a bachelor's degree in international studies

15   and Russian Slavic studies, I have a master's degree in

16   psychology and a Ph.D. in psychology.

17   Q    Where did you obtain your Ph.D.?

18   A    University of Memphis in Memphis, Tennessee.

19   Q    Could you tell us a little bit about your

20   post-doctoral training, professional training,

21   particularly as it relates to terrorist psychology?

22   A    I completed a residency at Wilford Hall and then I

23   received training, Behavioral Science Consultation Team

24   training, for three weeks in October of 2007 down at Fort

25   Huachuca, Arizona.

1    Q    Did that relate to terrorists or terrorism?

2    A    Correct.  That training was actually a three-week

3    required training before I went down and served at

4    Guantanamo Bay, Cuba.

5    Q    Do you have any professional certifications or

6    licenses?

7    A    Yes.  I'm licensed to practice psychology in Arizona.

8    Q    Will you give us an idea about your professional

9    experience as a psychologist?

10   A    I've served in several capacities:  Clinical

11   psychologist for individual therapy, group therapy, family

12   therapy, as well as administrator, served as clinical

13   director, served as surgeon general in my jobs, and

14   currently I'm a student at Air Command and Staff College

15   in Maxwell.

16   Q    Do you know the defendant in this case, Ali al-Marri?

17   A    Yes, I do.

18   Q    Do you see him here in the courtroom?

19   A    Yes, I do.

20   Q    When and how did you first become acquainted with the

21   defendant?

22   A    I was stationed -- I started PCS actually to the

23   Naval Brig in Charleston in September of '05, became aware

24   of Mr. al-Marri being held at the Brig.  I did not start

25   to actually interact with him until around July of 2006.

1   My predecessor in the position as clinical director was

2   PCS-ing, so someone needed to take over the role that he

3   held so I was told, "Major Sirratt, you're going to be

4   taking on that role.  Let me tell you about it."  And I

5   was introduced to Mr. al-Marri and --

6   Q    What is PCS-ing?

7   A    I'm sorry.  Let me explain PCS-ing.  My predecessor,

8   the Major that was there, decided that he was going to

9   move.  He got an assignment.  And military basically

10  decided they were going to send him to Guam and so I took

11  over his role as clinical director, so I was in charge of

12  both medical and clinical care at the Brig in Charleston.

13  Q    And that included the defendant; is that right?

14  A    Correct.  It included the regular prison population

15  and included Mr. al-Marri.

16  Q    Now will you elaborate a little bit on your role, the

17  role you assumed with respect to the defendant in

18  particular?

19  A    The role I assumed was being in charge of all his

20  medical and clinical care and that was basically making

21  sure his day-to-day medical care was taken care of.  If

22  there were any clinical issues that needed to be taken

23  care of, that was my responsibility as well.

24  Q    And did you do that through personal contact with the

25  defendant?

1    A     My responsibility, as it was explained to me, was to

2    be available to go down and, according to the Major I

3    replaced, go down and check on Mr. al-Marri weekly and to

4    see if his medical needs were being taken care of.  And so

5    I was introduced to Mr. al-Marri.  In the first meeting I

6    had, Mr. al-Marri was very kind and said, "I appreciate

7    you coming down here, but I really would prefer not to

8    speak to a woman.  I would prefer to speak to a male."

9    Q     Did you ultimately have the opportunity to have

10   meetings with the defendant in person?

11   A     Yes, I was.

12   Q     Tell us what brought that about.  How did things

13   change and why?

14   A     The initial meeting actually came about there was

15   another Major there that was actually in charge of

16   responsibility for the SHU and --

17   Q     By SHU, that means what?

18   A     Special housing unit.  That was the name that was

19   given to where Mr. al-Marri was located.  So special

20   housing units works out to be SHU.  He was responsible for

21   security for that area and he accompanied me to introduce

22   me to Mr. al-Marri and said, "This is the new Major."

23   This is the new Captain actually.  I was a different rank

24   at the time.  He said, "Give her a chance.  She's a good

25   person.  Talk with her."  Again, Mr. al-Marri was very

1   kind and said, "Thank you, but I really don't want to meet

2   with a woman."

3           And my understanding, although I didn't witness

4   these interactions, was the Major continued to say, "Hey,

5   give her a chance.  She's a nice person."  Again, this is

6   what I was told.  And I continued to go down and watch

7   interactions with Mr. al-Marri and this particular Major.

8           Eventually Mr. al-Marri requested to speak to me

9   and he requested to speak to me about medical issues, so I

10  went to speak to Mr. al-Marri.  And it took a couple of

11  months before he was willing to speak to me, but I did go

12  down and speak to him for a short period of time to

13  discuss the medical issues he was concerned about.

14  Q    Then after that initial successful contact, will you

15  tell us over what time period or periods you had personal

16  interaction with the defendant?

17  A    I'm not sure of the exact date he actually requested

18  to see me.  I want to say it was late fall perhaps of '06,

19  but maybe it was every week to two weeks I went down to

20  see him and talked to him about different issues that he

21  would address and would want me to, you know, take time to

22  talk about regarding medical issues.  That was probably

23  from maybe November of '06 through September of '07 when I

24  deployed to Guantanamo Bay, Cuba.  Then I followed up with

25  him when I came back from Cuba.

1   Q      When did you come back?  When was your next contact

2   after you left for Guantanamo Bay?

3   A      Unfortunately my last contact was in September of

4   '07, I deployed, and the last contact that I had with

5   Mr. al-Marri was in, I believe, June of '08.

6   Q      So there was a gap and then you had one visit, is

7   that right, in June of '08?

8   A      Correct.

9   Q      Now you have made reference to weekly sessions.  Were

10  you successful in having weekly sessions with him during

11  the time period before you left for Guantanamo?

12  A      I would not say every week, but almost every week.

13  Sometimes it was every two weeks.  It was almost every

14  week.

15  Q      Will you give us some idea of how long these sessions

16  were when you would sit down and talk with him?

17  A      The shortest one I think we had was that initial

18  session where it was 7 minutes where he was again very

19  kind, said, "Hey, I really don't want to talk to a woman."

20  The longest one I think was up to an hour and a half, hour

21  and 40 minutes.  So they kind of varied depending on what

22  Mr. al-Marri wanted to talk about.  We talked about all

23  kinds of different issues, mostly focused on medical

24  concerns, but we did talk about other things, religion,

25  history, other issues.

1    Q    Now what was really your purpose in engaging him in

2    discussions like that on religion, history or other sorts

3    of things?

4    A    It was honestly what he wanted to talk about.

5    Basically what we talked about, we kind of started going

6    down lists and he would have a list of things that he

7    would like to talk about and so we started out with a list

8    of these are the issues I want to talk about.  And from

9    the last time that we talked about, it was kind of a

10   follow-up and then the last part of the list was, okay,

11   these are the new issues I would like to talk about.

12            And sometimes in there, depending on what we

13   were talking about, something would trigger us talking

14   about history or something, you know, would trigger us

15   talking about -- you know, for instance, one time we

16   talked about Turkey or a couple of times we talked about

17   Turkey.  I happened to be stationed in Turkey before.

18   There might have been something in the news, you know,

19   that came up in topic of conversation, so we happened to

20   talk about that.  So sometimes even though we had had a

21   list we were going to go by and he had it written down and

22   we would go over it step by step, there might be something

23   else that would come up as a topic of conversation.  So

24   that's kind of how those things came up.  We generally

25   went by a list, item by item on a list that he would come

1    up with.

2    Q    He would develop the list and you would go down his

3    agenda?

4    A    Right.

5    Q    Now is it fair to say that your role included not

6    just the physical, medical aspects of his condition, but

7    also assessing his mental health?

8    A    It was an unofficial assessment.  From the very

9    beginning, he was very clear to me -- he made it very

10    clear to me that he really didn't believe in -- as he

11    joked with me, he said he didn't believe in head doctors.

12    It was our little joke.  More than once he would say that

13    I was the head doctor.  You know, my being a psychologist,

14    you know, head doctor, and then head doctor in terms of I

15    was in charge of medical.  That would be our joke.  And on

16    more than one occasion we talked about the fact that I was

17    the quote/unquote head doctor.  Sometimes he would write

18    notes to me and give them to the SHU staff and they would

19    give them to me and it would be "head doctor".  I was the

20    head doctor.

21         So he was very clear that he kind of really

22    didn't believe in psychology.  He really didn't see the

23    need for it.  And very clearly he was seeing me as the

24    person in charge of medical.  So when I talked to him, it

25    was in the role as the person in charge of medical, but I

1    also made sure that I assessed in terms of how was he

2    doing, how was he getting along, those activities of daily

3    living that I would do with any person that I was seeing

4    to make sure he was doing okay.

5    Q    Now in the course of these meetings, were there

6    occasions in which the defendant would raise various

7    complaints that he had about Brig personnel, the way he

8    was being treated, conditions of his confinement?

9    A    Absolutely.  Different issues that would pop up,

10   problems.  If there were issues with different noises, if

11   there was a problem with a particular staff member, if

12   there were complaints with somebody.  Maybe they were

13   being louder than normal.  Maybe they were shutting the

14   door too loudly, like the sliding doors, mechanized doors

15   that slid closed and open.  Somebody that was maybe being

16   a little noisy when he was trying to sleep.  Things like

17   that he would definitely bring up to me.  Maybe being a

18   little slow to get magazines and stuff like that.  Those

19   kind of issues he would definitely bring up to me.

20   Problems with medical staff on when the results were

21   coming back from different lab work, things like that.  He

22   was definitely bringing those up and I would try to take

23   that information and I would go investigate.

24           Even if it didn't have to do with medical, I

25   would try and investigate and find out from the staff that

1  sat there every day what's going on, try to find out from

2  the leadership if there was some issue that I needed to

3  find out what's going on, is there a bigger issue.  I

4  would talk to my medical staff.  What's going on with the

5  lab work?  Do we need an update?  Is it updated in our

6  computer system?  Do we just need to give him an update or

7  is it not actually being registered in our computer

8  system?  So that's why we would go over it every week.

9  You know, this is the update for that lab work.  Or, no,

10  it's not in the system.  You know, we would work on that

11  and try to get the updates.

12  Q    Now when you conducted this investigation into the

13  factual validity of the defendant's complaints, did they

14  always turn out to be factually valid?

15  A    No.

16  Q    Would you elaborate on that?

17  A    Sometimes they were legitimate, like we should have

18  gotten that information to him or we could have at least

19  gotten him an update.  Then there were other times where

20  it was picking on a particular staff person and kind of

21  singling him out of the crowd and there was no reason to

22  do that.  He was purposely picking on a particular staff

23  member, and that happened on more than one occasion.  It

24  happened repeatedly.  And it was this particular staff

25  member for this particular week or this particular staff

1  member for this particular month.  That happened on

2  numerous occasions.

3            Then there were other occasions where there

4  absolutely was information where we could have given him

5  an update or we could have at least said, "Hey, we don't

6  have any update on this.  They're running slow or late at

7  the lab."  Or "We should have been able to get you your

8  glasses, but there's some kind of glitch."  But there were

9  also the same number of times where there was no apparent

10  issue going on and it just seemed like complaining to

11  complain.

12  Q    Now based upon this period of interaction that you

13  had with the defendant and based also on your professional

14  training and experience, will you describe for the Court

15  your observations about pertinent personality

16  characteristics of the defendant?

17  A    You know, at the very beginning it was, I think,

18  difficult to kind of really understand because at the

19  beginning it was very brief conversations and I think he

20  was kind of holding a lot back.  And as time grew and I

21  got to spend more and more time with him, I think I got to

22  see a little bit more of his personality.  He would smile

23  more around me, I think show a little bit more of his

24  personality, would laugh more, would tell jokes more.  It

25  was more than just the head doctor joke that kept coming

1    up over and over again.  I mean, there's no doubt that I
2    certainly laughed at that joke.  I would make the joke
3    too.  By the end it was very clear to me he was a very
4    resilient human being.
5    Q    Now when you say "resilient", what do you mean?
6    A    I think it was a tough place for any person to be.  I
7    think it was a very difficult situation for anybody to be
8    in, anybody in this courtroom.  I think it's a tough place
9    to be, to be away from your family when your family is
10   very important to you and I think -- and I don't know what
11   all he went through.  I certainly know when I was there at
12   the Brig -- and I was there for only two years and I
13   didn't even interact with him for the two years.  I know
14   it's a difficult situation to be in.  But I think he made
15   the most of the time when I got to be around him.  I think
16   he made the most of the time.

17         I mean, he read so much.  He even made the
18   comment to me that in some ways it was a blessing that he
19   had a chance to read as much as he did the Quran and that
20   if he was back at home he wouldn't have had that exposure,
21   that time away from, you know, dealing with all the kids,
22   working so hard to make sure he got a chance to take care
23   of his family because he really would have had to work
24   very hard to take care of his family.  I mean, that's just
25   natural.  We all have to work for a living to take care of

1  our families.  He said, you know, "I get to read all of

2  this.  That's something I get to do for hours and hours

3  during the day, dedicated to this."  I mean, you know --

4  Q    Let me --

5  A    He made the most.

6  Q    Let me encourage you to focus on --

7  A    Right.

8  Q    -- those personality traits.  Were there any

9  difficult aspects of his personality that you observed?

