214
E-FILED
Tuesday, 17 November, 2009  12:57:58 PM
Clerk, U.S. District Court, ILCD

1            IN THE UNITED STATES DISTRICT COURT
            FOR THE CENTRAL DISTRICT OF ILLINOIS
2

3

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                      Plaintiff,      ) Criminal No.
                                       ) 09-10030
7            vs.                       ) Peoria, Illinois
                                       ) October 29, 2009
8   ALI SALEH KAHLAH AL-MARRI,         )
                                       )
9                      Defendant.      )

10

11

12                  SENTENCING HEARING
                     VOLUME 2 OF 2

13

14

15                      BEFORE:

16             HONORABLE MICHAEL M. MIHM
               United States District Judge

17

18

19

20

21

22

23

24

25

```
 1                        APPEARANCES:

 2


 3              DAVID E. RISLEY, ESQ.
            Assistant United States Attorney
 4               318 S. Sixth Street
              Springfield, Illinois  62701
 5
                       -- and --
 6
                MS. JOANNA BALTES
 7              Department of Justice
              Counterterrorism Section
 8            950 Pennsylvania Avenue NW
               Washington, DC  20530
 9          (Appeared on Behalf of the Government)


10
                L. LEE SMITH, ESQ.
11              Hinshaw & Culbertson
             416 Main Street, Suite 600
12             Peoria, Illinois  61602

13                     -- and --

14             ANDREW J. SAVAGE III, ESQ.
               Savage & Savage, P.A.
15               15 Prioleau Street
            Charleston, South Carolina  29401
16
                       -- and --
17
              LAWRENCE S. LUSTBERG, ESQ.
18                 Gibbons PC
                One Gateway Center
19            Newark, New Jersey  07204
            (Appeared on Behalf of the Defendant)
20


21


22


23             Karen S. Hanna, C.S.R.
             U.S. District Court Reporter
24             Central District of Illinois
       Proceedings recorded by mechanical stenography, transcript
25     produced by computer
```

1               THE COURT:  Good morning.  My understanding is

2     that you have a video to show and then after that we

3     will -- I will hear your arguments on the role in the

4     offense objection and I'll rule on that.

5               The two other issues, that is whether there

6     should be a downward departure because the criminal

7     history category VI overstates the criminal history and

8     likelihood to recidivate and whether there should be a

9     downward departure because of the length and harshness of

10    the conditions of confinement, I think you can just, as

11    far as I'm concerned, address those in your statement on

12    sentencing.  Is that agreeable to everyone?  Then I'll

13    effectively rule on them when I impose sentence.

14               MR. RISLEY:  Your Honor, theoretically that

15    sounds good, but we actually had decided we would -- that

16    Ms. Baltes will be giving the closing statements and I was

17    going to address that particular argument, so we would

18    have to rearrange some things.  If it's permissible to do

19    it in the main body, we would prefer doing that.  But if

20    the Court really wants to do that, we'll adjust.

21               THE COURT:  I don't care if you each do part of

22    the presentation.  I just would prefer to do it this way.

23    Do you have any objection to that?

24               MR. LUSTBERG:  No objection to that.  The only

25    thing, the only minor modification I would request is that

1    the video actually fits in more with our final

2    presentation.  If we could do it as part of that, it's

3    not --

4              THE COURT:  That's fine.  Fair enough.  All

5    right.  Then let's begin by discussing the objection, your

6    second objection, which is to page 16, paragraph 58,

7    concerning role in the offense.

8              MR. LUSTBERG:  Thank you, Judge.  Obviously the

9    issue of role in the offense is one that this Court

10   confronts, I would assume, fairly regularly.  It's a

11   sentencing guidelines issue that arises in many cases in

12   which there are multiple participants for which there are,

13   for example, conspiracies.  This of course is just such a

14   case.

15             And the Court is well aware of the guideline,

16   Section 3B1.2, which allows the Court to adjust the

17   offense level down by two, three or four points, two for

18   minor participant, four for minimal participant and three

19   for something in between.  We recognize that with respect

20   to this issue that we bear the burden of persuasion.

21             Of course the Court is also aware of the case

22   law that holds that this is a determination that's based

23   on the totality of the circumstances and in particular on

24   the defendant's position within the conspiracy, his

25   knowledge or understanding of the scope and structure of

1      the enterprise and the activities of others and his

2      relationship with the principal members of the conspiracy.

3              Here there really are three different ways to

4      look at it.  We propose two and the Government proposes a

5      third.  And I think based upon Mr. Risley's submission,

6      the Government's submission, again we sort of are at a

7      point where this is largely a matter of legal

8      interpretation.

9              There are, we submit, two different ways of

10     looking at this, either of which would result in an

11     appropriate consideration of Mr. al-Marri as a minor or

12     minimal participant.  First:  If we look at al-Qaeda as a

13     whole.  And second:  If we look simply at the conspiracy

14     that's set forth in detail in the factual basis that's

15     appended to the plea agreement here.  Under either of

16     these, we respectfully submit, Mr. al-Marri is

17     appropriately characterized as one with a mitigating role.

18             The Government's position, which I will address

19     in a little more detail in a minute or two, is that

20     actually you just look to his own participation and since

21     essentially that because he agreed then he could not

22     possibly have had a mitigating role because the issue is

23     his agreement.  For reasons I'll discuss in a moment, I

24     think respectfully that analysis is incorrect and

25     inconsistent with, in particular, the law of the Seventh

1   Circuit.

2            The question before the Court is whether

3   Mr. al-Marri is substantially less culpable than other

4   participants in either of the two conspiracies.  With

5   respect to al-Qaeda, that could not be clearer.  To say

6   he's anywhere in the hierarchy would be an extraordinary

7   overstatement.

8            We know a lot about the structure of al-Qaeda

9   and these arguments are set forth in detail in our brief,

10  but let's be clear.  Mr. al-Marri in the overall structure

11  of al-Qaeda was a sleeper agent who was entrusted with

12  almost no information, who was not given any particular

13  mission, who was consistently accepting directions from

14  others and he did not even know, as the evidence shows --

15  actually there's a lack of evidence that he knew anything

16  about 9-11 before it took place even though he was already

17  in touch with the relevant people then.  It makes really

18  clear what his overall role was in al-Qaeda, but let's be

19  more specific in terms of what his role was in the

20  conspiracy that is this case.

21           The people that he dealt with were Khalid Sheikh

22  Mohammed who was the chief of external operations for

23  al-Qaeda and the architect of 9-11 and Mustafa al-Hawsawi

24  who was the financier of those attacks.  To say that --

25  and those are the people whose names are actually in the

1    factual basis in this case.  Those are people who are

2    actually part of, according to the Government and

3    according to what Mr. al-Marri has admitted, who were part

4    of the same conspiracy that is at issue here.

5           When the Court thinks about this and looks at

6    the question of role, necessarily it's a comparative

7    analysis and the relevant comparison is between

8    Mr. al-Marri on the one hand and those individuals on the

9    other.  Of course it's patently obvious Mr. al-Marri

10   played a role nothing like either of those two people.  He

11   attended training camps.  He offered his services.

12          THE COURT:  I want to stop you there for a

13   moment.  I'm looking at the appendix to the pre-sentence

14   report.  It's page 30 of my copy where it sets out your

15   position concerning this objection and it says:  "The

16   defendant traveled to Pakistan to gain military training

17   to defend his country, a pilgrimage that was motivated by

18   beliefs about religious duties", etcetera, "not the desire

19   to join any terrorist operation."  That's not in the

20   record to my knowledge.

21          MR. LUSTBERG:  No, nor is it relevant to this

22   position and that's not -- we're not backing away -- I

23   think for purposes of this analysis, Your Honor, the Court

24   should completely credit every single aspect of the plea

25   agreement as it's written and as Mr. al-Marri admitted to

1    it in the course of his colloquy with the Court.  To the

2    extent there is anything additional -- in other words, let

3    me put it to you this way.  Just based upon those things,

4    Mr. al-Marri's role is simply substantially less than that

5    of KSM and al-Hawsawi.  Those are the other two

6    co-conspirators.  And in any conspiracy when the Court

7    evaluates relative roles, that's what it looks to.

8             THE COURT:  Let me ask you a question.  In the

9    Government's submission they cite to a Seventh Circuit

10   case, U.S. vs. McKee, and that was a case -- let me get to

11   that.  The description at the beginning of that case:

12   "McKee was part of a conspiracy to smuggle ecstasy from

13   the Netherlands to Chicago.  His co-conspirators,

14   MacIntosh and MacNac, lived in the Netherlands and

15   arranged for couriers to deliver ecstasy to Chicago.  His

16   role was to provide housing, transportation", etcetera,

17   "while they were in Chicago."

18             In that case the Court says:  "As McKee sees

19   things, he was entitled to the reduction because", quote,

20   "all of the other participants were higher up the food

21   chain than he was."  End quote.

22             But then it says:  "However, where each person

23   was an essential component in the conspiracy, the fact

24   that other members of the conspiracy were more involved

25   does not entitle a defendant to a reduction in the offense

1    level."  The Court found McKee was an average participant

2    because of his role in making the arrangements.  Could you

3    comment on that case in relation to this issue?

4              MR. LUSTBERG:  Certainly, Your Honor.  The

5    question is one of context and there's also some question,

6    I think, as to whether cases like McKee survive the

7    decision of the Seventh Circuit earlier this year in

8    United States vs. Hill which both parties cite to the

9    Court.

10             In Hill, the defendant pleaded guilty to -- or I

11   can't remember whether it was a trial or guilty plea, but,

12   in any event, was convicted of being a felon in possession

13   of a firearm, a very discrete offense.  Certainly one

14   could argue that he was essential to that offense, but the

15   facts of the case were that it was part of a much broader

16   gun running or gun smuggling type of operation.  That's

17   the case here.  And the Court found, the Court ruled, that

18   a role adjustment was appropriate.

19             The Court will have to of course determine --

20   and I'll address in a moment the question of whether --

21   the question that's raised by McKee as to whether

22   Mr. al-Marri was essential.  But the question is essential

23   to what.  Was he essential to the operations of al-Qaeda?

24   Clearly not.  Was he essential to the conspiracy that's at

25   issue here?  It's hard to argue that he was when he was

 1    not entrusted with any mission, when he was not directed

 2    to do anything, but, more to the point, when he was the

 3    person who was the object of those directions.  He was not

 4    giving orders.  He was receiving them.  He was not coming

 5    up with the mission.  He was going to do whatever he was

 6    going to do when he was ordered to do that.

 7           And along those lines, it's relevant to consider

 8    what actually occurred, which is to say that he was not

 9    able to engage in the communications that he was told to

10    do.  In fact, the entire thing basically went awry.  He

11    was, as it turns out, relatively unskilled in the computer

12    work that he was entrusted to do as we see from the way he

13    used the anonymizer program.

14           And the issue of whether one is essential

15    necessarily turns under all these cases on the question of

16    what the scope of his knowledge was.  That's really what

17    McKee, if you look at it, and a whole line of cases turn

18    on, which is you can't be essential unless you know that

19    what you're doing is -- where it fits into the overall

20    scheme of things.

21           THE COURT:  One of the fascinating things about

22    this case that for whatever reason neither side focuses

23    on, I'm looking at -- excuse me just a moment.

24    Paragraph 36 of the pre-sentence report makes reference to

25    the fact that he made a trip here actually the year before

1    in 2000 and it doesn't provide -- what I see in here

2    doesn't provide much information.  I don't know how long

3    he was in the country.  I don't know whether he came with

4    his family or not.  I'm guessing that maybe he didn't.

5    But it indicates that once he arrived here he established

6    a fictitious business, AAA Carpet, using a false name and

7    a stolen security card and obtained a number of credit

8    cards.  I think that was over in Macomb if I'm not

9    mistaken.  I'm just curious about how that fits into all

10   this.

11           MR. LUSTBERG:  I think what we've been told is

12   that the Government does not take the position that it

13   fits in with it at all.  There's no evidence that that

14   episode in 2000 had anything whatsoever to do with what

15   happened in 2001 to which Mr. al-Marri --

16           THE COURT:  So he just came over here in 2000

17   for the purpose of setting up a phony carpet cleaning

18   business?

19           MR. LUSTBERG:  As the Court may recall, that was

20   the subject of the charges that this Court dealt with --

21           THE COURT:  I understand that, but I'm just

22   saying the fact that those charges were dismissed with

23   prejudice doesn't mean that it has to be totally ignored.

24           MR. LUSTBERG:  No, and it shouldn't be ignored

25   by the Court to the extent that it bears at all upon the

1      facts of this case, but neither side, particularly the

2      Government who bears the burden with respect to that, has

3      adduced any evidence that it has anything whatsoever to do

4      with this case.

5                  Our theory all along has been that because he

6      had come to the United States in 2000 he was a good

7      candidate, and I think this was some of what was in the

8      factual basis, that essentially al-Qaeda saw him as a

9      person who could come into the United States, had done so

10     recently, so they would exploit that.

11                 THE COURT:  One of the things I found

12     interesting about that, I believe it's set out in here,

13     was that when he came here in 2000 he came here on a Saudi

14     Arabian passport and that he gave false information on the

15     visa application.

16                 MR. LUSTBERG:  There's no question and those are

17     matters that the Court can consider, but they are not

18     relevant to the conspiracy here.  They may be relevant to

19     the Court's ultimate sentencing in this matter, but they

20     are not relevant to the question of role in the offense.

21                 THE COURT:  Go ahead.

22                 MR. LUSTBERG:  Let me explain.  Our view all

23     along, and I think this is confirmed by the factual basis

24     in this case, is that al-Qaeda saw Mr. al-Marri, having

25     done that, as a good candidate to be the sleeper agent

1    that they recruited him to be, but there's no evidence

2    that he did those things at that time in order to qualify

3    for that.  There's been no proof of that.  In our

4    discussion with the Government, I think they concede there

5    is no proof of that.  The inference that we have always

6    drawn from it is that that made him someone that al-Qaeda

7    could take advantage of for that purpose.

8            But it's important to note that even after that,

9    he's provided with no information.  He's completely

10   directed by others.  He doesn't even do that which he's

11   supposed to be doing.  And for those reasons when one does

12   a straightforward analysis under Section 3B1.2, there's

13   just no question but that his role is less than the

14   average participant.  The average participant in this

15   offense is at a much higher level than him.  That's what

16   distinguishes this case from cases like McKee or any case.

17           THE COURT:  You would say in order to have a

18   conspiracy you have to have an agreement between two or

19   more persons and in this case the persons that the

20   Government is asserting that he conspired with were Khalid

21   Sheikh Mohammed and al-Hawsawi?

22           MR. LUSTBERG:  Correct.  Those are the people

23   according to the guilty plea that Mr. al-Marri has entered

24   into, according to the facts that have been adduced by the

25   Government, and I don't believe there are any other facts.

1          And that really fundamentally is where we part

2    company with the Government because the Government says

3    there's this agreement between Mr. al-Marri and these

4    other people and of course he's essential to that

5    agreement.  That certainly is true.  But if that were to

6    disqualify somebody for a role in the offense adjustment,

7    then there would never, ever be, ever, a role in the

8    offense adjustment in a conspiracy because in order to be

9    convicted of a conspiracy you have to have entered into an

10   agreement and conspiracies, far from being the type of

11   situation where role in the offense adjustments don't

12   occur, are exactly where they do.  What Courts do under

13   those circumstances is take a look at the entire scope,

14   the entire context, which respectfully, we submit here,

15   really is all of al-Qaeda and saying where did

16   Mr. al-Marri fit into this.

17          This case, Your Honor, has always been about

18   al-Qaeda and about Mr. al-Marri's association with

19   al-Qaeda.  It is al-Qaeda that he's alleged and admitted

20   to providing material support to, to conspire to provide

21   material support to.  And under Hill, the Court should

22   look at that entire context the same as the Seventh

23   Circuit did in that case and slot Mr. al-Marri into where

24   he belongs in that organization.

25          And I don't think that there's -- I don't think

1     there's a reasonable position that could be taken that in

2     the structure of al-Qaeda that Mr. al-Marri is anything

3     other than the most minimal participant, somebody who did

4     not even know what al-Qaeda -- the most horrible thing

5     that al-Qaeda was going to do and did do until after it

6     had occurred, somebody who was completely -- was one of

7     literally thousands of people who went to these camps and

8     who was recruited into that mission, somebody who came to

9     the United States without specific directions and was only

10    told to communicate with people so he could receive them

11    and be told what to do.  The notion that he's essential in

12    a situation in which nothing happened is counterintuitive.

13            But beyond that, it's simply wrong as a matter

14    of law to remove him from that context in making this role

15    in the offense determination.  That's really what Hill

16    says.  Hill bases it on amendments to the sentencing

17    guidelines that make that perfectly clear.  And the

18    Government's position that this is just his offense and

19    that he, therefore, is an average participant in this

20    offense is contrary to the law the way the Seventh Circuit

21    has pronounced it.

22            So it's for that reason and based upon a fair

23    view of all of the facts of this case that Mr. al-Marri is

24    appropriately viewed as having a mitigating role and,

25    respectfully, when you look at him within the context of

1    al-Qaeda as a whole, a truly minimal role.  There's no

2    real other way to view these facts.  I will be happy to

3    respond to whatever arguments Mr. Risley makes.

4         THE COURT:  Thank you.  I may have some other

5    questions.  What's the Government's response?

6         MS. BALTES:  Your Honor, if the Government had

7    charged Mr. al-Marri in an over-arching al-Qaeda

8    conspiracy and charged his coming into the United States

9    and all of the conduct associated with that as one of the

10   overt acts in the conspiracy, it's possible that he would

11   be eligible for a minor role in this case, but that's not

12   what the Government charged here.  The Government did not

13   charge him as part of an over-arching conspiracy, charging

14   everything that al-Qaeda has done in the United States or

15   abroad.

16        The defendant committed all of the conduct in

17   this case.  He did take direction from KSM, but he was the

18   one who prepared himself to be an ideal candidate for

19   al-Qaeda to send to the United States.  He attended

20   multiple training camps, received multiple training in

21   military type training, poisons research, how to conceal

22   his communication.  These are all actions that the

23   defendant himself undertook.

24        In addition, the 2000 trip, the Government's

25   theory on the case is that it probably was a test run.  It

1    was an example that he could take to al-Qaeda leadership

2    to show he had the ability to come into the United States.

3              THE COURT:  But you have not -- I mean, that may

4    be a reasonable inference, but as I understand it you

5    clearly have not presented any evidence into the record,

6    direct evidence into the record.

7              MS. BALTES:  And that's absolutely correct.

8    This is a plea situation.  The defendant pled guilty to

9    the relevant facts supporting the material support charge.

10   Mr. Lustberg provided his theory to the Court.  The

11   Government's theory is somewhat consistent with that.

12   Yes, that's probably what the 2000 trip was for, but

13   that's just one part of what the defendant himself did to

14   prepare himself for the mission for al-Qaeda.  He learned

15   about communications code.  He did.  He went and met with

16   KSM.  He kept in contact with KSM and he took direction

17   from KSM.  But absent his specific conduct in this case

18   and action that he took, there would never have been a

19   conspiracy to charge the defendant with.  He was --

20             THE COURT:  But that logic concerns me a little

21   bit because let's take, for example, the situation that I

22   get in this court quite commonly, the large drug

23   conspiracy.  We've got people at the top, middle, then

24   you've got the person down at the bottom who has the task

25   of driving the semi full of cocaine from point A to

1   point B.  That person doesn't know about the ultimate

2   plans of the conspiracy, is not an equity -- doesn't have

3   an equity interest in it, and yet you could make the same

4   argument that that person was essential to the conspiracy

5   because unless they can move the cocaine from point A to

6   point B they don't have an operation.  Isn't that correct?

7            MS. BALTES:  That's absolutely correct.

8            THE COURT:  That person typically gets a

9   reduction for role in the offense.

10           MS. BALTES:  Absolutely, and the Government

11  doesn't disagree with that proposition at all, but what

12  the defendant has been charged with is coming to the

13  United States and being a sleeper agent to wait for

14  further instructions from al-Qaeda to assist al-Qaeda in

15  some operation in the United States.  That's what he was

16  charged with.  Yes, there are other people that directed

17  him, but in any conspiracy involving al-Qaeda that's

18  always going to be the case.  There is the leadership of

19  al-Qaeda that includes Bin Laden who issues his fatwas and

20  then there are the people like KSM who were the

21  operational planners who directed.

22           All the operations are very compartmentalized

23  and not everyone in al-Qaeda knows about other operations,

24  which is consistent with the Government's theory and the

25  fact that there is no evidence to suggest that the

1      defendant knew about the 9-11 attacks.  Various 9-11

2      highjackers didn't even know what their role was going to

3      be until the morning of the attacks, but still they were

4      an essential part of the conspiracy and probably would not

5      have been given a minor role had they been captured before

6      they committed those acts on September 11.

7              But the defendant committed significant acts as

8      part of this conspiracy and if KSM was charged in this

9      conspiracy clearly he would be eligible for a leadership

10     role.  But the defendant shouldn't get the benefit of

11     getting a downward role for his role in the offense when

12     he's the one that committed all of the acts for the

13     conduct that he was charged with.  Certainly, again, if

14     this was an over-arching conspiracy, it would be more

15     appropriate because Mr. al-Marri's conduct would be

16     relative to other people's conduct within al-Qaeda.

17             THE COURT:  The indictment itself charges him

18     with providing material support to al-Qaeda.

19             MS. BALTES:  That's absolutely correct.  And if

20     the Sentencing Commission thought that every time someone

21     only provided material support that they would

22     automatically be -- a role adjustment would be

23     appropriate, certainly that might be in the sentencing

24     guidelines, but it's not.  The material support charge

25     covers a wide range of conduct.

1          THE COURT:  Well, they like to leave a few

2     things for us bunch of trial lawyers to figure out.

3          MS. BALTES:  Agreed.  Agreed.  But the material

4     support was essential to al-Qaeda's further missions in

5     the United States and the defendant's actions certainly

6     support that he was a vigorous participant and the only

7     participant in this particular conspiracy even though he

8     took his direction from al-Qaeda or from KSM which is not

9     unlike any other al-Qaeda operation.

10          THE COURT:  All right.  Thank you.

11          MR. LUSTBERG:  Thank you, Your Honor.  Briefly,

12     I would again commend to the Court's attention the Hill

13     case and on page 578 of the Seventh Circuit's opinion in

14     that case the Court addresses exactly this situation.

15          Ms. Baltes started her remarks by saying what we

16     charged here was not an over-arching conspiracy, but a

17     limited one.  And what Hill makes absolutely clear is the

18     fact that that was charged or even the fact that that was

19     the basis of the conviction is fundamentally

20     non-dispositive of the role in the offense issue.  In

21     particular, what the Court says is it was precisely the

22     District Court's rationale that the Court reversed there

23     because Hill was charged with, convicted of and sentenced

24     for only his own possession of the firearms and not the

25     burglary or sale of those firearms, that's the bigger

1    scheme, that the Court could not credit him for his lesser

2    role in the broader scheme to obtain and distribute the

3    firearms.  And this is precisely the view that the

4    Sentencing Commission has rejected.  That is, there was a

5    split in the circuits on this very question.  Where

6    somebody was essential to their little conspiracy or their

7    smaller crime, the question was can you consider the

8    over-arching, uncharged, unconvicted conduct in

9    determining role in the offense and the Seventh Circuit

10   has said in no uncertain terms you can and you must.

11           So what this Court has to do is to determine was

12   Mr. al-Marri an essential participant in al-Qaeda.  The

13   fact that he -- the fact that he committed many acts, the

14   acts that Ms. Baltes talks about, really distinguishes,

15   and when you look at those acts, distinguishes him from

16   the usual case where somebody is deemed to be essential.

17           I was a public defender for a while and we did a

18   lot of bank robbery cases and the issue would arise, for

19   example, with respect to the lookout who, by the way,

20   sometimes would get a downward role adjustment, but that

21   person was arguably essential.

22           The question here is what did Mr. Al-Marri do

23   that was essential.  It would be one thing if we were

24   talking about 9-11 highjackers and you could say this is

25   the thing that they did or this is the thing that they

1    were going to do.  But there is no evidence of the thing

2    that Mr. al-Marri did or the thing that Mr. al-Marri was

3    going to do.  That's what makes this case unique.  You

4    can't really assess his role as being anything more than

5    minor or minimal because there has never been a particular

6    theory or evidence as to what it was he was going to do

7    and there certainly is no evidence as to anything that he

8    did do.