10  A    Right, but what I'm trying to say is very resilient,

11  but part of that is also, I mean, very narcissistic.

12  Q    What do you mean by that?

13  A    Very confident.  He was also very manipulative.  He

14  could play staff members against each other.  Very

15  confident.  I think that all played together in his

16  ability to make it through this difficult situation.

17  Q    To cope with it?

18  A    To cope with it.

19  Q    Now will you describe for the Court your observations

20  about the defendant's mental health, the state of his

21  mental health during this time period when you had contact

22  with him?

23  A    He definitely had times when I would see him and he

24  would show signs of sadness, especially when he talked

25  about really wanting to have letters from his family,

1   wanting to see pictures of his family, there would be

2   sadness, wanting to know how his father was doing.  There

3   would definitely be times he was more sad.  There was a

4   couple of times -- and it's noted in my documentation

5   where I would mark that he was despondent, meaning kind of

6   sadness.  Those were sessions where there was sadness and

7   there was a couple of points where he just didn't want to

8   talk.  He kind of got to that point where we were talking

9   and it was kind of like, "I just don't want to say much

10  more."  Most of the time that I talked to him we talked,

11  we laughed, we talked about different issues, we were able

12  to communicate, things were okay.  There were a couple of

13  times I could tell he was having a little bit sadder day.

14  Q    So there were ups and downs?

15  A    Ups and downs.

16  Q    What about --

17  A    Pretty normal.

18  Q    How would you characterize the state of his mental

19  health in general?

20  A    Okay.  Pretty good.

21  Q    Now you said there was a break when you went for a

22  period of time on duty to Guantanamo Bay?

23  A    Correct.

24  Q    When was that again?  What was that time period?

25  A    Last time I saw him was in late September, 2007.  I

1    went for training in October and I didn't see him again

2    until around early to mid-June 2008.

3    Q    When you saw him again, what were the circumstances?

4    A    I saw him when I got back.  We spoke for about an

5    hour and 40 minutes.  Essentially we had the opportunity

6    to catch up, see how he was doing.  Because when I left I

7    didn't know if I would have the opportunity to see him

8    again, kind of said our farewells when I left, so it was

9    an opportunity to kind of -- "Didn't know if I was going

10   to get the chance to see you again.  How are things

11   going?"  He asked me if I had had a chance to see his

12   brother and I said I had.  Just --

13   Q    By his brother, you mean his brother Jarrallah who

14   was a prisoner at that time at Guantanamo Bay; is that

15   correct?

16   A    Correct.  So we just caught up.

17   Q    Now comparing your observations of the defendant at

18   that time with those in your sessions before, did you

19   observe any significant change in his mental state or

20   mental health?

21   A    Did not appear to be much of a change to me.  He

22   seemed about the same.

23   Q    During this time did you ever feel concerns that the

24   defendant might be showing some signs of psychiatric or

25   psychological pathology?

1   A     Not when I saw him in June, no.

2   Q     And before, at any point in time?

3   A     No, not during the time that I saw him.

4   Q     Over the course of your conversations with the

5   defendant, you mentioned that you talked about Turkey.

6   What was the nature of those conversations?

7   A     We were talking about Turkey, talked about a lot of

8   different issues with Turkey.  I happened to mention -- we

9   were talking about different issues related to history and

10  religion and we talked about Turkey and I mentioned that I

11  had been stationed there.

12           So we talked about the fact that that was a

13  Muslim country, yet they had a secular government.  We

14  talked about the fact that a Muslim country really

15  shouldn't have a secular government.  They really kind of

16  weren't supposed to do that.

17  Q     Now were you asserting that proposition or was he

18  asserting that proposition or both?

19  A     We both asserted it, but certainly he, you know, kind

20  of said it first and I was like asking him why that didn't

21  seem right and he was explaining to me why that really

22  wasn't right.  And that had been asserted to me before by

23  some other Muslims that I had met previously.  But he was

24  asserting it and I was saying that didn't seem right to me

25  either.

1   Q    Now were there other conversations that you had with

2   the defendant where you discussed world affairs and in

3   particular any of the defendant's beliefs about things

4   that needed to change in the world?

5   A    Yes.  We talked about the Palestinian issue.  We

6   talked about the United States and some inconsistencies in

7   the United States, talking about democracy and how the

8   United States had been saying they wanted democracy, but

9   yet the United States wouldn't back free elections in

10  Palestine.  Talking about how when Hamas got voted in in

11  the elections in Palestine, the United States wouldn't

12  support those elections and how the Muslim world kind of

13  saw that as, "Wait a second.  That's inconsistent.  You're

14  saying you're kind of pro democracy, but yet they got

15  voted in at the election and now you're saying it's a bad

16  election."

17       Kind of how, you know, his Palestinian brethren

18  were being killed.  Also talked about one of his lawyers

19  that he previously had that was Jewish and he explained

20  that relationship.  It was like he was a nice guy and he

21  understood that he was a good man, but he couldn't have

22  him on his legal team because he was Jewish.  It was like

23  he could kind of forgive him, but he couldn't really

24  forgive him because, you know, he was involved in killing.

25  The money that he gave to different organizations, it was

1    involved in the killing of his Palestinian brethren.  Then

2    he talked about infidels.  We had more than one

3    conversation talking about infidels.

4    Q    Tell us about those.

5    A    Infidels should be killed.  Infidels, Americans --

6    Q    How did he define infidels?

7    A    Nonbelievers.  Infidels should be killed.  You know,

8    very specific saying that -- nobody at the Brig.  Very

9    specific.  Saying the Savages were great.  You know, very

10   specific.

11   Q    When you say the Savages, you mean Andy and Cheryl

12   Savage, his attorney --

13   A    Absolutely.

14   Q    -- and his wife?

15   A    Absolutely.  He never had anything bad ever to say

16   about them.  Was very kind talking about the Brig staff,

17   saying that he really felt like they were very kind and

18   treated him well.  He was -- again, he was talking about

19   the staff that I knew, the people I worked with.  I don't

20   know if he had unkind thoughts about anybody before then,

21   but certainly he said kind things about them.

22          He talked about Americans, that they needed to

23   get out of the Middle East and talking about violence

24   against them, talking about violence against Israel,

25   talking about --

 1   Q     When you say he talked about violence against these
 2   people, what do you mean?
 3   A     They needed to get out of the Middle East.  They
 4   needed to be destroyed.  They needed to be gone.
 5   Q     At some point did you make any observation about
 6   whether there was anyone left from the scope of these
 7   groups that he believed needed to be destroyed?
 8   A     Uh-huh.
 9   Q     Tell us about that.
10   A     At some point -- can you restate that question again?
11   I'm sorry.
12   Q     There were various groups, you're indicating, that he
13   indicated needed to be destroyed.  Did you have a
14   conversation about what was going to be left?
15   A     Kind of what he talked about was kind of Americans
16   and then Jews and then I kind of asked about Sunis and
17   Shi'as.  I said, "What happens when there's Sunis and
18   Shi'as left?"  Because that was an issue.  As I was
19   getting ready to go to Gitmo, I found out I was going to
20   Gitmo and I think it was in May and I was reading up on
21   that.  I said, "What happens when Sunis and Shi'as are
22   left?"  I was like, "What then?  Is everything peaceful?"
23   Because some of the reading was suggesting that there was
24   a lot of animosity.  And he said, "Well, then the Shi'as
25   are gone."  And I didn't understand him.  He said, "Then

1    the Shi'as are gone.  You know, they're different.  Then

2    the Shi'as are gone."  I said, "Well, is there fighting?

3    He said, "Yeah," you know, smiling.  I couldn't quite

4    understand that.  Does that mean they're really fighting

5    or are they just pushed to the side or are they in Iran?

6    I didn't quite understand.  I didn't quite exactly

7    understand that.

8    Q    Now let me direct your attention to the date

9    specifically of June 25 of 2007.  Do you recall a

10   conversation on that date?  You have had the opportunity

11   to refer to those notes you spoke about; is that right?

12   A    Yes, sir.

13   Q    Now on that date was there a particular conversation

14   about infidels?

15   A    Yes, sir.

16   Q    And you noted that in your notes; is that correct?

17   A    Yes, sir.

18   Q    Will you tell the Court about that conversation?

19   A    Can I look at those notes again.

20   Q    Yes.  Your Honor, may I approach the witness?

21            THE COURT:  You may.  Is there a particular

22   exhibit number?

23            MR. RISLEY:  I have talked to the defense about

24   that.  We have a clean copy, Government Exhibit 6, and I

25   would move for its admission into evidence.

1          THE COURT:  Any objection?

2          MR. LUSTBERG:  No, Your Honor.

3          THE COURT:  It's admitted.

4          MR. RISLEY:  Your Honor, we're talking about --

5     on the bottom of those pages there are some numbers and

6     this is 25, document 25 out of 53.  There aren't actually

7     53, but that's the number at the bottom.  June 25 of 2007.

8     By the way, Your Honor, this is the copy that was given to

9     us.  They're not very good on some dates, including this

10    one.

11         THE COURT:  Go ahead.

12    BY MR. RISLEY:

13    Q    Now, Doctor, you have had an opportunity to review

14    that.  Is your memory refreshed about that date and that

15    conversation?

16    A    Yes, sir.

17    Q    Will you tell the Court -- just describe to the Court

18    that conversation that you made note of in your report.

19    A    I think I've already talked about it a little bit.

20    It just talks about the fact that Mr. al-Marri was making

21    comment about how his brother was saying that down at

22    Gitmo they were being told that they could -- that he

23    perhaps could be there forever or until the end of the war

24    it appears and that the infidels should be out of --

25    needed to get out of the Middle East, that the fighting is

 1  going to continue until the infidels leave, get off of any

 2  Muslim soil.

 3  Q    Now if I'm understanding you correctly, he's saying

 4  that if his brother Jarrallah and his enemy combatants

 5  were going to be detained until the end of the war, that

 6  was going to be a long time because it would continue on

 7  until when?

 8  A    If I'm reading this correctly, capturing what he

 9  said, until all the infidels leave all the Muslim land,

10  all the Muslim soil.

11  Q    Okay.  I'll take that back.  Now one of the issues

12  that of course the Judge has to deal with in making a

13  sentencing decision is assessing what potential danger the

14  defendant would pose if he were to be released.  Do you

15  have -- based on your experience with the defendant over

16  this period of time and your professional training and

17  experience, do you have any views on that subject?

18  A    Yes, sir.

19  Q    Will you share that with the Court?

20  A    Yes, sir.  I actually believe, based on my

21  experiences and based on my subsequent experience, not

22  only from my time talking with Mr. al-Marri and then my

23  time at Gitmo, my experiences combined, kind of what I did

24  down at Gitmo, which I can't exactly go into, a lot of

25  experience doing this kind of thing, making judgments and

1   recommendations about individuals' future possibilities in

2   engaging in hostile acts against the United States, I do

3   feel in Mr. al-Marri's case it's likely that he might in

4   fact engage in hostile acts against the United States.

5   Does that answer your question?

6          MR. RISLEY:  Yes.  I have no other questions,

7   Your Honor.

8          THE COURT:  All right.  Thank you.

9   Mr. Lustberg?

10                    **CROSS EXAMINATION**

11  BY MR. LUSTBERG:

12  Q    Hi, Dr. Sirratt.

13  A    Hello, sir.

14  Q    I'm Larry Lustberg.  I'm one of the attorneys for

15  Mr. al-Marri.

16  A    Yes, sir.

17  Q    Jewish by the way.  Let me get to that.  Did you have

18  an opportunity in preparing for this hearing to look at

19  any of the exhibits that have been filed by the defense?

20  A    Some of them.

21  Q    Well, did you look at an exhibit that was a letter

22  from Mark Berman?  Is that one that you saw?

23  A    Yes, sir.

24  Q    And you're aware -- well, was Mr. Berman the

25  attorney, to your knowledge, that Mr. al-Marri was talking

1    to you about, the Jewish lawyer?

2    A    I believe so.

3    Q    And do you recall then that Mr. Berman talked about

4    how he and Mr. al-Marri would have back and forth

5    discussions in an open-minded fashion about their

6    different cultures and religions, correct?

7    A    I believe that's what it said in the letter.

8    Q    And do you have any reason to disbelieve that?

9    A    I believe that's what it said in the letter.

10   Q    Well, have you spoken to Mr. Berman?

11   A    I have not spoken with Mr. Berman.

12   Q    Did you speak to Mr. al-Marri about his conversations

13   with Mr. Berman?

14   A    What I spoke with Mr. al-Marri about was the fact

15   that he said that Jews are infidels and they should die.