9           Now the Government says, well, you know, that's

10   because he got caught.  And that may be.  But now we're

11   talking about a role adjustment.  And so with respect to

12   that role adjustment, one has to look at what he actually

13   was going to do and what he actually did.  And viewed in

14   the larger context that this Court is required to look at

15   under Hill and under the sentencing guidelines, there

16   really is no other conclusion other than it warrants a

17   mitigating role.

18          Ms. Baltes' final remark was that this was his

19   conspiracy.  He was the only participant in it.  Obviously

20   as a matter of law that doesn't stand up.  In order to

21   conspire, you have to conspire with someone else.  And

22   under the terms of this plea agreement, under the factual

23   basis that the parties worked out and that Mr. al-Marri

24   set forth at the time of his guilty plea, he conspired

25   with these two other people and the Court has to evaluate

1   his role vis-a-vis those two other people.

2          For sure, the fact that they might deserve

3   upward role adjustments may mean that he doesn't get one,

4   but you have to look at the whole context here under the

5   law of this circuit.  And I think once the Court does

6   that -- it's not that the Sentencing Commission should

7   have done anything special on this issue with respect to

8   material support.  I can see a material support case where

9   a person could get an aggravated role adjustment, one

10  where someone could get no role adjustment.  In a case

11  like this, when you look at the facts of the case as they

12  are agreed upon by the parties and set forth in the plea

13  agreement, a downward role adjustment is appropriate and

14  fair and an accurate way of evaluating the acts that he

15  actually did and the agreement he actually entered into in

16  the broader context.

17         THE COURT:  What is the language on page 578

18  that you were referring to?

19         MR. LUSTBERG:  Okay.  So on 578 there's citation

20  to a case called Perez and that language is right below

21  that or near that which says that --

22         THE COURT:  Hold on a minute.  I don't see that.

23         MR. LUSTBERG:  Well, I'm working off of a

24  Lexis --

25         THE COURT:  There's language I see that says:

 1      "Determination of a defendant's role in the offense is to

 2      be made on the basis of all conduct within the scope of

 3      1B1.3 and not solely on the basis of elements and acts

 4      cited in the count of conviction."  Is that the kind of

 5      wording you're talking about?

 6              MR. LUSTBERG:  The paragraph I'm reading from,

 7      Your Honor -- and I apologize.  We're working off of

 8      different versions of this case in the sense you're

 9      looking at it in the book and I'm looking at it in a Lexis

10      print-out.  The paragraph begins with the phrase -- I

11      believe that paragraph starts on 577 and goes over onto

12      578.  It starts:  "In view of the amended commentary."  So

13      it's that paragraph and it's further down that paragraph

14      that the language I read to the Court -- that's where the

15      language appears that I read to the Court.

16              THE COURT:  All right.  I have that.  Thank you.

17      Let me take a moment and read this again.  Well, the

18      resolution of this I think is a pretty close question, but

19      I'm going to grant the objection.

20              Looking first at the wording of the indictment

21      itself, as I said a few minutes ago, the charge is that

22      the defendant knowingly conspired with others unindicted

23      to provide material support and resources, namely

24      personnel, to a foreign terrorist organization, namely

25      al-Qaeda.  Now the personnel that's referenced in the

1    indictment, as I understand it, is the defendant himself.

2         In terms of characterizing his involvement here,

3    I agree with the Government in many respects.  I mean,

4    this was -- it's not, for example, a good comparison to

5    compare this person with a person driving the cocaine from

6    point A to point B.  Here we have someone who, if you

7    would, trained for the role that he was to play by going

8    through the military training in camps, training on not

9    just the use of weapons and poisons but also the use of

10   codes.  In fact, when he came to this country he had codes

11   that he was supposed to use to carry out his assignment.

12   Whether or not he knew exactly what he was going to do

13   after he got here, we don't know.  There's nothing in the

14   record to suggest that he specifically knew.  And it would

15   be unlikely, I would think, that he did know because to

16   the extent to which he's fairly characterized as a sleeper

17   agent, that is the nature of that type of operation as I

18   understand it.  Everything is done on a need-to-know

19   basis.  So, for example, if someone is arrested, then they

20   are not capable of giving up, if you would, what was

21   supposed to happen.

22         But it is clear to me that based not just on the

23   indictment but on the statement of facts that the people

24   that he's effectively charged with conspiring with were

25   the two that we've already referred to.  Those people

1    certainly were much higher up the al-Qaeda chain than he

2    was.  And I'm not minimizing in any way what he could have

3    done while he was here.  I'm simply saying in the context

4    of the sentencing guidelines, my understanding of them and

5    the application of the case law, that it's appropriate to

6    say that in relation to them his involvement was

7    substantially less and so for that reason I'm going to

8    give him a two-level downward adjustment as a minor

9    participant.

10           Because of all -- everything that was involved

11   in preparing him to come here and everything that was

12   expected of him, while we don't know the details, but he

13   was certainly sent here as an agent, as a representative

14   of al-Qaeda, I think it would be inappropriate to say that

15   his role was minimal.  But comparatively speaking, it was,

16   I believe, minor for purposes of the guidelines, so that

17   adjustment will be made.

18           And the effect of that -- excuse me just a

19   moment.  That would change paragraph 56 -- I'm sorry.  I

20   apologize.  Paragraph 58, which is the adjustment for role

21   in the offense, that would change from zero to a minus 2,

22   which would change the total offense level from a 37 to a

23   35.  That would change the guidelines.  The range would

24   now be 292 to 365, which is still very substantially above

25   the limit of 180 months, the 15-year limit of the statute.

1            Now concerning these other matters, as I said, I

2    would prefer to deal with the other two by simply having

3    you address them in your final statement.  If you want to

4    bifurcate that in some way, that's fine.  And then because

5    I'm doing it that way, the Government gives its statement,

6    defense gives its, if you want to go back and forth after

7    that, I'll certainly allow some of that.  What I would

8    like to start with then is the Government's statement

9    regarding sentence.

10            MR. RISLEY:  Your Honor, we're going to take you

11   up on your offer about bifurcating.

12            THE COURT:  That's fine.

13            MR. RISLEY:  What I'll do, if it please the

14   Court, is to address the issue of whether the criminal

15   history category of VI, which is automatic under the

16   sentencing guidelines for an offense in which the

17   defendant qualifies for the terrorism enhancement and it's

18   been stipulated by the defense that the defendant does,

19   and of course it's a separate question even though he

20   qualifies for that does it overstate the criminal history.

21   So what I'm going to do is first of all address the

22   theoretical point.  What is the criminal history category

23   supposed to -- what is the purpose of it and how does that

24   relate to this case and then turn to the practical

25   defendant specific issues.

1          First of all, the sentencing guidelines

2    expressly state a purpose and then they implicitly have a

3    purpose for the sentencing guidelines.  The expressly

4    stated purpose is that the criminal history category

5    represents the Sentencing Commission's best judgment of

6    factors that would predict -- predictive factors about the

7    chances of recidivism.  How likely is it that the

8    defendant would go back and do the same -- commit the same

9    or similar offense or pose a danger to the community?  So

10   that's a predictive element to it.

11         There's another implicit element to this, a

12   vector that intersects in the ultimate criminal history

13   category, and that is the degree of risk that would be

14   associated if the defendant does recidivate.  And that's

15   illustrated in such things as the career offender

16   provisions where a defendant all of a sudden because of

17   certain particular types of offenses jumps to the head of

18   the class so to speak and becomes a criminal history

19   category VI.

20         And so there's two elements.  One is predictive

21   and the other one is consequence, degree, the extent of

22   the damage if the defendant did become a recidivist.  All

23   of that amounts to classic risk assessment factors.

24         Now turning to the practical as it relates --

25   well, before we leave the theoretical, Section 4A1.3 of

1    the sentencing guidelines talks about the standard for

2    downward departure and it begins:  "If reliable

3    information indicates that the defendant's criminal

4    history category substantially overrepresents the

5    seriousness of the defendant's criminal history or the

6    likelihood that he will commit other crimes, a downward

7    departure may be warranted."

8              That's the standard that we're talking about.

9    The two operative words there which in the Government's

10   view are virtually dispositive, the first is the word

11   "reliable" information and the second is the word

12   "substantially" overrepresents.  It's not enough just to

13   overrepresent.  It has to substantially overrepresent it.

14   Otherwise deference is given to the Sentencing

15   Commission's formulation.  And that conclusion has to be

16   based on reliable information.

17             So now let's turn to this particular defendant

18   and the information before the Court about him.  Speaking

19   broadly, the gist of the defendant's argument, position is

20   that because there are people who have observed that he --

21   okay, I don't mean to be flippant about this, but

22   basically that he's a nice guy, that because of that he's

23   not likely to be a terrorist or return to any sort of

24   terrorist activity, including lending material support to

25   terrorism.

1          Your Honor, even if -- okay.  They've talked to

2    the defendant.  There are people in the Brig that have

3    talked to the defendant.  There are people in the prison

4    system who have talked to the defendant.  And the evidence

5    is, and the Government does not controvert it, that the

6    defendant has on many occasions showed all sorts of signs

7    of being an affable guy, sometimes humorous guy.  We don't

8    contest the assertion that he's a family oriented man, any

9    of those sorts of things.  To then reach the conclusion

10   that based upon that, even if you accept all that picture

11   as being true, that the defendant does not pose a risk of

12   recidivism is an irrational jump in logic.

13          To use an extreme example, and it's not

14   completely apt here, but Ted Bundy was by all accounts an

15   extremely charming, likable guy, if it wasn't for that

16   serial killer part of him.

17          The criminologists, when they try to predict

18   future behavior, don't look to whether the defendant has

19   personality characteristics like, you know, family

20   oriented, although that's a factor, whether they're a nice

21   guy but for their criminal activity, but it's particularly

22   true with terrorism.  There is a growing body of well

23   publicized and well recognized research about the

24   psychological profile of a terrorist and the bottom line

25   of all that and I cite as one example, probably the most

1    notable example, a book by Mark Sageman written in 2004

2    called Understanding Terrorist Networks and works that he

3    cited in that, Mark Sageman being a forensic psychiatrist

4    with a background in the CIA.  He was a CIA officer who

5    worked in Afghanistan while he was a CIA officer.  But it

6    took an empirical look at a large body of terrorists and

7    what is the psychological profile.  Basically the bottom

8    line is it debunked all the usual assumptions about the

9    psychological makeup of a terrorist and ends up with the

10   picture that the defendant's attorneys paint of the

11   defendant is entirely consistent with, not inconsistent

12   with, being a terrorist.  Now I'm not saying the reverse

13   is true, that because the defendant has this he's more

14   likely to be a terrorist.  My point is there is nothing

15   inconsistent about that picture and being a terrorist,

16   much less someone who would lend material support to

17   terrorism, one step essentially removed.

18          Let's look at what we do know about the

19   defendant on the other side.  Now we heard from the view

20   of Dr. Sirratt yesterday.  Now, okay, she didn't make the

21   best witness that this Court has ever seen or that we've

22   ever seen.  Nevertheless, I think that it's fair to say

23   that when the Court considers what she reported that the

24   defendant said to her on certain subjects, it's credible,

25   believable.  And the important part of her testimony is

1    not the opinion she expressed at the end because, as I

2    indicated to the Court, there's no scientific basis for a

3    professional opinion as to a defendant's potential to be a

4    danger.

5              THE COURT:  I've heard testimony of that type

6    several times in certain contexts of other cases.

7              MR. RISLEY:  And it's an imperfect science.

8              THE COURT:  I agree with that.

9              MR. RISLEY:  And I do not want to overstate

10   that.  It is what it is.  I think the Court understands

11   what I mean when I say you take those qualifying factors

12   into the weight to be given to it.  That was not -- it may

13   have been the last thing she said in her testimony on

14   direct examination, but it's not the most important thing.

15             Let's go back to the really critical things and

16   that were the statements that she reported that the

17   defendant made to her about his attitude towards the

18   infidels, which would be everybody except Muslims, and

19   they need to be -- need to get rid of them.  Now she said

20   that she didn't remember the exact words he used, but the

21   gist of it was they needed to be killed.  That was the

22   context.  That was what he was saying.  He made -- now

23   then you look at the statement that he made about the

24   Shi'a.  What about if you get rid of anybody else and you

25   only have Muslims himself left?  What then?  Well, then we

1   have to, you know, kill the Shi'a.

2              Those things, Your Honor, are really powerful

3   key indicators of a person who has bought into and still

4   adheres to the terrorist -- the legitimizing ideology of

5   al-Qaeda and similar terrorist organizations.  I say that

6   because it is so aberrational even among Muslims holding

7   extremist views that it stands out.  It just screams to

8   someone who has that understanding, that perspective, that

9   this man has a world view, an ideology that is entirely

10  consistent with being a terrorist and inconsistent with

11  any other course in his life.

12             And just to illustrate that -- I mean, the

13  infidel part is obvious, but let's focus in on the remark

14  about Shi'a, okay?  Now there is a well known, well

15  publicized, historical conflict between the Suni and the

16  Shi'a.  The question isn't, however, whether there's a

17  religious or cultural conflict between them, but whether

18  as a matter of religious principle is it permissible to

19  target the Shi'a to be killed simply because of their

20  religion -- not because of their politics or anything

21  else, but simply because of their religion.  And the

22  ideology of al-Qaeda is that the Shi'a are apostates.

23  They're not true Muslims.  They are apostates.  They then

24  bootstrap from that to a proposition because they are

25  apostates, they assert the dubious proposition that the

1    punishment for apostasy in Islam is death and, therefore,

2    they are legitimately executed as apostates.  Now that

3    ignores the fact that this doctrine of death for apostasy

4    is rooted in historical roots in Islamic law to a period

5    of time in which apostasy from Islam is the functional

6    equivalent of treason and punishable as such.

7            There are other instances, there's at least one

8    with the Prophet Muhammad, that are entirely inconsistent

9    with that view that that's a general principle, that it

10   applies in all contexts.  It's been an item of some

11   controversy because al-Qaeda and similar organizations

12   have asserted this idea that the Shi'a are targetable as

13   Shi'a, as apostates, and they can be executed basically on

14   sight, if anything worse than infidels, and that was very

15   notable in the al-Qaeda insurrection in Iraq where the

16   Shi'a were targeted as Shi'a.

17           Now I will contrast that, just to show you how

18   aberrational that thinking is within Islam itself, with

19   the Amman Message.  Now there isn't a lot known about the

20   Amman Message in the United States, but there is within

21   Islam.  In the principle of Islamic law, one of the bases

22   for determining -- making legal rulings is to determine

23   whether a proposition is -- whether there's consensus, the

24   Islamic term is ijma, on that subject.  And if there is,

25   then it's regarded as a principle of law, of just -- if

1    there's unanimity, then it's accepted as law.  And there's

2    a principle -- there is a set of principles that the Amman

3    Declaration set forth about which there is today not only

4    ijma within a particular school of thought, therefore main

5    schools of Suni thought, but also all of several other

6    schools, Shi'a and others, such that within those schools

7    there is consensus.  It makes it kind of a super

8    consensus, super Islamic law today.  And those

9    propositions are these, that there is the conclusion --

10   and I have -- what I will do is give the Court, if I may

11   approach the bench, Government Exhibit 7 which is a copy

12   of the published Amman Declaration.

13           As you can see, there are different bodies of

14   scholars, hundreds of scholars from all across the

15   spectrum of Islam, that agree, proposition one, they

16   specifically recognize the validity of all eight Mathhabs,

17   which are legal schools, of Suni, Shi'a and other

18   traditional Islamic schools, including Sufism, and even

19   true -- it says true Salifi thought.  So that is in terms

20   of defining who is a Muslim, Shi'a are defined as being

21   Muslim.

22           Number two:  Based upon this definition, they

23   forbid takfir, which is declarations of apostasy between

24   Muslims.

25           Those two principles constitute incontrovertibly

1   not just the mainstream, but unanimity within the Muslim

2   community.  So for al-Qaeda to take the position, and its

3   affiliates, that Shi'a are targetable as Shi'a and can be

4   killed is an extremist position that is just beyond the

5   pale even within extremism and that is a view that was

6   expressed apparently rather nonchalantly by the defendant

7   to Major Sirratt.

8          Now that is an indication that, nice guy,

9   affable guy, sense of humor, family man, all those sorts

10  of things, that he has a mind set such that future acts of

11  violence against the United States and others are likely,

12  that their view is morally justified.  And if the burden

13  is to show by reliable evidence that there's a substantial

14  reason to believe otherwise, well, the Government doesn't

15  see that.

16          THE COURT:  Thank you.  Do you have a separate

17  response concerning the belief that there should be a

18  reflection in the sentence for conditions of confinement?

19          MS. BALTES:  Yes.  Do you want me to discuss it

20  or is the defense --

21          THE COURT:  No.  I would prefer you to finish

22  and then I'll hear everything they have to say.

23          MS. BALTES:  Would you like me to discuss that

24  first and then go into the 3553 factors?

25          THE COURT:  Any way you want to do it is fine.

1          MS. BALTES:  Then I'll discuss it as I discuss

2     the factors then.

3          THE COURT:  That's fine.

4          MS. BALTES:  Your Honor, I know the Court is

5     obviously well aware of the guideline range, but in

6     discussing the 3553 factors obviously one of the critical

7     factors is what the applicable guideline range is and

8     based on the departures that the Court has already ruled

9     on the guideline range would be 292 to 365 months, which

10    obviously is far in excess of the statutory maximum in

11    this case of 180 months.  The Government does assert that

12    the appropriate guideline range then is 180 months and it

13    should be nothing less and there should be no additional

14    departures in this case.

15          The nature and the circumstances of the offense

16    I think probably provide the Court with extremely

17    significant factors in determining whether or not

18    180 months is appropriate.

19          As the Court is well aware and has been

20    discussed in the filings by the defense and the

21    Government, this is a case involving the defendant's

22    participation with al-Qaeda.  As the stipulated facts in

23    the plea agreement and the plea colloquy clearly state,

24    the defendant did a lot of preparation for his mission to

25    the United States.  He trained at various times in

1    al-Qaeda training camps where he learned about the use of

2    weapons, he learned to communicate through codes so he

3    would not be detected by law enforcement, he learned about

4    poisons research, all in preparation for his mission to

5    the United States.  He was directed by Khalid Sheikh

6    Mohammed to enter the United States on September 10, 2001.

7    Khalid Sheikh Mohammed is the principal architect of the

8    9-11 attacks and he was the external operations chief and

9    the defendant admitted in his plea colloquy that he knew

10   that that was KSM's role within al-Qaeda.

11        The defendant was well aware of al-Qaeda's

12   violent philosophy against the United States.  He agreed

13   in the plea agreement that he was aware of the 1996 fatwa

14   issued by Osama Bin Laden and of the 1988 fatwa issued by

15   al-Qaeda.

16        I think it's helpful to point out -- it's

17   possible that people do not even remember or people

18   haven't read what the fatwas say, but it's clear that

19   violence against the United States was the number one goal

20   of al-Qaeda.

21        In the 1996 fatwa, Bin Laden specifically stated

22   that:  "Terrorizing you while you are carrying arms on our

23   land is a legitimate and morally demanded duty.  It is a

24   legitimate right well known to all humans and creatures."

25   He further provided:  "Death is truth and ultimate destiny

1    and life will end anyway.  Without shedding blood, no

2    degradation and branding can be removed from the forehead.

3    These youths know that.  If one is not to be killed, one

4    will die anyway and the most honorable death is to be

5    killed in the way of Allah.  They are even more determined

6    after the martyrdom of the four heroes who bombed the

7    Americans in Riyadh.  My Muslim brothers of the world,

8    your brothers in Palestine and in the land of the two holy

9    places are calling upon your help in asking you to take

10   part in fighting against the enemy, your enemy and their

11   enemy, the Americans and the Israelis."

12            The defendant specifically applied to Bradley

13   University in the summer, in the mid-summer of 2001, so

14   that he could obtain a student visa and enter the United

15   States.  There was no true purpose for him coming here to

16   obtain an education.  He had already obtained a bachelor's

17   degree from the same university in 1991.  He applied for a

18   second bachelor's degree specifically for the purpose so

19   he could obtain a student visa.  It was a late admission

20   to Bradley University.  As soon as he was admitted, he was

21   only interested in obtaining his visa.  And even though he

22   was in such a rush to gain admission to Bradley

23   University, he waited several weeks before coming to the

24   United States and actually showed up several weeks late

25   for class.  This is all evidence that supports the

1  Government's theory this was the only true purpose for him

2  coming to the United States.  It was as an agent of

3  al-Qaeda, not to come to school.

4          Before he came to the United States, he again

5  met with Khalid Sheikh Mohammed to receive additional

6  instructions and he met with Mustafa al-Hawsawi in Dubai

7  where he received money and a laptop computer.

8          Once the defendant entered the United States, he

9  went to Bradley University and he attempted to enroll in

10  6 credits even though he was supposed to enroll in

11  12 credits as an international student.  The university

12  let him enroll in 9 credits.

13          Ten days later he traveled outside of Peoria to

14  another university in the area and set up five e-mail

15  accounts under different names and sent an e-mail --

16  created an e-mail for Khalid Sheikh Mohammed in which he

17  told him, "I had to enroll in 9 credits," and provided his

18  cell phone number in a previously determined code so that

19  Khalid Sheikh Mohammed would be able to contact him.

20          This is despite the fact that on September 21

21  when he did this he was well aware of what al-Qaeda had

22  done to the United States on September 11 and that 2,973

23  people had been murdered by al-Qaeda.  He never disavowed

24  al-Qaeda at this point and he continued to communicate or

25  attempt to communicate with al-Qaeda to await his further

1   mission.

2           The fact that he was arrested in December of

3   2001 and has been charged with material support and not

4   with any other plot is something that the Court should

5   also consider.  He did not have an opportunity to

6   potentially carry out some other terrorist acts in the

7   United States, perhaps not because he didn't want to but

8   because he was arrested in 2001.

9           During this time also instead of spending his

10  time going to class, he conducted research on his

11  computer.  Now the defendant admitted this in his

12  stipulated facts and plea colloquy.  He admitted doing

13  research into various cyanides and poisons.  When the

14  Court directly asked him whether this is the type of

15  research that he had learned in training camps, the

16  defendant admitted that this was the type.

17          Whether or not this was going to be part of some

18  additional plot by al-Qaeda, certainly the Government

19  cannot assert at this point, but it is inescapable that he

20  came to the United States upon the direction of al-Qaeda.

21  He clearly understood that al-Qaeda's mission against the

22  United States was violent and he committed -- he continued

23  to attempt to contact al-Qaeda and maintain his status as

24  a sleeper agent and conduct the research that was

25  consistent with his training.  He was employing the

1  training that he had received on numerous attendance at

2  training camps both in getting into the United States and

3  once he was in the United States to avoid detection.

4        Now the history and characteristics of the

5  defendant are also important to note here.  The defense, I

6  know, plans on putting forth a video that shows that he is

7  certainly someone that loves his family and that has a

8  family that loves him.  There's no dispute that the

9  defendant probably does love his family, but I think it's

10  also important for the Court to note that as part of his

11  coming to the United States and part of what made him an

12  ideal sleeper agent was that he was able to come with his

13  family.  He brought his wife and his children to the

14  United States on his mission for al-Qaeda.  So he might be

15  a loving family man, but he also brought his family to

16  participate in what he was doing and to provide him cover

17  so that he would be unlikely to be detected by law

18  enforcement.

19        The defendant's history and characteristics

20  certainly indicate that he had other opportunities.  He

21  came to the United States.  He obtained a bachelor's

22  degree in 1991.  He was provided all sorts of

23  opportunities both educationally and professionally.  He

24  was employed as a banker in Qatar.  He certainly had a lot

25  going for him and would not -- I'm sure the Court has

1     sentenced individuals where they are pushed into a

2     criminal life because of circumstances, maybe

3     socioeconomic factors, but that's certainly not the type

4     of defendant the Court would sentence today.  He is

5     someone that specifically chose to join al-Qaeda and to

6     join their philosophy of militant extremist religion and

7     come to the United States to pursue some type of violent

8     act.