16   Q    Let me make sure I understand this.  It's your

17   testimony that Mr. al-Marri said to you that Jews are

18   infidels and they should die?  Is that your testimony?

19   A    I don't believe he said that in exactly those same

20   words, but --

21   Q    Okay.  Well, what words did he use?  This is pretty

22   important.

23   A    It's pretty important, but I didn't quote him.

24   Q    Do you have any recollection about what his exact

25   words were when he said that?

1  A    Those were his approximate words, but I didn't tape

2  record him, sir.

3  Q    You said you had an opportunity to look through your

4  reports before you testified today?

5  A    Not my reports.  The 600s that were stapled together.

6  Q    Are those the reports that you wrote as a result of

7  your meetings with Mr. al-Marri?

8  A    Not reports.  Those are the 600s I wrote.  Most of

9  them, yes.

10  Q    Pardon me?

11  A    Most of them.

12  Q    I'm sorry.  Most of them you did have a chance to

13  look at?

14  A    Most of my 600s were stapled together.

15  Q    There were missing ones?

16  A    Yes.

17  Q    In any of those reports that you looked at, was there

18  any discussion of Mr. al-Marri saying that Jews are

19  infidels and they must die?

20  A    I don't write down every word that Mr. al-Marri says.

21  Q    I see.

22  A    Just like I don't write down every word that anybody

23  says in my 600s.

24  Q    I understand, ma'am.  Do you try to write down what

25  you think is important?

1    A     I write down the words that I write down.

2    Q     Okay.  I understand that answer, but -- and I

3    understand you write down the words you write down.  I'm

4    trying to understand how you make the decision about what

5    you write down.  Let me ask this question.  Do you write

6    down what you think is important?

7    A     My job was to make sure that Mr. al-Marri's medical

8    needs were taken care of.

9    Q     Let me try my question again if you don't mind.  My

10   question was:  Do you write down the words that you --

11   things that somebody says to you that you think are

12   important?

13   A     My job was to make sure that Mr. al-Marri's medical

14   needs were taken care of.

15         THE COURT:  Just a moment.  Please listen to the

16   question and try to answer that question.  If you feel you

17   can't answer that question in the form he asked it, you

18   can tell him that, but otherwise I would expect that you

19   would answer the question directly.  Do you wish to ask

20   the question again?

21   Q     Thank you, Your Honor.  My question is:  Do you write

22   down in those -- I'm sorry.  What did you call them?

23   A     They are 600s, sir.

24   Q     600s.  Do you write down in those reports, those

25   600s, what you think is important that the person you're

1   talking to has said?

2   A    I write down related to their medical history or

3   their medical questions what I think is pertinent to their

4   medical information because that was why I was going down

5   to interact with Mr. al-Marri.

6   Q    Okay.  I understand that.  If we could -- and we're

7   going to make this a little easier so everybody can see

8   it.  Let's call up the June 25, 2007, which I think you

9   said was page 25 out of 53.  This is the one you looked at

10  a few minutes ago, correct, ma'am?

11  A    I believe so.

12  Q    Doctor, was this the report that you looked at a

13  couple of minutes ago when Mr. Risley showed it to you to

14  refresh your recollection?

15  A    It looks like it is.

16  Q    You're not sure even though you just looked at it a

17  few minutes ago?

18  A    It's hard to read, sir, but I believe it's the

19  correct one.

20  Q    I'm directing your attention to paragraph 7.  I know

21  this is particularly hard to read.  If you could take a

22  look at it and do the best you can.  This was the

23  paragraph that you were commenting on in your testimony

24  under direct examination from the Government a few minutes

25  ago.  Do you recall that, Doctor?

1  A    Yes, sir.

2  Q    And this paragraph talks about Mr. al-Marri's court

3  case, right --

4  A    Yes, sir.

5  Q    -- at the beginning?  You wrote that down, right?

6  A    Yes, sir.

7  Q    What did that have to do with his medical condition?

8  A    I happened to write it down.  I guess I thought it

9  was important.

10  Q    That's what I was trying get at a few minutes ago.

11  You wrote that down because you thought it was important,

12  correct?

13  A    Yes.

14  Q    Did you write down in this report or anywhere else

15  where Mr. al-Marri said that Jews are infidels and must be

16  killed?

17  A    No, I didn't write it down in this paragraph.

18  Q    Let me ask something else.  You're right.  It's not

19  in this paragraph.  Did you write it down in any other

20  paragraph in any other one of these reports that you

21  reviewed?

22  A    I didn't see it anywhere.

23  Q    Do you know when he said that?

24  A    I don't remember what date.

25  Q    Let me ask you this.  Does that statement that you

1   claim he made, does that in any way contribute to your

2   opinion that he is, to use your phrase, likely to become

3   violent at some point?  What did you say?  He's likely to

4   be what?  What was your conclusion a few moments ago?

5   A    I don't remember exactly what I said.

6   Q    Okay.  Well, let me ask the question then.  You were

7   asked a question based on your experience upon his

8   release, is Mr. al-Marri likely to commit another crime?

9   Is that what it was?

10  A    I don't remember the exact question.

11  Q    Okay.  What's your opinion about what Mr. al-Marri is

12  going to do if and when he is released?

13  A    What's my opinion?

14  Q    Yes.

15  A    I think based on my experience, not only

16  with Mr. al-Marri but also my experience at Gitmo where

17  that was actually one of the jobs that I partook in, that

18  I actually had to make those judgment calls, and whether

19  or not people did make statements like that or did not,

20  based on that experience my estimation is that he is

21  likely to partake.

22  Q    Likely to partake.  I'm asking you the question:  Is

23  the statement that you say he made that Jews are infidels

24  and should be killed, is that one of the reasons why you

25  think he's likely to partake?

1    A    One of the many reasons.

2    Q    One of many reasons?

3    A    Uh-huh.

4    Q    Let me go back to your experience.  You said that's

5    based not only on your contact with him, but on your other

6    experiences?

7    A    Experiences at Gitmo.

8    Q    Your experiences at Gitmo.  And do those experiences

9    include anybody whom you have seen who did in fact partake

10   in acts against the U.S. after they left?

11   A    I cannot talk about what my job was there.

12   Q    I'm not asking you -- I'm asking you for the

13   experience upon which you drew that leads you to believe

14   that Mr. al-Marri is likely to partake.  I'm asking you

15   whether you have been correct about that before and under

16   what circumstances?

17   A    Yes.

18   Q    And can you tell us what those circumstances were?

19   A    No.

20            MR. LUSTBERG:  Judge, we need to discuss this if

21   the Court doesn't mind.

22            THE COURT:  All right.  Well, let me ask the

23   witness to step outside, please.  Please step outside.

24                  (Witness leaves courtroom)

25            THE COURT:  Go ahead.

1           MR. LUSTBERG:  Thank you, Your Honor.  Judge,

2    these are extremely serious allegations that appear in

3    nothing that we have ever been provided that we're now

4    hearing for the first time.  The Government is calling a

5    person as an expert in essence to opine that Mr. al-Marri

6    is likely to reoffend in some way.  She is now claiming

7    that that -- claimed on direct examination that that

8    conclusion is bolstered by experiences that she has had in

9    the past.  However, she is unwilling to share those

10   experiences which prevents us from probing that extremely

11   important information that, frankly, as I'm going to

12   attempt to show, is at odds with other information she

13   had.  But be that as it may, we need to -- there could be

14   no more critical piece of information and I think we

15   should have the right to probe that and understand what

16   the basis of it is.

17           We have been given nothing.  In fact, we

18   provided these to the Government, these medical records

19   that is Government Exhibit 6.  There is no other

20   information, nothing else that we have to probe that and

21   that is now becoming obviously a very critical fact.  So I

22   would ask for the opportunity to either have the

23   Government provide the information upon which that is

24   based or to probe further.  I understand there may be

25   sensitive materials.  If that's the case, then I think

1   appropriate steps need to be taken and the Court can

2   review in camera what that information is and make an

3   appropriate determination as Your Honor has done in this

4   very matter in the past.

5              THE COURT:  All right.  What's the response?

6              MR. RISLEY:  Your Honor, I'm not sure what the

7   lack of clarity is.  She's said that this is an opinion

8   that she formed based upon her extended interaction with

9   the defendant personally and based upon her professional

10  experience, which included a stint of time with some

11  duties that called upon -- where she was called upon to

12  face these sorts of issues at Guantanamo.  No, she has not

13  been specific about what those duties were, but other than

14  that I think it's pretty clear what the basis for this is.

15             THE COURT:  Well, as I understand what she said,

16  her duties at Gitmo included in effect making the type of

17  assessments that she was asked to give here on the stand

18  today.

19             MR. RISLEY:  She did.

20             THE COURT:  And that she did that.  That is part

21  of the basis for her expert opinion.  Normally the

22  opposition, whatever we're talking about, is allowed to

23  challenge or test the credibility of the foundation for

24  the expert's testimony.  Isn't that correct?

25             MR. RISLEY:  Well, that's correct, and I'm not

1     contesting that.  Your Honor, there is a little bit

2     though -- I think we need to clarify a couple of points.

3     Number one, we didn't even know about this witness until

4     we were contacted by the people at the Department of

5     Defense that Mr. Savage had interviewed her and during the

6     course of the interview she had said essentially what she

7     testified to here and the person, the representative from

8     the Department of Defense, contacted Ms. Baltes and

9     indicated to her that you might be interested in talking

10    to this person, which we did.

11            Now the reports we received from the defense, so

12    when they say they were taken by surprise I'm surprised

13    because essentially that's why we have it.  We learned

14    about it because of their interview of this witness before

15    we interviewed her.

16            MR. LUSTBERG:  Judge, I have the greatest

17    respect for Mr. Risley, but there's just some mistakes

18    there.  First of all, I'm not saying that we were

19    surprised that she existed or as to some of the things

20    that she said Mr. al-Marri said.  Let me tell you that

21    what she has testified to here today is not in these

22    reports.  We have never heard that before.  Most

23    particularly, this argument that she is now -- the

24    conclusion, the dramatic conclusion of her direct

25    testimony today, which is that Mr. al-Marri is likely to

1    partake in violent acts against the United States, appears

2    no where here and was not in fact said in the interview

3    that was done of her by Mr. Savage and Ms. Savage and we

4    would be prepared to call them as witnesses to say that.

5              But that is neither here nor there.  This is not

6    a failure of discovery.  I'm not blaming the Government

7    for not turning over information.  What I'm saying is that

8    she's now saying that based on her experience she's good

9    at predicting whether people are likely to partake, to use

10   her verb.  I want to probe those experiences.

11             THE COURT:  I didn't actually hear her say she

12   was good at that.  My understanding was that --

13             MR. LUSTBERG:  You understand my -- I think you

14   understand -- I think Your Honor understands my point.

15   I'm trying to --

16             THE COURT:  Exactly.  Let me talk.  I can

17   understand because of the circumstances that it would be

18   inappropriate for her to talk about specific cases by

19   name, but I don't understand why even in open court she

20   couldn't testify, for example, if there was some case down

21   there where she had come to a conclusion that the person

22   was not -- she didn't think would be a risk and then after

23   they were released -- I'm assuming that's what she's

24   talking about.

25             MR. RISLEY:  I'm not sure, Your Honor.

1          THE COURT:  Well, that's what it sounds like to

2     me anyway.

3          MR. RISLEY:  It's possible.

4          THE COURT:  I don't see where there is any

5     national security or classified information problem with

6     her answering that kind of a question.

7          MR. RISLEY:  There may be some way that we can

8     work around it, Your Honor.  It's my understanding some of

9     her duties may get us into sensitive areas.  What I would

10    ask the Court to consider is we're not offering this as an

11    expert opinion as such.  What this is is a professional

12    who does have a view and what we're talking about goes to

13    the weight of that.

14         THE COURT:  I don't know what the distinction is

15    you're making between an expert and a professional.  She's

16    obviously presented, I thought, as an expert witness.

17         MR. RISLEY:  The difference is this.  There's a

18    letter even from Mr. Berman in here, one of the

19    defendant's attorneys, where he opines himself on this

20    very subject.  Here we have somebody who is a

21    professional.  She surely is not disqualified from having

22    an opinion simply because she's qualified.

23         THE COURT:  I don't believe Mr. Berman has a

24    Ph.D. in psychology.

25         MR. RISLEY:  No, he doesn't.

1                THE COURT:  That's why she was qualified.

2                MR. RISLEY:  But it seems anomalous to say we'll

3     consider that, but not consider someone who does.

4                THE COURT:  Well, I'll give -- we're going to --

5     we've been going for two hours now.  We're going to take a

6     15-minute break.  You should confer and talk to her and

7     talk to opposing counsel.  When I come back in 15 minutes,

8     I need to know what the situation is.

9                MR. SMITH:  Your Honor, could we have 20 or 25

10    minutes?  I'm sorry.  15 is fine.

11               THE COURT:  Fine.  We're in recess for

12    15 minutes.