9            The fourth factor that the Court considers in

10    sentencing is that the sentence imposed reflect the

11    seriousness of the offense.  There is a wide-ranging

12    conduct that certainly Courts would see in material

13    support cases.  Material support cases could run the gamut

14    of someone that provided less support to a designated

15    terrorist organization than what the defendant did here.

16    The defendant pled guilty to providing material support to

17    al-Qaeda and I think it's important to put in context the

18    timing of this.  This was in 2001, obviously when the

19    nation experienced the terrorist attacks of September 11.

20           Again, the Government is certainly not asserting

21    that there's any evidence that the defendant was aware of

22    those attacks, but al-Qaeda was extremely active during

23    2001 in its attacks on the United States and he was sent

24    here as someone who could help in the post 9-11

25    environment.

1          I mean, there's a reason why KSM told the

2     defendant that he had to get here on September 10.

3     Clearly once September 11 happened, al-Qaeda leadership

4     knew that it would be very difficult to enter the country

5     and that law enforcement would be on the alert for anyone

6     they thought would be suspicious.

7          And what the defendant did, he attended multiple

8     training camps.  He conspired with the senior leadership

9     of al-Qaeda.  Al-Qaeda is a very highly compartmentalized

10    organization.  Not all the operators knew of the different

11    tasks.  But this defendant was not some low level lackey.

12    Low level lackeys would not have had access to al-Qaeda's

13    senior leadership and they certainly would not have been

14    entrusted with an operation to come into the United States

15    post 9-11.  He must have had some role in al-Qaeda and

16    they trusted him, whether it was based on his training,

17    his ability to enter the United States which he had

18    demonstrated in 2000, but that is a very serious offense.

19    There is no way to minimize the potential for what could

20    have happened had he not been arrested in 2001 and,

21    therefore, the seriousness of this offense should not be

22    understated by the Court.

23          Now I'm sure the defense will argue and have

24    argued in their papers that the fact that he has been

25    confined since 2001 should be a factor to reduce his

 1    sentence because he's been already punished based on the

 2    seriousness of his offense.  There is no doubt that the

 3    conditions of confinement that the defendant endured

 4    during his time in the Brig were different than most other

 5    inmates in the United States.  The Government does not

 6    dispute any of the facts that were put forth yesterday in

 7    the testimony of Mr. Seymour or Mr. Pucciarelli.  The DIA

 8    interrogations of the defendant that lasted until

 9    approximately October of 2004 certainly provided harsher

10    conditions for Mr. al-Marri than someone that would have

11    been in a state custody or Bureau of Prisons custody.  He

12    wasn't provided with a mattress.  He was in a cell by

13    himself.  He was in solitary confinement.  He was

14    interrogated.

15            And at this point I would like to draw the

16    Court's attention to one of the defense exhibits,

17    Exhibit 2, that the Government provided which is a summary

18    of the interrogations.  "Al-Marri was interrogated" --

19            THE COURT:  I'm sorry.  Is it your exhibit?

20            MS. BALTES:  It's Defendant's Exhibit 2.

21            THE COURT:  All right.  I've got it.

22            MS. BALTES:  "Al-Marri was interrogated on

23    37 days from September 2003 through July 2004.  With the

24    exception of two conversations which occurred in his cell,

25    all the interrogations were video recorded in an

1  interrogation room.  Some of the sessions were

2  extraordinarily brief, lasting just minutes, and other

3  sessions lasted for hours.  Retained recordings have

4  session lengths varying from 38 minutes to just under

5  9 hours.  During the almost 9-hour session there was a

6  2 1/2 hour break and another short break.  During the long

7  sessions al-Marri was offered and took meals and prayer

8  breaks.  There was a session at least one a month

9  typically with sessions on consecutive days, but there was

10  never more than five consecutive days of interrogation.

11  There was a 10-day period where there were nine

12  interrogation sessions.  With the exception of the use of

13  the duct tape described in a separate memorandum, the

14  interrogators followed interrogation procedures consistent

15  with the Army Field Manual.  No enhanced or extraordinary

16  interrogation techniques were employed.  There was no use

17  of sleep deprivation or stress positions.  Interrogation

18  sessions were conducted in a humane fashion."

19          In addition, Exhibit 4, Defendant's Exhibit 4,

20  discusses information that was contained in a 2008 DIA

21  Joint General Counsel-Inspector General Report regarding

22  destruction of tapes that the defense has alluded to.

23  Obviously the defense argument is that because there was

24  destruction of tapes, there must be some bad faith purpose

25  and there must have been other abusive techniques that

1    were concealed because things were destroyed, but that

2    simply is not the case.

3            Evidence in the case showed that:  "After the

4    interrogation of al-Marri concluded, the interrogation

5    team destroyed what they believed to be all the recordings

6    of the interrogation sessions.  The interrogation team and

7    manager for the interrogation regarded the recordings as

8    working materials similar to handwritten notes,

9    destruction of which they believed was required when no

10   longer needed for intelligence purposes.  This belief was

11   consistent with then DIA and DoD issuances concerning

12   information security.  During the course of the

13   interrogations the interrogation team chief asked about

14   disposition instructions for the al-Marri recordings and a

15   DIA attorney advised that there was no specific

16   instructions regarding retention or disposition of the

17   al-Marri recordings.  When the recordings were destroyed,

18   there was no court order or executive agency preservation

19   order requiring their retention."

20           While the defense might have a different

21   interpretation of why, the Government certainly thinks

22   it's important that the Court consider that this was an

23   Inspector General Report that was issued that clearly

24   discussed why the recordings were destroyed and that there

25   was no bad faith and there was no purpose.  If there was

1   some bad faith or intent on the Government to destroy,

2   certainly everything would have been destroyed and the

3   videotape which the Government provided a summary of to

4   the defense in which the defendant's face was duct taped

5   certainly would have been among the tapes that would have

6   been destroyed and that's not the case.

7              On Defense Exhibit 8, information contained in

8   the document on October 21, 2003, the Government provided

9   information regarding one of the interrogation sessions.

10  Essentially this is -- I think this is important for the

11  Court to consider as well because there was a lot of

12  testimony yesterday about the different treatment between

13  the different enemy combatants that were at the Brig and

14  the treatment that the defendant endured when he was

15  undergoing DIA interrogation and when he was under Brig

16  control.

17             But the report on the 21st of September 2003

18  certainly indicates that he was provided socks.  He

19  demanded socks, clock, dental floss and Q-tips.  He had

20  received socks due to feeling chilly and to minimize the

21  bruising caused from the ankle shackles.

22             THE COURT:  Well, my understanding from my

23  reading of all those documents is that there were times

24  that he was given things, say, for example, socks or a

25  clock or the Quran, and then other times that those were

1   taken away.  The fact that he was provided socks on a

2   particular date doesn't mean he always had them.

3          MS. BALTES:  And the Government certainly is not

4   asserting that, but I think it's important based on the

5   evidence that the defense put forth yesterday that -- I'm

6   sure there were times during the interrogations where

7   things were taken away and there was evidence that the

8   Quran was taken away and this was all part of DIA's plan

9   in interrogating the defendant, but this was not inhumane

10  treatment.  It was pursuant to the standard Army Field

11  Manual.  And although the defendant might have been

12  uncomfortable, he was never tortured.  No enhanced

13  interrogation techniques were used.

14          And the Government certainly doesn't condone

15  what happened or -- I mean, this is a criminal prosecution

16  of the defendant and the conditions of his confinement

17  were certainly different than any other criminal

18  defendant, but it's very important to put in context about

19  why that happened.

20          In 2001 the defendant was arrested three months

21  after the September 11 terrorist attacks.  He was

22  initially arrested because the Government found evidence

23  that he had been in contact with Mustafa al-Hawsawi or

24  attempted to contact Mustafa al-Hawsawi.  At that point

25  during the several months after the 9-11 terrorist

 1    attacks, the FBI had identified Mustafa al-Hawsawi as one

 2    of the persons who had assisted the 9-11 highjackers with

 3    money and with western style clothing so that they could

 4    enter the United States undetected and be available on

 5    September 11 for terrorist attacks.

 6          Additionally, the Government at that point knew

 7    that the defendant had been in touch with Khalid Sheikh

 8    Mohammed.  Again, the Government was aware that Khalid

 9    Sheikh Mohammed had been involved in planning the 9-11

10    attacks.

11          So while the DIA interrogations of the defendant

12    certainly would not be standard in any criminal case, it's

13    very important to put these in context in the post 9-11

14    environment.  It was DIA's job to assess the threats that

15    the defendant might pose against the United States and

16    that's why he was declared an enemy combatant in 2003,

17    when the United States learned of information that they

18    believed at that point needed to be -- that he was a

19    member of al-Qaeda and that's why he was declared an enemy

20    combatant.

21          So the interrogations of the defendant are

22    definitely unique to a criminal case and are not something

23    that Courts have seen very frequently.  However, the post

24    9-11 environment was a very different time in the United

25    States and the Government's belief at that time that he

 1   was communicating with people that had planned the 9-11

 2   attacks was very, very significant and that's why he was

 3   treated the way he was.

 4          Now it's interesting to note obviously that

 5   that's not -- it wasn't an incorrect conclusion.  I mean,

 6   the defendant was in contact with Khalid Sheikh Mohammed

 7   and he was in contact with Mustafa al-Hawsawi.  Obviously

 8   there is no evidence to suggest that he was part of the

 9   9-11 attacks.  But after 9-11 the Government was extremely

10   concerned about what additional attacks could be happening

11   and the fact that a sleeper cell agent had managed to come

12   into the country on September 10 and was positioned to

13   work for al-Qaeda was very threatening and still should be

14   threatening.  Al-Qaeda still harbors the same violent

15   philosophies against the United States that they did in

16   2001.

17          So for these reasons, although the conditions of

18   confinement were certainly not what a criminal defendant

19   would see and the defendant was not charged, he did not

20   have access to his attorneys for the first couple of

21   years, the Government took all of that into account in the

22   determining the plea agreement in this case.  There were

23   two charges that the defendant was charged with.  Had he

24   gone to trial, clearly there would have been -- there's

25   litigation risk for both sides.  But if convicted at

1    trial, the defendant would have had a much greater

2    exposure than the plea agreement that he pled to today.

3              THE COURT:  Well, I would like to ask you about

4    that because I'm not sure I understand why that's so.  He

5    was convicted -- or he was charged in Count 1 with

6    conspiracy.  Count 2 was the substantive count of

7    providing material support, correct?

8              MS. BALTES:  Yes.

9              THE COURT:  But it's exactly the same conduct,

10   correct?

11             MS. BALTES:  That's true.

12             THE COURT:  And I don't recall in over 27 years

13   on the bench ever imposing a consecutive sentence on a

14   person for two different counts involving the same

15   conduct.  Am I missing something?

16             MS. BALTES:  Certainly --

17             THE COURT:  If that's the point you were making,

18   that he was theoretically exposed to 30 years rather than

19   just 15, I don't think I've ever done that in 27 years.

20             MS. BALTES:  There certainly is nothing in the

21   guidelines that prohibits a judge from imposing a

22   consecutive sentence.  And given the conduct of this

23   defendant, certainly if he had gone to trial the

24   Government would have asserted that that would have been

25   appropriate.  But it is.  It's a theoretical risk and

1    there are lots of litigation risks about going to trial.

2    The fact is the defendant did plead guilty in this case.

3            But the Government certainly was aware of the

4    prior conditions of confinement that the defendant endured

5    in negotiating this plea agreement and that's the point

6    the Government would like to take into account today, that

7    those were already taken into account, so an additional

8    departure is something the Government objects to based on

9    the prior conditions of confinement.

10           THE COURT:  So you're saying to me you took it

11   into account by agreeing to drop Count 2?  Is that

12   correct?

13           MS. BALTES:  That's correct.

14           THE COURT:  Anything else or is that it?

15           MS. BALTES:  Well, certainly a sentence range

16   could be different if someone goes to trial or if someone

17   pleads guilty.  I mean, I think that --

18           THE COURT:  But not in these circumstances

19   arguably because the guidelines come in twice greater than

20   the statutory maximum.  I don't recall ever having a

21   situation like that before.

22           MS. BALTES:  Certainly the situation is unique

23   before the Court for many respects, but --

24           THE COURT:  I am a little curious about what he

25   was charged with because it seems kind of ironic to me

1      that he's facing a 15-year maximum sentence for this

2      conduct and on a typical Friday I am routinely sentencing

3      many young adults to 20, 30 years, 40 years on drug

4      charges.  It seems like the statutory maximum in this case

5      is ridiculously low.

6              MS. BALTES:  Well --

7              THE COURT:  Is that factored into your decision?

8              MS. BALTES:  I do and I think the Government

9      would agree that the statutory maximum of 15 years for

10     conduct that supports the material support charge in this

11     case is ridiculously low, which is why the Government

12     highlights the fact that the guideline range absent the

13     statutory maximum started at 360 months to life and even

14     with the role adjustment that the Court granted this

15     morning it's still 292 months to 365.  Obviously all those

16     are factors that the Court will take into consideration

17     when sentencing this individual, but 180 months, yes, for

18     the conduct that this defendant pled guilty to and

19     admitted in his colloquy does seem low, which is why if

20     the Court was to grant some type of downward departure

21     less than 180 months it would obviously reduce that and

22     not reflect the seriousness of the offense for which he

23     was charged.

24              And in the sentencing papers the Government

25     filed, obviously the Court is aware of the Government's

1    argument with respect to the credit for time served issue.

2            THE COURT:  Well, I would like you to address

3    that briefly.

4            MS. BALTES:  The Government's position is that

5    under the statute the authority rests with BOP to

6    determine the credit for time served for an individual.

7            THE COURT:  And I don't think the defense

8    challenges that.  As I understand it, it's very clear that

9    once he's sentenced here, goes into the Bureau of Prisons,

10   the Bureau of Prisons is not, not going to give him any

11   credit for time served when he was being held as a

12   material witness up until the time that he was indicted in

13   the Southern District of New York.  It's my understanding

14   that they would give him credit for the period of time

15   that he was under that first indictment up through -- up

16   to the date that he was designated an enemy combatant in

17   this court and then he would not be credited for the

18   period of time that he was held in the Brig from '03 to

19   '09.

20           MS. BALTES:  That's my understanding.  The

21   Bureau of Prisons typically does not award credit for time

22   served for time spent as a material witness.  That's

23   pursuant to their internal guidelines.  It doesn't qualify

24   under 18 U.S.C. 3585(b) as something that qualifies for

25   credit for time served.

1          THE COURT:  Do you agree with my understanding

2    that he would be given credit for the time that he was

3    under charge with the first indictment?

4          MS. BALTES:  Yes.  Yes.  BOP's interpretation

5    and certainly the Government's interpretation of 3585(b)

6    is consistent.  Because he was charged in a federal

7    criminal case, that qualifies under the statute for credit

8    for time served.  I'm not sure how the computation works

9    out, but that time would be.

10         THE COURT:  Go ahead.

11         MS. BALTES:  Now the time that he was in

12   military detention, however, also does not qualify as

13   3585(b) credit for time served.  The reasons for that the

14   Government laid out in the sentencing memorandum, but I

15   think it's important to note that the same reasons why it

16   doesn't qualify for credit for time served are perfect

17   factors for the Court to consider in whether to grant a

18   downward departure based on conditions of confinement.

19         I mean, essentially it's -- the defense

20   obviously would like the defendant to receive credit for

21   the time that he served in the Brig and if it's not a

22   credit for time served sentence, then they are proposing

23   it as a downward departure based on his conditions of

24   confinement.  And the reasons -- the reasons why it's not

25   appropriate under 3585(b) are that it's not -- obviously

1     it doesn't satisfy the statutory requirement that it was a

2     criminal sentence.  He was never charged with anything and

3     so it doesn't qualify under 3585(b).

4              THE COURT:  But the reason that he was being

5     held there as an enemy combatant is for the most part the

6     very same conduct that he's charged with in this

7     indictment.  Isn't that correct?

8              MS. BALTES:  To a point.  When he was declared

9     an enemy combatant in 2003, it was based on the AUMF,

10    Authorization For Use of Military Force, and that

11    authorized the executive branch to declare someone an

12    enemy combatant because they're a member of al-Qaeda.  Now

13    the information that was contained in what's been called

14    the Rapp Declaration, which I'm sure Your Honor is aware,

15    certainly contained a lot of the facts.  They're similar

16    to the conduct that he pled guilty to in the criminal

17    case.  But that doesn't mean that that was required under

18    the AUMF.  It was simply to determine whether someone was

19    a member of al-Qaeda.

20             And I want to provide the Court with a little

21    bit of an analogy because this is certainly a complicated

22    area I admit.  But if someone is designated as an enemy

23    combatant and designated in military custody, it's because

24    they are going to be taken off the battlefield and away so

25    they cannot cause any harm to forces.  If you had a

1    situation in World War II where an enemy -- or where a

2    German soldier was captured, they would be put into

3    military detention because they are a member of the enemy

4    forces, but that person might not be charged with a war

5    violation or a criminal violation simply because they are

6    a member of the enemy forces.  However, if while that

7    person was in military custody there was evidence to

8    suggest that they had committed some type of war crime --

9    and during World War II that certainly was possible.

10   Maybe they were involved in concentration camps.  Maybe

11   they were part of the Nazi SS forces.  Clearly that

12   evidence would have supported charging them with a war

13   crime.  But it can be different.

14          Now it's much more complicated in the time that

15   we're dealing with now because we're talking about

16   al-Qaeda.  Al-Qaeda members are not uniformed forces.

17   They are not part of a nation's army.  So it's different.

18   When al-Qaeda declared war on the United States, as

19   evidenced by the '96 and the '98 fatwa, this was a holy

20   war.  It was in Bin Laden's statement.  All Muslim

21   brothers have to fight the infidel and eradicate the

22   infidel from the Holy Land and from Mecca.  And clearly

23   al-Qaeda brought that fight to the United States in

24   September of 2001, even earlier by the bombing of the

25   USS Cole in 2000 and the East African bombings in 1998.

1           So the United States had the authority to detain

2   somebody as an enemy combatant simply because they're a

3   member of al-Qaeda.  The fact that the same facts support

4   that he was a member of al-Qaeda that supports the

5   criminal case though do not mean that he should get credit

6   for the time he served.  He was a member of al-Qaeda.

7   That's why he was detained as an enemy combatant.

8           In addition to him being a member of al-Qaeda,

9   he also provided material support.  He came here as a

10  sleeper agent to the United States on September 10, 2001.

11  That's the criminal conduct he's charged with in this

12  case.  And there is a difference.  And I understand that

13  it's not a difference that's easily understandable as it

14  would be in 1946 post-war Germany, but the reasons for him

15  being designated as an enemy combatant in 2003 were

16  because he was a member of al-Qaeda.  And the evidence

17  that he was a member of al-Qaeda certainly was much of the

18  same evidence that he admitted to in 2009 in his plea

19  agreement.

20          Part of reason for that is because if you're a

21  member of an enemy force, typically you wear a uniform so

22  it's very easy to identify someone as a member of an enemy

23  force, but that's not how al-Qaeda operated and he didn't

24  come into the United States wearing a uniform.  He came in

25  with his family on September 10, 2001.

1          For those reasons, Your Honor, it's not --

2     that's why it doesn't support the 3585(b) factors for time

3     served and because of that the Government asserts that the

4     Court should take that into serious consideration in

5     determining whether or not it's appropriate then to grant

6     the defendant credit or a downward departure based on his

7     conditions of confinement at the Brig.

8          The fifth factor under 3553 that the Court

9     should consider is obviously the need for adequate

10    deterrence and protection of the public.  The terrorist

11    cases are tricky because, as Mr. Risley already discussed,

12    the terrorism enhancement applies in this case, the

13    defendant stipulated that it applies, and so it adds a

14    12-level upward adjustment to the base offense level, but

15    it also does move the criminal history category to VI.

16         And as Mr. Risley already discussed, the reason

17    for that is because the Sentencing Commission in their

18    research in support of putting the terrorism enhancement

19    in the guidelines acknowledged that there is a high

20    likelihood of recidivism and lack of rehabilitation for

21    people that are engaged in terrorist acts.  It's because

22    they -- people that are members of al-Qaeda and engage in

23    terrorist acts have bought into a philosophy, a violent

24    philosophy, where they believe that their faith justifies

25    their committing terrorist acts.

1          The defendant clearly in 2001, he bought into

2    that philosophy.  It doesn't appear from the record that

3    there's been any disavowal of al-Qaeda by the defendant

4    apart from -- and we obviously heard a lot of evidence

5    yesterday about his ability to develop meaningful

6    relationships with his attorneys who are Americans and

7    with the Brig staff who are uniformed personnel in the

8    military and that might seem inconsistent to an observer

9    that someone that could maintain those relationships,

10   especially with Americans, could still harbor the same

11   al-Qaeda philosophy, but the discussions with

12   Major Sirratt as indicated in her notes that the

13   Government submitted yesterday reveal that the defendant

14   still harbors the same philosophy as al-Qaeda with respect

15   to infidels.  The fact that he has carved out an exception

16   for the people at the Brig who treated him well and for

17   his American attorneys doesn't mean that he doesn't still

18   harbor the same views that he did in 2001 when he came

19   into the United States on behalf of al-Qaeda and there's

20   no -- there is a letter, I believe, from the defendant's

21   attorney which was based on conversations that Mr. Berman

22   had with al-Marri prior to 2006 when Mr. Berman left for

23   Israel and Mr. Berman talks in there about how they had

24   heated exchanges about the Middle East and that the

25   defendant had never met someone who was Jewish before and

1    they were able to discuss these topics and Mr. Berman's

2    characterization is based on those conversations and that

3    he saw this transformation in the defendant and based on

4    that he believes that the defendant wouldn't pose a

5    threat.  But interestingly in there, Mr. Berman notes

6    that -- he acknowledges that it might be that the

7    defendant never posed a threat.  I think that the letter

8    states:  "It's my sense that he would not perform those

9    acts today.  This is not a man filled with rage,

10   notwithstanding the manner in which he was treated over

11   the past years.  He is a man" -- I'm sorry.  "For those

12   reasons, regardless of the acts, if any, he may have been

13   prepared to engage in when he arrived in the United

14   States, it is my sense that he would not perform those

15   acts today."

16           I think it's important to put in context that

17   the defendant -- the letters in support of his supposed

18   rehabilitation, this dramatic transformation, don't really

19   talk about a transformation from what.  It doesn't appear

20   that there is an acknowledgment that the defendant in 2001

21   was capable of anything violent.  But the facts that he

22   pled to, the logical inference from those facts is that he

23   was here on behalf of al-Qaeda and, as Your Honor noted

24   yesterday, it's inconceivable to believe he was not going

25   to be asked by al-Qaeda to do something that was going to

1    result in some type of violent act against the United
2    States.

3              And so all of these views have to be put in
4    context.  At the same time Mr. Berman was having these
5    conversations with Mr. al-Marri, these heated exchanges
6    which lead him to believe that he's not going to pose a
7    threat, the defendant was having discussions with Major
8    Sirratt which I think show a different side.  Maybe he
9    felt more comfortable with her expressing certain views,
10   but he expressed the views that all infidels -- I don't
11   know the exact language, but certainly the impression
12   Major Sirratt was left with was that he harbored the same
13   philosophy that al-Qaeda had.  And this is in 2007.

14             So I'm not sure what the dramatic transformation
15   has been other than the defendant has been able to develop
16   meaningful relationships and so those people are certainly
17   carved out in his exception of what an infidel is, but I
18   don't think that that should provide comfort to the Court
19   in determining whether or not he's going to pose a threat
20   to the community or to the public once he is released from
21   the sentence.

22             The last factor that the Court considers is the
23   need to avoid unwarranted sentencing disparities.  There
24   is obviously a wide range of conduct that forms the basis
25   for a material support charge, so this is obviously why

1    it's so important that the Court considers many factors in

2    determining the sentence.

3            I'm not sure it's helpful to look at every

4    single material support case.  I mean, certainly the

5    sentences have ranged from 5 years to 15 years because

6    that's the statutory maximum.  I know the defense has

7    pointed out several cases that they think are illustrative

8    of what the conduct is in this case and what the sentence

9    should be.

10           Specifically there were two Military Commission

11   cases, the Hamdan case and the Hicks case that the defense

12   cites as examples of why the defendant's sentence here

13   should be much less than 15 years.  In addition, the

14   Warsame case was cited by the defense, a recent sentence

15   of 92 months.