13                         (Recess taken)

14                THE COURT:  I understand your client is in

15    prayer.  I was asked about this over the break.  I said if

16    he wants to do that while we're discussing the legalities

17    of this, fine.  We are not going to change the schedule in

18    order to accommodate that.  I'm sorry, but that's the way

19    it is.  So if you want to -- if he wants to be here for

20    our discussion, that's fine.  That's your decision.  I

21    told you that.  That word was passed to you while we were

22    in break.

23               MR. LUSTBERG:  I understand.  I understand,

24    Judge.  I think Mr. Savage is just consulting with him as

25    to what he wants to do.

1            THE COURT:  That's fine.  Please be seated.  I

2    have made accommodations for your client over the course

3    of these hearings.  As you know, I have started things

4    late or whatever.  But I'm not going to stop this

5    sentencing hearing under these circumstances.

6            MR. LUSTBERG:  I understand, Judge.

7            THE COURT:  Where are we on this legal issue?

8            MR. RISLEY:  Your Honor, right now Ms. Baltes

9    and a representative from the Department of Defense are

10   talking to the witness to determine -- to assess this

11   Guantanamo issue which she brought up.  I'm not sure, and

12   they're determining this, to what extent it's even

13   relevant to her opinion.

14           THE COURT:  Well, she stated it was part of the

15   basis for her opinion.

16           MR. RISLEY:  It was.  It was.  And I will tell

17   you that while of course it's part of her experience, one

18   would expect that, sort of the question that the Court

19   posed, is her opinion really based on that or is it based

20   on the conversations.  They are assessing that right now

21   as to are there potential classification issues that are

22   involved in this.  Again, I want to emphasize, I

23   understand that she is a Ph.D., but even a Ph.D. can have

24   a lay opinion but they can't divorce it from their

25   professional training.

1           THE COURT:  Well, even if it were a lay

2    opinion -- let's just take that for a minute.  Even if it

3    were just a lay opinion, doesn't he still have the right

4    to test the credibility of her basis for that lay opinion?

5           MR. RISLEY:  Absolutely, and that's what we're

6    doing right now is to find that out ourselves to what

7    extent and we haven't fully done that.

8           THE COURT:  In that respect, I don't think it

9    matters at all whether she's labeled -- whether it's

10   labeled a lay opinion or an expert opinion.

11          MR. RISLEY:  Well, I understand the point, but

12   there are some formalities associated with expert

13   opinions.  And we don't want to overstate the reliance

14   that we're asking the Court to place upon the opinion, but

15   it's still relevant just like the opinions expressed by

16   the witnesses on behalf of the defendant.  But Ms. Baltes

17   has returned to the courtroom.  May I have just a moment

18   to find out, Your Honor, what we've learned?

19          THE COURT:  Fine.

20          (Discussion held off record)

21          MR. RISLEY:  Your Honor, it sounds like we're

22   not going to really have any issues, which were our

23   concern, about cross-examination about the basis for her

24   opinion, so anything that --

25          THE COURT:  Well, before she comes back in, can

1    I assume that you're not going to ask for names, are you?

2                 MR. LUSTBERG:  Your Honor, here's what I want to

3    do.  I want to ask her -- I'm not sure I need to and I

4    will admit that I'm thinking out loud here.  But what I

5    want to ask her is whether she -- how many assessments of

6    this kind did she do, what did she do to do those

7    assessments and how did they turn out.  And I don't have

8    to go into names, but I would want to know specifically

9    the evidence that she relies upon to conclude that a

10   person who she predicted or didn't predict either way was

11   going to be a danger or was going to partake in violence

12   against the United States, what they actually -- what she

13   discovered they actually did do.  Now it may turn out

14   there's a particular case that we need to find out more

15   about.  We can deal with that, I suppose, down the road

16   and cross that bridge if we come to it.

17                But that's the sort of question I would want to

18   ask about this, to explore the basis for her sense that

19   she's essentially an expert in doing these kind of

20   predictions or that she has done them in the past.  That's

21   all.

22                THE COURT:  Well, I think we've only got a

23   problem here if we get to a situation where the amount of

24   information you're asking for regarding a particular

25   incident gets down to a point of names or specific

1    circumstances.  But in terms of how many of these she's

2    done, what the assessment consisted of and then in terms

3    of after the fact, how is it that she found out whether

4    there was or was not a problem, that seems appropriate.  I

5    assume, based on her direct, that we're talking about her

6    doing pre-release assessments of people who were released

7    from Gitmo.

8              MR. LUSTBERG:  That's what I understand.

9              THE COURT:  I think that could be maybe your

10   first clarifying question.

11             MR. LUSTBERG:  I'm with you there.

12             THE COURT:  I don't see anything inappropriate

13   about that.  All right.  Where is the witness?

14             MR. RISLEY:  I just motioned for her to be

15   brought in, Your Honor.

16             THE COURT:  Great.  Doctor, will you come back

17   and take the stand again, please?  You're still under

18   oath.

19                   **CONTINUED CROSS EXAMINATION**

20   BY MR. LUSTBERG:

21   Q    Doctor, when you stepped off we were discussing your

22   Guantanamo experience.  Just to recap, Doctor, you were in

23   Guantanamo from when to when?

24   A    Late October, maybe the 26th through the 27th, 2007

25   to 31 May 2008.

1    Q    So from October '07 until May '08?

2    A    Yes, sir.

3    Q    And do I understand that during that time that you

4    would assess Guantanamo detainees to determine what their

5    likelihood of partaking in violence against the United

6    States would be upon release?

7    A    Yes, sir, towards the end of that time.

8    Q    When did you start doing those sorts of assessments?

9    A    I would say maybe March of '08.

10   Q    So for approximately -- so you did those for about

11   two months?

12   A    Yes, sir.

13   Q    How many people did you assess during that two month

14   period?

15   A    I would say maybe 20 to 30.

16   Q    And were any of those released from Guantanamo?

17   A    Some of them, yes, sir.

18   Q    How many?  Do you know?

19   A    I apologize.  I don't remember.

20   Q    Have you followed what they did afterward?

21   A    No, sir.  Since I was sent back or my deployment

22   ended, I did not follow them.

23   Q    Okay.  So let me make sure I understand.  So you

24   assessed, did you say, 20 to 30 people?

25   A    20 to 30.

1   Q     During the time period between March '07 and May '08

2   to determine whether they were likely upon release to

3   partake in violence against the United States; is that

4   correct?

5   A     Correct, sir.

6   Q     And of those, you don't know -- and you don't know

7   exactly how many of those people actually were released?

8   A     I would say maybe between 5 and 10, a small

9   percentage.

10  Q     Do you know any of them -- and I'm not asking for

11  names.  Do you know for a fact that any of them

12  specifically were released?

13  A     I know there were a few, maybe 5 to 10 that were

14  released, and I don't know the outcome.

15  Q     You don't know what happened to them?

16  A     No, sir, because I came back to the United States.

17  Q     So you don't know whether your assessments of them

18  turned out to be correct or incorrect; is that right?

19  A     That is accurate, sir.

20  Q     Have you done those sorts of assessments other than

21  those 20 or 30 people at Guantanamo and other than what

22  you're telling us -- well, strike that.  Other than those

23  20 or 30 people at Guantanamo, have you ever done those

24  kinds of assessments in any other context?

25  A     Yes.

1  Q    What was that context?

2  A    Assessments, regular assessments in my job as a

3  psychologist.

4  Q    Tell me -- let's go to Guantanamo.  How would you do

5  those assessments?  Tell me how you would -- what exactly

6  would you do?

7  A    Look at a number of issues, a number of items and

8  make recommendations.  I was one of many individuals that

9  would make recommendations and then someone far above my

10  pay grade, far, far above my pay grade, would make the

11  financial decision.

12  Q    But my question is in making those assessments, were

13  there specific types of questions that you would ask?

14  A    There are specific things that I would look at and

15  there are specific things that other people would look at

16  to make the recommendation.

17  Q    What specific things did you look at?

18  A    I apologize, sir.  I can't really speak to those

19  specific things.

20  Q    Well, let me ask you this question without waiving my

21  right to pursue that further.  Did you use any kind of

22  psychological testing?

23  A    No, sir.

24  Q    So there wasn't any battery of tests -- and I'm not

25  an expert in this -- but MMPI or any --

1    A     It wouldn't be like a standard assessment, psych

2    assessment that you would use say perhaps -- that you

3    would use like at a sanity board or something in the

4    United States or something like that.

5    Q     Like a what?  I'm sorry.

6    A     Like a sanity board or intelligence testing or

7    something like that in the United States.

8    Q     Are there any testing instruments that could be used

9    to assess a likelihood of risk of future violence that

10   you're aware of?

11   A     I'm sure there are some.

12   Q     But you're not aware of them?

13   A     Yes, sir, I am.

14   Q     Well --

15   A     This is just different.

16   Q     Okay.  What are those tests that are available?

17   A     Relevant to this, sir?

18   Q     With all due respect, that's up to the Judge.

19   A     Sir, it's not related to this.

20   Q     I'm not -- what I'm asking -- let me be clear.  What

21   I'm asking is are there tests that could have been used to

22   assess somebody's risk of potential future violence that

23   were not used in this case?

24           THE COURT:  Are we talking about Mr. al-Marri's

25   case?

1    Q    Well, no.  We're now actually talking about the

2    Guantanamo cases.  Thank you, Judge, for clarifying.

3    A    I'm sorry.  Could you ask the question again?  I'm

4    not understanding.

5    Q    Sure.  I'm sure that's my fault.  What I'm asking is

6    this.  I asked you whether there were tests that could be

7    used to assess somebody's risk of future violence and I

8    think your testimony was you're sure there are.

9    A    Yes, sir.

10   Q    And so I'm asking you as a Ph.D. psychologist what

11   those tests are.

12   A    And are you asking me why I didn't ask for those with

13   Mr. al-Marri?

14   Q    That might be my next question, but that's not the

15   question I'm asking right now.  Right now I'm just asking

16   you what the tests are.

17   A    I'm sorry, sir.  I don't have the answer for that.

18   That might be why I didn't give them to Mr. al-Marri other

19   than the fact that I wouldn't have been giving them to

20   Mr. al-Marri.  I don't know.

21   Q    I was actually talking about Guantanamo.  How about

22   at Guantanamo?  Did you give them to anybody there?

23   A    That wasn't my role.

24   Q    Your role was to assess their risk of future

25   violence; is that right?

 1    A    That's not part of what we did.

 2    Q    That was not part of what you did?

 3    A    That's not what we did, no.  We did look at several

 4    factors and I can't go into what those factors were.

 5    Q    Well, let me ask you this before I just give up on

 6    that.  Were those the same factors that you utilized in

 7    reaching the opinion that you testified to under oath a

 8    little bit ago that Mr. al-Marri was such a danger?

 9    A    Say that one more time.

10    Q    You said there are certain factors you didn't want to

11    disclose.

12    A    There is a certain set of factors that they looked at

13    at Guantanamo and there's a certain way they looked at

14    them and they requested people who are not only

15    psychologists, they were other job duties and other

16    individuals who had nothing to do with psychology, and

17    they looked at different areas and so based on their

18    criteria they looked at a lot of different areas and so

19    each of those individuals based on that criteria made

20    recommendations and so that's why it was different at

21    Guantanamo.  And, again, I can't go into that.  And

22    everyone made recommendations.

23    Q    So here's my question and let's see if I understand

24    that these are the things you can't go into.  You can't

25    tell us what factors are examined in order to determine

 1   whether somebody is likely to be a risk of future danger?

 2   A    What I'm trying to explain without going into the

 3   details at Gitmo, there are several factors that were

 4   looked into and some of the factors we looked at from

 5   different aspects.  Some of them were interrogators, some

 6   of them were analysts, and different people looked at

 7   them.

 8            THE COURT:  May I try something here?

 9            MR. LUSTBERG:  That would be great, Judge.  I'm

10   looking for all the help I can get.

11                    **E X A M I N A T I O N**

12   BY THE COURT:

13   Q    You said there were several factors that were

14   considered down at Gitmo, correct?

15   A    Yes, sir.

16   Q    I gather from that that your input was only part of

17   what was considered?

18   A    Yes, sir.

19   Q    There were a number of other people who came at it

20   maybe from different disciplines or different points of

21   view who also contributed and then --

22   A    Yes, sir.

23   Q    There might be an end product as a result of all of

24   that?

25   A    And they all looked at the same factors, sir, had

1    access to the same --

2    Q    I don't think -- we're not asking here for all of

3    those factors that all of those different people

4    contributed.

5    A    Yes, sir.

6    Q    I think what he's focusing on is was there some set

7    of psychological indicators that you were using just for

8    your part of the input into this?

9    A    I would say looking at an individual's

10   characteristics in terms of their behavior while they were

11   incarcerated.  I would say looking at whether or not

12   someone -- how they interacted with others.  Certainly as

13   you look at Mr. al-Marri -- or I looked at Mr. al-Marri.