16           There's obviously distinguishing features in all

17   these cases, but in the Warsame case one of the

18   significant factors in the sentence of 92 months was that

19   the defendant in that case cooperated and that is a huge

20   factor that is not present here.

21           The other two cases, David Hicks and Hamdan --

22   in the Hamdan case, at the sentencing and throughout

23   actually the litigation Hamdan expressed great remorse for

24   what he had done and expressed a disavowal of what he

25   believed he was asked to do by al-Qaeda and that he would

1   have ever done anything violent.  That has never been seen

2   by the defendant in this case.

3          In addition, the Military Commission cases are

4   not bound by sentencing guidelines.  The sentences are

5   handed down by the members who are similar to a jury in a

6   federal jury trial.  So there's a lot of factors that

7   obviously went into that decision, but I don't think

8   that's particularly helpful.

9          But if one wanted to look at the other Military

10  Commission cases where material support was charged, the

11  case of Bahlul would be an example that the Government

12  would point to.  In that case Bahlul was charged with

13  material support and conspiracy.  It's not cited in the

14  defendant's papers.  They cite to --

15         THE COURT:  How do you spell the name?

16         MS. BALTES:  B-A-H-L-U-L.  Now Bahlul was

17  charged with material support and he was -- actually the

18  conduct supporting that charge was that he created the

19  propaganda video for the USS Cole.  It was produced after

20  the USS Cole bombing and it was distributed by al-Qaeda in

21  propaganda for that act against the United States.  In

22  addition, his role was as some type of personal secretary

23  to Bin Laden.  Now in that case the defendant was

24  sentenced to life in prison.

25         So there's a huge range of sentences and conduct

1   that have been charged in material support cases which is

2   why this factor is probably one of the less significant

3   factors that the Court should look at and the other

4   factors I think paint a much better picture of who the

5   defendant is and what the purpose of the 3553 factors are

6   for the Court in fashioning a sentence, which the

7   Government obviously asserts is a 15-year sentence.

8            And with that, Your Honor, I will stop there and

9   if I may have a few minutes in rebuttal based on the

10  defense case.

11           THE COURT:  Thank you.  We're going to be taking

12  a break in a couple of minutes.  Before that I had two

13  things I wanted to mention to defense counsel for

14  clarification.

15           One is because there's a reference to this in

16  the pre-sentence report, but there are no additional

17  details.  And you don't have to give me additional

18  details, but if you're willing to I might find them

19  enlightening.  Let me find the reference.  Hold on.

20           Paragraph 105 of the pre-sentence report, this

21  is under the section concerning financial condition,

22  ability to pay, in effect ability to pay a fine.  It says:

23  "The defendant reported no assets.  He advised he

24  currently owes $1.5 million to Islamic Bank, Doha, Qatar

25  for a business loan."  And you can think about this over

1   the break.  But I'm very curious about that.  Most people

2   don't borrow $1.5 million.  I don't know when that

3   occurred, what happened.

4          The other thing is in a number of the -- I think

5   almost always when Mr. al-Marri wrote a letter to someone,

6   the letter would begin by him saying, "Peace be upon those

7   that follow the guidance."  I would like to know what that

8   means.  We'll be in recess for 15 minutes.

9                  (Recess taken)

10         MR. SMITH:  Your Honor, before we start back in,

11  just a housekeeping matter to take care of.  Yesterday

12  there were a number of documents that were shown to the

13  Court as well as some photographs and videos.  We have

14  marked as Hearing Group Exhibit A the documents that were

15  shown yesterday and also we have made a video, and I will

16  give a copy to the Government of the video showing -- the

17  DVD that has the videos and photographs.  I understand

18  from the Government as far as the video, they wish that to

19  be kept under seal.

20         THE COURT:  How can I keep it under seal if it's

21  admitted into evidence?

22         MS. BALTES:  The Government's concern with the

23  exhibits yesterday were that there was no redaction in the

24  written material of some of the active duty military

25  personnel, so we would request that to the extent that the

1  exhibits have those names either we be provided an

2  opportunity to redact them or they be kept under seal.

3  The issue with the video is that it does show the full

4  faces of active duty personnel which is something the

5  Government is concerned about considering a lot of those

6  people serve overseas.  So if the Court cannot seal that

7  video, then we would like to be able to work with the

8  defense to provide a copy.

9           THE COURT:  I would hope that the parties could

10  confer on that, try to come up with something that

11  addresses the Government's legitimate interest and at the

12  same time recognizes that normally once an exhibit is

13  admitted into evidence, it becomes part of the -- becomes

14  accessible by the public.

15           MR. SMITH:  Certainly we can redact the

16  documents to remove any names.  That's not any problem.

17  As far as -- I don't know technically how we redact faces,

18  but -- we can do it?  Okay, we can do it.

19           MS. BALTES:  I think it takes a little bit of

20  time though, so --

21           THE COURT:  I'm certainly willing to seal it

22  until that's done, but with the understanding that

23  following the sentencing that that would have the highest

24  priority so that whether it's a member of the public

25  generally or the news media, whoever can have access to

1     it.

2             MR. SAVAGE:  We will redact names and we will

3     redact faces of military members.

4             THE COURT:  Have you conferred so that you are

5     on the same page as to which names need to be redacted

6     from where?

7             MS. BALTES:  We have had discussions about that

8     before, but I will make sure that --

9             THE COURT:  I do think we need to be very exact

10    about that.  Does that implicate -- is that solely focused

11    on what was presented yesterday or is it -- are there

12    other exhibits in the ones that I received prior to trial

13    that need further redaction?

14            MS. BALTES:  The two exhibits that also included

15    that information were the ones that the Government

16    requested be sealed yesterday and certainly we can work on

17    redacting copies of those so that those can be made public

18    as well.

19            THE COURT:  Very good.  All right.  Thank you.

20    So with that caveat then, as I understand it, all of the

21    exhibits that were admitted yesterday -- all of the

22    exhibits that were presented yesterday are admitted.

23            MR. LUSTBERG:  Thank you, Your Honor.  If it

24    please the Court, I will first address the departure

25    issues that we raised.  I know the Court is going to

1  consider these all together, but it will just help us to

2  keep it straight if I can do it that way and then move on

3  to 3553(a) factors and at that point, actually given that

4  the second factor is the history and characteristics of

5  the defendant, that's when we will show the videotape to

6  the Court that we wanted to.

7          THE COURT:  Fair enough.

8          MR. LUSTBERG:  Let me start with the downward

9  departure that we requested based upon Section 4A1.3(b).

10 Mr. Risley addressed that issue with Your Honor first, so

11 I'll address it first as well.

12          Section 4A1.3(b) is a particular departure under

13 the guidelines that is permitted when a defendant's

14 criminal history category under the guidelines

15 substantially overstates (a) his criminal history and/or

16 (b) the likelihood that he will commit another crime.

17          THE COURT:  Is it "and/or" or both?

18          MR. LUSTBERG:  Well, you know what?  As soon as

19 I said that, I realized you would ask me that question and

20 I'm going to get the exact language so we don't have to

21 speculate about that.  That's the language directly from

22 the guidelines and it says:  "If reliable information" --

23 I'm sorry.  This is upward departure.

24          THE COURT:  I've got it.  It's "or".

25          MR. LUSTBERG:  Yes, it's "or.  "If it

1   overrepresents the seriousness of the defendant's criminal

2   history or the likelihood that he will commit."

3            The way the cases address this is to boil it

4   down to initially a fairly simple inquiry which is is this

5   defendant in this case the usual criminal history category

6   VI defendant.  Respectfully, Mr. al-Marri is not.  As the

7   Court is aware, he scores out before the terrorism

8   enhancement as a criminal history category II and even

9   that is based upon an 18-year old DWI conviction and the

10  fact that he eventually, because he had left the country,

11  pleaded guilty to that offense in October 17 of 2001 when

12  he returned and he was sentenced on November 29, 2001, a

13  couple of weeks before he was taken into custody, and so

14  his arrest on these charges constituted sort of a

15  violation of that probation and that is what increased him

16  from criminal history category I where he normally would

17  have been for a DWI to criminal history category II.  So

18  clearly a person with that criminal record is not

19  typically a category VI, is not usually a category VI

20  offender.

21           Here obviously that's not what we're talking

22  about.  What we're talking about is the terrorism

23  enhancement and, as the Court is well aware, the terrorism

24  enhancement increases a defendant's offense level by 12

25  and also automatically increases his criminal history

1  category to VI based upon two things, the dangerousness of

2  the offense and the likelihood of recidivism.  But as the

3  Government has repeatedly said today, the terrorism

4  enhancement applies to a large, broad range of offenses

5  and it's because it applies to such a broad range of

6  offenses that Courts have in fact -- and we provided the

7  authorities to Your Honor in our sentencing memo --

8  departed downward, in fact departed downward as far as

9  criminal history category I even when that enhancement

10  applies and especially in situations where it overstates

11  the likelihood of recidivism.

12          As Your Honor knows, it is the defense's very

13  strongly held view that Mr. al-Marri's likelihood of

14  recidivism is overstated by criminal history category VI

15  and by the Government's presentation here today.

16  Mr. al-Marri will not recidivate for a number of reasons.

17  I would like to take those in order because they are all

18  the reasons that this Court ought to consider in deciding

19  whether criminal history category VI is in fact

20  appropriate.

21          First, he has been very significantly punished

22  and, therefore, very significantly deterred by the type of

23  punishment that has been inflicted upon him and that he

24  understands would be inflicted upon a person who does --

25  who would commit the kind of offense that he has committed

1    in the past.  But we as a practical matter, Your Honor,

2    really do believe that this is a defendant who has

3    changed.  And with all due respect to Dr. Sirratt, her

4    testimony in that regard is entirely unconvincing.  It

5    completely ignores the evidence.  Not that, as Ms. Baltes

6    says, Mr. al-Marri has carved out a number of Americans

7    who he likes, but the fact that -- and you will hear this

8    from his own mouth shortly and much more.  And that's why,

9    Judge, it's a good idea for you to take this all as a

10   whole and not rule on these applications one at a time.

11          Mr. al-Marri's affection for people at the Brig

12   and for his attorneys is not limited to them.  He

13   understands that those are Americans and he has a greater

14   understanding of this country and of the good here that is

15   represented by particularly Mr. and Mrs. Savage who have

16   spent an extraordinary amount of time, energy, personal

17   resources to stand by Mr. al-Marri's side for what is now

18   years under what has at times been extremely emotionally

19   draining and difficult circumstances.  And Mr. al-Marri

20   doesn't say so, therefore, he would never do anything to

21   hurt the Savages.  What he says is that he understands now

22   what Americans are about, that the Savages are the kinds

23   of Americans that are out there all around this country

24   and the kind of people who he would never hurt.  And so he

25   has a different view, not just of them and not just of the

1    uniformed staff at the Brig that treated him with decency,

2    but of all of us as a result of that.  That is the fact.

3              Now Major Sirratt says that she had

4    conversations with Mr. al-Marri where he said something

5    along the lines of the Jews are infidels and they should

6    be killed.  Your Honor, you have Government Exhibit 6 and

7    I would challenge the Court to go through Government

8    Exhibit 6 and find any statement that says anything like

9    that.

10              THE COURT:  I did that yesterday.

11              MR. LUSTBERG:  It's not there.  It's not there,

12   as she herself admitted, but let's talk about what is

13   there.  There is for sure a discussion that we went over

14   on cross-examination of Major Sirratt on June 25, 2007 in

15   which Mr. al-Marri discusses the fact that he and his

16   brother, who was at the time detained at Guantanamo, would

17   not be released until the war was over and that the war

18   would not be over until there were no longer infidels on

19   Palestine soil or words to that effect.

20              Your Honor, if you read that particular

21   discussion on that day it's abundantly clear exactly what

22   was going on and what was going on was that Mr. al-Marri

23   was having a discussion about politics.  He was having a

24   discussion about what was likely to happen.  He had at no

25   point said, "I will be involved in killing people," or

1   even that they should be killed.  He was saying that he

2   would remain in custody or his brother would remain in

3   custody for the length of the war and that that war would

4   go on for a very long time.  At no point in that

5   discussion does he say that that was his position.  Now

6   Dr. Sirratt says that's what he said and the Court will

7   have to evaluate of course her credibility in light of the

8   fact that she was taking notes about things far beyond the

9   medical services that she says she was tasked to provide.

10  One would think if he said something like that, it would

11  appear in the notes and it doesn't.  Instead what appears

12  is really a relatively -- I mean, obviously these are

13  serious matters, but it's an abstract general discussion

14  of these issues.

15          You will hear with your own ears and not too

16  long from now what Mr. al-Marri himself has to say about

17  his view of these things and you will see it is not in the

18  least consistent with Dr. Sirratt, who in any event has

19  had no contact with him over the last -- really any

20  significant contact since 2007, which is now two years

21  ago.

22          Likewise Your Honor can examine her report,

23  form 600 or whatever it is, about the issue of Suni and

24  Shiites.  And, again, it's the report dated July 12, 2007.

25  Again, it is an abstract discussion of these issues.  They

1   are discussing those types of matters.  There is no point

2   at which Mr. al-Marri evidences any commitment to

3   undertake any violent act or even any sympathy with those

4   violent acts.  They are discussing the difference between

5   Sunis and Shiites.  And when you read that paragraph,

6   that's exactly what it talks about.

7         To rely upon that to say that those two

8   discussions in the context of a man who has been so

9   severely punished and, therefore, so severely specifically

10  deterred, in the context of a man who has become -- it's

11  not just as Mr. Risley says that he's a good guy.

12  Respectfully, that has not been our position.  It is not

13  our position he is unlikely to recidivate because he's a

14  good guy with a good sense of humor.  That really does

15  demean the argument that we're making.

16        The argument that we're making is unbelievably

17  real and is revealed by the evidence of record and by the

18  way that Mr. al-Marri interacted with everybody from the

19  commander on down at the Brig and has continued to this

20  day at places, at Pekin and with all of us, and we're not

21  really allowed to testify, but it does speak of a

22  remarkable transformation and Mr. Berman's letter does

23  bear powerful witness to that transformation, a

24  transformation of a man who came here, has pleaded guilty

25  to coming here to do bad things and now will not do bad

1    things to the United States, does not believe in doing

2    that and stands for peace and love.  And you're going to

3    hear that for yourself.

4           Mr. al-Marri will not commit another offense and

5    putting him in criminal history category VI completely

6    overstates his likelihood of recidivism.  Certainly the

7    Government has not come forward with any evidence that is

8    the least bit persuasive on the fact that that's the kind

9    of thing that he's likely to do.  He should be treated as

10   a criminal history category I or criminal history

11   category II if you want to use the one that would

12   otherwise be --

13          THE COURT:  So there shouldn't be any reflection

14   in his criminal history category for his conduct in this

15   case?  Is that what you're saying?

16          MR. LUSTBERG:  Well, typically --

17          THE COURT:  Answer that question.

18          MR. LUSTBERG:  You're correct, Judge.  That is

19   our position and that is the position that is consistent

20   with what has happened in other cases with the terrorism

21   enhancement that we cited to the Court in our papers.  I

22   did not see anything -- I haven't seen any case law that

23   has addressed it to the contrary.  We did cite cases to

24   Your Honor where people in criminal history category VI

25   were reduced to criminal history category I

1    notwithstanding the terrorism enhancement and it is our

2    position that's what ought to happen here.

3            At the end of the day one could -- that matters

4    a great deal because that would bring his offense -- if he

5    were criminal history category II, for example -- well, it

6    would still be at a level that would be slightly above the

7    180 months, but much closer.

8            However, there's an extent to which all that is

9    quite academic because Your Honor's starting point is not

10   the guideline range that you arrived at.  Your Honor's

11   starting point is 180 months.  The Government did not

12   address this point at all, but we did in our papers, which

13   is this.

14           Under Section 5G -- I think it's 1.1 of the

15   guidelines.  Under Section 5G1.1(a) of the guidelines, it

16   states as follows:  "Where the statutorily authorized

17   maximum sentence is less than the minimum of the

18   applicable guideline range, the statutorily authorized

19   maximum sentence shall be the guideline sentence."

20           That is, therefore, the starting point for Your

21   Honor's 3553 -- for any departure analysis, although this

22   obviously is a departure so it wouldn't be the starting

23   point for this last one, but for any departure for

24   conditions and also for any 3553(a) analysis.

25           The Government has not pointed to any authority

1    and there isn't any that stands for the proposition that

2    where the sentencing guideline range is above that, that

3    that should be the starting point from which Your Honor

4    works or even that it should carry any weight and they

5    give it a great deal of weight in the way the Courts have

6    sentenced.  That is to say the Court should not consider

7    the fact that the guidelines have arrived at a range

8    higher than 180 months in deciding whether and how far to

9    vary from the guideline range if that's what the Court

10   chooses to do.

11             THE COURT:  Are you saying I shouldn't consider

12   that?

13             MR. LUSTBERG:  You should not consider that.

14             THE COURT:  Where does it say that in there?

15   All it says is that effectively or as a practical matter

16   in that situation the guideline range becomes 180 because

17   that is the statutory maximum.

18             MR. LUSTBERG:  Right.  And then under 3553 one

19   of the factors the Court is supposed to consider is the

20   guideline sentence and what the Sentencing Commission has

21   said is under those unique circumstances -- and the Court

22   pointed out it doesn't happen very often.  I mean,

23   typically the statutory maximum and the guidelines tend to

24   be in closer proximity to one another and usually in fact,

25   I'm sure in the vast majority of Your Honor's sentences,

1   the guideline range is beneath the statutory maximum and

2   so you don't encounter that issue.  But the Sentencing

3   Commission has told you how to treat that in those rare

4   circumstances where you do.

5          THE COURT:  No doubt the guideline range becomes

6   180 months.

7          MR. LUSTBERG:  Pardon me?

8          THE COURT:  The guideline range is 180.

9          MR. LUSTBERG:  Correct.  No question.  So that's

10  the point from which you start.  And --

11         THE COURT:  No doubt about that.

12         MR. LUSTBERG:  And it's also the guideline, it

13  is the wisdom of the Sentencing Commission, that is

14  supposed to be weighed under 3553(a).  That's one of the

15  3553(a) factors.

16         THE COURT:  Well, let me just interrupt.  I

17  don't want to spend a lot of time on this.

18         MR. LUSTBERG:  I'm not going to.

19         THE COURT:  Because obviously if the statutory

20  maximum is 180, to say that the guideline range remains

21  above that is ridiculous.

22         MR. LUSTBERG:  Correct.  Right.  But the

23  Government spent a great deal of time in their

24  presentation -- the only reason I'm addressing this -- and

25  in our brief it's a footnote around page 100.  The

1   Government spent a great deal of time arguing that because

2   the sentencing guideline range would otherwise have been

3   much higher, that somehow that should, I guess, argue

4   against or be considered by the Court in arguing against a

5   variance.  I think legally that's incorrect and that's the

6   position I'm taking here and I think that 5G speaks to

7   that.

8              THE COURT:  All right.  You've made your point.

9              MR. LUSTBERG:  I want to now address the

10  conditions of Mr. al-Marri's detention.  That has

11  obviously been the focus of this hearing in many ways from

12  its outset and continues to be an extremely important

13  issue and I want to first deal with a couple of the points

14  that the Government made.

15             First, I appreciate Ms. Baltes' concession that

16  the conditions under which Mr. al-Marri was detained were,

17  to use her terms, different from any other criminal

18  defendant.  She's obviously correct about that.  However,

19  she says a few things that are disturbing.

20             First of all, she says that it shouldn't matter

21  because -- or not that it shouldn't matter, but it should

22  matter less because of the offense that he committed.  To

23  be sure, Your Honor, when you ultimately arrive at a

24  sentence in this matter, you're going to consider all of

25  the 3553(a) factors and the first one is the nature and

1    circumstances of the offense, so we're not arguing that

2    that shouldn't be considered.  But the notion that that

3    offense because of what it was justifies those conditions

4    of confinement or more to the point that that offense

5    because of what it was serves to undermine an argument

6    that those conditions of confinement ought not be

7    considered by the Court in deciding whether to vary from

8    the guidelines is wrong and disturbing.  If the Court

9    finds that those conditions are different from any other

10   criminal defendant, then under the case law that we have

11   cited to the Court your Honor has the discretion to depart

12   downward from the guidelines on that basis and certainly

13   you have the discretion under 3553(a) to consider that as

14   one of the circumstances of the offense in deciding what

15   the ultimate sentence ought to be.

16          So whether you do it by way of departure or

17   variance always is a little bit of angel stands on the

18   head of a pin.  It matters little.  The point is that the

19   fact that Mr. al-Marri was held under those conditions for

20   as long as he was -- and I'm going to talk about them in a

21   moment -- ought not be in any way mitigated because of

22   what this offense was.  That's just unfair and it's wrong.

23          Beyond that, the notion that somehow that was

24   already taken into account in the plea agreement that we

25   reached is an extraordinary contention.  I don't know all

1   of the details as to why the Government chose to enter

2   into the plea agreement it did.  There were obviously a

3   lot of discussions back and forth, including discussions

4   that are not relevant to the Court as to what we thought

5   the likelihood was of Mr. al-Marri getting credit for time

6   served from the Bureau of Prisons.  I will say that the

7   assessment of what that likelihood was is different -- was

8   different then than it is now, but in any event the point

9   is this.

10          The plea agreement was, as Ms. Baltes says, a

11   plea agreement that was reached in order for the parties

12   to do what they always do in reaching plea agreements,

13   which was to moderate each side's litigation risk.  That's

14   correct.  It is not and was not by its terms an effort to

15   take into account the conditions under which Mr. al-Marri

16   was held.  And you know that because from day one and as

17   part of the plea agreement we have been telling Your Honor

18   and telling the Government that that was going to be an

19   issue that we were going to raise at sentencing and that

20   that should be relevant to the sentence that the Court

21   reaches.  That's beyond what the plea agreement did.

22   There's just no question that that was the intent of the

23   parties and it was not the intent of the parties to in any

24   way say that because this was a good deal in some sense

25   that, therefore, Mr. al-Marri's -- the conditions under

1  which he was held should somehow be less significant in

2  the Court's analysis.

3              Really it is not disputed and it is indisputable

4  that unusually harsh conditions of pre-trial confinement

5  are a mitigating circumstance that may warrant a downward

6  departure.  That is the law.  It's the law of this

7  circuit.  It's the law of the land.  And in this case

8  there really is no question but that those conditions

9  existed.  I want to talk about a few of those conditions.

10             First, for six years Mr. al-Marri was in

11  indefinite detention.  No matter how good things were at

12  the Brig -- and they did improve.  There's no question

13  about that.  Until February of this year, he was not

14  charged.  There was no process.  There was no end in

15  sight.  I was asked by a newspaper reporter recently,

16  "Does Mr. al-Marri feel like there's now light at the end

17  of the tunnel?"  One of the great things about our

18  criminal justice system is there is light at the end of

19  the tunnel.  Sometimes that light is a long way off, but

20  at least there's a tunnel that you can look through.  At

21  the time that he was in the Brig there was no tunnel, let

22  alone light at the end of it.  It was just going to go on

23  and on and on and he had no idea when it would ever end or

24  whether it would ever end.  For all that time, from

25  June 23, 2003 until October 14, 2004, he didn't see any

1     lawyers, anybody from the ICRC, nobody outside of his

2     interrogators and Brig staff.

3              But be that as it may, the point of it is he

4     didn't have any sense that it would ever come to an end

5     and that is one of the most brutal things that I can

6     imagine somebody going through, the notion that you're

7     there and there's no end in sight.  You can't even mark

8     off the days and say, "It's one fewer day before I get

9     out."  Because you don't know that it will ever end and

10    there's no process to determine whether it will ever end.

11             That has devastating psychological consequences.

12    It has -- as the expert testimony or the expert literature

13    that we have cited to Your Honor in our brief indicates,

14    it leads to pervasive hopelessness, deep despair, so much

15    so that there really are very serious constitutional

16    questions that the Supreme Court discusses in the Zadvydas

17    case and really that were only avoided in this case

18    because Mr. al-Marri's case then in the Supreme Court was

19    mooted by the indictment here.