14   I don't mean to put words in your mouth, sir.  As I looked

15   at Mr. al-Marri, very manipulative, some of the commentary

16   that Mr. al-Marri made to me about infidels on several

17   occasions, all those factors I took into account.

18   Certainly I took into account those factors, discussions

19   with individuals down at Gitmo, took those factors into

20   account.

21   Q    So what you did down at Gitmo was basically the

22   same -- are you telling me that you didn't use any factors

23   in your Gitmo opinions that you didn't use with him?

24   A    No, sir.

25   Q    Are you talking about the same set of factors?

1  A    No, sir.  There were additional factors I used down

2  at Gitmo as well.

3  Q    There were additional factors?

4  A    Yes, sir.

5  Q    Were those psychological?

6  A    Yes, sir.  There were additional documents that I

7  also got to be able to review as well.

8  Q    So you're saying you had access to information down

9  there --

10  A    Additional information.

11  Q    -- that you did not have in Mr. al-Marri's case?

12  A    Yes, sir.

13  Q    Well, then am I understanding correctly that in

14  regard to Mr. al-Marri your opinion is for the most part

15  based on your conversations with him, statements that he

16  made to you and your observations concerning how he

17  interacted with you and other people at the Brig?

18  A    Yes.  And the big difference with Mr. al-Marri is I

19  got to spend over a thousand hours personally with him and

20  that was completely different than what I got to spend

21  with the individuals at Guantanamo.  The personal time

22  that I got to spend with Mr. al-Marri was very different.

23  Q    I just have one other question and then I'll give it

24  back to you.  If I understand what you're saying

25  correctly --

1   A    Yes, sir.

2   Q    You gave your input into these situations at Gitmo

3   involving 20 or 30 people?

4   A    Yes, sir.

5   Q    The combined input of all the people involved in that

6   process --

7   A    Yes, sir.

8   Q    -- led to the release of 5 to 10?

9   A    Yes, sir.

10  Q    But you don't know whether any of the 5 to 10 who

11  were released went back to the battlefield or went back to

12  terrorist activities; is that correct?

13  A    Sir, I don't know about that group.  I do know that

14  the same process was used with other individuals that were

15  at Guantanamo and out of that process there were

16  individuals that were released and subsequently I think of

17  that group --

18  Q    Well, I think we've all read about that in the news

19  media.  But in terms of the cases where your opinion was

20  used --

21  A    Yes, sir.

22  Q    -- as part of the input, you don't know --

23  A    No, sir.

24  Q    -- what the result was?

25  A    No, sir.

1          MR. LUSTBERG:  Thanks.

2                    **CONTINUED CROSS EXAMINATION**

3     BY MR. LUSTBERG:

4     Q    Let me follow up on one point.  How many hours did

5     you say you spent with Mr. al-Marri?

6     A    Over a thousand.

7     Q    You spent a thousand hours with him?

8     A    Over a thousand.

9     Q    Hours?

10    A    Yes.

11    Q    That was between when and when?

12    A    I don't remember.

13    Q    Let me show you -- do you have Government Exhibit 6?

14    A    A thousand minutes.  I don't remember exactly.

15    Q    Well, with all due respect, that's an important

16    difference.

17    A    I apologize.  I might have misspoken.

18    Q    I want to go through it.  I'm showing you what's been

19    marked as Government Exhibit 6.  If we could just go

20    through the amount of time that you spent, okay?

21    A    If I had a pen, I could tell you.

22              THE COURT:  What is No. 6?

23    Q    That's the packet of what I've been calling reports.

24    I think now I've learned they're called form 600s.  Is

25    that right, that they're form 600s, Doctor?  Hello?

1    A    600s.  I think I misspoke.  I think it was more like,

2    I apologize, 20, 30, 40 hours.  I misspoke.

3    Q    20, 30 or 40 hours?

4    A    I don't remember exactly.

5    Q    But --

6    A    I misspoke.

7    Q    I understand.  The first time you met him, was that

8    July 24, 2006, correct?  That's the first form?

9    A    I think I met him briefly before that when the Major

10   before me had just really briefly, just doing his last

11   sessions with him, just came by and said, "Hey, this is

12   the person that's going to follow up with you."  That was

13   really just maybe a few seconds.  This is the first time

14   actually I really talked to him for more than a couple of

15   seconds.

16   Q    This one was 7 minutes according to the form,

17   correct?

18   A    Yes.

19   Q    And then the next form 600 in the packet is on

20   August 18, 2006, and this was where you did not see him,

21   correct?

22   A    Looks like it.

23   Q    Is that right?

24   A    Looks like it.

25   Q    Next one, this is page 3 of Government Exhibit 6.

1    A     Uh-huh.

2    Q     September 21, 2006.  You did not speak to him,

3    correct?

4    A     Looks like it.

5    Q     So we're still at 7 minutes.  On the next week,

6    September 28, 2006, you did not speak to him; is that

7    correct.

8    A     Looks like it.

9    Q     The next one, October 6, 2006, you did not speak to

10   him; is that correct?

11   A     Looks like it.

12   Q     The next one, October 23, 2006, you did not speak to

13   him; is that right?

14   A     Looks like it.

15   Q     The next one, November 20, 2006, you did not speak to

16   him; is that correct?

17   A     Okay.

18   Q     Is that a "yes"?

19   A     The 20th?

20   Q     Yes.

21   A     Correct.

22   Q     Next week, November 27, 2006, you did speak to him,

23   right?

24   A     Uh-huh.

25   Q     You spoke to him for 11 minutes; is that right?

1    A    Correct.

2    Q    And just to look down, towards the bottom of the

3    report it says "participation in session" and there's a

4    box that says "participatory" -- and maybe we can pull

5    this up.  It's 8 out of 53.  November 27, 2006.  Make it

6    easy for everybody to follow.

7              Okay.  Towards the bottom -- and you can follow

8    it on yours or on the screen -- there's this line that

9    says "participation in session", "participatory",

10   "non-participatory".  You checked "participatory"?

11   A    Correct.

12   Q    That means that he was willing to meet with you and

13   talk with you, correct?

14   A    Yes.

15   Q    It does happen, does it not, sometimes at your job

16   that people are not willing to speak to you, right?

17   A    Correct.

18   Q    And that was not the case here?  Mr. al-Marri was in

19   fact willing to speak to you, right?

20   A    Correct.

21   Q    And then next it says "attentive", "inattentive", and

22   he was attentive; is that right?

23   A    Correct.

24   Q    And the discussion here was you discussed medical

25   concerns; is that right?

1  A    Correct.

2  Q    So this session then was, as we said, was 11 minutes,

3  right?

4  A    Yes.

5  Q    Okay.  Going to the next one --

6         THE COURT:  Are we going to go through each and

7  every one of them?

8         MR. LUSTBERG:  Uh-huh.  I mean, Judge, she's

9  representing an amount of time that's not close.

10         THE COURT:  I know, but maybe there's a better

11  way to do that.  I've added them up in my own head.

12  A    And I admit that I misjudged that completely.  I said

13  hours instead of minutes.  I'm sorry.

14  Q    You think it's about a thousand minutes?

15  A    I think it's a little over a thousand minutes.

16  Q    Okay.

17  A    I admitted that.

18         THE COURT:  I'm not telling you you can't do it,

19  but if the whole purpose of it is to just focus --

20         MR. LUSTBERG:  No, it isn't.  I'm just going to

21  use this to go through some other areas.  By way of

22  example, let's turn to December 28, 2006.

23         THE COURT:  What page is that?

24  Q    This is 9 out of 53, and if we could go to the second

25  paragraph which says:  "Provider listened, watched about

```
 1    40 minutes of Major's visit with EC."  So this was not

 2    your visit with Mr. al-Marri?

 3    A    No.

 4    Q    Whose visit was it?

 5    A    It was the Major that was in charge of the SHU.

 6    Q    And I take it that there was discussion in the course

 7    of that about the Iraq war?

 8    A    I apologize.  Was it the second paragraph you said?

 9    Q    Well, the one that starts "provider listened,

10    watched", December 28.

11    A    Yes.

12    Q    You testified earlier that in fact even though your

13    job was to essentially focus on medical needs, you would

14    have discussions with Mr. al-Marri about history and

15    politics and so forth, right?

16    A    Correct.

17    Q    And apparently this Major had similar sorts of

18    conversations with him about politics, right?

19    A    Correct.

20    Q    In those discussions you would have your opinion when

21    you had them with him, he would have his opinion and you

22    would discuss it, correct?

23    A    Correct.

24    Q    Sometimes you agreed, sometimes you disagreed I take

25    it?
```

1    A    Correct.

2    Q    For example, it sounds like you might have agreed

3    about -- or there was an expressed agreement about Turkey,

4    right?

5    A    Correct.

6    Q    But you maybe disagreed about some other things he

7    said.  Maybe you didn't agree with him about Palestine.  I

8    don't know.

9    A    We just had discussions.

10   Q    Those discussions, were those types of discussions

11   one of the things that you factored into your opinion that

12   you testified to here earlier today?

13   A    That we had discussions?

14   Q    Well, any political discussions, his statements, like

15   a statement like this, that he discussed the Iraq war and

16   how the U.S. is in a difficult situation, did that

17   statement contribute to your opinion today that he's

18   likely to partake in future violent activity?

19   A    That statement?

20   Q    Yes.

21   A    No.

22   Q    Anything in this report that does contribute to that?

23   A    I don't see anything.

24   Q    Is there anything in this report upon which you base

25   your conclusion that he is manipulative or narcissistic?

1    A    Nothing in this note.

2    Q    Let me ask you, narcissistic, what does that mean?

3    A    Narcissistic?

4    Q    Explain to the Court, and to me because I'm not as

5    smart as the Court, what does that mean?

6    A    Because you're not as the smart as the Court?  Is

7    that what you said, sir?

8    Q    What does narcissistic mean, ma'am?

9    A    Narcissistic, kind of -- simplistically, a little bit

10   of arrogance, kind of feeling better than, there's a

11   little bit of that manipulation, a little bit of that kind

12   of haughty behavior.  He really did feel smarter -- at

13   least my perception was that he felt smarter than, more

14   intelligent than the people around him, really felt that

15   he could explain things better than, more thoroughly than

16   the people around him.  He had a better understanding of

17   everything than those around him.  Really smarter than --

18   very thoroughly smarter than those around him.

19   Q    So when you say that he was narcissistic, what you

20   mean he is that he thought he was smarter than other

21   people around him?

22   A    I didn't say he was narcissistic.  He kind of had

23   some traits of narcissism.  I didn't think he was

24   diagnosable.

25   Q    You don't think he was diagnosable as being

1  narcissistic?

2  A    No.

3  Q    And do you recall -- again, I know you just reviewed

4  these records recently.  Is there any place in these

5  records where you made any note of his narcissism?

6  A    No.  I didn't think he had narcissistic personality

7  disorder, so therefore I didn't put that.  I didn't think

8  he had a personality disorder.

9  Q    You said that he has narcissistic traits?

10  A    Right.  I did not think he had a disorder.  I did not

11  think it was pertinent.  If I thought he had a personality

12  disorder and I felt that strongly about it and I felt it

13  needed to be documented, I would have documented it.

14  Q    Okay.  I think you testified that his narcissistic

15  traits is one of the reasons why you think that he's

16  likely to partake in future violence against the United

17  States.  Is that correct?

18  A    My concern when I was writing these notes was not

19  about what was going to happen when he was released.  My

20  concern when I was writing these notes was making sure

21  that he was taken care of medically and, if need be,

22  clinically.  My concern was not about when he was released

23  in a year or two years or five years.  My concern was

24  about making sure today, next week, when I was transferred

25  that the person who followed behind me could continue with

1    his medical and clinical care.  That was my number one

2    concern period.  End of story.

3    Q    Okay.  If you wouldn't mind trying my question, which

4    is did your sense that he has narcissistic traits

5    contribute in any way to your conclusion that he is likely

6    to partake in violence against the United States?

7    A    That is part of it, but it's not documented in these

8    notes because these notes are about --

9            THE COURT:  Excuse me.  Let me interrupt.  I'm

10   going to ask you to please just answer the question that

11   was asked and then stop and he'll ask another question.

12   A    Yes, sir.

13   Q    Do you know the question?

14   A    Sir, you can repeat it and I'll answer the question.

15   Q    My question is does the fact that you -- you

16   testified that Mr. al-Marri has narcissistic traits and I

17   asked you does that contribute to your conclusion that

18   he's likely to partake in future violence against the

19   United States?

20   A    Yes, sir.

21   Q    Okay.  The answer is "yes"?

22   A    Did I believe that the narcissistic traits has played

23   into my suggestion that I believe in the future -- yes.

24   Q    Tell me why.

25   A    Why?  I believe that the traits existed even before

1   he was incarcerated.  I believe spending more time

2   obviously incarcerated, having more time to I guess get

3   strong in his beliefs, al-Qaeda beliefs, as well as

4   reading, being more strong in his faith in the Quran.