20             But this case is even a little different than

21    that.  This case is even a little different from the case

22    where somebody faces indefinite detention.  This was a

23    case in which Mr. al-Marri was before Your Honor in this

24    court facing criminal charges after he had been facing the

25    same criminal charges that were in the Southern District

1    of New York where we argued there was no venue, which is

2    why it ended up before this Court.

3              Your Honor probably remembers that day in June

4    of 2003.  It was about a week or ten days before we were

5    to have a suppression hearing in the case and I think

6    about a month before the trial that the Court scheduled

7    and Mr. Smith was here and the Government came over and

8    showed Your Honor the order from the President declaring

9    Mr. al-Marri an enemy combatant.

10             Up until that time Mr. al-Marri did have an end

11   in sight.  Your Honor had carefully at his arraignment

12   laid out for him what the maximum penalties he faced were.

13   Your Honor had apprised him, as all good district court

14   judges do, of what his rights were.  He knew those rights

15   and he knew what he faced.  And suddenly beginning in June

16   of 2003, he didn't.  Suddenly he was in, as some people

17   have described it, a legal black hole where there was not

18   only no end in sight, but not even a process to determine

19   that end.

20             This is much worse than a sentence of life

21   imprisonment, what he was going through at that time, in

22   some ways because it was indeterminate and there was no

23   sense as to what would happen to him, as to what would

24   even become of him.  So that when his interrogators would

25   tell him, "We can make you disappear so that nobody will

1  ever know", that was credible.  That was credible.  It was

2  frightening.  It was unbelievably scary.  It's almost

3  really an unimaginable situation, respectfully, in this

4  system of laws that we have that somebody can be held

5  without any charges, without any sense that definition

6  will ever take place and for six years -- not a year, not

7  those 16 months, but for six years, from June of 2003

8  until Mr. al-Marri was indicted and this matter returned

9  to this court in February, actually into March of this

10  year, that was his situation.

11       Respectfully, Judge, it's unique, it's

12  extraordinary, it's unusually harsh, whatever words the

13  Court chooses to use.  It's an unbelievable situation that

14  was not otherwise taken into account by the sentencing

15  guidelines and it certainly warrants a downward departure.

16  So indefinite detention is the first thing I wanted to

17  bring to Court's attention.

18       Second, to this very day, to this day and from

19  the time of his original arrest on a material witness

20  charge in December of 2001, so now almost eight years

21  later, Mr. al-Marri's confinement has been unique and

22  characterized by one extraordinary factor and that is

23  complete isolation.  He has -- for an enormously long time

24  he had no contact with anybody, but he has never been in

25  population.  He has never had any interaction with other

1    inmates or prisoners as they're called at the Brig.

2            THE COURT:  Some of that I assume arguably could

3    be for his own protection.

4            MR. LUSTBERG:  Could be.  But if he were asked,

5    Judge, he would desperately crave the companionship of

6    somebody, somebody to talk to.  And the effects of that

7    isolation are set forth in detail in the reports that we

8    have provided to Your Honor from Dr. Grassien.

9            Initially Dr. Grassien's reports were relatively

10   academic in the sense that he was really reviewing for

11   this Court, actually for a different Court at the time,

12   the literature on isolation, but ultimately, you know, he

13   himself interviewed earlier this year Mr. al-Marri and his

14   certifications stand for the proposition that

15   Mr. al-Marri's symptoms, his hypervigilance, his paranoia,

16   his anxiety, his jumpiness, are all things that are

17   consistent with isolation.

18           To be sure -- and we don't really disagree with

19   Major Sirratt's view that Mr. al-Marri is a strong and

20   resilient person.  He's honestly one of the strongest,

21   most resilient people I've ever met.  But the notion that

22   one could go through eight years with the limited social

23   interaction, so incredibly few conversations, the months

24   where people were only allowed, as Your Honor has seen

25   from the record, to say "noted" to him and nothing else,

1       the months where his only conversations were with

2       interrogators, the times even thereafter his interactions

3       were limited to attorneys or the ICRC or fleeting

4       conversations with people at the Brig, that is

5       extraordinary.

6                And it's extraordinary, Judge, not only for the

7       time at the Brig but also in the Peoria County jail and we

8       submitted materials to Your Honor on that, at the MCC in

9       New York where I first met him, and he was there too under

10      23 hours a day lockdown and the other hour, which didn't

11      occur every day, he was allowed rec in a steel cage, again

12      with nobody else.  It's exceptional.  It's extraordinary.

13      It's unusually harsh.  It warrants a downward departure.

14               We have provided evidence to the Court about

15      what that was like and what the psychological consequences

16      are.  It's the sort of thing that, working from the

17      statutory maximum and from the guidelines, the sentencing

18      guidelines, that should be considered in imposing a just

19      sentence.

20               The Court, I think, got a particularly good look

21      at what it was like from some of the video that Your Honor

22      had the opportunity to see yesterday and that was made

23      available to us because video was kept on a 24-hour a day,

24      7-day a week basis at the Brig.  Let's just point out a

25      few features of that.

1          Not only was there no human contact except for

2     interrogation, which I'll talk about later, and with

3     relatively few conversations with captors for a long time,

4     but the lack of interaction was heightened by the way

5     Mr. al-Marri was treated.  Your Honor saw him.  The only

6     time he was allowed to move about, it was with goggles and

7     earmuffs.  It's one thing to have somebody move about a

8     facility in shackles and handcuffs.  That's -- it's true.

9     That's routine in Bureau of Prisons facilities and in, I

10    think, most correctional facilities.  But to blindfold and

11    earmuff somebody every time they move around to avoid even

12    the opportunity to view another person, the opportunity to

13    hear another person, is an extraordinary and extremely

14    harsh thing to do and just really goes to the very essence

15    of what it is to be treated as a human being.  Human

16    beings are social.  I think Dr. Sirratt said that.  And

17    the notion of treating somebody as if it doesn't matter,

18    as if that is something other than -- and I heard the

19    Government say that Mr. al-Marri was not tortured.  That,

20    to me, is torture, to keep somebody from having even the

21    most rudimentary human interaction that goes along with

22    seeing other people and hearing other people.

23          Your Honor also saw the extraordinary sensory

24    deprivation that Mr. al-Marri experienced in his cell for

25    months and months and months at the Brig.  We sat and

1   watched for something like three minutes or so

2   Mr. al-Marri uncomfortably shifting his position on his

3   metal bed where there was no mattress.  There was nothing

4   there.  I think in that case he was able to put toilet

5   paper underneath his head at some point to try to use it

6   as a pillow, but that was the closest thing to soft in

7   that room.  It was a cold, hard, metallic, cement

8   existence.  And that existence is one that is, again,

9   almost inconceivable.  You know, we wake up in our beds

10  and those beds have a softness to them and that helps us

11  get through the night and it does help us get through the

12  day because we can touch and feel things that give when we

13  touch and feel them.  Mr. al-Marri didn't have that for

14  months and months at a time.

15          I was thinking about that 3-minute video and I

16  was thinking to myself that meant that 3 minutes was

17  repeated 20 times in that hour and that 3 minutes was

18  repeated another 24 times in that day and it was day after

19  day and week after week and month after month.  That is

20  exceptional, it's extraordinary, it's brutal, and it's the

21  kind of thing that ought to be recognized in a sentence

22  that promotes respect for the law.

23          The result of all this of course, Your Honor, is

24  predictable.  It has devastating effects on a person's

25  mental health.  It creates obsessiveness, a situation

1    where people would, for example, think that noxious odors

2    are being introduced into their cell when they're not or

3    when you become obsessively preoccupied with sounds, for

4    example the sound of a fan or the slamming of a door.

5              As one Court said in one of the cases that we

6    cited to Your Honor, that sort of isolation, that sort of

7    sensory deprivation is worse than a lashing by a cat of

8    nine tails.  It's truly horrible punishment and most

9    respectfully, Your Honor, it deserves some credit.

10             So I've talked about the indefiniteness.  I've

11   talked about the isolation.  I want to talk, third, about

12   the interrogation.  Your Honor has learned a lot about

13   that interrogation and, candidly, the Court knows probably

14   more about it than we on the defense side do because you

15   were actually able to view the one video which we weren't,

16   although we got a summary, and you were able to see the

17   longer memos which we do trust are adequately captured in

18   the summaries that Your Honor required.

19             That interrogation the Government describes

20   today as consistent with the Army Field Manual other than

21   the one interrogation in which Mr. al-Marri was gagged,

22   his mouth stuffed with -- I believe it was towels and duct

23   tape -- but that's not correct.  The methods of

24   interrogation that were used on Mr. al-Marri are methods

25   that have been repudiated correctly by the Government

1   today and that are inappropriate for a society of laws.

2          What we know is that, among other things,

3   Mr. al-Marri was told that if he did not answer the

4   questions of the interrogators and did not cooperate with

5   them that his family would be rounded up, that they would

6   be tortured in cells next to him where he could hear them.

7   He was shown pictures of them to drive this point home.

8   Mr. al-Marri -- that doesn't necessarily appear in each of

9   the summaries, but Mr. al-Marri wrote about that at the

10  time and related it and it's consistent as we know with

11  evidence of what the Government has done in other cases to

12  lend credibility to it.

13         It's almost impossible to imagine somebody going

14  through that.  It's almost impossible to imagine the type

15  of -- being interrogated in the way that Mr. al-Marri was

16  with those kinds of threats, not only to him but to his

17  family, that he would disappear, that his wife would be

18  raped, this sort of thing that we've put in our papers.

19         I understand that the Government thinks that may

20  not be violative of the U.S. Army Field Manual.

21  Respectfully, it's violative of basic human rights, human

22  decency, and it goes to the conditions under which he was

23  confined which he had to endure and which simply ought to

24  in a good system of justice play a role in the additional

25  punishment that was meted out.  Why?  Because Your Honor

1    will have a sense of what the punishment ought to be for

2    Mr. al-Marri's case and some of that punishment has

3    already been visited upon him.

4            And I want to take a quick detour here to

5    address a point that Your Honor raised with Ms. Baltes in

6    your colloquy with her this morning and that was whether

7    he was really being held for the same thing as what he's

8    charged with here.

9            I understand Ms. Baltes' position, which is he

10   could have been held in a military situation on the

11   battlefield and so forth and never charged and, therefore,

12   there would never be credit for anything.  But here

13   there's just no question but that the facts under which he

14   was being held -- and it's not simply association with

15   al-Qaeda because the Rapp Declaration, Your Honor, didn't

16   come out of no where.  The Government didn't submit that

17   Rapp Declaration out of the goodness of their hearts.

18   They submitted that Rapp Declaration because Mr. al-Marri,

19   as Your Honor will recall because the matter was

20   originally before you, challenged his confinement by

21   filing a petition for a writ of habeas corpus and in

22   response to that petition the Government justified his

23   continued detention with that declaration and other

24   material and that declaration and that other material is

25   absolutely on all fours with the charges in this case.

1      If you compare the Rapp Declaration with the

2  stipulation of facts in our plea agreement, the basis

3  is -- the overlap is extreme.  There is discussion of

4  Mr. al-Marri's participation in the training camps.

5  There's discussion of him having met Khalid Sheikh

6  Mohammed and agreeing to assist al-Qaeda.  There's

7  discussion of the fact that he received money from

8  al-Hawsawi to buy, for example, a laptop computer.

9  There's discussion of the communications with Khalid

10  Sheikh Mohammed and the codes.  There's discussion of his

11  failed communications with others.  There's discussion of

12  his use of computers to research cyanide.

13      The guts of this case -- not only the guts, but

14  the details of this case are identical to the reasons he

15  was being held.  The notion that that should factor in not

16  one single bit to punishment in this case because it was a

17  different sort of detention is an extraordinary one.

18      And that, Your Honor, is a different argument.

19  Let me be clear of what I'm not saying because you pointed

20  out that we agree about credit for time served.  We'll

21  litigate that issue if we have to with the Bureau of

22  Prisons.  That is to say we're going to request that the

23  Bureau of Prisons -- the Bureau of Prisons said they're

24  not going to give credit for time served.  If we have to

25  challenge that determination we will.  We think that there

1    is a good argument under 3585.  The Bureau of Prisons

2    disagrees.  That's for another Court at another time.

3    Probably not Your Honor because if I understand the law

4    correctly, if we do something it would be filed in

5    whatever district he's being held.

6            But we don't need to look forward to that.  This

7    is not a -- this is not for this Court to decide, as Your

8    Honor has pointed out, the 3585 area.  What Your Honor is

9    deciding is the issue of whether it's appropriate to

10   depart downward based upon conditions that Mr. al-Marri

11   suffered during the time he was an enemy combatant and

12   during the time that he was held for precisely the same

13   reasons as underlie this very case.

14           I began to talk -- let me say something else

15   before I move on from the interrogations because the

16   interrogation issue overlaps some of the other

17   deprivations that Mr. al-Marri suffered because, as Your

18   Honor knows, part of interrogation method was to keep him

19   in an uncomfortable, to make it euphemistic, setting and,

20   for example, to deprive him of his Quran when that would

21   advance the interrogation process.  One can have one's own

22   views about whether that's appropriate to use religion in

23   that way.  Whether it's appropriate or not, it's

24   extraordinary.  It's harsh.  The Court ought to consider

25   it in determining whether to depart downward.

1            But the sensory deprivations go beyond that of

2      course.  In addition to the cell that Your Honor saw

3      Mr. al-Marri attempting to get comfortable on top of the

4      bed, underneath the bed, crawling around the floor, that

5      cell, as Your Honor knows, had no sunlight.  The windows

6      were blacked out and there was a magnet even over the

7      little window that looked out into the hallway or

8      corridor.

9            As I mentioned, there was nothing soft in there,

10     not even eventually when he gets -- if I can approach to

11     show the Court -- the suicide blanket, which is

12     Defendant's Exhibit 1.  This blanket just doesn't cover a

13     person.  It's harsh.  It's thin.  It is not soft.  It does

14     not give the tactile sensation that human beings need in

15     order to survive day to day.  We brought it to the Court

16     so Your Honor could have a sense of that.

17           Your Honor heard about the grating noise of the

18     fan, about the fact that for months Mr. al-Marri can't see

19     without glasses, was not provided with glasses so he could

20     not even experience the harsh environment that was around

21     him.  He was deprived of basic hygiene items such as a

22     toothbrush, dental floss, tooth paste, soap.  At times he

23     was deprived of socks or footwear, clean clothes.  And

24     throughout he had absolutely no privacy.  Now many inmates

25     don't have privacy.  Privacy is something that goes away

1    when you're in prison.  But Mr. al-Marri was under 24 hour

2    surveillance 7 days a week even when he engaged in the

3    most personal private bodily functions.

4          All of this, as we pointed out in our papers,

5    Your Honor, is contrary to Bureau of Prisons standards, to

6    ACE standards and really the standards of human rights and

7    human decency and they ought to be considered by Your

8    Honor in determining whether Mr. al-Marri's sentence

9    should be decreased because of the punishment he has

10   already endured.

11         Now I just want to add one thing because Your

12   Honor specifically pointed us to this late yesterday

13   afternoon and that is you asked about the conditions

14   elsewhere.  We have provided literature to the Court --

15   that is other than in the Brig because the Court is

16   correct that Mr. al-Marri was at the Brig for obviously a

17   long period, from June 23, 2003 until March of this year,

18   almost six years, but since then he has been at Pekin and

19   the situation there is not like that for sure, but it

20   remains a situation where he's isolated, has no contact

21   with people.  It remains in that way different from what

22   other prisoners experience because the SHU where he's held

23   is typically reserved for people who have committed some

24   institutional infraction, who are there because they're in

25   administrative segregation.  That obviously is not the

1   case.  He's there forever.

2          We obviously take issue with the Government's

3   position that Mr. al-Marri's indefinite detention was

4   justified by the laws of war and was constitutional.  At

5   the very least, I think anybody would have to concede that

6   that issue was a cutting edge legal one.  In fact, as Your

7   Honor well knows, it was one as to which the Supreme Court

8   had granted certiorari and was going to consider in this

9   very case before the matter became mooted.  We believe of

10  course that we have the better of the argument, that

11  Congress did not in fact authorize that detention under

12  the AUMF, that it was inappropriate to exercise domestic

13  military jurisdiction when the civil courts of our nation

14  were operating and that the President or the executive

15  does not have inherent authority to seize and detain

16  people who are arrested here in the United States.

17         But those issues are not issues for Your Honor

18  now and they were mooted, but we just want to make sure

19  that we don't concede what the Government's position is,

20  that somehow his detention was lawful.

21         That said, it's not the lawfulness or

22  unlawfulness that's really before Your Honor.  What's

23  before Your Honor is the experience of it and we hope that

24  by virtue of the presentation that we've made that we've

25  given the Court some insight into what that experience

1   was, how intimidating and scary and brutal and difficult

2   it was for anybody, even somebody like Mr. al-Marri who is

3   in fact strong and resilient.

4           I want to go back to something that I failed to

5   mention before with respect to Mr. al-Marri's likelihood

6   of recidivism and this is something that not much has been

7   made of here, but really should.

8           Exhibit 78 to our sentencing memo --

9   unfortunately the hard copy that we provided, it got left

10  out of, but it's in the one that was filed publicly.  Let

11  me just grab it.  It's the document whereby the Government

12  ultimately vacated the special administrative measures as

13  to Mr. al-Marri and it did that based upon a finding that

14  Mr. al-Marri was no longer a danger to communicate with

15  al-Qaeda or others.  And I would commend that document to

16  Your Honor so you can take a look at it because it bears

17  directly on the issue of recidivism as was raised by Major

18  Sirratt, goes to his future dangerousness.

19          This is July 7 of this year and it says:  "After

20  further analysis" - it's a memo to Mr. al-Marri from the

21  warden at Pekin.  It says:  "After further analysis of

22  your communications, conduct and guilty plea, the

23  Counterterrorism Section of the National Security Division

24  believes there is no longer a substantial risk that your

25  communication or contacts with persons could result in

1    death or serious bodily injury to persons or substantial

2    damage to property that will entail the risk of death or

3    serious bodily injury to persons.  The U.S. Attorney's for

4    the Central District of Illinois and the Federal Bureau of

5    Investigations concur in this request.  Therefore, your

6    SAM", standing for Special Administration Measure -- "is

7    hereby vacated."

8           That's significant because Your Honor has seen

9    what the SAMs were and what they meant and among the

10   things they meant were it created extreme difficulty for

11   Mr. al-Marri in terms of getting materials to read, in

12   terms of correspondence, so forth.

13          And I want to turn to that because we've talked

14   about sensory deprivation.  One of the things that strikes

15   you when you look at that video of Mr. al-Marri on that

16   hard, metal bed is that he has nothing to do.  Obviously

17   there's no television there, but there's no books, nothing

18   to read, nothing to write with, there's no Quran.  For

19   months and months he's deprived of those sorts of things

20   that will keep a person from literally going crazy from

21   boredom and inability to keep themselves occupied.  I

22   think what it would be like to go through a day like that,

23   let alone day after day, week after week and month after

24   week and year after year.

25          And year after year as well, Mr. al-Marri is

1    deprived of contact with his family.  You know, family

2    contact is something that's part of the usual prisoner or

3    inmate's life.  They can call.  They can write.  They can

4    receive visitors.  For years Mr. al-Marri couldn't call.

5    For years the only writing -- he couldn't write or receive

6    letters and when he did they were delayed by months or

7    even up to a year we heard yesterday.  He still to this

8    day has never received a visit from a family member.  It's

9    almost extraordinary to think about, that that's the kind

10   of thing that we would do to somebody, but that's what has

11   been done to him and that remains the case to this day.

12           Now this day he does have calls.  Now he has --

13   I think it's going to be fewer, but he now gets periodic

14   calls with his family.  He does have the opportunity now

15   to receive letters, although they remain delayed because

16   they have to be reviewed if they are in Arabic and Your

17   Honor saws what happens when they do get reviewed in terms

18   of the types of redactions that take place.

19           The family contact is also part of what it is to

20   be human and you're going to see in a moment what

21   Mr. al-Marri's family is composed of and you'll have an

22   opportunity to see what it is he has missed as a result of

23   all that.

24           But these are the extraordinary -- and I agree

25   with Ms. Baltes -- the conditions of his confinement that

1    are different from other criminal defendants.  And as Your

2    Honor ponders the quantum of punishment that Mr. al-Marri

3    ought to receive, I would request on his behalf that you

4    reduce that punishment to account for the punishment he

5    has already received and that's punishment that is

6    exceptional and warrants treatment that is nuanced and

7    based upon his particular case.

8            Now when I say "based upon his particular case",

9    in no way -- and when we turn to the 3553(a) factors, of

10   course we're going to address this.  In no way does that

11   mean to undermine the seriousness of his crime.  He

12   recognizes it.  We recognize it.  He's facing a lot of

13   time as a result of that.

14           And let me just detour to address a point that

15   Your Honor made that I completely understand, which is

16   Your Honor said each week you sentence people to very long

17   sentences on drug offenses in what seems like less serious

18   crimes in some ways.  You know, that's Congress' will

19   unfortunately.  The sentences for drug offenses are very

20   long.  I often have wished they weren't.  But you should

21   know that in this case, you know, the available sentence

22   before the Patriot Act, which was passed in the fall of

23   2001, for material support was 10 years.  Congress, in

24   light of what occurred here, extended the maximum to

25   15 years for that.  The fact that it's a serious offense

 1    certainly should weigh in the analysis, but the amount of

 2    punishment that one receives should be proportionate and

 3    should be proportionate in the sense not only to other

 4    cases, which we're going to talk about later, not only to

 5    the extent that uniformity is promoted by the sentencing

 6    guidelines, but it should account for the punishment that

 7    one has already experienced as a result of the very same

 8    acts for which he stands before the Court for sentencing.

 9            Judge, if it's okay with Your Honor, we would

10    like now, Mr. Savage will present to Your Honor a video

11    tape that goes to actually the second 3553(a) factor,

12    which is the history and characteristics of the defendant.

13    Then I'll come back and I'll address each of the other

14    3553(a) factors and then we'll be finished.

15            THE COURT:  All right.  Thank you.  Mr. Savage?

16            MR. SAVAGE:  May it please the Court.  Good

17    morning, Judge.  Judge, a couple of matters.  You had

18    asked earlier about the report of his financial condition.

19    Mr. al-Marri is going to make a statement to the Court and

20    I would urge the Court to question him about that if you

21    would like.  As I understand it, that is a family

22    business.  He was in the auto parts business in Doha.

23    Following his detention here, that business went down the

24    drain.  And the amount of money is not U.S. currency

25    but Riyal.

1           THE COURT:   What's the difference?

2           MR. SAVAGE:   It's about half.   Is that right?

3   3.6 to the dollar.

4           THE COURT:   Thank you.

5           MR. SAVAGE:   One other thing, Judge, before I go

6   into the video.   One of the contractors -- and those

7   contractors are unnamed, so I want to be careful what I'm

8   saying here.   But there was one who participated in the

9   events of March 11, 2004 that Your Honor had an

10  opportunity to see the video and to read the summary that

11  testified this year before Congress, the Senate Judiciary

12  Committee in May of this year, where -- he, who is now no

13  longer a government employee -- condemned the enhanced

14  interrogation techniques, those techniques which were used

15  on March 11 against Mr. al-Marri, stating that they were

16  worthless and groundless, they were morally in opposition

17  to what America stands for.   That was the day that

18  Mr. al-Marri was not water boarded, but the effect of the

19  interrogation techniques were the same.   That is he was

20  gagged in his mouth and he was taped three different

21  occasions, one up to 15 minutes long, to give the same

22  sense of deprivation of air that is the same thing that

23  the water board does.

24          In addition to that, the United States Attorney

25  this summer released many documents about the CIA

1    techniques and other techniques that are used, condemning

2    the very same techniques that were used against

3    Mr. al-Marri on many occasions during those interviews:

4    The threats of physical abuse against him, the actual

5    physical abuse against him, the threats against his

6    family, the sexual acts he was threatened with and his

7    family was threatened with, the fact that he was told that

8    he would be released and the government would report that

9    he had escaped.  Certainly that does say that he was

10   tortured at that time.