5   It's not the Quran.  I think it's his strengthened belief

6   with al-Qaeda as well as his manipulations, all of these

7   things, his faith, all of these things play a role.  I'm

8   sorry.  Did I answer --

9   Q    No.  My question was how does narcissism contribute

10  to the likelihood of future violence?  Can you cite to me

11  a single study that's going to tell me that somebody who

12  suffers from narcissistic traits or has narcissistic

13  traits is likely to be violent in the future?

14  A    I don't have a single study, sir, to give you.

15  Q    Is there anybody -- is there any place I can look for

16  such a study?

17  A    Sir, I don't know of a place.

18  Q    Now you say that his beliefs in al-Qaeda increased

19  during the time period he was in custody.  You just said

20  that, right?

21  A    Yes, sir.

22  Q    What do you base that opinion on?

23  A    His conversations with me that he shared with me

24  about the infidels, his conversation -- his talk about

25  al-Qaeda.

1    Q     What did he say about al-Qaeda?

2    A     His conversations that he talked about infidels and

3    the fact that infidels and al-Qaeda -- the fact that

4    infidels needed to die, his understanding about al-Qaeda.

5    I mean --

6    Q     What understanding about al Qaeda?  And if you could

7    point me to where in these notes.  By the way -- strike

8    that.  You are aware that Mr. al-Marri was in custody

9    because of his alleged association, which is now admitted,

10   with al-Qaeda, correct?

11   A     Yes.

12   Q     So that was something important to you, right?  That

13   was an important background fact you were aware of?

14   A     It's not an important background fact.

15   Q     That's not important?

16   A     No, sir.

17   Q     Show me where in your notes there is a discussion

18   that shows anywhere that he has an increased commitment to

19   al-Qaeda and its mission in these notes?

20   A     Sir, we didn't talk about an increased commitment to

21   al-Qaeda.  We talked about al-Qaeda.  We talked about

22   history.  We talked about the fact that he could

23   understand al-Qaeda and their mission.  He could

24   understand why there was such hatred.

25   Q     Where are those notations in these form -- whatever?

1    A    600s?

2    Q    600s, yes.  Where is that?

3    A    Sir, I didn't write everything down.

4    Q    Right.  But you never wrote anything down about that,

5    did you?  Where does it say anything that would lead

6    anybody to believe he had an increased commitment to

7    al-Qaeda in these notes?

8    A    I didn't write everything down and it wasn't an

9    increased commitment.  We talked about al-Qaeda.  We

10   talked about understanding al-Qaeda.

11   Q    Do you know when?

12   A    I would assume it was around the time that he talked

13   about the infidels.  I would assume it's around the time

14   he talked about the Palestinians.

15   Q    Let's take a look at those notes.

16   A    I understand, sir.  It's not in the notes.

17   Q    It's not in the notes and that's because you didn't

18   think it was important enough to write down?

19   A    Sir, I wrote the notes down.  I wrote them out.  My

20   goal was honestly for the most part to jot down

21   information.  What was key for me was not about providing

22   information to somebody.  My key was what did I talk about

23   with Mr. al-Marri.  My goal was what did I talk about with

24   him so next time if he brought up certain issues, I would

25   remember them.  My goal was medical and clinical.

1  Q     Where does it say you spoke to him about al-Qaeda?

2  A     It's not in these.

3  Q     Okay.  Let me back up.  You testified that when you

4  first started speaking to Mr. al-Marri he was polite, but

5  he declined to speak to you because he didn't want to have

6  a woman psychologist, correct?

7  A     Correct.

8  Q     And you understood that as sort of culturally based,

9  correct?

10 A     Correct.

11 Q     And you said that he was actually quite polite about

12 it, right?

13 A     Very polite.

14 Q     But over time you kept working at it and you and he

15 developed a trust, right?

16 A     I believe so.

17 Q     And so you would discuss with him things like

18 politics and current events and that kind of thing, right?

19 A     Mostly history as opposed to current events.

20 Q     Fair enough.  And you would also talk to him about

21 what he was going through, right?

22 A     He would give me updates after phone calls with

23 attorneys or visits by Mr. or Mrs. Savage.

24 Q     Let me give you an example to just focus a little bit

25 more.  If we could call up April 5, 2007.  Under

1  paragraph 5, which actually is entitled "optometry",

2  towards the bottom of that paragraph, do you see that?

3  A    Yes, sir.

4  Q    There is a discussion of -- it says:  "EC and this

5  provider discussed how Muslims deal with head problems."

6  Do you see that?

7  A    Yes.

8  Q    "Referred this provider to a book Fortification of

9  the Muslim Through Remembrance and Supplication From the

10  Quran and the Sunnah.  Do you see that?  Do you recall

11  that discussion with Mr. al-Marri?

12  A    Yes.

13  Q    I think you testified about that this morning, right,

14  or earlier this afternoon?

15  A    I don't know.  I don't recall testifying about it.

16  Q    "Discussed how he utilizes the book/prayers to help

17  him cope with being held captive."  Do you see that?

18  A    Right.

19  Q    "He stated that he is a weak man, but is strong with

20  Allah's support."  Do you see that?

21  A    Correct.

22  Q    So he was talking to you about how he copes with

23  being held captive, right?

24  A    Correct.

25  Q    And you were aware of the conditions under which he

1  │  was being held captive, right?

2  │  A    He told me about what it was like before I met him.

3  │  Q    But even right then and there you were aware that he

4  │  was completely isolated, right?

5  │  A    Correct.

6  │  Q    That he had no contact at all with family members?

7  │  A    Correct.

8  │  Q    With anybody from the outside other than his

9  │  attorneys and Red Cross representatives, right?

10  │  A    Correct.

11  │  Q    And other than that the only people he had contact

12  │  with were personnel of the Brig, right?

13  │  A    Correct.

14  │  Q    And what he was talking to you about here in a very

15  │  personal way was how he would manage to get through all

16  │  that, correct?

17  │  A    Correct.

18  │  Q    Did you think it was good that he was willing to talk

19  │  to you about that sort of thing?

20  │  A    Absolutely.

21  │  Q    Did you understand that for a person of his faith

22  │  that this is the way that -- that people's faith is one of

23  │  the things that gets them through it?

24  │  A    Yes.

25  │  Q    And did you think from your perspective that it was a

1   good thing that he was studying -- that he was having an

2   opportunity to study the Quran and study his religion?

3   A    I thought it was a good thing.  Absolutely.

4   Q    You did?  In fact, you advocated pretty hard for him

5   to have access to books and access to religious materials,

6   right?

7   A    Yes.

8   Q    He would ask you to help him in that regard and you

9   did help him, right?

10  A    Yes.

11  Q    And you also tried to help him to have contact with

12  his family members, right?

13  A    Yes.

14  Q    And that was because you thought that would be a good

15  thing for him, right?

16  A    Yes.

17  Q    And did you think it was a bad thing that he had been

18  denied that before?

19  A    I thought he should get regular access to his family

20  if at all possible.

21  Q    Right.  But in any event, even though this paragraph

22  is under "optometry", you really were talking to him about

23  personal issues, about how he was coping with this, and

24  you understand that for somebody like him coping meant --

25  had a lot to do with his faith, right?

1    A    Everything to do with that with Mr. al-Marri.

2    Q    And is the fact that he relied on his faith one of

3    the reasons why you think that he's a likely future danger

4    to the United States?

5    A    No, I don't think it's relying on his faith.  I think

6    perhaps my perception would be it's almost a twisting of

7    that.  I don't think this is -- I think this makes perfect

8    sense.  In fact, he let me borrow the book and I actually

9    got a copy of it so I could understand better.  I don't

10   think it's relying on faith.  I think it's a twisting of

11   faith.

12   Q    And there's no -- I'm not going to find where he

13   twisted that faith in these other notes, am I?

14   A    No.

15   Q    But I do find here under "optometry" where you talk

16   about this issue about how he was coping through his

17   religion, right?

18   A    Yes.

19   Q    And if we could go to the very next report on

20   April 12, 2007, paragraph 6 -- I think it's 6, the bottom

21   one.  Do you see that?

22   A    Yes.

23   Q    This was a fairly long paragraph that you wrote that

24   has nothing at all to do with his health, right?

25   A    Correct.

1  Q    What it says is that "EC 2" -- that's Mr. al-Marri,
2  right?
3  A    Correct.
4  Q    "Wanted to thank the CO and staff for all that they
5  do."  See that?
6  A    Yes.
7  Q    Was he grateful -- did he express that type of
8  gratitude to you and to other people at the Brig on other
9  occasions as well?
10  A    Yes.
11  Q    "He stated he knew the higher chain of command is
12  blocking some of the issues that EC 2 has asked about,
13  again stated he appreciated the effort of the CO and
14  staff."  Do you see that?
15  A    Yes.
16  Q    You returned the book to him.  Then it says toward
17  the bottom:  "Discussed how difficult it was that he
18  almost didn't" -- I'm sorry.  Let me go back a second.
19  You gave it back to him in case he needed it given he had
20  just received pictures of his kids for the first time in
21  two years.  Do you see that?
22  A    Yes, sir.
23  Q    Were you involved in advocating for him to be able to
24  get pictures of his kids?
25  A    Yes, sir.

1    Q    "Discussed how difficult it was he almost didn't
2    recognize his children."  Do you see that?
3    A    Yes, sir.
4    Q    Obviously he was sad and understandably upset about
5    this issue, right?
6    A    Yes, sir.
7    Q    "Discussed how important seeing his family on DVD,
8    CDs or talking to his family would be to him.  Stated that
9    he hasn't talked to his wife in four years and hasn't
10   received pictures of his kids in two years."  Do you see
11   that?
12   A    Yes, sir.
13   Q    He was talking to you in personal fashion really as a
14   psychologist, not having anything to do with medical
15   treatment, regarding personal issues, right?
16   A    I don't know if he was talking to me as a
17   psychologist per se.  I think he was just talking to me.
18   He was sharing that with me.
19   Q    Fair enough.  But my point is that you wrote that
20   down because you thought that was an important thing to
21   note, correct?
22   A    Well, what would happen is Mr. al-Marri would come
23   with his list of information that he wanted to share with
24   me and I let him guide me on what he wanted to talk about
25   because that was my job was to take information that he

1  wanted to talk to me about.  And if that was one of the

2  issues he wanted to talk about, that's what we talked

3  about.  If he didn't want to talk about it -- and it was

4  really a list of optometry, medication, whatever, and

5  that's what we talked about.

6  Q   And we see other times when he talked to you about

7  optometry?

8  A   Right.  If that's what he wanted to talk about,

9  that's what we talked about.  That was an issue that was

10  important to him, so that's what we talked about.

11  Q   When you talked about that and because it was one of

12  the issues that you talked about, you wrote it down in

13  this form, correct?

14  A   I mean, it's something he had on his list.

15  Q   But I'm asking about the process by which you decided

16  to put it on this report.

17  A   If it was one of his issues and it was on his list of

18  things, then we talked about it.

19  Q   Well, one of the things in this paragraph is that he

20  was thanking the CO and staff.  That was something that

21  you noted, right?

22  A   Right, because that was something important that he

23  waned to convey to me, pass along to the CO.

24  Q   And because it was one of those things, you put it

25  here on your form, right?

1   A      Something he wanted me to convey.

2   Q      During these meetings that you had with him, which it

3   appears they eventually become almost weekly, right?

4   A      Right.

5   Q      Was he ever -- did he ever act in any violent way

6   towards you?

7   A      No, sir.

8   Q      And was he respectful towards you?

9   A      Always.

10  Q      And was he -- did he express his gratitude for your

11  efforts on his behalf?

12  A      Yes.

13  Q      Do you think as a psychologist that the fact that he

14  was not violent towards you and the fact that he was

15  grateful towards you and the fact that he was respectful

16  towards you has any value in terms of thinking about his

17  future?

18  A      I think he was respectful towards me and I think

19  non-violent towards me because I always treated him with

20  respect and I always treated him as a human being and I

21  was always -- I think as he got to know me better, he

22  always knew that I came to talk to him as an advocate and

23  to try to genuinely help him with the issues that he

24  presented.  Whether it was a medical issue or it was a DVD

25  or about a book on calculus or whatever it was, I

1  genuinely tried to get him the assistance that he

2  requested or the issues that he requested assistance with

3  and that I was truthful and honest with him.  And I think

4  over time he opened up more to me and he would talk with

5  me longer and I think that's why he treated me with

6  respect, because I treated him with respect.

7  Q    In your experience, when somebody opens up and talks

8  longer, that's a good sign in terms of whatever --

9  A    Rapport.

10  Q    -- rapport you're building and you're trying to build

11  rapport to help them in some manner, correct?

12  A    Correct.

13  Q    I mean, one of the things you're trying to do is

14  essentially help him through what he's going through and

15  presumably rehabilitate him to a certain extent; is that

16  fair?

17  A    I would say at least help him get through that

18  situation.