11           Your Honor, I came into the case when Mr. Berman

12   called me in June of 2004 when the Supreme Court

13   determined that people who were in the status that

14   Mr. al-Marri was being held in were entitled to counsel.

15   At that time we went through a pretty intense background

16   investigation that led to a top secret security clearance

17   and we were permitted to see Mr. al-Marri in October of

18   that year.  Some nine months later my wife, Cheryl, who is

19   not a lawyer but works in our office, also went through a

20   background check and she as well was given permission to

21   see Mr. al-Marri.  We have maintained his primary contact

22   with the outside world for several years and our

23   observations of him, our in-depth conversations, which

24   actually were a thousand hours, there was a great

25   dichotomy between the allegations charged against him and

1    our impressions of him at that time.  We thought it was

2    incumbent upon us to look into this a little bit further

3    and in doing that we traveled to the Middle East

4    approximately a year ago to look into whether or not he

5    had been truthful with us, what his family was like, what

6    his religious beliefs were like, what his business

7    reputation was, and I would like to present to you a very

8    short summary of that trip.

9                        (Video played)

10             Ali is one of a family of 12 children.  His

11   father, as you know, is recently deceased.  His mother is

12   alive.  Cheryl had an opportunity to speak with his

13   mother.  Because of the culture there, I was prohibited

14   from speaking to any of the women who were post-puberty.

15   His brother Naji, who is pictured on the screen now, and

16   his brother Mohammed are both older than him.  Mohammed

17   was trained as a civil engineer at the University of

18   Texas.  Naji attended Bradley University in the early

19   eighties.  Both of them work in the oil and gas industry

20   in Saudi Arabia.

21             When Ali left home, he left several family

22   members, all very close family members.  The gentleman on

23   the top right is his cousin.  His brother is next to him.

24   Another brother is next to him.  Another brother.  The

25   young man on the left with his hand on his head is his

1    eldest son.  In front of him are other brothers, one

2    cousin and his baby child who was six months of age when

3    he was originally detained.  The young man on the right is

4    a nephew.

5         Abdalhadi, Naji, Mohammed and his cousins all

6    have since his arrival in Pekin been able to speak to him,

7    so he has maintained since his arrival communication by

8    telephone with his brothers and as well with his wife.  He

9    was not able to do that at all until the first call in

10   2007.  He had another call in the Brig in -- excuse me,

11   2008, and then he had another second call in 2009.

12        We have a video of his family that was taken at

13   the same residence.  This is his brother Mohammed's

14   residence in Saudi Arabia.  The audio is not on.  This is

15   when I was speaking to his older brother, Mohammed.

16   Mohammed represents himself as a spokesman for the family.

17   Well, let's pass on.

18        THE COURT:  While they're doing that, just a

19   question.  There has been a reference, there was

20   yesterday, to a brother that was being held in Guantanamo.

21   Is that -- what is his status?

22        MR. SAVAGE:  His brother Jarrallah, who was

23   detained on the same day, December 12 of 2001, in

24   Pakistan, he was taken from Pakistan and he was placed in

25   American custody.  He was then taken to another air base

1    in Afghanistan and then to Guantanamo.  One day in the

2    summer of July of 2008 when he went to bed, he was a

3    terrorist.  When he woke up, he went home.  No explanation

4    given.  He is now living in Doha.  He's not under any

5    restrictions in the country of Doha.  There was no request

6    by the American government to limit his restrictions.  His

7    passport was returned to him by December, I believe, of

8    last year.  So in theory he could go any place, do

9    anything he wants.  But he's engaged in a business now in

10    Doha and is leading a life of a law abiding citizen, never

11    tried.

12            THE COURT:  Are you ready to proceed now?  Let's

13    try it.

14                    (Video played)

15            MR. SAVAGE:  You will notice that you don't see

16    any of his sisters.  The men are basically segregated from

17    the women, particularly when guests are around.  They are

18    all very, what I would say, conservative in their

19    political beliefs.  They are all very religious.  They are

20    all well thought of in their community.  There has been

21    some family taint because of the arrest of their younger

22    brothers, but they are still engaged in business and hold

23    very responsible positions in the community.

24            Ali was a good parent as reported by the family.

25    This is his younger son.  The pictures that you saw there

1  are actually outside in the desert in a family home there

2  similar to what you would think of in the states as being

3  a summer home.  We might choose to be around a lake or

4  water, but they choose to be in the desert.

5       Judge, after several years at the Brig and at

6  the urging of the Brig staff, Ali was allowed to receive a

7  video from his family and I believe this was in late 2007.

8  It took some time to go through the clearance, but he was

9  eventually allowed to see this and we'll show an example

10  of that, please.

11                     (Video played)

12       These are his daughters doing their homework and

13  singing songs.  This is showing now their achievements in

14  school.  Of course they don't study all the time.  A kiss

15  from his daughter.

16       Judge, when we were there we wanted to explore

17  the community.  We wanted to see the business world in

18  which he worked.  We wanted to know what his reputation

19  was.  And I must say that we spoke to Sunis and Shi'a.

20  The idea that he would harm somebody who was Shi'a is

21  contrary to the evidence that we discovered there.  He

22  worked side by side with them.  Let's show the video about

23  his employment.

24                     (Video played)

25       MR. SAVAGE:  We knew that his brothers had been

1    schooled in America and we were curious as to why that

2    was.  We wanted to know what type -- what role religion

3    played in Ali's life.  Your Honor, you will be able to

4    hear directly from Mr. al-Marri about his religious

5    beliefs and how they apply to this situation.

6         When he arrived here, he has been described as a

7    sleeper agent, a fair description but belies the

8    appearance that he had upon his arrival.  Can we put up

9    the photograph?  That's a picture that was taken of him in

10   2001 shortly after his arrival.  His wife of course is not

11   in the photograph, although she was in America, because of

12   the cultural attitude towards photographers and one of his

13   daughters is missing from that photograph.  No one in his

14   family, the children or his wife, could speak any English.

15   Mr. al-Marri's English at that time was not what it is

16   today.  Of course he has been speaking exclusively English

17   since December of 2001.

18        But it was apparent upon his arrival where he

19   had come from and he immediately after his arrival came

20   under the scrutiny of the FBI through reports of citizens

21   that saw him, heard his language and were concerned about

22   him.  He was not unknown when he arrived.  I believe the

23   taxicab that drove him from Chicago to Peoria first

24   reported him and others at Bradley University reported him

25   as being a suspicious person, all because of how he looked

1 | and how he spoke.

2 |      Over the years that he has been incarcerated,

3 | his family has changed.  His oldest son, Abdulhadi, was

4 | 10 years of age in 2001.  He was 8.  I'm sorry.  He was

5 | 8 years of age in 2001 and there's a picture of him today

6 | or last year.  His daughters, who are twins, Maryam and

7 | Hajar, were 7 years of age.  They are now post-puberty, so

8 | we don't have photographs of how they look today.  This is

9 | Khaola.  She was 3 years of age at the time.  This is how

10 | she looked when we were in his country last year.

11 | Abdulrahman was an infant, has never spoken to his father,

12 | and a photograph of him today or last year.  Again, his

13 | wife is not in those photographs because of their cultural

14 | beliefs.  When she came to America, the wife was wearing

15 | traditional clothing.  And as you might know, the women at

16 | least cover themselves completely.  They wear a head cover

17 | all the time and that's how she was dressed when they

18 | arrived in Chicago in September of 2000.  Thank you, Your

19 | Honor.

20 |      THE COURT:  Thank you.  I think this would be a

21 | good time to break for lunch.  I would like to start again

22 | at 1:15.  Do you have some additional arguments to make?

23 |      MR. LUSTBERG:  Yes, Your Honor.  It will not be

24 | long.

25 |      (Noon Recess)

1             THE COURT:  Mr. Lustberg?

2             MR. LUSTBERG:  Thank you so much, Your Honor.

3    And let me just start by saying thank you very much for

4    the really extraordinary amount of time you have allocated

5    to this.  It's obviously a very emotional, difficult and

6    intense matter for all of us and I really would commend

7    the Court for the way it's been handled.

8             All that remains for us is to essentially apply

9    all of what you heard to the statutory factors that this

10   Court must consider under 18 U.S.C. 3553(a), so to provide

11   whatever assistance we can as to an appropriate sentence

12   in this case I'll do that relatively quickly because I

13   don't want to repeat all of what I said before.

14            The first factor -- and I should say Ms. Baltes

15   of course accurately summarized what those factors are.

16   The first factor is of course the nature and circumstances

17   of the offense.  Let me be as clear as I can be.  Nothing

18   that we have said now, nothing that we will ever say and

19   I'm sure nothing Mr. Al-Marri will say should be thought

20   of as undermining in any way the recognition that this is

21   an extremely serious offense.  Each and every one of

22   Mr. al-Marri's actions from attending camps to agreeing to

23   serve, to coming here and doing what he did are things

24   that must give rise to concern and that do deserve

25   punishment.  The only question for the Court is what the

1    quantum of that punishment should be.

2              In assessing the nature and circumstances of the

3    offense, I would just add that one of the factors, as

4    agreed, that the Court looks at is what harm was caused.

5    And thank God, no harm was caused in a sense.

6    Mr. al-Marri's actions, whatever they would have been, and

7    of course they remain uncertain, never resulted in any

8    violent act or any other harm to American citizens or

9    property.  And that is a good thing.  We absolutely

10   acknowledge that.  So I want to start with that and the

11   Court will weigh that appropriately, as it should, and

12   will impose a harm punishment even if that punishment is

13   no more than that which Mr. al-Marri has already served.

14             The second factor of course is the history and

15   characteristics of the defendant.  Your Honor has come to

16   learn a lot about Mr. al-Marri through the course of these

17   proceedings, through the course of other proceedings, and

18   as a result of all that you have read.  And we have put a

19   lot in front of you to read we understand.  You have seen

20   and heard about his positive attributes as a father and

21   his religious devotion, his employment and his

22   intelligence.

23             You've also gotten a window from some of the

24   testimony that you've heard and some of what you've seen

25   into his humanity, his resilience, as Major Sirratt said,

1  his strength, his sense of humor and his generosity in
2  ways that were of course quite small because there wasn't
3  much he could do for people at the Brig, but those who
4  have come to know him even in passing, the marshals who
5  have transported him back and forth, those personnel at
6  Pekin.  We have had a lot of contact with all those people
7  and the response we get is the same.  I guess to use
8  Mr. Risley's point, he's kind of a nice guy.  You sort of
9  saw that on the tape when, even shackled and blindfolded
10  and earmuffed, he has a big, warm smile for, you know, the
11  guard who is taking him back into custody after he has had
12  his dental work done.  It doesn't -- it's a small thing,
13  but what it shows is fundamentally Mr. al-Marri's humanity
14  and it's that humanity that really is the reason I think
15  why this group of attorneys who are here today have stood
16  by him for so many years.

17       I have been involved with Mr. al-Marri since
18  2002.  And like Mr. Berman who wrote to the Court, we have
19  come to know him under what was truly the worst of
20  circumstances.  What we have come to know is a man who
21  loves people and who can be loved, who cares about people
22  and who accepts caring from people, who learns, who has a
23  mind that really is a sponge.  He's open minded.  And not
24  only in terms of learning about his own faith, but who
25  will listen to people about their own beliefs.  Who has

1    taken away from all of it a love of, a caring for and a

2    knowledge about this great country of ours that, believe

3    it or not, even with what he's going through, means that,

4    in our view, he will never reoffend.  Those are the

5    history and characteristics of this extraordinary person

6    in many ways.

7            The third factor that the Court must consider is

8    just punishment and respect for the law.  I just want to

9    spend a minute if I can on that, Your Honor, because I've

10   been to a lot of sentencings under 3553(a) and typically

11   that factor of just punishment which appears in

12   3553(a)(2)(A), and which also mentions reflecting the

13   seriousness of the offense, which we have completely

14   acknowledged, but the question of just punishment is one

15   that typically Courts use to impose more rather than less

16   punishment.

17           In this unique situation, just punishment and

18   respect for the law requires respectfully that this Court

19   take into account what Mr. Al-Marri has been through and

20   the punishment he has already endured.  The indefinite

21   detention, the isolation, the sensory deprivation, the

22   interrogations all make what he has experienced something

23   that must be recognized.

24           When I talk to people, regular Americans -- my

25   father is a truck driver -- and I tell them that there's a

1    chance that this man will be sentenced and what he's gone

2    through would not be recognized by the Court, those people

3    are astounded.  And I'm not saying of course that's what's

4    going to happen.  But what I guess I'm saying is in order

5    to foster a respect for this country and the law that

6    really is what this country is all about, this Court

7    should not ignore what Mr. al-Marri has gone through,

8    particularly when some of that is policy that has been

9    repudiated by our Government.

10            I do have to address deterrence of course and,

11    as always, there are two forms of deterrence.  There's

12    general deterrence and specific deterrence.  Anybody who

13    knows what Mr. al-Marri has gone through in this case,

14    it's gotten a great deal of public attention, would of

15    course be deterred from engaging in acts such as those

16    that he engaged in.  It may be difficult to deter

17    terrorism, as some say, but anybody who knows what he has

18    been through, the punishment he has endured, the

19    proceeding that he faces today will certainly think twice.

20            And that's really what the Court has to think

21    about.  You want to send a message, but that message has

22    been sent out and sent out more poignantly than ever when

23    you look at these videos of what this man has been

24    through.  Removed from his family for eight long years,

25    isolated and abused.  Personally that sort of treatment

 1   will certainly deter.  This is a serious crime and it has

 2   been treated seriously.  There is plenty of deterrence

 3   here.

 4            With respect to specific deterrence and

 5   protection of the public, I think we have made our

 6   arguments with respect to Mr. al-Marri and his likelihood

 7   of recidivism.  As I mentioned earlier this morning,

 8   there's no question that at least to a certain extent --

 9   even the Government in its own documents with respect to

10   vacating the SAMs has some level of agreement with that.

11   But one thing he also know that hasn't yet been

12   mentioned --

13            THE COURT:  Well, I want to stop you a moment

14   because I read that document that you mentioned and as I

15   understand the document all it says is as of this date --

16            MR. LUSTBERG:  July.

17            THE COURT:  -- we don't believe that that

18   problem exists while you're -- he's in custody while this

19   is being written.

20            MR. LUSTBERG:  Right.

21            THE COURT:  Of allowing him to communicate.  I

22   don't see how you get from that to we believe you're not

23   going to go out and commit a terrorist act in the future.

24            MR. LUSTBERG:  Of course the SAMs had been in

25   place all along while he was in custody.

1          THE COURT:  I understand.

2          MR. LUSTBERG:  So the question is could he be

3    trusted.  There certainly came a time when -- partly, I

4    think -- and, you know, I was part of the discussions

5    about that.  The sense was, look, we were now in 2009.

6    His contacts with al-Qaeda happened back in 2001.

7          THE COURT:  They were all stale.

8          MR. LUSTBERG:  They were all stale.  So really

9    the likelihood of his communicating with al-Qaeda had

10   dissipated, but for the same reason -- after all, his

11   crime was all about communicating.  The likelihood of his

12   reassociating with al-Qaeda likewise has dissipated over

13   time.  So I think it's at least relevant.  For sure, it's

14   not a direct reflection of anybody saying he's not a risk,

15   but certainly there was a recognition that he was no

16   longer any kind of risk of committing those sorts of

17   offenses at that time so the SAMs were not necessary.  I

18   don't think there is any evidence, in fact I know there's

19   none, that since the SAMs have been vacated there has been

20   any conduct that would cause anybody to second guess that

21   decision.

22          But beyond that, one thing we haven't really

23   talked about -- and the Court will recall this because we

24   had a discussion about it at the time of the guilty plea.

25   As Your Honor may recall, one of the conditions of the

1    guilty plea is that at the conclusion of whatever sentence

2    the Court imposes, Mr. Al-Marri is to be deported.  He's

3    not permitted to defend against deportation proceedings.

4    He has agreed to it.  He will be removed from American

5    soil.  Now I mean obviously these offenses are

6    international in nature and doesn't preclude somebody from

7    doing something wrong, but it certainly lessens the

8    likelihood that he will do anything, that he will -- that

9    he can do anything here for sure.  And the chances of him

10   ever coming back here, if ever he would do that -- it's

11   hard to imagine he would after what's has been through --

12   but the chances that he would be allowed back are none.

13          So in terms of reoffending at least in the way

14   that he offended this time, the probabilities are just

15   exceptionally low and that is built into the plea

16   agreement between the parties and I think bears

17   mentioning.

18          But more than that -- and I think one can

19   understand it when we see the video from this morning --

20   he wants to go home.  He wants to go home to those

21   children and that family.  He wants to -- it's going to be

22   a difficult transition, but he wants to become part of

23   their lives again.  It's completely understandable.

24   That's the person he wants to become.  It's the person he

25   was and he wants to return to it.

 1            But even more so, this is a defendant who simply

 2    has learned his lesson.  But more than that, he has

 3    learned about this country.  He has learned about the

 4    country from Andy and Cheryl Savage, from Mark Berman.  He

 5    has learned about this country from Brig staff, from the

 6    incredibly gracious people at Pekin, from the marshals

 7    that transport him back and forth to court.  He knows that

 8    this is a place that will punish him harshly, but one

 9    that's also full of good and generous people who do not

10    deserve what al-Qaeda intended.  He feels -- and he will

11    express this to you -- at the core of his being that

12    violence is not what should happen.  He is not a danger

13    anymore.

14            The final factor that we have to address under

15    3553 is sentencing disparity.  I do think, Your Honor,

16    that it is appropriate to look to the Military Commission

17    cases and I say that with some authority because if you

18    read the Court's decision in Warsame, which I'm sure Your

19    Honor has, you can see that the Court there in evaluating

20    18 U.S.C. 3553(a)(6) looked to the Military Commission

21    cases.  So that while of course it's true what Ms. Baltes

22    says that each case is different and can be distinguished,

23    it's also the case that it's not inappropriate to look at

24    Military Commission cases even though sentencing

25    guidelines don't apply in those cases.  The Court did it

1   in Warsame and the Court should do it here.

2          Obviously if you look at Hicks and look at the

3   facts of Hicks which we set forth in our brief, there's a

4   tremendous amount of overlap.  The difference is that

5   Mr. Hicks actually did fight against this country and he

6   got 7 years, most of which was suspended, and after

7   9 months he went home.

8          Mr. Hamdan, who was the actual driver for Osama

9   Bin Laden and also transported weapons in that car, got

10  66 months.  He was given 61 months of credit for his time

11  at Guantanamo.

12          But leave aside these specific cases on the

13  grounds that they are distinguishable.  We have provided

14  Your Honor with data that cuts across the various cases

15  under this particular statute, 18 U.S.C. 2339(b), and what

16  you can see is that the average sentence for somebody who

17  goes to trial -- actually I think it's for all defendants,

18  108 defendants -- was approximately 10 years, between

19  118 months to 122 depending on how many counts there were.

20  For people who actually pleaded guilty like Mr. al-Marri

21  has, the average sentence is between 102 and 107 months.

22  For actual conspiracy, as opposed to the substantive

23  count, which obviously Mr. al-Marri pled guilty to

24  conspiracy to provide material support, and with people

25  who pleaded guilty the average sentence is 82, 83 months.

1   This is the sort of data that under the current sentencing

2   regime the Court should consider respectfully.  We would

3   ask that you do that.

4          In Warsame, Ms. Baltes says that the difference

5   there was that he cooperated.  Actually I didn't note that

6   in the opinion, but I do note that the Government in that

7   case did ask for a sentence beneath the guideline range

8   and asked for a sentence of 150 months.  But in light of

9   the particular -- particularly in light of the conditions

10  of his confinement, the Court there departed downward to a

11  sentence of 92 months and in doing so compared his case to

12  the Lackawanna 6 where the sentences were between 84 and

13  120 months and that's where there actually was evidence of

14  a plot.  And in Warsame, by the way, there was no specific

15  violence, as I understand the facts, but it was a

16  situation where the defendant actually did act as a

17  security guard and actually did deliver funds here in the

18  United States.

19         I should finally note in that regard that there

20  has been a lot of mention throughout this case of the

21  other ECs.  The one thing I would point out with respect

22  to Mr. Padilla, as the Court knows, the Court -- the Court

23  in the Padilla case did depart downward to take account of

24  Mr. Padilla's custody at the very same Brig, just a cell

25  or two away from Mr. al-Marri.  That's relevant only

1    because the Government argues here that one's time spent

2    as an enemy combatant ought not necessarily be considered

3    in assessing a sentence for the criminal offense, but it

4    certainly was there and in that case Mr. Padilla got a

5    substantial downward departure.

6          But beyond that, the Court will recall that he

7    was not in custody at the Brig as long as -- not nearly as

8    long as Mr. al-Marri has been or was and his conditions,

9    as we saw repeatedly, were not nearly as stringent as were

10   Mr. al-Marri's.

11         For all of these reasons, the 180 months sought

12   by the Government is respectfully just too long.  Your

13   Honor, this Court sentences defendants all the time and

14   all the time defense attorneys get up and ask the Court to

15   temper justice with mercy or, in the more mundane terms

16   that we all live with today, to balance all the factors of

17   18 U.S.C. 3553(a).  Not nearly as eloquent as saying

18   balance justice with mercy, but that's how we talk now.

19         This case has always been extremely difficult,

20   challenging.  It's always presented amazingly

21   sophisticated, difficult legal issues.  When I talk about

22   it to people, I say it's a case where actually you can

23   argue and cite Marbury vs. Madison and mean it.  It just

24   has had those kinds of fundamental issues.

25         And I was thinking even yesterday when Your

 1    Honor was just ruling on the one guidelines adjustment,

 2    once again we were right on a blank slate.  It seems like

 3    that's been the journey that all of us have been through

 4    here.  Today the Court is again facing this challenge of

 5    what to do with this extraordinary case, a case in which a

 6    person was treated, as Ms. Baltes says, unlike other

 7    prisoners and how you weigh that against a crime that is

 8    so undoubtedly serious.

 9            What's great about this country is really put at

10    issue in this case.  On the one hand we want to protect

11    ourselves from harm and the Government's -- it's the

12    Government's job to do that and they have done it

13    vigorously.

14            On the other hand, the way this Court sentences

15    Mr. al-Marri will send out more than a message about that

16    harm.  It will send out a message about forgiveness.  It

17    will send out a message that we do believe, as we do in

18    this country, that people can change.  It will send out a

19    message that we as a county when we make mistakes and

20    treat people poorly, we'll accept responsibility for that.

21    It will send out a message that acknowledges the humanity

22    of even people who break our laws, people who, even though

23    they violated a statute, even though they put us in danger

24    even, have feelings, who shouldn't be detained in a cell

25    that's all metal and cement, people who, notwithstanding

 1    what they've been through, have real humor and real

 2    humanity.

 3              Your Honor, as you go about imposing sentence on

 4    this defendant we would ask that you consider all of that,

 5    all of those values that make us great, and that the Court

 6    depart very significantly downward from the 180 months

 7    that the guidelines provide for and let Mr. al-Marri go

 8    home.  Thank you.

 9              THE COURT:  So you're asking for a time served

10    sentence?

11              MR. LUSTBERG:  Judge, that's the request.

12              THE COURT:  Okay.  Thank you.  What's your

13    reply?

14              MS. BALTES:  Your Honor, there are just a few

15    points I would like to respond to and I will try to be

16    brief.

17              The Court asked about Mr. al-Marri's brother,

18    Jarrallah al-Marri.  Contrary to what Mr. Savage told the

19    Court, the defendant was released from Gitmo and he was

20    released to Qatar and not supposed to travel, him telling

21    Qatar authorities that's what he was going to do.  In

22    fact, he went to the United Kingdom twice and once

23    actually was able to enter the country and the other time

24    he was deported and sent back to Qatar.  He was arrested

25    or captured in 2001 in Pakistan after fleeing from

1   Afghanistan and held as an EC in Guantanamo Bay until

2   recently in 2008.

3           One thing that I think is important to make

4   very, very clear in this case, the defense has asserted

5   that the interrogation of the defendant involved using

6   enhanced interrogation techniques and that's a very

7   serious charge that the Government does not want to go

8   unanswered in this case.

9           The Inspector General report from the Defense

10  Intelligence Agency, a summary provided to the defense,

11  specifically talks about the types of interrogations that

12  were used on the defendant and certainly the defense may

13  not agree with that, but that report was thoroughly

14  investigated, the interrogations of the defendant, and

15  provided that report to Congress, and I think it's

16  important for the Court to consider the source and the

17  amount of time that went into producing that document that

18  clearly stated that that was absolutely not the case.  The

19  defendant was never in CIA custody and the various

20  exhibits that the defense put forth to the Court regarding

21  the Inspector General report from the CIA discussing

22  abusive techniques and enhanced interrogation techniques

23  are completely irrelevant in this case.