19  Q    And to help him get through it in a way that's

20  healthy and that will make him a good person when he gets

21  out, right?

22  A    If we could be lucky, yes.

23  Q    And so the fact he was opening up to you and was

24  being respectful and grateful to you and not violent at

25  all, you would think those are good signs, right?

1    A     I think good signs, but I don't know long term.

2    Q     Well, I know you don't know long term, but I'm asking

3    whether the fact that he participated, that he was

4    attentive, that he was respectful, that he was grateful,

5    that he did all those things, are those factors that you

6    thought about in terms of his long term likelihood of

7    rehabilitation?

8    A     I felt like -- personally for me, I think he was

9    respectful of me, but I don't feel like necessarily that's

10   for everybody.  I felt like it was good for me.  I felt

11   like he was respectful of those of us at the Brig that

12   were respectful of him.  And I think he was very

13   respectful of the Savages.  I don't think he would ever

14   say anything poorly about them.  I think he respects them

15   very much, probably like family.  I think he's very -- has

16   very fond feelings of several people at the Brig who

17   treated him very well.  But I don't believe that carries

18   on to everybody.

19   Q     Let me be sure I understand.  So you found that he

20   was respectful of people, not only you but other people at

21   the Brig and of course the Savages because they treated

22   him well?

23   A     Right.  I think he was respectful to people who

24   treated him with respect.

25   Q     And did you get the sense that that was something

1  that had changed over the course of his time in custody or

2  do you just not know how he had changed because you were

3  only there for such a short time?

4  A    I can't really speak to what it was like prior, but

5  my understanding is that at least during the time I was

6  there -- and even after I was gone, some of the same

7  people obviously were still there.  So my understanding is

8  he continued to be respectful, so that kind of same -- it

9  continued to be a respectful relationship.  So I would say

10  probably at least for three or four years, mutually

11  respectful.

12  Q    Did you have an opportunity to look at other records

13  regarding his custody from prior to the time that you

14  began interacting with him?

15  A    I have looked at the records.  Certainly my memory is

16  not as sharp on those records, but I did look at, I

17  believe, records maybe in the year or two prior.

18  Q    So if you did, did you note that over time as the

19  restrictions on him eased up that he became --

20  A    He was better.

21  Q    That he was better, right?  He was more compliant, he

22  was more obedient of the rules and he was --

23  A    It was a trend.

24  Q    So he was improving, right?

25  A    It seemed that way.

 1   Q    And he was improving in part because even though he

 2   was still in isolation and -- let me back up.  By the way,

 3   have you dealt with people before who have lived in that

 4   sort of isolation that Mr. al-Marri lived in?

 5   A    Not until I went to Guantanamo.

 6   Q    As a psychologist, what did you note about the way it

 7   makes people behave, being isolated like that?

 8   A    I think it's very tough on people.

 9   Q    And how do they react to that toughness?

10   A    I think we're all social beings, so when we're more

11   isolated it tears people apart pretty quickly.

12   Q    So what kind of symptomatology do they develop as a

13   result of that kind of isolation?

14   A    I'm trying to find the right words.  Usually people

15   struggle.

16   Q    Anxiety?

17   A    Anxiety.  People tend to pay attention to noises like

18   that, you know, the smaller things, the little things.

19   Q    Let me stop you.  So you become sort of --

20   A    Hypersensitive.

21   Q    Hypersensitive, right, to things like fans?  You

22   pointed to that fan, right?

23   A    Right.

24   Q    And in other sensory things?  And were you aware that

25   during the first part of Mr. al-Marri's custody that he

1    was in a situation of really extreme sensory deprivation

2    where it was just him in a room and just a metal bed and

3    essentially nothing else?

4    A    That was my understanding.

5    Q    And based on your experience as a psychologist, would

6    you expect that to have any kind of effects on him?

7    A    I would expect that would have an impact, yes.

8    Q    What would that impact be do you think?

9    A    I would expect the person to have some lingering

10   impacts, lingering effects.  That's why I said

11   Mr. al-Marri is very resilient.

12   Q    I'm sorry?

13   A    That's why I said Mr. al-Marri is very resilient to

14   experience that and, when I saw him, to be as strong as he

15   was and to be doing as well he was.  That's why I would

16   describe Mr. al-Marri as being very resilient.

17   Q    All right.  So in any event, partly due to your

18   efforts and the efforts of others at the Brig, his

19   treatment improved and he was also improving in terms of

20   his psychological well being?  Would that be fair?

21   A    Yes, I believe so.

22   Q    And let me ask you this.  Did you ever hear stories,

23   for example, of the way Mr. al-Marri interacted with other

24   staff at the Brig?  The one I'm going to ask you about,

25   for example, is him turning his television so the guards

1  || could watch the Super Bowl.

2  || A    I'm sorry.  I didn't hear that story.

3  || Q    You didn't hear that story?  That might have been

4  || when you were in Guantanamo.

5  || A    I didn't hear that story.

6  || Q    The way he was interacting with people there, does

7  || that play any role at all in your assessment today that he

8  || is, to use your term, likely to partake in future violence

9  || against United States?

10 || A    I really do believe that he liked -- I mean, he got

11 || along well with several of the guards and there was a

12 || mutual respect.  They got along well with him.  They

13 || treated him well.  He treated them well.  It was an odd

14 || arrangement of this mutual respect in a very difficult

15 || situation.  You know, I believed him when he said, "It's

16 || not I don't dislike you people."  I mean the Brig staff.

17 || "I don't dislike the Savages."  I believe that.  I just

18 || never quite understood some of that hatred and dislike

19 || that he mentioned and talked about with me.  And that was

20 || two years ago.  Maybe things have changed.  Maybe things

21 || have changed.  That was two years ago.

22 || Q    So you're saying that the opinion you gave was based

23 || upon a time period a couple of years ago and --

24 || A    I haven't talked to him this week or anything.

25 || Q    Never mind this week.  The last time you talked to

1   him was --

2   A     June of '08.

3   Q     That conversation in June of '08, what did you talk

4   about?

5   A     It was really catching up.  It was like I hadn't seen

6   him since September of '07.  He asked me if I had had a

7   chance to see his brother.  I had.  I didn't speak to him.

8   I just told him I had seen him and he looked healthy to

9   me.

10  Q     Was there anything about that conversation -- well, I

11  think at the time you said you thought -- you didn't

12  notice any psychopathology, correct?

13  A     No.  It seemed like he was doing well.

14  Q     It seemed like he was continuing that road towards

15  improvement?

16  A     Doing well, had been reading.  I think he was doing

17  okay.

18  Q     And based upon what you saw, you thought he was

19  continuing to overcome the ill effects of his isolation?

20  A     He seemed like he was continuing -- like everything

21  was fine.  Like he continued on from September.  He was

22  doing well.  I mean, it was like he was continuing to

23  read.  He had been working out as well.

24  Q     Did you think at the time -- you only had that one

25  meeting with him?

1    A    Right, because then I was transferred.

2    Q    And did you think that all that continued recovery

3    boded well for his future continued recovery?

4    A    I didn't know obviously what was going to happen, but

5    I figured he would be continuing to read and I didn't,

6    again, know how long he would be at the Brig, etcetera,

7    so --

8    Q    So let me ask you this.  Assuming that it did

9    continue through that time period and including up through

10   the time here in Pekin, does that play any role in your

11   assessment of his likelihood to partake in violence

12   against the United States?

13   A    I know the last time I talked with him about those

14   issues, that leads me to believe the likelihood about

15   those issues, but in June of '08 we didn't talk about

16   those issues.

17   Q    Okay.  Here's the question I want to ask though.

18   What I want to understand is how that recovery that he was

19   going through, based upon the initiatives of people like

20   you and people at the Brig to make his life better and his

21   response to that, my question is does it -- is that a

22   factor at all -- I'm not asking you to do the calculus,

23   but is that a factor that a psychologist considers in

24   deciding the likelihood that somebody would commit a

25   violent act in the future?  Do you even think about those

1   facts?

2   A    I think you do think about those facts.  I would hope

3   that would play a role.

4   Q    You would hope it would?

5   A    I would hope so.

6   Q    So it would be important in making that assessment

7   today to know what's occurred really in all the time other

8   than -- and you haven't really spent any time with him

9   since '07?  You just had the one meeting in '08, right?

10  A    Correct.

11  Q    A lot has happened in those two years since, right?

12  A    A lot has happened in my life in two years.

13  Q    I'm sure.  And so here's my question.  The assessment

14  that you gave earlier today is based upon a statement that

15  doesn't appear in any of these reports but that was

16  fundamentally in the course of a discussion about

17  Palestine, world politics and infidels, right?

18  A    Yes, sir.

19  Q    Okay.  And you were having that sort of historical,

20  political, whatever you want to call it, discussion with

21  Mr. al-Marri and those are the kinds of discussions you

22  would have with him, right?

23  A    Right.

24  Q    And he expressed his opinion to you, right?

25  A    Yes, sir.

1   Q    Okay.  And it's based upon that opinion more than

2   anything else that you have come to the conclusion that

3   you have expressed earlier today?  Am I right about that?

4   A    That and building up, you know, all the discussions

5   and my time with him.

6          MR. LUSTBERG:  One moment, Your Honor.  Your

7   Honor, thank you very much.  Thank you very much, Doctor.

8   I appreciate it.

9          THE COURT:  Re-direct?

10         MR. RISLEY:  We have no other questions, Your

11  Honor.

12         THE COURT:  Thank you.  You may step down.

13  Thank you.

14              (Witness excused)

15         MR. RISLEY:  Your Honor, we have no other

16  witnesses.

17         THE COURT:  Okay.  Do you have any other

18  witnesses?

19         MR. LUSTBERG:  No, Judge.

20         THE COURT:  Well, it seems like we've been here

21  longer today than we really have been.

22         MR. LUSTBERG:  I'm thinking the same thing, Your

23  Honor.

24         THE COURT:  I would like to try to -- we won't

25  go -- I don't think we'll go past 5:00 o'clock, but I

1   would like to try to address the first objection to the

2   pre-sentence report.  Let me get that in front of me.

3         The first objection is a reference to page 16,

4   paragraph 56.  That's the two level upward adjustment.

5   Who's going to address that?

6         MR. LUSTBERG:  The Court is unfortunately still

7   stuck with me.  Thank you, Your Honor.  Let me first note

8   that the adjustment that appeared in the pre-sentence

9   report, while the Government supports it today, was not

10  originally part of the plea agreement or something that

11  was -- frankly, I don't think it was discussed between the

12  parties at all.  In any event, it was not originally part

13  of the calculus that the parties had worked out in advance

14  of the plea.  That doesn't of course dispose of the issue,

15  but I think it's worth noting.

16        2M5.3(b)(l)(E) provides for a two level upward

17  increase in the offense level if the defendant provided

18  material support with the intent, knowledge or reason to

19  believe that it would be used to commit or assist in the

20  commission of a violent act.

21        The defense's position, Your Honor, is based

22  largely upon, and the dispute with the Government is based

23  largely upon, what the three word phrase "a violent act"

24  means.  Our position is that the defendant, in order to

25  qualify for this adjustment, that he has to have conspired

1    in this case with the intent, knowledge or reason to

2    believe that the support he was offering was to be used in

3    the commission of a particular violent act.

4          Why do I say that?  Well, first of all, of

5    course the guideline doesn't say -- it doesn't say to

6    assist in the commission of violence or to assist in the

7    commission of terrorism, nor could it because this is

8    within the context of a terrorism guideline.  And I should

9    also note that in this context we have not objected of

10   course to the huge increase in offense level and, at least

11   for now, increase in criminal history category based upon

12   the terrorism enhancement of Section 3A1.4.  Those are all

13   built in.  But this is an additional two points.  This is

14   two points above assisting in terrorism.  This is two

15   points that is applied if a person committed or assisted

16   in the commission or had reason to believe that he was

17   assisting in the commission of a violent act.

18         And it simply doesn't make sense to read that

19   sentencing guidelines provision as applying to violence in

20   general.  Why do I say that?  Because of course

21   Mr. al-Marri in his guilty plea admitted that he conspired

22   to further the terrorist activity and terrorism objectives

23   of al-Qaeda.  I would not stand here and say to you that

24   those -- that the terrorist activity of al-Qaeda was

25   non-violent.  But what we know about this case and one of

1     the things that makes the case rather unique is that

2     Mr. al-Marri's own mission was undefined.  He was taking

3     directions from others and there was no particular violent

4     act that he had agreed to do or that he was being directed

5     to participate in.  There's no dispute about that.  The

6     Government, as they say in their papers, candidly admits

7     to it.

8              Their argument is that the words "a violent act"

9     in 2M5.3(b)(1)(E) means that it's at least one violent act

10    and that one violent act would suffice, but of course the

11    Sentencing Commission could have written "at least one

12    violent act" if that's what they meant by it.

13             What this means is that you get an additional

14    two points beyond this very high sentencing guideline

15    range, beyond the even higher terrorism enhancement, if

16    you had some direct participation or were assisting in the

17    commission of a particular violent act.