24          With respect to the overrepresentation of the

25  criminal history, the defense characterizes that the

 1   defendant has already been significantly punished and,

 2   therefore, has been significantly deterred and that his

 3   confinement has transformed him into a person who embraces

 4   Americans.  I would like to point out to the Court that

 5   this supposedly has happened during the years that he has

 6   been confined, but this is not the first time that he had

 7   an opportunity to live among Americans and to experience

 8   the way of life here.  The defendant in fact came here in

 9   the late eighties to attend Bradley University and

10   received a bachelor's degree.

11           THE COURT:  1983 actually.

12           MS. BALTES:  And he was here until, I believe,

13   1990 or '91.  He certainly had an opportunity to get to

14   know Americans and to understand the lifestyle, almost as

15   much time as he was detained since 2001.  And yet after

16   that, that's when he subscribed to al-Qaeda's philosophy.

17   That's when he went to the training camps and it's after

18   that that he came to the United States in 2001.  So his

19   exposure to Americans during the last couple of years is

20   certainly not the first opportunity for him to understand

21   what the lifestyle and the culture of the United States is

22   about and to embrace it, but he rejected that back in 2001

23   and it certainly should be a factor for the Court to

24   consider whether he will reject that when he's released

25   from custody in this case.

 1          In addition, the defense has stated that there

 2   were numerous things that the defendant claims were said

 3   to him by interrogators.  With all due respect, I think

 4   what he has told his attorneys is not supported in the

 5   record.  It's not supported by the interrogation reports.

 6   Certainly it's possible that not everything was written

 7   down, but, again, it should be something for the Court to

 8   consider.

 9          THE COURT:  Well, there was at least one -- I

10   think more than one reference to him being told that if he

11   didn't cooperate, they could not guarantee the safety of

12   his family and I believe he was shown pictures of his

13   family.

14          MS. BALTES:  He was shown pictures of his family

15   and there was one reference in the reports which was

16   turned over to the defense in which the interrogator said,

17   "You will be kept safe, but yet in Saudi Arabia your

18   family could be rounded up."  Certainly I'm not putting

19   forth that assertion in any way to minimize that that was

20   told to him, but the statements that have been made and

21   the statements that appear in the defendant's sentencing

22   certainly are much more detailed and much more dramatic

23   than that account and, again, should be something for the

24   Court to consider in light of the fact that the defendant

25   has lied throughout.  He obviously lied to get into the

1   United States.  He has pled guilty to being a sleeper

2   agent.  We certainly heard testimony of his narcissistic

3   nature, his manipulative nature.  We heard testimony from

4   the Brig staff yesterday that he would routinely make

5   things up to cause problems at the Brig.  So, again, an

6   additional factor for the Court to consider, the source of

7   those statements.

8           In addition, again the conditions of

9   confinement, the defense relies on two declarations that

10   were provided by Dr. Grassien, the first one that was

11   provided based on the underlying abuse allegation in which

12   Dr. Grassien had not met with the defendant and then the

13   second one that was created for purposes of this

14   sentencing after the defendant met with Dr. Grassien

15   several weeks ago, I believe, October 9 of 2009.

16           Just to point out -- and this is also in the

17   Government's submission earlier this week with respect to

18   the Government's response in the underlying habeas

19   petition about conditions of confinement.  But

20   Dr. Grassien's declaration and his 5-hour discussion with

21   the defendant, the conclusions that he came to about the

22   effects of isolation were based on research that he

23   conducted for a paper that was published in 1983.  That

24   paper has been severely criticized by others who have

25   conducted research into supermax facilities as lacking any

1   empirical research.  Again, the Government thinks it's

2   important for the Court to take into consideration all

3   those.

4           It's interesting to note, too, that rather than

5   bringing Dr. Grassien to testify here in court where he

6   would be subject to cross-examination on his views, the

7   defense chose to submit a declaration to the Court

8   instead.

9           I believe Your Honor correctly noted that the

10  issue with the Government's withdrawing the SAMs really

11  has no bearing on the Government's request for a lengthy

12  sentence in this case.  The SAMs were specifically

13  withdrawn because the defendant has been detained since

14  2001 and, therefore, his ability to communicate and to

15  provide information that the Government would consider of

16  intelligence value to al-Qaeda has been greatly diminished

17  or at this point non-existent.  That certainly has no

18  bearing on the defendant's ability to reconnect with

19  al-Qaeda once he is released from prison and, therefore,

20  just the fact the SAMs have been withdrawn in this case

21  should have no bearing on the likelihood that he will pose

22  a threat in the future.

23          The video that the defense showed this morning

24  shows Mr. al-Marri's family and they obviously greatly

25  miss him.  That's part of what the Court has to consider

 1   under the 3553 factors, the defendant's history, and

 2   obviously his history includes his family.  Again, what

 3   the Court should keep in mind is that the defendant

 4   contemplated absence from his family.  He attended various

 5   training camps where he was gone for months at a time away

 6   from his family, likely with no contact.  And when he

 7   attended those training camps, he specifically provided

 8   information so that al-Qaeda could contact his family in

 9   the event he was murdered.  Clearly the defendant at that

10   time contemplated not being there to provide for his

11   family.  And although maybe he would not have intended

12   that had been the case, he certainly contemplated that.

13   And while it's extremely unfortunate his family has

14   suffered because of his absence, that absence is due to

15   the conduct that the defendant chose in his life.  He

16   chose a path that led him down supporting al-Qaeda and

17   supporting a violent mission against the United States.

18          One last comment, Your Honor, with respect to

19   some of the issues in disparity in sentencing.  I've

20   already commented on the Military Commission cases and

21   that I think the guidelines are not applicable in that

22   situation.

23          But, in addition, the defense points out the

24   Padilla case and in that case they correctly note that the

25   District Court judge did provide a downward departure for

1  the conditions of confinement of 42 months and the

2  Government objected to that and that case is currently up

3  on appeal.  So of course everything should be considered a

4  factor by this Court in determining the appropriate

5  sentence, but Mr. Padilla was facing 30 years and the

6  ultimate sentence that was handed down by the District

7  Court judge was still in excess of the 15-year sentence

8  that the Government seeks in this case.

9          The Government respectfully requests that the

10  Court deny a downward departure for conditions of

11  confinement and deny the downward departure also for

12  overrepresentation of criminal history.

13          With respect to the criminal history, the

14  terrorism enhancement was stipulated by the parties in

15  this case.  That is pursuant to the plea agreement.  The

16  application of the terrorism enhancement is a two-fold

17  process.  One:  It involves the increase of 12 levels for

18  the base offense level.  Two:  It increases the

19  defendant's criminal history to a criminal history

20  category VI.  There was nothing in the plea agreement

21  where the defense was allowed to just pick and choose

22  which part of the terrorism enhancement be applied and I

23  think that's very important to note.  There's a reason why

24  the criminal history category is VI and Mr. Lustberg has

25  discussed that.  I won't belabor the point.  I think the

1    Court is well aware of that.  But that was stipulated to

2    in the plea agreement.  And even though it's now being

3    brought as a request for downward departure for

4    overrepresentation of the criminal history, it essentially

5    guts the effect and application of the terrorism

6    enhancement which is what the parties agreed to in this

7    case.

8              Your Honor, the Government respectfully requests

9    that the defendant be sentenced to 180 months in this

10   case.  The Government believes that that will send a

11   message regarding people that come to the United States to

12   commit terrorist acts.  Terrorism is a horrific crime that

13   literally rips at the fabric of our society.  The

14   defendant came here ostensibly to enjoy and take advantage

15   of the educational opportunities that this country affords

16   to students and international students all over the world.

17   It's ironic that this case does turn on values that we

18   hold so dear when the reason why the defendant came here

19   was because he believed in al-Qaeda's mission of hatred of

20   Americans and all things American and the Government

21   respectfully requests that you sentence him to 180 months.

22              THE COURT:  All right.  Thank you.

23              MR. LUSTBERG:  Thank you, Your Honor.  Of

24   course, Your Honor, you have Dr. Grassien's materials.

25   There's a 2006 article.  The purpose of submitting it was

1    to show the effects that Mr. al-Marri's isolated existence

2    have had psychologically.  Actually, you know, we have --

3    I don't think there's a loss of disagreement as to what

4    those effects are.  In fact, even Major Sirratt talked

5    about them to a certain extent.  That was the reason why

6    we didn't feel like we had to call Dr. Grassien.  But in

7    any event, just so you understand, it's not correct that

8    it's based on a 1982 article.  There's more recent

9    materials and the Court has it and you can weigh that

10   accordingly.

11          Second, with respect to the downward departure

12   based upon the criminal history category VI

13   overrepresenting criminal history, there was not anything

14   in the plea agreement that prevented us from making that

15   motion.  We made that motion.  It's been made in other

16   cases.  It's not an effort to pick and choose or to in any

17   way repudiate our stipulation.  People stipulate to things

18   all the time and then ask for appropriate downward

19   departures that are specifically provided for in the

20   sentencing guidelines.  That's all we're doing and the

21   Court has a right to hear those arguments and we have made

22   them.

23          Third, the notion -- and Your Honor correctly

24   pointed this out -- that there were threats to

25   Mr. al-Marri's family is backed up by the materials the

1    Government has turned over.  It's not that something was

2    going to happen to them in Saudi Arabia.  This is

3    Exhibit 13.  It says -- Defendant's Exhibit 13.  "Towards

4    the end of the session, the interrogator developed and

5    drove a strategy to shake Mr. al-Marri.  The interrogator

6    told Mr. al-Marri that he had a job to do and if he would

7    not cooperate he would have to have the Saudi and Qatari

8    authorities round up his family."  This was not some

9    passive thing.

10            He would then -- he then proceeded to mention

11   all of Mr. al-Marri's siblings and some of their spouses.

12   "The interrogator then said he would be back tomorrow for

13   his answer.  When he came back, Mr. al-Marri did not speak

14   to him or did not want to cooperate.  The interrogator

15   asked Mr. al-Marri if he had made a decision regarding

16   cooperation, was he ready to talk or allow his family in

17   Saudi Arabia and Qatar to suffer the consequences of his

18   refusal."

19            This was not subtle.  This was not something may

20   happen.  This was a direct threat.  And the Court is

21   correct that pictures of Mr. al-Marri's family were used

22   to interrogate him.  It's also the case that this is one

23   of the very same techniques that has been criticized and

24   repudiated by the administration and that's something that

25   the Court ought to the consider in deciding whether

1  Mr. al-Marri deserves any credit for the conditions that

2  he endured.

3            Finally, Judge, again I want to be clear.  It is

4  the case that Mr. al-Marri committed a serious offense.

5  We don't in any way walk away from that.  It is also the

6  case that he was here in the United States before doing

7  that.  But whatever the impulses were that led him to do

8  what he did in 2001 are the very impulses that we have to

9  deal with now.

10           So the fact that he had the opportunities to do

11  things differently before he turned in a wrong direction

12  at that time certainly should be considered, but it's what

13  he has learned since then that matters.  If he had been a

14  perfect -- and he wasn't.  I mean, he had some DWIs and so

15  forth, but his behavior before 2001 is not the issue.  The

16  issue is what has he done since this time.  The Court has

17  heard a great deal about it and I'm not going to repeat

18  it, but for all the reasons I've set forth earlier I think

19  the Court can take comfort -- and you're going to hear

20  from Mr. al-Marri himself -- that he is not a man who will

21  reoffend and that he has come to a completely different

22  view of this country.

23           However, I think the best way for Your Honor to

24  understand that is to hear from Mr. al-Marri himself, so

25  if you would I think this might be the appropriate time

 1 | for that.

 2 |         THE COURT:  All right.  Mr. al-Marri, if there's

 3 | anything you wish to say before I impose sentence, now

 4 | would be the time to do it.

 5 |         MR. AL-MARRI:  Your Honor, would you allow me to

 6 | have my Quran?

 7 |         THE COURT:  What?

 8 |         MR. AL-MARRI:  My Quran.

 9 |         THE COURT:  Sure.

10 |         MR. AL-MARRI:  Before I start, I would like to

11 | thank the Judge and this Court for giving us enough time

12 | for my lawyers to present my case.  And then you must

13 | understand that this statement is my writing.  I have

14 | announced to my lawyer to not even correct the grammar

15 | problems.  This is my writing.

16 |         And I would like to address first something you

17 | had mentioned at an earlier time, that what does that

18 | mean, also as in this statement, the first paragraph and

19 | the last paragraph.  Those are a traditional Islamic

20 | opening and ending salutation.  It is in all letters, all

21 | writings, all -- it is not specific for this case or for

22 | this issue.  It is just a matter of traditional Islamic

23 | writing.

24 |         THE COURT:  I assume the guidance is a reference

25 | to the Quran?  Is that correct?

1           MR. AL-MARRI:  Guidance as guidance.  You

2    believe it is the Bible.  I believe it's the Quran.

3    Whatever is guiding you.

4           THE COURT:  Okay.

5           MR. AL-MARRI:  In the name of Allah, all praise

6    to Allah and peace and prayer of Allah be upon his last

7    messenger Mohammed, the messenger of mercy.

8           Judge Mihm, peace be upon who follow the

9    guidance.  I would like to start by saying that I've been

10   waiting for this day for the last 2,880 days or the last

11   8 years.

12          Judge Mihm, I am glad I have no blood on my hand

13   and my assistance did not cause any bloodshed or lead to

14   that either, nor would I have ever agreed to that and I

15   will never agree to that in the future, but I am sorry for

16   providing assistance for those who would do this country

17   harm.

18          Judge Mihm, all of my captors know that I speak

19   my mind, be it in politics, religion or personal issues,

20   and you have heard some of the American people who were

21   responsible for detaining me that I was never violent or

22   expressed a desire to harm them or any American people,

23   with the exception of course of Dr. Sirratt, which I

24   believe my lawyer has showed that she was inconsistent.

25   But for the record, I did not say what she has said I

1  said.

2          Judge Mihm, my religious beliefs refined after

3  or through my years of thoughtful prayers and study during

4  my incarceration I realize prohibit me from engaging in

5  violence towards any man.  I forcefully reject any sort of

6  violence for religious, political or other reasons.  I say

7  this to the Court and I also state this to the

8  representatives of my country who are present with us

9  today.  I know that the news people are here so -- I'm

10  sorry.  I know that the news people are here, so I know my

11  word will be received by those with whom I associated with

12  in 2001.  You have my word.

13          I had to make my position clear when I spoke to

14  Mr. Risley and the FBI before entering my guilty plea.  At

15  that time I was not under threat or abuse and I spoke the

16  truth about my activities.  As my lawyer was present at

17  that time, Mr. Risley said, "Thank you for talking to us

18  and being truthful with us."

19          You have seen pictures of my kids when I left

20  them 8 years ago and their recent pictures.  Missing all

21  of those years, missing hearing the first words of my

22  youngest child -- missing hearing the first words of my

23  youngest child, missing the crying of not wanting to go to

24  school, missing solving their problems with kids in the

25  school or in the neighborhood, missing their smile and

 1  laughter, of buying them toys or new things, missing --

 2  missing not being there to take care, protect and provide

 3  as fathers do, missing all of that and all of the

 4  father/kid activities is more than enough punishment.

 5       My 80-years old mother, 5 kids, wife,

 6  7 brothers, 4 sisters, more than 70 nephews and nieces and

 7  about 12 grandchildren from my nephews and nieces are

 8  being punished too of no fault of theirs, rather mine.  I

 9  have said more about it because it has been 8 years since

10  I have seen or have been away from them.

11       Even though I am a changed person from the 2001

12  al-Marri, I hope you would look with an eye of mercy on me

13  today.  But if not, Judge Mihm, have mercy on the 80-years

14  old -- have mercy on the 80-years old who tells me her

15  wish is to see me before she passes away.  I have already

16  lost my father during my incarceration.  It will be

17  unimaginable to lose both of my parents without being

18  there for them or saying goodbye.

19       Judge Mihm, have mercy on the child -- on the

20  wife who chose to wait for her 8 years imprisoned husband

21  rather than going on with her life even after I asked her

22  to do, but refused and chose to wait.

23       Judge Mihm, have mercy on the suckling infants

24  who have never -- Judge Mihm, have mercy on the suckling

25  infants who have never seen me.  They only know me by

1   name.

2              Judge Mihm, have mercy on my American family

3   here, my brother and sister Andy and Cheryl Savage, who

4   cried yesterday when -- or day before yesterday when they

5   read this letter, which was one of the hardest things

6   because I am causing pain and hurt to my family whom I

7   would give my life for, but it is out of my hand to

8   alleviate their pain.  Judge Mihm, I am helpless to

9   alleviate their pain, but you are not.  Judge Mihm, have

10  mercy on all of them by sending me home to my Arabian

11  family accompanied by my American family by giving me a

12  time served sentence.

13             Before I finish my statement, I would like to

14  give all praise and thanks to my Lord Allah, lord of all

15  lords, for the support he gave me and is still giving and

16  I hope will continue.  I would like to thank my government

17  who stood by me and my family during this ordeal.  And I

18  would like to thank all of the American people who dealt

19  with me humanely and kindly during my incarceration.  And,

20  Judge Mihm, as Allah and this Court are my witness, I

21  forgive all who harmed and caused me pain.

22             And I would like to thank -- I would like to

23  thank my legal team, Larry, Mark, John, Lee and Andy, and

24  the behind the scenes heroes, Jenny, Eileen, Alex, Bobby

25  and Heather, who I believe have done an excellent job.

1           And remember what I said in our first meeting.

2    My opinion of you will not be affected by the ruling of

3    the Court as it is not in your hands as long as you

4    prepare well for the case and it is beyond any doubt that

5    you have done that with an utmost excellence.

6           Last, but not least, I would like to thank my

7    American family.  It is an honor to call them my brother

8    and sister, Andy and Cheryl Savage, who are also part of

9    my legal team.  You have changed my perception of the

10   American people's generosity, kindness and their culture

11   fundamentally, to the better of course.  I will never do

12   anything to harm the American people.  And I will still

13   name my future son and daughter after you as I promised

14   before if Allah blesses me with more children.  I pray to

15   Allah to assist me in showing you how much I appreciate

16   your help and show you my appreciation and not repay you

17   because I do not believe it is possible to repay you

18   monetary or otherwise for what you have done for me.  It

19   is trying to reach the stars with -- or it is like trying

20   to reach the stars with my hands.  However, I will pray

21   and always will to the one who can.  May Allah reward you

22   as best as he rewards any of his servants and make you, I

23   and our loved ones to follow the right path that will lead

24   us all to an eternity of life together in paradise in the

25   afterlife.  Amen.

1          I would like to remind myself first, then my

2    loved ones, that if today's judgment is favorable, it is

3    from the generosity of all generous, all merciful Allah,

4    then the fairness of Judge Mihm and the excellence of my

5    legal team lead by Mr. Andy Savage and Mr. Larry Lustberg,

6    and if not it is due to my sins.  I advise myself and my

7    loved ones to accept Allah's judgment and be patient.  As

8    Allah has said in the Quran, it may be that you dislike a

9    thing which is good for you and that you like a thing

10   which is bad for you.  Allah knows, but you do not know.

11          Finally, glorified is your Lord, the Lord of

12   honor and power.  He is free from what they attribute unto

13   him.  And peace be on the messengers.  All praise and

14   thanks are to Allah, lord of the mankind and all that

15   exist.  Chapter 37:180, 182.  Thank you very much, Your

16   Honor.

17          THE COURT:  Thank you.  I'm going to take about

18   a ten minute recess and then I'll come back and impose

19   sentence.

20                    (Recess taken)

21          THE COURT:  My comments will be rather lengthy,

22   so it's fine with me, Mr. al-Marri, if you just remain

23   seated.

24          MR. AL-MARRI:  Thank you.

25          THE COURT:  First of all, the Court adopts the

1    factual findings and guideline application as contained in

2    the pre-sentence report except for the one change that I

3    made and that has been reduced to writing.

4          You have had quite an odyssey.  I'm not quite

5    sure where that odyssey began or when in relation to this

6    case.  I don't know, for example, where and when and under

7    what circumstances you became radicalized in your

8    religious beliefs to the extent that you believed, I'm

9    sure sincerely, that it was the right thing for you to do

10   to go to the training camps and get your training and do

11   all of those other things that we'll be talking about.

12         There's no doubt that you were not only trained

13   in the camps, but in military matters, weapons, the use of

14   poisons, codes for communicating.  It's also clear from

15   your stipulation that you were a courier on at least one

16   occasion, as I recall, from al-Hawsawi to Khalid Sheikh

17   Mohammed carrying electronic equipment.

18         It's also clear to me that your trip to the

19   United States in 2000 is not just some aberrant event that

20   comes out of no where and goes back into no where.  That

21   makes no sense.  Although I don't know exactly what that

22   was, I do believe in some way it's related.  And I think

23   it's worthy of note that when you came here in 2000 that

24   you used, I believe, a Saudi passport and gave some false

25   information for your visa application and when you came

 1  here you set up a fictitious company, AAA Carpet.

 2              So I don't know.  I would be -- I would like to

 3  know.  I won't know.  But I would be curious to know how

 4  you became radicalized and when because when I look at

 5  your family on this screen, it's a beautiful family.  It's

 6  a wonderful family.  Not just your children, but your

 7  brothers.  That's a family that anybody, whether you live

 8  in that country or here, would justifiably be very proud

 9  of.

10              It's also clear that you, after you came back in

11  '91, got married, you went to work and developed some very

12  good -- a very good work record, had responsible positions

13  there.  People have commented on that.  You were a

14  respected person.

15              Again, putting all of that in context, the

16  family, the respect in the community, the job, all of

17  that, I don't understand how we get from that picture to

18  training in an al-Qaeda camp in Pakistan, but we know it

19  happened.

20              I might point out parenthetically right now by

21  the way that you're absolutely right about your lawyers.

22  One of the things that's clear in this case is that the

23  lawyers on both sides have been superlative and your

24  lawyers for a long time, as long as I've been involved in

25  this case and before that, have been aggressively

1   representing you in every court in the land up to and

2   including the Supreme Court.  They are very decent people.

3   They are good lawyers.  They are very honorable officers

4   of the Court and you could not do better.  I could say the

5   same thing about the Government attorneys.

6          Anyway, so we know you came here in 2000 and

7   then you went back and then certain events happened in

8   2001.  I believe you were a courier in that year and at

9   some point the decision was made for you to come here.

10  That was, as I understand it, an agreement that you made

11  with Khalid Sheikh Mohammed that you were to come here and

12  be a sleeper agent, but you were carefully admonished to

13  be here by the 10th of September.  And we all know what

14  happened on September 11.  Someone cited the number

15  earlier.  I don't know, I don't recall the exact number,

16  but it's just under 3,000 people were murdered that day by

17  the planes that flew into the World Trade Center and the

18  Defense Department.

19         You said in your statement -- and, again, I have

20  great respect for what you said in your statement.  I had

21  the sense that you were being sincere.  But one of the

22  things you said was, "Nor have I ever agreed to do harm."

23  With all due respect, I don't agree with that.  It's hard

24  to know the extent to which you had specific ideas about

25  what you might ultimately be doing here in the United

1    States as a sleeper agent when you finally did get that

2    e-mail or that phone call about this is what there is to

3    be done, but it's also clear in my mind that as of

4    September 11 you had to know what was going to be expected

5    of you.

6          And I've thought a lot about this case and

7    struggled with the idea of what the just sentence would

8    be.  One of the things that popped into my mind when I was

9    thinking about this was, you know, I recall where I was

10   when I first heard about the planes going into the World

11   Trade Center.  I was right out here in the parking lot

12   coming to work after a meeting at a hospital.  I think

13   every American knows where they were that day.  Your

14   lawyers know where they were that day.  You were somewhere

15   that day and you were here and so you heard of these same

16   things that all of us heard and after that you made a

17   conscious, deliberate decision to continue.  You could

18   have stopped at that point, may not have been easy but you

19   could have stopped, but you didn't.