18             Now the Government points out that there are no

19    cases that support that position.  I should note that

20    there are no cases that support their reading of this

21    guideline either.  In fact, the one case that we cite in

22    our brief, a case called Aref, is one in which the act

23    that qualified for this enhancement was in fact a

24    particular violent act.  That case was the importation of

25    a missile that was to be used to attack the Pakistani

1  embassy.

2          That of course is exactly what's missing here,

3  the contemplation at least or the direct participation in

4  a specific violent act that would arguably occur and that

5  would result in this additional two points above and

6  beyond that enormous sentencing guidelines that already

7  apply here.

8          In the probation report there are two facts

9  cited in support of maintaining this adjustment.  And this

10  is at the end of the report where the various objections

11  are responded to by Ms. Kennedy and two sets of facts are

12  related there.

13          One is that Mr. al-Marri obtained cash and a

14  laptop, both things that he has admitted to, but neither

15  of which in any way go to whether there was a particular

16  violent act.

17          Second:  That he researched cyanide and

18  bookmarked dams, tunnels and waterways.  That requires a

19  huge leap of faith that's simply not applicable here.

20  There's no question that he did those things.  There's no

21  question he researched cyanides and he bookmarked dams,

22  tunnels and waterways.  But as the expert reports that

23  we've provided indicate, particularly the report of

24  Mr. Martinez, which is Exhibit 49, and the report of

25  Mr. Capps, which is Exhibit 67, Mr. al-Marri's actions in

1   that regard were very inchoate and very ill formed.  He in

2   fact surfed the net is what he did and looked for those

3   various things.  He never took any steps whatsoever to

4   contact any of those sites or any of the manufacturers of

5   any cyanide products.  He never -- there's no e-mail or

6   other traffic regarding a recipe, formula or plan,

7   according to Mr. Martinez.  There's no instructions on how

8   to mix or use according to Mr. Capps.

9           Simply put, we're just not far enough along in

10  whatever it was that Mr. al-Marri was to have done to

11  warrant this additional two point adjustment.  That is not

12  in any way undermining the plea that he made to providing

13  material support for terrorism.  That material support for

14  terrorism is built into the 26 points that is the base

15  offense level here and, more importantly, it's built into

16  the 12 additional points in the 3A1.4 terrorism

17  enhancement to which we stipulated.

18          But these additional two points require more.

19  They require actions taken towards a particular violent

20  act and that's not here in this case, it's concededly not

21  here, so what the parties have really is a textual

22  analysis that we would submit for the Court's resolution.

23  Thank you, Your Honor.

24          THE COURT:  Thank you.  What's the response?

25          MR. RISLEY:  Your Honor, I won't belabor what we

1  said in our written response other than to say I agree

2  this is a textual interpretation question.  It's one in

3  which the Government maintains the Court ought to

4  interpret the text in its common, everyday, obvious, at

5  least to us, meaning, which is if the offense involved the

6  provision of material support or resources with reason to

7  believe they are to be used to commit or assist in the

8  commission of a violent act.

9        The defendant does not appear to claim that he

10  didn't have reasonable cause to believe that his offer of

11  himself to al-Qaeda to further its terrorist purposes

12  would not be used to commit a violent act.  His argument

13  is that it has to be a particular violent act.  Well, when

14  you think about the purposes for sentencing, that's a

15  rather -- what difference would it make whether he

16  anticipates violence or he anticipates particular

17  violence?

18        THE COURT:  Well, part of the argument is that

19  what this really amounts to is double counting because of

20  the upward adjustments that are made otherwise.

21        MR. RISLEY:  Well --

22        THE COURT:  In the offense level and the

23  16 levels, I think, that are added.

24        MR. RISLEY:  They didn't assert that argument,

25  but --

1          THE COURT:  I heard that in what he said.

2          MR. RISLEY:  Just now?  Okay.

3          MR. LUSTBERG:  No.  It's in our papers too.

4          MR. RISLEY:  Well, anyway, Your Honor, it isn't

5    the only place where the guidelines double count some

6    things in the context of violent crime.

7          The point is, number one, that's what the

8    guidelines say and they should be applied as they state

9    them.  And whether it's a particular violent act or not

10   has nothing to do with double counting because you would

11   have the same double counting even if you considered -- if

12   you could prove a particular violent act.  Their argument

13   is that because the Government's evidence -- because we

14   cannot prove that the defendant anticipated a particular

15   violent act, this provision doesn't apply.  If it did,

16   they would say, if it's double counting, that it still

17   wouldn't apply.

18         Well, the guidelines don't say that.  In the

19   end, in the final analysis, the guidelines, where it's

20   talking about the difference, we're starting at 30 years

21   to life and then going down two levels.  Well, it's still

22   away above 15 years, which is the effective guideline

23   range in this case.  So we don't want to --

24         THE COURT:  But that's another issue.  I mean,

25   that doesn't answer --

1          MR. RISLEY:  It is and that's why we said the

2     Court ought to, as a matter of principle, rule on it.  But

3     the textual question, which they have just said is the

4     real question, does it mean a violent act or a particular

5     violent act.  Our position it means what it says, a

6     violent act, which is some act of violence.

7          THE COURT:  All right.  Thank you.  Do you have

8     any remarks?

9          MR. LUSTBERG:  Just on the double counting issue

10     really quickly.  Here's why it makes sense as an

11     adjustment.  What I think the Commission was thinking

12     about -- what the Commission was thinking about is if you

13     are involved in a particular violent act, if you're

14     involved in attempting to blow up the Pakistani embassy,

15     then even with all of these other adjustments for

16     terrorism then you deserve an additional two points.  But

17     terrorism is violent.  So the fact that it's already built

18     into the base offense level here and that it's already

19     built into the terrorism enhancement doesn't mean that

20     adding the two points is, strictly speaking, double

21     counting.  What it means is that the Commission wanted

22     something in addition.  This Court should interpret what

23     the Commission wanted as an additional two points that

24     should be added if, and only if, there's a violent act

25     that actually took place or was contemplated.

1       And here what you can say is, and what I think

2  the Government's position is, is that violence was

3  contemplated, but that's not what it says.  It says

4  "violent act".  And there's no question that the

5  Commission could have said "violence" or could have just

6  said "terrorism".  It wouldn't have made sense for it to

7  say "terrorism" because it's a terrorism guideline, but it

8  could have said "violence" and then the Government's

9  position would make sense, but it doesn't use that phrase.

10  It uses the phrase "a violent act".  Uniquely in this case

11  there isn't one and that's why we take the position that

12  we do.

13       THE COURT:  Well, my guess is that your

14  arguments here on this point perhaps weren't anticipated.

15  There is no case on it.  It may well be, although I can't

16  really say that, that when this particular item was under

17  discussion they didn't have this discussion, even

18  informally, as to whether or not they were talking about a

19  specific or particular violent act or just generally

20  speaking a violent act.

21       Well, the objection is far from frivolous, but I

22  don't believe it has merit and I'm going to deny the

23  objection.  It would be a very interesting question for

24  the Court of Appeals to consider.  I do take it at its

25  normal reading.  Knowledge or reason to believe they are

1  to be used to commit or assist in the commission of a

2  violent act.

3          What do we know was in the mind of the defendant

4  at the time that he entered this country on September 10?

5  Looking at the transcript of the plea on page 33,

6  question:  "At the time you had this conversation with

7  him" -- I'm not sure which of the two people we were

8  talking about here, KSM or -- Khalid Sheikh Mohammed, yes.

9  Reference to the conversation he had with Khalid Sheikh

10  Mohammed and it says:  "At the time you had this

11  conversation with him, were you aware that al-Qaeda had

12  been responsible for attacks, other attacks against the

13  United States?"  "Yes."  "Were you aware of the 1998

14  bombings of the two embassies in East Africa?"  "Yes."

15  "Were you aware of the 2000 attack on the USS Cole?"

16  "Yes."  "And also at that time were you aware of the 1996

17  and 1998 fatwas issued by Osama Bin Laden against the

18  United States?"  "Yes."  So all of that was certainly in

19  his mind when he came here.

20          Now we also know from the statement, the facts

21  from the plea agreement, that he had participated in

22  military training at one or more camps before he came

23  here.

24          I also think it's -- and I wanted to clarify

25  something on this.  My understanding is that -- and I

1        would be happy to hear what counsel says from either side

2        on this.  But my understanding was that the information

3        about the cyanide was not something that was created on

4        the computer until after he came here.  Is that an

5        accurate statement or not?

6                    MS. BALTES:  Your Honor, we believe that's the

7        case.  The defendant did admit that he purchased the

8        laptop computer in August just prior to entering the

9        United States.  Because the defendant did admit the

10       relevant facts that serve to support the Government's

11       position with respect to the research, we have not

12       litigated full blown the computer forensics, but --

13                   THE COURT:  That's my understanding.  But if

14       that's incorrect, I would certainly stand corrected.

15                   MR. RISLEY:  Your Honor, this is an area that I

16       have spent more time probably on than anybody and I can

17       say that we are unable to determine the date of the

18       research, so I think it would be incorrect to assume it

19       was afterwards.

20                   THE COURT:  All right.  All right.  I appreciate

21       your representation as an officer of the Court.  Well,

22       obviously if it happened before he came, that's one thing.

23       If it happened after he came, it's another.  But in either

24       event, what we have is indicated research on cyanide.

25                   I've read the exhibit that talks about the

1    opinion of the forensic examiner that the defense used.

2    I'm having trouble understanding how he came to the

3    conclusion that based on what he saw there was no reason

4    to be worried about it.  I've got a lot of trouble with

5    that.  Anyway, that was on the computer.

6         We know also that he came here on the 10th of

7    September.  There's nothing in the record to suggest that

8    he knew about 9-11, but we do know that he did a number of

9    things after 9-11 with the full knowledge of what al-Qaeda

10   had done on 9-11, and that is fly planes into the World

11   Trade Center and the Defense Department.

12        I think it's fair to say, although I don't know

13   that these words are used in the factual basis, but I

14   think it's fair to characterize what is in there as

15   suggesting that he was a sleeper agent, that he did not

16   know -- or maybe he did, but there's no evidence that he

17   knew what his specific role would be once he got here.

18   But in view of everything that was going on at that time,

19   to conclude that it was not in his mind that he was going

20   to be asked to engage in a violent act against the United

21   States, with all due respect, I don't believe is a

22   reasonable conclusion to come to.

23        You certainly have a legitimate argument

24   concerning whether or not what is intended here would

25   require a specific act that would have to be identified

1    and the Court of Appeals, when they consider this

2    question, may agree with you, but I don't believe that

3    that is what is required by this reading so I'm going to

4    deny the objection.

5           I think this would probably be a good time to

6    stop.  And I know we started at 10:00 today, but I would

7    hope we could start at 9:00 tomorrow.  And what we have is

8    what I have identified as the other three objections.

9    I'll certainly hear whatever arguments you have to give on

10   the role in the offense, whether or not there should --

11   the Court should effectively depart because his criminal

12   history category VI overstates his criminal history and

13   likelihood to recidivate, also whether the Court should

14   consider a downward departure or adjustment because of the

15   length and harshness of conditions of his confinement,

16   which I think we probably all agree the time that we

17   focused on today was the time at the Brig, but there's

18   also another time when he was in material witness custody,

19   so that's a big question.  Anything else we should talk

20   about before we stop for today?

21           MR. LUSTBERG:  Just one thing.  I just want

22   to -- we're not calling any more witnesses, but I just

23   want to put the Court on notice.  So the way this will

24   work tomorrow, if I understand correctly, we'll go through

25   the objections and then we'll have our argument under

1    3553.

2                THE COURT:  Correct.

3                MR. RISLEY:  As part of the 3553 analysis, one

4    of the issues of course is the nature and circumstances of

5    the offense and the history and characteristics of the

6    defendant.  In connection with the history and

7    characteristics of the defendant, we're going to show,

8    it's not very long, but some video materials that we also

9    showed at the bond hearing that Mr. al-Marri had in

10   Charleston.

11               THE COURT:  How long is that?

12               MR. LUSTBERG:  It's, at most, ten minutes, five

13   minutes.

14               THE COURT:  That's fine.

15               MR. LUSTBERG:  It's five to ten minutes.  But we

16   were just going to do it as counsel.  I mean, we don't

17   think there's a witness that's needed.

18               THE COURT:  That's fine.  I was thinking, why

19   don't we start with that in the morning?

20               MR. LUSTBERG:  Okay.  Well, I mean it really

21   isn't -- we can if Your Honor wants, but --

22               THE COURT:  I understand why you're offering it.

23               MR. LUSTBERG:  I just want to make sure that you

24   understood that was --

25               THE COURT:  No problem.  Anything else?

1          MR. RISLEY:  Not from the Government, Your

2    Honor.

3          THE COURT:  Thank you.

4

5          (Whereupon the hearing was continued

6              until October 29, 2009)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25