20         And by the way, I want to mention another thing

21   about your family.  And I am absolutely convinced you have

22   the greatest love for your family.  But with all due

23   respect, I have to ask what kind of man comes to this

24   country as a sleeper agent for al-Qaeda, knowing what

25   al-Qaeda does and learning on September 11 what it had

1    done, what sort of man brings his family to this place, a

2    family, a young family, small children, where apparently

3    they don't speak the language.  I don't understand that,

4    sir.  I don't understand how you made that choice to do

5    that because then it was not just your commitment to

6    jihad.  It was committing all of those that you loved and

7    I find that troubling.

8            So I think that 9-11 was the defining moment for

9    you, at least in terms of how I view this case, in terms

10   of the seriousness of the conduct and other things.  I

11   think 9-11 -- not what happened in the training camps, not

12   what happened when you were acting as a courier, not when

13   you came over here for some nefarious reason in 2000.

14   9-11 was the defining moment for you because that's when

15   you decided to remain part of a conspiracy when you could

16   only expect that you were going to be asked to either

17   directly or indirectly harm American citizens.

18           So talking about the criminal history

19   category VI, I recognize that I have the discretion to

20   depart downward from level VI to a lower level.  I choose

21   in the exercise of discretion not to because I do not

22   believe that a level VI substantially overstates the

23   seriousness of your history or, for that matter, the

24   likelihood of recidivism.  And I'll talk about that later.

25   I'm not going to repeat all of the things that I've

 1   already said.  All of those are part of the explanation

 2   for why I feel that this category VI is appropriate.

 3          The training, I might point out, the training

 4   that you received was all very consistent with your

 5   mission here, at least it would have to have been

 6   explained to you that way I think, and that was to inflict

 7   damage on the United States.  I would be the first one to

 8   say that I am not in any way well read concerning the

 9   dynamics of al-Qaeda, but I think I could reasonably

10   assume that not everyone who trains in training camps or

11   did at that time develops the personal relationship that

12   you did with Khalid Sheikh Mohammed and al-Hawsawi.  And

13   of course at that time you knew about the embassy bombings

14   in East Africa.  You knew about the USS Cole.

15          I do also think it's worthy of note that --

16   there have been different interpretations placed on this

17   concerning what was found on your computer.  Concerning

18   the cyanide poison, that does not exist in isolation on

19   your computer.  It exists beside or on the same computer

20   with information about waterways and I believe dams and

21   tunnels, things like that.  I don't believe it would be an

22   unreasonable inference to conclude that that research was

23   at least the beginning attempt to develop information upon

24   which later decisions could be made concerning possible --

25   the use of some sort of weapon of mass destruction.  Any

1    suggestion that you developed this cyanide information for

2    a cousin at home, in the context of this case I don't

3    believe that has any merit.

4            So all of this means in my mind that this was

5    extremely serious conduct and in that sense I do not

6    believe that -- I don't believe that your criminal

7    history VI is substantially overstated.

8            Concerning the likelihood for you to recidivate,

9    that's a difficult analysis.  At the end of the day, in

10   spite of what you've said here today, and I believe that

11   you've spoken sincerely and from your heart, I believe

12   that the risk of recidivism is very high.  I heard what

13   you said in your statement.  I don't really see that as a

14   repudiation of al-Qaeda.  I think it can be fairly

15   characterized as you giving your word to me that you would

16   not go back to being involved with that organization, but

17   I don't hear it as a repudiation of al-Qaeda or a

18   disavowal for others of jihad.  And whatever your sentence

19   ends up being here today, I believe that when you do go

20   home, and you will, I believe that there is a very strong

21   risk that you will renew old acquaintances and

22   associations in spite of the wonderful family that you

23   have.

24           Counsel has argued that significant punishment

25   in this case, and it was significant, that is deterrence.

1    I certainly agree with him that that can be.  I don't

2    believe in your case that ultimately it will prove to be

3    so.

4         We've heard here today that you have changed,

5    that -- I mean, it's clear, not only from what you've

6    written but your relationship during your court

7    appearances and otherwise, it's clear that you have

8    developed a good friendship and affection for the people

9    on your defense team.  And that's no surprise because

10   they're very nice people and they've gone way beyond what

11   one would expect a lawyer to feel obligated to do to plead

12   your case from Peoria all the way to Washington.

13        Your attorneys argue of course it's more than

14   that, that you have now seen the light because of your

15   exposure with those good people.  But what troubles me

16   about that is that that argument, I won't say

17   conveniently, but it avoids the reality that you didn't

18   drop here in Peoria out of a helicopter on September 10.

19   You had been in this country for eight years, from 1983 to

20   1991.  And I forget now the exact number of schools you

21   attended.  I think Southern Illinois, maybe a university

22   in Macomb, Knox College.

23             THE DEFENDANT:  Canton, Spoon River College.

24             THE COURT:  Okay.  And then Bradley University.

25   I can only assume, I think very strongly assume, that you

1    met an awful lot of nice Americans during that time, a lot

2    of college professors, fellow students, people that you

3    may have lived around.  And I'm so certain of that

4    because, first of all, these university environments that

5    I'm talking about, including Peoria, contrary to some

6    belief that someone like you would simply be profiled and

7    treated differently, in my experience that's not true,

8    especially in university settings.  People go out of their

9    way to encourage folks coming from another place.  I know

10   that Bradley is like that.  Bradley has always been that

11   way and I'm sure there were professors that went out of

12   their way to help you.  But the point I'm making is why

13   did you need this epiphany from the friends you've gained

14   on your defense team now or over the course of their

15   assistance?  You spent eight years here.  You knew who we

16   were as a people.

17          Other judges -- it's been noted there have been

18   other judges who departed downward from category VI to

19   something lower.  I think one even was to a level I.  I

20   respect their decisions.  I assume they made those

21   decisions based on the facts in their case and their

22   conscience in terms of what they felt, the right thing

23   that he or she felt was called for under their

24   circumstances.  But I don't believe there's anything in

25   any of those findings that would compel me to come to the

1    same conclusion, so I reject the idea of a reduction in

2    your criminal history category.

3            Concerning your confinement, I don't know if

4    this case is unique.  There may be other cases that I'm

5    unaware of that would make it less than unique.  But it

6    may be that the early part of your confinement from when

7    you were a material witness and held in isolation and,

8    more severely, when you were held as an enemy combatant in

9    South Carolina, that that -- there may be another case

10   where that type of treatment while in confinement existed.

11   I'm not aware of it.  I think this case is at least highly

12   unusual.

13           There can't be any doubt that the treatment you

14   received at the Brig from the time you arrived there until

15   late 2004 when you were allowed to have lawyers for the

16   first time was very severe and we've heard all the reasons

17   why that characterization is correct.  I think the bottom

18   line on most of it, the bottom line on the most serious

19   part of it is the intense and ongoing isolation.

20   Definitely severe.

21           And I do know that there were some things said

22   to you about your family.  And whether it was what is

23   reported by the government agents or whether it was

24   reported by you, in my personal belief as a judge in a

25   civilian court, those totally are unacceptable.

1    Threatening someone's family for what they've done, that's

2    not who we are.  Whether these methods of interrogation

3    are fairly characterized as enhanced interrogation or

4    something else frankly is irrelevant to me.  There's no

5    doubt that it was very severe.

6            Certainly things got a lot better later on.  It

7    sounds like by the time you left the Brig you had a lot

8    more going for you than almost anybody else in the prison

9    system in a lot of ways.  Not everybody.  Certainly your

10   isolation from your family and things like that remained

11   as a problem.

12           It's not certainly part of the explanation that,

13   well, this post 9-11 world.  It's true that immediately

14   following that not only was there great mourning over the

15   people who died, but certainly great fear and continuing

16   concerns that there would be other things that would

17   happen.  But in the context of a civil court, which is

18   where this case ends, not a military tribunal, in the

19   context of this court that period of time, especially from

20   the time your arrived at the Brig in '03 until late in

21   '04, was very severe.

22           The Government has suggested in some ways that

23   this has already been taken into account in the plea

24   agreement.  I'm sorry.  I still don't understand that.  As

25   I said earlier today, there were two counts.  The

1   Government has agreed to drop one count.  If they hadn't

2   and you had gone to trial on both counts and been

3   convicted, I don't believe there is any way as a matter of

4   conscience I could have sentenced you to a consecutive

5   sentence under those circumstances.  And I'll talk more

6   about that in just a minute.

7          Excuse me just a moment.  I did want to comment

8   about one statement Mr. Savage made about being people

9   being suspicious of you because of how you looked or

10  dressed.  With all due respect, I don't believe that was

11  true here in Peoria.  I could be wrong.  But I've lived

12  here for 40 years and there's a very large, for example,

13  Lebanese community here, I think a pretty large

14  Palestinian community here.  People in this area are very

15  used to having folks from the Middle East living here and

16  working here.  Then of course we've got Bradley University

17  which has done a great deal to foster acceptance of people

18  from diverse backgrounds.  And frankly, the same thing I

19  think could be said for Caterpillar because of its status

20  in the world and the fact that we have people coming in

21  and out of here all the time to work.  I don't believe

22  that, based on my experience in this community, that that

23  happened.

24         Now there were some specific things that

25  happened.  Candidly, taking a taxi cab from O'Hare Airport

1    to Peoria is unusual.  You may not have made other

2    arrangements to do that, but that would be highly unusual.

3    You had an incident in an electronic store that was

4    reported to the FBI, but that happened, I believe, because

5    of the fact that you paid, if I understand it correctly,

6    with a credit card and yet claimed to have no credit

7    history and some of the information you put on the

8    agreement or the contract that you signed was different

9    from some other information that you had provided.  In the

10   post 9-11 world, I can see how that would be suspicious.

11   And then when you were arrested by the police on the old

12   warrant and you, as I understand it, ultimately posted

13   bond on that, I believe that you paid the bond out of a

14   large amount of cash that was in a briefcase, which would

15   also be suspicious.

16          I want to talk very briefly about the 3553

17   factors.  Concerning the guidelines themselves, it's

18   certainly correct that the guideline that applies here is

19   the 180 because that's the statutory maximum.  I do think

20   it's interesting to note that the guidelines, which

21   consider a number of different factors in determining

22   where the guideline range should be, consisting not only

23   of the relevant conduct in the offense but also all of the

24   background information, that in this situation, based on

25   the change that I made, was 292 to 360, which in fact was

1  substantially more than the 180.

2          The nature and circumstances of the offense.

3  I'm not going to go through all of those.  If anyone who

4  is interested in this wishes to spend the time, the

5  factual basis, a very detailed factual basis, is set out

6  in the plea agreement.  That document is available for

7  anyone to copy and take with them.

8          I do believe that at the time that you came to

9  this country you had decided to commit yourself to be a

10  sleeper agent for al-Qaeda and I can only assume that that

11  would mean anything that that involved, including, as I

12  understand it, the ultimate honor of death by martyrdom.

13          After 9-11 you opened up the e-mail accounts.

14  You enrolled at Bradley University, although I think it's

15  painfully clear that that was really only done as a cover.

16  From what it says in the pre-sentence report, you attended

17  virtually no classes, or very few classes I should say,

18  and you were failing on whatever subjects you were taking

19  there at the time that you were arrested.

20          I do not believe that you were a lackey.

21  Someone used that word today.  I don't believe that.  I

22  believe that would be not only an insult to your

23  intelligence -- and I believe you're a very intelligent

24  person -- but I also think it would be an insult to the

25  commitment you made to al-Qaeda before you came here.  And

1    I'll say it for the last time.  In terms of the nature and

2    circumstances, all of this in my view became much worse

3    effective 9-11.

4         Your personal characteristics.  There has been a

5    lot of discussion about that.  We know that you came from

6    a very respected family, one of several brothers, very

7    respected.  You do have another brother who at least for a

8    period of time was considered an enemy combatant himself.

9    There's no doubt that you have a very highly respected

10   family and your own children and wife are very good

11   people.  And I guess that says something about you, too,

12   or you wouldn't have them.

13        We know you came here, spent eight years here,

14   ultimately got your bachelor's degree and went back.

15   Responsible jobs after you went back.  As I said, the

16   pre-sentence report ends without any real addressing of

17   when and where you became radicalized, but it's clear that

18   you did.

19        I want to skip over reflects the seriousness of

20   the offense, promotes respect for law.  I'll come back to

21   that.

22        In terms of an adequate deterrence to others, I

23   don't really think that's a particularly active factor in

24   this case.  I think just about any sentence the Court

25   would impose would properly address that.  It's suggested

1    here that the general deterrence is the fact that you were

2    removed from your family for eight years, put in Brig

3    isolation.  I'm not sure how effective that is as general

4    deterrence.  I'm guessing that people, other people who

5    become committed to al-Qaeda or some other terrorist

6    organization, may often believe that they won't be caught

7    or, if they are caught, that it doesn't matter.

8            To protect the public from further crimes by

9    you.  Your lawyers have repeatedly, consistently,

10   aggressively and with great emotion argued that your

11   chance of committing a new crime, new harm to the United

12   States is extremely low.  With all due respect, I don't

13   accept that.  I believe that the risk of your

14   reassociating with those who brought you here to begin

15   with, I believe that's high.  I believe that based on

16   everything I've read and heard that you do not truly

17   regret what you did and I believe you would do it again

18   after you go home.  Whether that is coming back here or

19   doing something else somewhere else remains to be seen.

20           In terms of desperate sentences, there's been a

21   reference to some of those and I'm not going to dwell on

22   them overly much, but I did want to touch on a couple

23   of them.  Bear with me just a moment.

24           Yaser Hamdi, as I understand it, ultimately his

25   civil case was dismissed.  It was recorded that he was

1    released and returned to Saudi Arabia.  No reasoning.

2    There's a suggestion in the Government's argument that it

3    was because of his great remorse.  I don't know exactly

4    what that means.

5            David Hicks was an Australian citizen trained in

6    al-Qaeda camps.  He was captured on the battlefield in

7    Afghanistan after affiliating with the Taliban unit.  He

8    was detained at Guantanamo from January of '02 to March of

9    '07.  He ended up pleading guilty in front of a Military

10   Commission to one count of material support, which is the

11   same type of thing you pled guilty to.  He was sentenced

12   to seven years, but as I understand it only nine months of

13   that was served and the rest of it was suspended.  The

14   reasoning for that is not available and he returned to

15   Australia 60 days after sentencing.

16           Jose Padilla was one of the other people held

17   there at that time.  He was an American citizen trained in

18   al-Qaeda camps, sought to provide support to al-Qaeda.  He

19   was arrested as a material witness in May of 2000 for

20   suspicion of plotting a dirty bomb attack.  He was

21   declared an enemy combatant, transferred to the Brig in

22   June of 2002, which is before you got there.  He was held

23   there until November of '05 when he was transferred to a

24   Miami jail, charged with a conspiracy to murder, kidnap,

25   maim and a conspiracy to provide material support to

1   terrorism.  As I understand it, he received 208 months on

2   Count 1, 60 months on Count 2 and 180 months on Count 3 to

3   run concurrently and, as I understand it, that case is on

4   appeal.

5              Warsame, Mohamed Warsame, has been referred to.

6   He was a Canadian citizen, attended two al-Qaeda camps,

7   including lectures by Osama Bin Laden, received funds to

8   return to Toronto.  He solicited an equivalent amount of

9   funds to send back to Pakistan.  He entered the U.S. as a

10  resident alien in August of 2001, maintained

11  communications with al-Qaeda associates.  He was held in

12  Minnesota corrections for 5.5 years prior to trial and he

13  pled guilty to the same exact count that you did.  In that

14  case the judge imposed a sentence of 92 months with full

15  credit for 68 months spent in pre-trial detention and that

16  credit was given, the explanation was, because his

17  confinement was significantly more onerous than the

18  conditions faced by the ordinary pre-trial detainee and

19  found the terrorism enhancement overstated his criminal

20  history category and there was never any link to any

21  specific terrorist plan or plot.

22              I could go on, but I think that each of these

23  cases is instructive.  As I said earlier, every one of

24  those judges had to make their own decisions based on

25  their assessment of the facts and the various sentencing

1   factors.

2           Lastly, I want to talk about the sentence should

3   reflect the seriousness of the offense, promote respect

4   for law, provide just punishment.  Mr. Lustberg is

5   correct.  Usually this part about just punishment, that's

6   usually, when it is invoked in any detailed way, it's

7   invoked because of a judge's belief that there is a call

8   for a very serious sentence.

9           I take very seriously this mandate of providing

10  a just punishment.  That in effect is a very personal

11  decision.  It's my decision and the weight of that

12  decision remains with me after you leave, just as it does

13  almost every Friday when I sentence other people.  I see

14  this as a terribly serious responsibility.  There may be

15  some appeals that are filed yet that are still allowed by

16  the plea agreement, but in all other respects this case

17  ends here in this courtroom today, which I would point out

18  is a civilian court.

19          You were held from December 12 of 2001 to today,

20  in my opinion, substantially for the same conduct that was

21  charged in the indictment.  And as a matter of conscience

22  for me and I think as a proper reflection of the facts and

23  the law, I think a just sentence must reflect that

24  71 months that you were held.  I say 71 months.  As I

25  understand it -- and I didn't bring that sheet out with

1   me.  But as I understand it, there's 71 months that you

2   have been held -- am I correct, Mary?  Is it 71 months?

3   71 months that you have been held that the Bureau of

4   Prisons is not going to give you credit for because it was

5   a period of time when you were a material witness or a

6   period of time from the day that you left here in June of

7   2003 until the day you were indicted earlier this year.  I

8   believe that in order for this sentence to reflect respect

9   for law and be a just punishment that I should reduce your

10  sentence by that 71 months.

11          The remainder -- there is other time for which

12  you will be given credit by the Bureau of Prisons and I'm

13  not going to reduce the sentence in that respect.  I will

14  leave them to do their duty under the law.  I have no

15  reason to doubt that they will not do their duty.  And we

16  did check with them and they seemed very clear about the

17  exact amounts that you will receive or not receive.

18          The last thing that I need to discuss is the

19  conditions of confinement.  I've already indicated that

20  some of them were, if not unique, highly unusual.

21  Especially the period of time from June of '03 until the

22  late fall of '04 was extremely severe in terms of

23  isolation and other things and I do believe that some

24  adjustment for that is appropriate.  But I will tell you

25  that it's not going to be dramatic and the reason that it

1   isn't is because I have to weigh against that the other

2   factors that I've talked about with some serious focus on

3   the fact that I believe that you still present a very

4   dangerous risk of future harm.  So I am going to be making

5   an adjustment on your sentence of an additional 9 months.

6          If my math is correct, what that means then is

7   that I'm going to be imposing a sentence of 100 months.

8   There are some other periods of time that will come off of

9   that, but -- there is nothing that has inevitably drawn me

10  to these exact numbers.  In spite of everything, there is

11  a certain amount of arbitrariness involved.

12         I think most judges, certainly the judges that

13  I've known over the years, make every effort to give the

14  sentence that they believe is correct.  At the end of the

15  day I think we are defined as a people by how we deal with

16  difficult and unpopular legal issues and that's especially

17  true in this context.  There is a war on terror.  It

18  exists.  It existed -- I guess it didn't get the full

19  attention of the American public until 9-11, but we know

20  that it's ongoing both here and in other places and there

21  are many, many Americans in harm's way as I speak and that

22  creates a very complicated situation for this type of

23  case.  But I can only say as long as cases like this are

24  processed in the civilian courts, the types of

25  considerations that we've been struggling with here the

1   last two days, those struggles will continue because there

2   are very few bright line answers involved.

3              I recall a couple of years ago I had the great

4   honor of going to China for the State Department to talk

5   to a number of different universities and law schools over

6   there about the American legal system and the Chinese

7   students were extremely active in their questioning and

8   although they were respectful, they didn't take any of my

9   comments at face value so we talked a lot about the Bill

10  of Rights and other things.  And of course I was hit with

11  a lot of the things that were going on at that time about

12  the Patriot Act and this and that, cases like yours,

13  whatever, and they demanded explanations for a lot of that

14  and I told them I thought candidly that I couldn't give

15  them all the answers at that time.  I said we are

16  struggling with these things and we will continue to

17  struggle with them and it may take years before we've

18  settled on the answers that we feel comfortable with as a

19  people, but I said I am certain of the fact that that will

20  happen because the commitment to the rule of law in this

21  country is not dead.  It's not represented by one side or

22  the other.  It's not only represented by defense lawyers.

23  It's every bit as much embodied by the prosecutors.  In

24  any event, I am now ready to impose sentence.

25              Pursuant to the Sentencing Reform Act of 1984,

1    the defendant is hereby committed to the custody of the

2    Bureau of Prisons for a period of 100 months.  And that

3    sentence reflects a reduction by the Court of 71 months,

4    which is my understanding of the period of time when you

5    were in custody beginning on December 12 of 2001 until the

6    time that you were -- I'm sorry -- the time that's not

7    going to be given credit by the Bureau of Prisons.  So

8    it's the time that you were a material witness.  It's the

9    time that you were in the Brig in South Carolina.  It also

10   reflects a reduction of 9 months for the harsh conditions

11   of confinement for part of the period of time that you

12   were being held and most specifically the first part of

13   the time that you were being held as an enemy combatant.

14           The Court finds that you do not have the ability

15   to pay a fine and no fine is imposed.

16           Following your release from custody you shall

17   serve a 3-year term of supervised release.  Within 72

18   hours of your release from custody you shall report in

19   person to the probation office in the district to which

20   you are released.

21           The Court finds that you do not present the

22   likelihood of future substance abuse and waives the

23   mandatory drug testing requirement.

24           While on supervision you shall not commit

25   another federal, state or local crime.

 1                    You shall not possess a controlled substance.

 2                    You shall cooperate in the collection of DNA as

 3       directed by the probation office or the Bureau of Prisons.

 4                    In addition to the standard conditions of

 5       supervision, you shall comply with the following special

 6       conditions.

 7                    Number one:  You shall not reenter the United

 8       States illegally during the time of supervision.

 9                    Number two:  If for any reason you are released

10       in this country during the time of your supervision, you

11       must immediately report to the U.S. Probation Office in

12       this building or if released by immigration officials

13       somewhere else or if you return to the United States for

14       any reason you will immediately report to the nearest

15       federal probation office.

16                    Number three:  You shall not own, purchase or

17       possess a firearm, ammunition or other dangerous weapon.

18                    A special assessment of $100 is imposed and

19       payable immediately.

20                    Does the defense have any recommendations for me

21       to make to the Bureau of Prisons?

22                    MR. LUSTBERG:  Your Honor, we have been in touch

23       with the Bureau of Prisons and we believe they are going

24       through a pretty careful deliberative process with respect

25       to that and so we will -- in fact, I wouldn't be surprised

1  if decisions have already been made, so we will refrain

2  from requesting them of the Court.

3          THE COURT:  Does the Government have a motion to

4  make regarding Count 2?

5          MS. BALTES:  Yes, Your Honor.  The Government

6  moves to dismiss Count 2 of the indictment.

7          THE COURT:  That motion is granted.  Count 2 is

8  dismissed with prejudice.

9          Now at the time of your plea agreement, you told

10  me that because of the terms of your plea agreement in

11  some respects, not all, you were giving up the right to

12  file an appeal following your sentence.  Nonetheless, to

13  the extent to which you feel you have any appeal rights

14  that survive that waiver and it is your wish to appeal, I

15  instruct you that any notice of appeal must be filed with

16  the Clerk of the Court within ten days of today's date.

17  As your -- your attorneys standing beside you have an

18  absolute responsibility to file that notice for you if

19  that is your wish.  Do you understand?

20          MR. AL-MARRI:  Yes.

21          THE COURT:  All right.  Good luck.

22          MR. LUSTBERG:  Your Honor, just one matter.  We

23  have been asked to withdraw the exhibit that is the

24  blanket as the Court doesn't have any particular place to

25  put it, so we'll take that back.

1          THE COURT:  Do you have any objection to that?

2          MS. BALTES:  No.  I believe the Brig wants it

3  back.

4          THE COURT:  Okay.  That's granted.

5

6                    * * * EXCERPT CONCLUDED * * *

7

8

9

10                    REPORTER'S CERTIFICATE

11          I, Karen S. Hanna, certify that the foregoing

12  transcript constitutes a true and accurate transcript of

13  the original shorthand notes of the proceedings had at the

14  time and place aforesaid before the HONORABLE MICHAEL M.

15  MIHM, U.S. District Judge.

16

17                              s/Karen S. Hanna
                                _____
18                              Karen S. Hanna, C.S.R.
                                License #084-001760
19

20

21

22

23

24

25